IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

---

DERRICK HAMILTON,

Plaintiff,

v.

NEW YORK CITY MUNICIPAL, and ANDREA B. EVANS, Chair, New York State Parole Board,

Defendants.

---

Civil Action No.
9:11-CV-0348 (DNH/DEP)

APPEARANCES:

| FOR PLAINTIFF: | OF COUNSEL: |
|---|---|
| DERRICK HAMILTON, *Pro Se*<br>93-A-5631<br>Auburn Correctional Facility<br>P.O. Box 618<br>Auburn, NY 13021 | |
| FOR DEFENDANT NEW YORK CITY: | |
| COFFEY LAW FIRM<br>119 Washington Avenue<br>2nd Floor<br>Albany, NY 12210 | DANIEL W. COFFEY, ESQ. |
| FOR DEFENDANT EVANS: | |
| HON. ERIC T. SCHNEIDERMAN<br>Office of the Attorney General<br>State of New York<br>Department of Law<br>The Capitol<br>Albany, New York 12224 | ADRIENNE J. KERWIN, ESQ.<br>Assistant Attorney General |

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

REPORT AND RECOMMENDATION

*Pro se* plaintiff Derrick Hamilton, a New York State prison inmate as a result of a 1993 homicide conviction from Kings County, has commenced this action pursuant to 42 U.S.C. § 1983 against the City of New York ("City") and Andrea B. Evans, who chairs the New York State Parole Board, asserting deprivation of his civil rights. In his complaint the plaintiff, who passionately argues that he was wrongly convicted, advances the novel proposition that the Parole Board should not be permitted to consider the conviction leading to his incarceration, when considering him for parole, without first providing him with a hearing to allow him to prove his innocence, despite having been convicted at trial. Hamilton also asserts that City prosecutors and other employees violated his constitutional rights in conjunction with both his conviction and the more recent parole hearings, and that the City should be assessed *Monell* liability for those deprivations.[1]

Currently pending before the court in connection with this action are three motions. Each of the defendants has moved to dismiss plaintiff's

---

[1] *Monell v. Dep't. of Soc. Serv. of City of New York*, 436 U.S. 658, 98 S.Ct. 2018 (1978).

claims, the City under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief may be granted, and defendant Evans pursuant to Rule 12(c) for judgment on the pleadings. In addition, with the filing of his complaint plaintiff interposed a request for temporary injunctive relief. While his request for a temporary restraining order was denied, the court has construed plaintiff's request as seeking a preliminary injunction, and has directed that the defendants provide a response to that motion. For the reasons set forth below, I recommend that both defendants' motions be granted and that plaintiff's motion for a preliminary injunction be denied as moot.

## I. BACKGROUND [2]

Plaintiff is a prison inmate currently entrusted to the care and custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Complaint (Dkt. No. 1). While the record discloses that plaintiff's incarceration stems from a July 1993

[2] In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's amended complaint, the contents of which have been accepted as true for purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 94, 127 S. Ct. 2197, 2200 (2007) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 1965 (2007)); *see also Cooper v. Pate*, 378 U.S. 546, 546, 84 S. Ct. 1733, 1734 (1964). In addition, when evaluating defendants' motion I have also considered the materials submitted by the plaintiff in opposition to the defendants' motion, Dkt. No. 27, to the extent they are consistent with the allegations set forth in his complaint. *See Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (Hurd, J.).

judgment of conviction from Kings County, few details regarding plaintiff's conviction are revealed by the record, other than that it was apparently a second degree murder conviction related to the shooting death of a victim named Nathaniel Cash and that the conviction followed a criminal trial.[3] *Id.* at ¶ 8*; see also* Hamilton Aff. (Dkt. No. 2) Exh. 2 at p. 15-18/44. The plaintiff, who is currently confined in the Auburn Correctional Facility, is apparently now parole eligible. Complaint (Dkt. No. 1) ¶ 5; *see also* Hamilton Aff. (Dkt. No. 2) ¶ 10.

On December 31, 2009, Hamilton requested that the Parole Board conduct a hearing to permit him to prove his innocence of the crime for which he was convicted, based upon submissions which, according to Hamilton, support his claim. Complaint (Dkt. No. 1) ¶¶ 10-13. Plaintiff asserts that by the time this action was filed he had appeared before the Parole Board

---

[3] Little more illumination is provided by the reported court decisions related to plaintiff's criminal conviction. *See, e.g., People v. Hamilton*, 272 A.D. 553, 708 N.Y.S.2d 136 (2d Dep't 2000) (affirming both plaintiff's 1993 conviction and an order issued in 1996 denying a motion to vacate the judgment of conviction pursuant to N.Y. Criminal Procedure Law ("CPL") § 440.10); *People v. Hamilton,* 54 A.D.3d 773, 862 N.Y.S.2d 911 (2d Dep't 2008) (denying an application for a writ of error coram nobis to vacate plaintiff's conviction on the basis of ineffective assistance of appellate counsel); *People v. Hamilton*, 74 A.D.3d 1359, 903 N.Y.S.2d 267 (2d Dep't 2010) (same); *Hamilton v. Chambers*, 35 A.D.3d 859, 826 N.Y.S.2d 724 (2d Dep't 2006) (denying a mandamus petition brought pursuant to N.Y. Civil Practice Law & Rules Article 78 seeking to direct the trial court to conduct proceedings to permit plaintiff to submit exculpatory evidence with regard to a pending CPL Article 440 petition).

approximately five times, but the Board refused to grant a hearing to permit him to adduce evidence of his innocence.[4] Complaint (Dkt. No. 1) ¶ 15. *See also* Hamilton Aff. (Dkt. No. 2) ¶ 10. Plaintiff ultimately appeared before the Parole Board on July 26, 2011. *See* Hamilton Letter Dated 7/27/11 (Dkt. No. 17). According to the plaintiff, during that proceeding the Board "refused to assess the reliable evidence that truly demonstrated [his] innocence." *Id.*

## II. PROCEDURAL HISTORY

Plaintiff commenced this action on March 30, 2011. Dkt. No. 1. Plaintiff's complaint names New York City and New York State Parole Board Chair Andrea B. Evans as defendants and asserts five separate causes of action, two of which name only New York City as a defendant and are based upon alleged policies leading to the deprivation of plaintiff's constitutional rights, with the remaining three being asserted against both defendants. In his complaint, plaintiff seeks both injunctive relief and monetary damages in the amount of $200 million. *Id.*

---

[4] While plaintiff's submissions intimate that substantive matters were discussed during each of those Parole Board appearances, in support of her motion defendant Evans has submitted transcripts revealing that at each of the Parole Board hearings held on September 15, 2009, March 23, 2010, May 18, 2010, August 24, 2010, November 16, 2010, and February 23, 2011, plaintiff's interview by the Board was postponed at his request, in light of the pendency of a state court motion to vacate his conviction pursuant to CPL Article 440 and a state court habeas corpus petition. *See* Kerwin Aff. (Dkt. No. 9-1) Exh. A. The last adjournment, until June 2011, was deemed a final postponement. *See id.*

Accompanying plaintiff's complaint was a motion seeking a temporary restraining order ("TRO") and a preliminary injunction. Dkt. No. 2. In his motion, plaintiff requests the issuance of an order enjoining defendants

> from utilizing the July 12, 1993 judgment of conviction against Hamilton at Parole release hearings. Unless Hamilton is provided a forum during the parole release hearings to present proffered evidence that truly demonstrates that judgment is unconstitutional. And based on a stigma plus due process violation.

Proposed Order to Show Cause (Dkt. No. 2) at p. 4. By order dated June 10, 2011, District Judge David N. Hurd denied plaintiff's TRO application but directed the defendants to respond to plaintiff's motion for a preliminary injunction.[5] Dkt. No. 7.

On June 24, 2007, defendant Evans submitted her opposition to plaintiff's preliminary injunction motion and cross-moved seeking judgment on the pleadings dismissing plaintiff's complaint for failure to state a cause of action.[6] Dkt. No. 9. In her cross-motion defendant Evans argues that 1)

---

[5] A subsequent letter from the plaintiff requesting an order directing the Parole Board to stay any parole release hearings during the pendency of this action was treated by the court as a renewed request for a TRO and was denied by order issued by District Judge Hurd on July 26, 2011. *See* Dkt. Nos. 13, 14.

[6] That motion was filed contemporaneously with submission of an answer on behalf of defendant Evans generally denying the allegations in plaintiff's complaint, asserting several affirmative defenses, and appending various transcripts of plaintiff's parole proceedings. Dkt No. 8.

Hamilton's claim is not yet ripe since at the time of filing there had been no substantive proceedings held with respect to Hamilton's request for parole; 2) plaintiff's complaint fails to allege the requisite degree of personal involvement in the violations alleged to support a finding of liability against her; 3) plaintiff's complaint fails to state a cognizable claim in light of the fact that as a prison inmate Hamilton does not enjoy any constitutional right to parole; 4) plaintiff's claims against her for money damages in her official capacity are precluded by the Eleventh Amendment; and 5) plaintiff is entitled to absolute immunity, or at a minimum good faith qualified immunity.

Defendant Evans' motion was followed by the City's application, on July 28, 2011, for dismissal of plaintiff's complaint for failure to state a cause of action upon which relief may be granted. Dkt. No. 15. In its motion, the City argues that 1) plaintiff's claims surrounding his parole proceedings are improperly asserted against the City; 2) his section 1983 claims arguing for his innocence are precluded by his failure to first obtain a reversal of his conviction through proper channels; and 3) his *Monell* claim against the City is not plausibly stated. *Id.* The three pending motions, which are now fully briefed, have been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District

of New York Local Rule 72.3(c). *See also* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

### A. Standards of Review

#### 1. Dismissal Motion Standard

The City's motion seeks dismissal of plaintiff's complaint for failure to state a cause of action for which relief may be granted, pursuant to rule 12(b)(b) of the Federal Rules of Civil Procedure. Such a motion calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal*, 556 U.S. 662, ___, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 555, 127 S. Ct. 1955). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S. Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York*, 514 F.3d 184, 188 (2d Cir. 2008) (citing *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.'" *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper*, 378 U.S. at 546, 84 S. Ct. at 1734; *Miller v. Wolpoff & Abramson, LLP*, 321 F.3d 292, 300 (2d Cir. 2003), *cert. denied*, 540 U.S. 823, 124 S. Ct. 153 (2003); *Burke v. Gregory*, 356 F. Supp. 2d 179, 182 (N.D.N.Y. 2005). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal*, 129 S. Ct. at 1949. In the wake of *Twombly* and *Iqbal*, the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, "'but whether the

claimant is entitled to offer evidence to support the claims.'" *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.*, 223 F. Supp. 2d 435, 441 (S.D.N.Y. 2001) (quoting *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 673 (2d Cir. 1995)) (citations and quotations omitted).

2. Judgment on the Pleadings

Defendant Evans' motion is brought pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, which governs the entry of judgment on the pleadings.[7] When analyzing a Rule 12(c) motion, I must apply the same standard as that applicable to a motion under Rule 12(b)(6), as articulated above. *See, e.g.*, *Sheppard v. Beerman*, 18 F.3d 147, 150 (2d Cir.), *cert. denied*, 513 U.S. 816, 115 S. Ct. 73 (1994); *Wynn v. Uhler*, 941 F. Supp. 28, 29 (N.D.N.Y. 1996).

3. Preliminary Injunction Standard

---

[7] Rule 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Rule 12(d) further mandates that

> [i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.

Fed. R. Civ. P. 12(d).

The prevailing test in this circuit for the granting of a preliminary injunction, while often difficult to apply, is well-settled and readily stated. To merit such relief, a party must establish both 1) a likelihood that it will experience irreparable harm in the absence of such interim relief, and 2) either a likelihood of success on the merits, or the existence of sufficiently serious questions going to the merits to make them fair ground for litigation and, additionally, that a balance of comparative hardships tips decidedly in its favor. *Time Warner Cable, Inc. v. DIRECTV, Inc.*,497 F.3d 144, 152-53 (2d Cir. 2007); *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000); *Otokoyama Co. Ltd. v. Wine of Japan Import, Inc.*, 175 F.3d 266, 270 (2d Cir. 1999); *Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 142 (2d Cir. 1997); *N.A.A.C.P., Inc. v. Town of East Haven*, 70 F.3d 219, 223 (2d Cir. 1995) (citing *Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir. 1991)). The burden of establishing entitlement to injunctive relief, in accordance with this standard, rests with the moving party. *Technical Publ'g Co., div. of Dun-Donnelley Publ'g Corp. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984); *see also*, *e.g.*, *Capital Servs. of New York, Inc. v. E-Poxy Indus., Inc.*, 196 F.R.D. 11, 12 (N.D.N.Y. 2000).

Superimposed upon this test is a principle which, in light of the circumstances now presented, significantly heightens the benchmark for entitlement to the injunctive relief now requested. When a mandatory injunction is sought which, if granted, would alter the status quo or provide the moving party with substantially all of the relief sought in the action, that party must make a "clear" or "substantial" showing of likelihood of success on the merits in order to qualify for such relief. *New York Magazine, a Div. of Primedia Magazines, Inc. v. Metropolitan Trans. Auth.*, 136 F.3d 123, 127 (2d Cir.), *cert. denied*, 525 U.S. 824, 119 S.Ct. 68 (1998); *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996); *Tom Doherty Assoc., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).

B. Legal Sufficiency of Plaintiff's Claims Against Defendant New York City

1. Third, Fourth, and Fifth Causes of Action

Plaintiff's third, fourth, and fifth causes of action, while naming both New York City and Chairperson Evans as defendants, address the procedures surrounding his parole release hearing, attacking the fairness of those procedures. *See* Complaint (Dkt. No. 1) ¶¶ 26-28. There is no indication anywhere in plaintiff 's complaint, however, that defendant City has had any direct involvement in those hearings. The New York State Board of

Parole is a state agency which derives its powers and duties from state law. *See* N.Y. Exec. Law § 259-c.[8] Nowhere in plaintiff's complaint is there any factual allegation of involvement on the part of defendant City employees in the parole process. The third, fourth, and fifth causes of action of plaintiff's complaint therefore fail to state plausible claims against that defendant.

2. *Monell* Claims

Plaintiff's remaining two claims are asserted under a *Monell* theory of liability. While amenable to suit under section 1983, a municipality may not be held liable under that section for the acts of its employees based upon a theory of *respondeat superior*. *Monell*, 436 U.S. at 691, 98 S. Ct. at 2036; *Blond v. City of Schenectady,* No. 10-CV-0598, 2010 WL 4316810, *3 (N.D.N.Y. Oct. 26, 2010) (McAvoy, S.J.), *reconsideration denied*, 2010 WL 5185801 (N.D.N.Y. Dec 15, 2010);[9] *Birdsall v. City of Hartford*, 249 F. Supp. 2d 163, 173 (D. Conn. 2003). For liability to attach against a municipality under section 1983, a plaintiff must establish that the constitutional violation

---

8 If named as a defendant the Parole Board would be immune from suit, since the absolute immunity states enjoy under the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities when the essence of the claim involved is one against a state as the real party in interest. *Richards v. State of New York Appellate Div., Second Dep't*, 597 F. Supp. 689, 691 (E.D.N.Y. 1984) (citing *Pugh* and *Cory v. White,* 457 U.S. 85, 89-91 102 S. Ct. 2325, 2328-2329 (1982)).

9 Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

which has occurred resulted from "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by [the municipality's] officers. . . [or] pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels. *Monell*, 436 U.S. at 690-91, 98 S. Ct. at 2036. *Blond,* 2010 WL 4316810, *3. *Perez v. Cnty. of Westchester,* 83 F. Supp. 2d 435, 438 (S.D.N.Y. 2000), *aff'd*, 242 F.3d 367 (2d Cir. 2000).

Municipal liability can be established in a case such as this in various ways including, *inter alia*, through proof of an officially adopted rule or widespread, informal custom demonstrating "a deliberate government policy or failing to train or supervise its officers." *Bruker v. City of New York*, 337 F. Supp. 2d 539, 556 (S.D.N.Y. 2004) (citing and quoting *Anthony v. City of New York,* 339 F.3d 129, 140 (2d Cir. 2003)) (other citation omitted). A plaintiff may also show that the allegedly unconstitutional action was "taken or caused by an official whose actions represent an official policy," or when municipal officers have acquiesced in or condoned a known policy, custom, or practice. *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.), *cert. denied sub nom.*, *Cnty. of Schenectady v. Jeffes*, 531 U.S. 813, 121 S. Ct. 47 (2000); *Wenger v. Canastota Cent. Sch. Dist.*, No. 5:95-CV-1081, 2004 WL 726007,

at *3 (N.D.N.Y. Apr. 5, 2004) (Scullin, C.J.). It should be noted, however, that generalized allegations that a municipality has failed to train its employees regarding the constitutional rights at issue are insufficient to plausibly invoke *Monell* as a basis for finding liability on the part of the municipality. *Gause v. Rensselear Children and Family Services,* No. 10-CV-0482, 2010 WL 4923266, *4 (N.D.N.Y. Nov. 29, 2010).

Plaintiff's first and second causes of action, asserting *Monell* liability against the City, are devoid of allegations concerning the specific policies giving rise to potential liability. Plaintiff's complaint alleges, for example, simply that the City's policies ". . . permit New York City Police and District Attorney officials to use unreliable witnesses to subject [plaintiff] to a presumption of guilt at parole release hearings."[10] Complaint (Dkt. No. 1) ¶ 24. The complaint goes on to aver that the City's policy ". . . allow[s] its agents, New York City police, District Attorney officials, Probation and Court officials to impose a stigma plus on [the plaintiff]." Complaint (Dkt. No. 1) ¶

[10] While presented as supporting his challenge to the fairness his parole proceedings, plaintiff's claims against the City appear in reality to raise constitutional concerns regarding his underlying conviction. Since the conviction occurred in 1993 it appears likely that any constitutional claims arising from his trial and conviction have long since become subject of the three-year statute of limitations applicable in New York to Section 1983 claims. *See Ormiston v. Nelson*, 117 F.3d 69, 71 (2d. Cir. 1997); *Pinaud v. County of Suffolk*, 52 F.3d 1139, 1156 (2d. Cir. 1995).

25. These allegations, particularly as they relate to but a single event or incident, are insufficient to form a basis for *Monell* liability against defendant City. *DeCarlo v. Frye,* 141 F.3d 56, 61 (2d Cir. 1998).

3. Dismissal Under *Heck v. Humphrey*

In its motion, defendant City also asserts plaintiff's claims are barred under *Edward v. Balisok*, 520 U.S. 641, 117. Ct. 1584 (1997) and *Heck v. Humphrey*, 512 U.S. 477, 114 S. Ct. 2364 (1994), based upon his failure to invalidate his conviction by direct appeal or through other appropriate channels before commencing a damage action under section 1983. Plaintiff counters that his allegations do not require him first to secure invalidation of his conviction and that he should be permitted to proceed with his section 1983 claims under *Wilkinson v. Dotson*, 544 U.S. 74, 125 S. Ct. 1242 (2005).

Beginning with *Heck*, the Supreme Court has issued a series of decisions addressing the interplay between damage actions under section 1983 and habeas petitions brought pursuant to 28 U.S.C. § 2254. In those decisions the Supreme Court has wrestled with the question of when a damage claim under section 1983 may be pursued and when, on the other hand, a habeas petition represents the exclusive remedy. In *Heck,* for example, the plaintiff in that action, which was brought pursuant to section

1983 and sought only damages, alleged that he was unlawfully investigated and wrongly convicted. *Heck*, 512 U.S. at 478-79, 114 S. Ct. at 2368. While in his complaint the plaintiff sought only money damages and not release from confinement, the Court nonetheless concluded that recourse under section 1983 was not available since any award in his favor would "necessarily imply" the invalidity of his conviction. *Id.* at 486-487, 114 S. Ct. at 2372-73.

In one of the more recent cases in the *Heck* line, *Wilkinson v. Dotson*, 544 U.S. 74, 125 S. Ct. 1242 (2005), a case from which Hamilton attempts to draw support, plaintiffs challenged the constitutionality of administrative determinations denying them parole eligibility. Concluding that they could proceed under section 1983, the Court noted that the plaintiffs did not seek an injunction ordering immediate or speedier release; instead, they merely challenged the state's procedures for determining parole eligibility and suitability, and thus a favorable determination on their claims would not necessarily imply the invalidity of their convictions or sentences, or secure an earlier release, and their claims therefore would not run afoul of *Heck. Wilkinson,* 544 U.S. at 82, 125 S. Ct. at 1248.

To be sure, the ultimate objective of the plaintiff in this case is to prove

his innocence, a claim which, if substantiated, would by very definition undermine his 1993 conviction. Plaintiff's complaint also asserts that "[d]efendant Evans should be prohibited from utilizing the July 12, 1993 judgment of conviction – stigma plus – at any executive or administrative proceeding." Complaint (Dkt. No. 1) ¶ 32. Such a ruling would clearly imply the invalidity of the judgment of conviction. Nonetheless, the primary thrust of plaintiff's complaint appears to focus upon his request that he be afforded the opportunity at a parole hearing to present evidence of his innocence of the crime of conviction.

The Supreme Court's recent decision in *Skinner v. Switzer,* ___ U.S. ___, 131 S. Ct. 1289 (2011), provides helpful guidance in navigating the waters lying between 28 U.S.C. § 2254 and 42 U.S.C. § 1983. That case involved an effort to require DNA analysis of previously-untested biological evidence in order to potentially exonerate the petitioner, who was convicted of capital murder and sentenced to death. *Id.* at 1294-95. Observing that success in obtaining the desired DNA testing would only ensure access to such testing, which could either favor the plaintiff, support his conviction, or ultimately prove inconclusive, the Court concluded that success in obtaining that relief would therefore not *necessarily* undermine the lawfulness of his

custody, and accordingly the suit was not precluded by *Heck* and its progeny. *Id.* at 1293.

The reasoning supporting the Court's decision in *Skinner* is equally applicable in this instance. What plaintiff seeks is only the opportunity to present his claim of innocence to the Parole Board. Affording him that opportunity could result in his convincing that Parole Board of his innocence, though it is equally, if not more, plausible that the effort could be rejected in light of plaintiff's conviction at trial. Accordingly, plaintiff's section 1983 damage claims in this action are not barred under *Heck* and its progeny.

C. Sufficiency of Plaintiff's Claims Against Defendant Evans

1. Ripeness

Defendant Evans argues that plaintiff's claims are not ripe since at the time of the filing of his complaint he had not yet appeared before the Parole Board for an interview, and thus no substantive determination had been made, nor had the Board ruled on whether he could be permitted to argue his innocence during his parole hearing.

The ripeness doctrine, which derives from the constitutional limitations on judicial power imposed under Article III of the Constitution, serves to prevent the premature adjudication of issues that may never arise. *Nat'l Park*

*Hospitality Corp. v. Dep't of Interior*, 538 U.S. 803, 807-08, 123 S. Ct. 2026, 2030 (2003); *see also Marone v. Green Cnty. Prob.,* No. 1:08-CV-658, 2008 WL 4693196, *2 (N.D.N.Y. Sept. 26, 2008) (Treece, M.J.) (citations omitted). While it may well be as defendant Evans contends, that at the time this action was commenced, plaintiff's constitutional claims were not ripe, subsequent events have removed this potential impediment. It appears that plaintiff has now had a Parole Board interview, as a result of which parole was denied. Plaintiff's claims therefore now squarely present a case and controversy in a constitutional sense that is ripe for determination. *Allen v. Steen*, No. 94-CV-0277E(H), 1995 WL 643846, at *4 (W.D.N.Y. Oct. 19, 1995).

2. Plaintiff's Due Process Claims

In his three claims against defendant Evans plaintiff purports to assert due process causes of action. Hamilton contends that his due process rights were violated by the Parole Board's reliance upon his conviction, despite his professed innocence, and its failure to provide him a mechanism to challenge his conviction during the parole process.

To successfully state a claim under 42 U.S.C. § 1983 for denial of due process, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient

process. *See Tellier v. Fields,* 280 F.3d 69, 79-80 (2d Cir. 2000) (citations omitted); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir.), *cert. denied*, 525 U.S. 907 S. Ct. 246 (1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996); *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 2976 (1974). As a threshold matter, the court must therefore determine whether there is a protected liberty interest at stake in the case. *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 1908 (1989)).

In his pleadings plaintiff makes prominent use of the term "stigma plus". "Stigma plus" due process claims involve allegations that a person whose reputation that has been questioned is entitled to, but has been denied, the opportunity to address the allegations against him or her. *See Valmonte v. Bane*, 18 F.3d 992, 999-1001 (2d Cir. 1994) . The making of an allegedly false statement concerning a plaintiff can give rise to a liberty interest deprivation triggering the requirements of due process, if the statement 1) is sufficiently derogatory to injure the party's reputation, 2) is capable of being proven false, 3) is false, and 4) provided additionally that there results "a material state-imposed burden or alteration of the plaintiff's status or rights. *Sadallah v. City of Utica,* 383 F.3d 34, 38 (2d Cir. 2004). While the stigma portion of the test may be easy to apply, the second, or "plus" element is

most often stated in the employment context and is not easily translated into other arenas. *See Hall v. Marshall*, 479 F. Supp. 2d 304, 314 (E.D.N.Y. 2007) (citing *Neu v. Corcoran*, 869 F.2d 662, 667 (2d Cir. 1989)).

This, however, is not a typical stigma plus claim. Plaintiff's contention is that he was wrongly convicted. The requirements of due process, however, were fully satisfied when plaintiff was provided with his constitutionally guaranteed right to a jury trial, following of which he was convicted. Under these circumstances there was no need to provide a "name clearing" hearing before relying upon his conviction as one of the factors informing the decision of whether to grant him parole. *See Menechino v. Oswald*, 430 F.2d 403 (2d Cir. 1970), *cert. denied*, 400 U.S. 1023, 91 S. Ct. 588 (1971); *see also Anderson v. Recore*, 446 F.3d 324, 328 (2d Cir. 2006) .

In any event, assuming *arguendo* plaintiff can establish both that his parole has now been officially denied and that his conviction played a role in that denial, he nonetheless has not stated a cognizable constitutional claim regarding his parole denial.[11] Courts have long held that, in general, prison

[11] While it appears that a parole hearing may have been held on July 26, 2011, and presumably parole was denied at that time, the record does not disclose what factors were considered by the Board in making that determination, nor what procedures were followed. I note, parenthetically, that by statute when parole is not granted following a personal interview, the inmate must be informed in writing within two weeks of the interview of the "factors and reasons for such denial of parole. Such reasons shall be (continued...)

inmates do not enjoy a constitutionally protected right to release on parole unless the state in question has created a protectable liberty interest through its prescribed parole scheme. *Standley v. Dennison*, No. 9:05-CV-1022, 2007 WL 2406909, at *1 (N.D.N.Y. Aug. 21, 2007) (Sharpe, J. & Lowe, M. J.); *Allen v. New York*, No. 9:05-CV-1613, 2006 WL 2864951 at *1 (N.D.N.Y. Oct. 5, 2006) (Mordue, C. J.); *see also Lee v. Governor of New York*, 87 F. 3d 55, 58-59 (2d Cir. 1996). The court must therefore determine whether New York's statutory parole regime creates a protected liberty interest sufficient to trigger the Fourteenth Amendment's procedural due process requirements. As the Second Circuit has noted, "[i]n order for a state prisoner to have an interest in parole that is protected by the Due Process Clause, he [or she] must have a legitimate expectancy of release that is grounded in the state's statutory scheme. . .. Neither the mere possibility of release, . . . nor a statistical probability of release, . . . gives rise to a legitimate expectancy of release on parole. *Barna v. Travis*, 239 F.3d 169, 170-71 (2d Cir. 2001) (per curiam) (citations omitted).

Against this backdrop, analysis of New York's parole provisions reveals

[11](...continued)
given in detail and not in conclusory terms." N.Y. Exec. Law § 259-i(2). While presumably plaintiff has received notification of the denial and the circumstances relied upon, he has not shared them with the court.

no basis to find the existence of a protected liberty interest in being released on parole. *Marvin v.* Goord, 255 F.3d 40, 44 (2d Cir. 2001); *Barna*, 239 F.3d at 171; *see also Larocco v. New York State Div. of Parole*, No. 9:05-CV-1602, 2006 WL 1313341, at *2 (N.D.N.Y. May 12, 2006) (McAvoy, S.J.). New York Executive Law § 259-i(2)(c), the statute governing the New York parole process, affords broad discretion to the Parole Board in determining whether to grant or deny an inmate's application for early release. For this reason, the Second Circuit has recognized that the New York's parole scheme creates no legitimate expectation of release mandating that an inmate seeking release be afforded procedural due process protection. *Duemmel v. Fischer,* No. 9:08-CV-1006, 2009 WL 174364, at *1 (N.D.N.Y. Jan. 23, 2009) (McAvoy, S. J.), *aff'd*, 368 Fed. App'x 180 (2d Cir. 2010); *see Barna*, 239 F.3d at 171; *see also Morel v. Thomas*, No. 02 CV 9622, 2003 WL 21488017, at *4 (S.D.N.Y. June 26, 2003).

This is not to say that a New York prison inmate may constitutionally be denied parole for purely arbitrary or otherwise impermissible reasons. *Boddie v. N.Y. Div. of Parole*, 288 F. Supp. 2d 431, 440 (S.D.N.Y. 2003). To the contrary, courts have recognized a limited due process right of New York inmates not to be denied parole for arbitrary or capricious reasons, or based

on a protected classification or irrational distinction. *See Standley,* 2007 WL 2406909, at *9; *see also Graziano v. Pataki*, No. 06 Civ. 0480, 2006 WL 2023082, at *7-9 (S.D.N.Y. July 17, 2006) (holding that prison inmates do not have a constitutional right to release on parole, but recognizing "a due process right to have the decision made only in accordance with the statutory criteria" specified by state law.) In that same vein, due process may be violated when a parole decision is based upon inaccurate information. *See, e.g., Hall*, 479 F. Supp. 2d 304.

Despite these limitations, the Parole Board is not prohibited from relying on the nature and gravity of a crime committed by an inmate being considered for parole; in fact, the Board is specifically empowered by law to take that into account as one of the considerations leading to the parole determination.[12] *See, e.g., Morel v. Travis*, 278 A.D.2d 580, 581, 737 N.Y.S.2d 160 (3d Dep't 2000), *appeal dismissed*, 96 NY.2d 752, 748 N.E.2d 1070 (2001); *see also Matter of Jones v. New York State Div. of Parole*, 24 A.D.3d 827, 828, 804 N.Y.S.2d 485 (3d Dep't 2005) ("the Board may consider a petitioner's continue lack of remorse when making a parole

---

[12] By law when making a decision regarding parole, the Board is required to consider such factors as the "seriousness of the offense with due consideration to the type of sentence, length of sentence and recommendations of the sentencing court, . . ..". N.Y. Exec. Law § 259-i(2)(c)(A)(vii); *Siao-Pao,* 564 F. Supp. 2d at 242.

determination, even where the petitioner has maintained his or her innocence following conviction.") (citation omitted), *lv dismissed*, 6 N.Y.3d 826, 846 N.E.2d 473 (2006). When grounded upon prescribed factors permissible for consideration, a decision to deny parole by the Parole Board is neither arbitrary nor capricious. *Siao-Pao v. Connolly,* 564 F. Supp. 2d 232, 242 (S.D.N.Y. 2008) (citing *Romer v. Travis*, No. 03 Civ. 1670, 2003 WL 21744079 (S.D.N.Y. July 29, 2003)).

Since plaintiff has no constitutional expectation to release on parole, and the Parole Board is statutorily empowered to consider plaintiff's crime of conviction when making a decision regarding parole, no due process cause of action is stated in his complaint, despite his profession of innocence.

3. Defendant Evans' Liability As An Official and In Her Individual Capacity

Plaintiff's complaint asserts damage claims against defendant Evans, who is presumably sued in both her official capacity and individually.

a) Official Capacity Damage Claim

The Eleventh Amendment protects a state against suits brought in federal court by citizens of that state, regardless of the nature of the relief sought. *Alabama v. Pugh*, 438 U.S. 781, 782, 98 S. Ct. 3057, 3057-58 (1978). As was previously noted, this absolute immunity states enjoy under

the Eleventh Amendment extends to both state agencies and state officials sued in their official capacities when the claim involved is essentially one against a state as the real party in interest.[13] *Richards*, 597 F. Supp. at 691 (E.D.N.Y. 1984), (citing *Pugh* and *Cory,* 457 U.S. at 89-91, 102 S. Ct. at 2328-2329). To the extent that a state official is sued for damages in his or her official capacity the official is entitled to invoke the Eleventh Amendment immunity belonging to the state.[14] *Kentucky v. Graham*, 473 U.S. 159, 166-67, 105 S. Ct. 3099, 3105 (1985); *Hafer v. Melo*, 502 U.S. 21, 25, 112 S. Ct. 358, 361 (1991).

Because plaintiff's section 1983 claim against defendant Evans in her official capacity is in reality a claim against the State of New York, it typifies those against which the Eleventh Amendment protects, and is therefore subject to dismissal. *Daisernia v. State of New York,* 582 F. Supp. 792, 798-99 (N.D.N.Y. 1984) (McCurn, J.).

---

[13] In a broader sense, this portion of defendants' motion implicates the sovereign immunity enjoyed by the State. As the Supreme Court has reaffirmed relatively recently, the sovereign immunity enjoyed by the states is deeply rooted, having been recognized in this country even prior to ratification of the Constitution, and is neither dependent upon nor defined by the Eleventh Amendment. *Northern Ins. Co. of New York v. Chatham County*, 547 U.S. 189, 193, 126 S. Ct. 1689, 1693 (2006).

[14] By contrast, the Eleventh Amendment does not establish a barrier against suits seeking to impose individual or personal liability on state officials under section 1983. *See Hafer*, 502 U.S. at 30-31, 112 S. Ct. at 364-65.

b) Individual Damage Claim

In her motion defendant Evans also asserts that plaintiff's complaint fails to demonstrate a basis to hold her personally accountable for the constitutional deprivations alleged.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir. 1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977), *cert. denied*, 434 U.S. 1087, 98 S. Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

In his complaint, plaintiff does not allege that defendant Evans played any active role in his parole proceedings. Instead, plaintiff's complaint makes it clear that she is being sued in her capacity as Chair of the New York State Parole Board. It is well-established, however, that a supervisor cannot be liable for damages under section 1983 solely by virtue of being a supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v.*

*Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501. Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal, has failed to remedy the wrong; 3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; 4) was grossly negligent in managing the subordinates who caused the unlawful event; or 5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty*, 490 F.3d 143, 152-53 (2d Cir. 2007), *rev'd on other grounds sub nom.*, *Ashcroft v. Iqbal*, 556 U.S. 662,129 S. Ct. 1937 (2009); *see also Richardson*, 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995); *Wright*, 21 F.3d at 501.

Plaintiff's complaint alleges that by virtue of her position defendant Evans is "responsible for [b]oard's policies and procedures." Complaint (Dkt. No. 1) ¶ 7. His complaint also alleges that the Board has violated his constitutional rights "by its policies." *Id.* at ¶¶ 27, 28. The precise policy and procedure in place and attributable to defendant Evans, however, is not clearly identified in plaintiff's complaint. As such, I conclude that plaintiff has

failed to establish a basis for finding defendant Evans accountable for the constitutional violations alleged and recommend dismissal of all claims against her in her individual capacity on this basis.

4. Absolute Immunity

As an additional basis for seeking dismissal of plaintiff's damage claims against her, defendant Evans claims entitlement to absolute immunity based upon her position. This argument, which is based upon the adjudicative nature of the function which she and her colleagues perform as parole commissioners, is premised principally upon the Second Circuit's decision in *Montero v. Travis*, 171 F.3d 757 (2d Cir. 1999). *See also King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999).

To ensure a properly functioning penal system, a Parole Board official should "be free to act upon his [or her] convictions, without apprehension of personal consequences to himself [or herself]." *Montero,* 171 F.3d at 760-761 (quoting *Bradley v. Fischer,* 80 U.S. 335, 347 (1871)). Immunity assumes that a risk of error and potential injury outweighs not deciding or acting at all. *Scheuer v. Rhodes*, 416 U.S. 232, 242, 94 S. Ct 1683, 1689 (1974) *overruled on other grounds*, *Davis v. Scherer*, 468 U.S. 183, 104 S. Ct. 3012 (1984). "The Second Circuit [has] . . . held that Parole Board

officials are entitled to absolute immunity from liability for damages under § 1983 for their decisions to grant, deny, or revoke parole." *Barna v. Travis*, No. 97 CV 1146, 1999 WL 305515, at *2 (N.D.N.Y. Apr. 22, 1999) (Smith, M. J.), *aff'd,* 239 F.3d 169 (2d Cir. 2001) (citing *Montero*, 171 F.3d at 760). To qualify for absolute immunity, parole officials must have been engaged in the performance of an adjudicative function at the time of the challenged action. *Montero*, 171 F.3d at 761; *see also Farid v. Bouey*, 554 F. Supp. 2d 301, 317 (N.D.N.Y. 2008).

Parole Board officials are enshrouded in absolute immunity when performing adjudicative functions in order to preserve impartiality in decision-making and to depreciate the overall costs of defending frivolous inmate suits. *Montero,* 171 F.3d at 760-61. Further, a state official is entitled to qualified immunity when the officer has an "objectively reasonable basis for believing in the lawfulness of his actions". *LeDuc v. Tilley,* No. 3:05CV157, 2005 WL 1475334, at *6 n.1 (D. Conn. June 22, 2005) (citing *Connecticut v. Crotty*, 346 F.3d 84, 101-02 (2d Cir. 2003)).

It should be noted that the Supreme Court has been "sparing" in recognizing claims of absolute immunity, *Forrester v. White*, 484 U.S. 219, 224, 108 S. Ct. 538, 542 (1988), as absolute immunity should be limited to

circumstances where the official is able to demonstrate that application of absolute, rather than qualified, immunity is required by public policy. *Scotto v. Almenas*, 143 F.3d 105, 110 (2d Cir. 1998) (citations omitted). A parole officer who claims the benefit of absolute immunity thus bears the burden of proof with respect to the issue. *DiBlasio v. Novello*, 344 F.3d 292, 297 (2d Cir. 2003) (quoting *Butz v. Economou*, 438 U.S. 478, 515, 98 S. Ct 2894, 2915 (1978)), *cert. denied,* 541 U.S. 988, 124 S. Ct. 2018 (2004) .

Absolute immunity is less likely to attach when the official function involved is less adjudicative in nature, such as when the officer acts under his or her own initiative rather than that of the court. *Scotto*, 143 F.3d at 111. In determining the applicability of absolute immunity, there must be a specific inquiry into the facts of the situation at hand to determine whether the particular acts or responsibilities of the officers fall within the confines of the absolute immunity doctrine. *King,* 189 F.3d at 288. If the officer's "function was administrative rather than adjudicative or prosecutorial and not integrally related to the judicial process," qualified, not absolute, immunity would attach. *Id.* at 288 (citing *Scotto*, 143 F.3d at 111-13). If a judicial function was performed, even if it was done in an erroneous manner, the function does not become any less judicial in nature. *Quartararo v. Catterson*, 917 F.

Supp. 919, 951 (E.D.N.Y. 1996) (quoting *Tarter v. State of New York*, 68 N.Y.2d 511, 517-18, 503 N.E.2d 84, 87 (1986)).

Plaintiff's claims in this action do not directly challenge a denial of parole. Nor does it appear that defendant Evans had any direct involvement in the decision regarding whether to grant plaintiff parole, or the procedures associated with that decision. The claims against defendant Evans in her capacity as Chair of the Parole Board appear to be predicated upon the procedures followed in making that determination, rather than on any adjudicative actions. In establishing those procedures defendant Evans acts in an administrative, rather than a quasi judicial, capacity. Accordingly, plaintiff's claims against her are not barred by absolute immunity. *See Scotto*, 143 F.3d at 111.

## IV. SUMMARY AND RECOMMENDATION

Plaintiff, who was convicted at trial in 1993 of second degree murder, now raises some allegations which, if founded, are indeed troubling and potentially undermine the validity of his conviction. One hopes that potential avenues exist whereby the plaintiff can pursue these allegations in attempt to establish his innocence and overturn his conviction, notwithstanding its age,

both under state law and by habeas petition pursuant to 28 U.S.C. § 2254.[15] It is clear, however, that a hearing before the parole board is not the appropriate vehicle for overturning the conviction and securing release, as seems to be plaintiff's intention. For a variety of reasons, as set forth above, plaintiff's claims in this action do not give rise to a cognizable constitutional claim and are therefore subject to dismissal as against both defendants.[16] It is therefore hereby respectfully

RECOMMENDED that the motions of defendant Evans and City of New York (Dkt. Nos. 9, 15) be GRANTED, and that plaintiff's complaint be DISMISSED in its entirety; and it is further hereby

RECOMMENDED that plaintiff's motion for a preliminary injunction

---

[15] One of those avenues could be through a habeas petition pursuant to 28 U.S.C. § 2254. Quite clearly any habeas petition now brought by Hamilton under section 2254 would be met with a statute of limitations defense under 28 U.S.C. § 2244(d)(1). The Second Circuit has not yet staked out a formal position regarding whether or not the United States Constitution requires that an "actual innocence" exception be engrafted into the one-year habeas statue of limitations. *See Whitley v. Senkowski*, 317 F.3d 223, 225 (2d Cir. 2003); *Warren v. Artuz*, No. 9:05 CV 1032, 2007 WL 1017112, at *9 (N.D.N.Y. Mar. 30, 2007). That court has nonetheless directed that district courts consider claims of actual innocence before dismissing habeas petitions as untimely. *Id.; see also Doe v. Menefee,* 391 F.3d 147, 161 (2d Cir. 2004), *cert. denied*, 546 U.S. 961, 126 S. Ct. 489 (2005).

[16] In light of my recommendation on the merits I have not considered defendant Evans' alternative argument of her entitlement to qualified immunity from suit, which shields government officials "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Scotto*, 143 F.3d at 110 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727 (1982)).

(Dkt. No. 2) be DENIED as moot.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated: January 10, 2012
Syracuse, NY







Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Mark W. BLOND, Jr., Plaintiff,

v.

The CITY OF SCHENECTADY, Mayor Brian Stratton, SPD Chief Chaires, SPD Officer Daniel McDonald, SPD Officer St. Onge (Phonetic Spelling), SPD Det. Sherri Barnes, Individually, and in Their Official Capacities, Defendants.

No. 10-CV-0598.

Oct. 26, 2010.

Mark W. Blond, Jr., Romulus, NY, pro se.

Alaina K. Laferriere, Carter, Conboy Law Firm, Albany, NY, Luke C. Davignon, Carter, Conboy Law Firm, Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

***1** Plaintiff commenced the instant action under 42 U.S.C. § 1983 against officials and employees of the City of Schenectady alleging his constitutional rights were violated while he was arrested and interrogated by the police. Defendants now move to dismiss pursuant to Fed.R.Civ.P. 12(c). Plaintiff cross-moves to amend his Complaint.

**I. FACTS**

For purposes of the instant motion, the following factual allegations are deemed to be true and all reasonable inferences are drawn in Plaintiff's favor.

On May 4, 2008, Plaintiff walked out the back door of his house. Defendant City of Schenectady Police Officer McDonald approached Plaintiff in an aggressive manner and "nearly broke the plaintiff's arm" before placing him in handcuffs. Plaintiff did not resist Officer McDonald. Without being informed of his Miranda warnings or advised of the charges against him, Plaintiff was placed in the back of McDonald's car so McDonald could question third parties. While in the car, Plaintiff asked Officer St. Onge to "disable his car that was parked in the back yard of the apartment." Officer St. Onge slammed the door shut in Plaintiff's face. "[T]he plaintiff made a second attempt to have his property protected with the same result of officer St. Onge slamming the police car door shut on the plaintiff." "This made the already alcohol induced plaintiff angry, in which he began hitting his head against the police car window (rear passenger side)." Officer St. Onge observed Plaintiff hitting his head against the window, but did nothing. Plaintiff hit his head against the police car window 4-5 times, after which the window shattered.

Plaintiff was not bleeding and did not sustain any cuts from having broken the car window. McDonald "ran from the backyard to the front and tried to rip the plaintiff out of the window that was broken." McDonald "then decided to open the police car door, where he and officer St. Onge tried to push [Plaintiff] into a[f]ire [h]ydrant." "[P]laintiff was instead pushed by both officer's [sic] to the ground where the glass was, [where] both officer's [sic] began kneeing the plaintiff in his lower back and the back side of his neck." Plaintiff's face was "pressed into the glass on the ground." McDonald sprayed a can of pepper spray in Plaintiff's face.

Plaintiff was left "on the ground with his face burning in pain" for approximately 30 minutes until another vehicle arrived to transport him to the police station. During this time, Plaintiff asked if he could use the hose to rinse the pepper spray from his eyes and face. The officers did not respond to Plaintiff's request.

Plaintiff was transported to the police station where pictures were taken of his face. After the pictures were taken, Plaintiff was permitted to rinse his face and eyes. Plaintiff believed he had glass in his eyes "from the oficer's [sic] pressing his face into the glass on the ground." An ambulance was called and Plaintiff was taken to the hospital. "The nurse flushed out the plaintiff's eyes

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

and found no glass." "The plaintiff was released from the hospital feeling dizzy back into the custody of the Schenectady police, where Defendant Detective Sherri Barnes question[ed] the plaintiff without his attorney and after his head injury."

## II. STANDARD OF REVIEW

### a. *Motion for Judgment on the Pleadings*

***2** Defendants move for judgment on the pleadings pursuant to Fed.R.Civ.P. 12(c). A Rule 12(c) motion is "designed to provide a means of disposing of cases when the material facts are not in dispute between the parties." 5C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1367 (3d ed.2010). A motion under Rule 12(c) is only useful if "all material allegations of fact are admitted or not controverted in the pleadings and only questions of law remain to be decided by the district court." *Id.*

The standard of review for a motion for judgment on the pleadings under Rule 12(c) is the same as for a Rule 12(b)(6) motion to dismiss. *Cleveland v. Caplaw Enter.,* 448 F.3d 518, 521 (2d Cir.2006); *Sharpe v. Taylor,* 2009 WL 1743987 at *6 (N.D.N.Y. June 18, 2009). The Court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." *Rosner v. Bank of China,* 349 F. App'x 637, 638 (2d Cir.2009). To survive a motion to dismiss, the Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* --- U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555.

The Court recognizes Plaintiff is proceeding pro se and, accordingly, his pleadings are held to a "less stringent standard than formal pleadings drafted by lawyers." *Ferran v. Town of Nassau,* 11 F.3d 21, 22 (2d Cir.1993) (quoting *Hughes v. Rowe,* 449 U.S. 5, 9, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)). Plaintiff's pleadings "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 474 (2d Cir.2006); *Pabon v. Wright,* 459 F.3d 241, 248 (2d Cir.2006); *Brownell v. Krom,* 446 F.3d 305, 310 (2d Cir.2006); *Forsyth v. Fed'n Employment & Guidance Serv.,* 409 F.3d 565, 569 (2d Cir.2005). However, *pro se* litigants are not exempt "from compliance with relevant rules of procedural and substantive law." *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983).

### b. *Motion to Amend the Complaint*

Plaintiff cross-moves to file an amended complaint. A party seeking to amend a pleading more than 21 days after the filing of a responsive pleading may do so with the consent of all parties or with leave from the Court. Fed.R.Civ.P. 15(a)(2). Plaintiff was previously advised that:

> Plaintiff may only amend his Complaint by motion that is in compliance with Local Rule 7.1., including a notice of motion and a supporting affidavit. Also, any motion to amend or supplement must be accompanied by an affidavit (*see* L.R. 7.1(a)(2)). Furthermore, "[a]n unsigned copy of the proposed amended pleading must be attached to a motion brought under Fed.R.Civ.P. 14, 15, 19-22." L.R. 7.1(a)(4). This proposed amended pleading must be a complete pleading, which will supersede the original pleading in all respects. *Id.* Plaintiff's proposed amended pleading shall not incorporate by reference any portion of any prior pleading. *Id.*

***3** Dkt. No. 9. Although Plaintiff has moved for leave to amend, he has not attached an unsigned copy of the proposed amended pleading to his motion papers and his motion does not "set forth specifically the proposed amendments and identify the amendments in the proposed pleading." Local Rule 7.1(a)(4). Because Plaintiff has not complied with the requirements of Local Rule 7.1, his motion is DENIED with leave to renew.

## III. DISCUSSION

Defendants move to dismiss the Complaint in its entirety. For Plaintiff to succeed on a claim under 42 U.S.C. § 1983 claim, he must prove that the defendant, while acting under color of state law, deprived him of his

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

rights, privileges, or immunities secured by the Constitution or laws of the United States. *Cornejo v. Bell,* 592 F.3d 121, 127 (2d Cir.2010); *see* 42 U.S.C. § 1983. A civil rights complaint "must contain specific allegations of fact which indicate a deprivation of constitutional [or federal statutory] rights; allegations which are nothing more than broad, simple, and conclusory statements are insufficient to state a claim under § 1983." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 887 (2d Cir.1987). A defendant's personal involvement in a § 1983 claim is a prerequisite to an award of damages. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). A plaintiff must allege specific facts to demonstrate that a particular defendant was personally or directly involved in the violation. *Provost v. City of Newburgh,* 262 F.3d 146, 155 (2d Cir.2001). The requirement of personal involvement may be satisfied by showing that the defendant: (1) personally participated in the violation; (2) was grossly negligent in supervising subordinates who committed the wrongful acts; or (3) exhibited deliberate indifference by failing to act on information indicating the unconstitutional acts were occurring. *Provost,* 262 F.3d at 154; *see also* *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citing *Williams v. Smith,* 781 F.2d 319, 323-24 (2d Cir.1986)).

**a. *The City of Schenectady***

The City of Schenectady moves to dismiss the claims against it on the ground that Plaintiff has failed to demonstrate a violation of any rights caused by municipal policy or custom. A municipality may not be held liable under Section 1983 solely on the doctrine of *respondeat superior.* *Monell v. Dep't of Soc. Services of City of New York,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). To be held liable for a constitutional violation, a municipality must have adopted a policy or custom that caused a deprivation of constitutional rights, or it must have directly caused an employee to violate another's constitutional rights. *Monell,* 436 U.S. at 692; *see* *Ximines v. George Wingate High Sch.,* 516 F.3d 156, 160 (2d Cir.2008). Here, Plaintiff fails to allege sufficient facts to support a reasonable inference that a municipal policy or custom resulted in a deprivation of his rights. Accordingly, Plaintiff's claims against the City of Schenectady must be DISMISSED.

**b. *The Mayor and the Chief of Police***

***4** The Mayor and the Chief of Police move to dismiss the claims against them on the ground that Plaintiff failed to plead any personal involvement by them. As previously noted, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006). Here, Plaintiff does not allege any facts plausibly indicating that either the Mayor or the Chief of Police Chief were personally involved in any alleged constitutional violations arising from his arrest, incarceration, or prosecution. Plaintiff similarly fails to plead sufficient facts to state a claim under the standards for supervisory liability applicable to § 1983 claims. Accordingly, Plaintiff's claims against the Mayor and the Chief of Police must be DISMISSED.

**c. *False Arrest, Malicious Prosecution, Failure to Provide Miranda Warnings, and Coercive Questioning***

Defendants move to dismiss any false arrest and malicious prosecution claims on the ground that Plaintiff does not allege that the criminal charges were disposed of in his favor. Plaintiff does not allege in his Complaint that any criminal actions against him were disposed of in his favor. While the Complaint does allege facts suggesting that Plaintiff was arrested, it makes no claim that the arrest was without probable cause. Accordingly, any malicious prosecution and false arrest claims must be DISMISSED.

Defendants move to dismiss any claim concerning the failure to administer Miranda warnings on the ground that it does not give rise to a private cause of action for damages. A Section 1983 claim cannot stand solely on the basis of an alleged failure to administer Miranda warnings. *Deshawn E. by Charlotte E. v. Safir,* 156 F.3d 340, 346 (2d Cir.1998) ("[P]laintiffs cannot base a § 1983 claim solely on a law enforcement officer's failure to administer Miranda warnings...."); *Neighbor v. Covert,* 68 F.3d 1508, 1510-1511 (2d Cir.1995) ( "[E]ven if we were to assume that [the plaintiff's] Miranda rights had been violated, that violation, standing alone, would not form a basis for liability under § 1983."). There is no allegation that coercion was applied to obtain a waiver of Plaintiff's rights against self-incrimination and/or to obtain a inculpatory statements or that any such statements were then used against Plaintiff in criminal proceedings. Accordingly, Plaintiff fails to state a claim upon which relief can be granted. *Id.* Further, because it appears that Plaintiff is currently incarcerated for crimes for which he was arrested in May 2008, any such claims may run afoul of the rule set

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

forth in *Heck v. Humphrey,* 512 U.S. 477, 486-89, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994) (a Section 1983 suit for damages that "would necessarily imply the invalidity of [the plaintiff's] conviction or sentence" is not cognizable, unless the plaintiff can show that the conviction or sentence has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.").

**d.** ***Inadequate Medical Care***

***5** To the extent Plaintiff asserts a Fourteenth or Eighth Amendment claim of inadequate medical care, any such claim must be dismissed because he failed to allege facts plausibly suggesting an unconstitutional deprivation of medical treatment. To establish such a claim, Plaintiff must show that defendants were deliberately indifferent to his serious medical needs. *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000); *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The deliberate indifference standard contains both an objective element and a subjective element. The former requires that the alleged deprivation of care be sufficiently serious in objective terms: the plaintiff's condition must present a "condition of urgency, one that may produce death, degeneration, or extreme pain." *Hathaway,* 37 F.3d at 66. The subjective element requires a showing that the defendants were aware of plaintiff's serious medical needs and consciously disregarded a substantial risk of serious harm. *Id.*

Here, Plaintiff's allegations against Defendants are insufficient to establish a constitutional deprivation. Plaintiff fails to allege a serious medical condition for which he sought and was denied treatment. Although Plaintiff was sprayed with pepper spray and he was not permitting to rinse his eyes for thirty to sixty minutes, this is insufficient to state a claim. *See* *Strassner v. O'Flynn,* 2006 WL 839411, at *8 (W.D.N.Y.2006) (and cases cited therein) (exposure to temporary discomfort of pepper spray is not a serious medical need). Plaintiff similarly fails to allege what harm, if any, resulted from the delay in treatment. Moreover, there are insufficient allegations of deliberate indifference to any medical need. Once he was brought to the police station and pictures were taken, Plaintiff was permitted to rinse his face. To the extent Plaintiff complained of glass in his eye (which could constitute a serious medical need), an ambulance was called and Plaintiff was taken to the hospital where a nurse rinsed his eye and did not find any glass. Accordingly, Plaintiff's claim of inadequate medical care must be DISMISSED.

**e.** ***Excessive Force and Failure to Intervene***

Defendants next move to dismiss the excess force and failure to intervene claims. When evaluating an excessive use of force claim under the Fourth Amendment, "courts should examine whether the use of force is objectively unreasonable 'in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation.' " *Jones v. Parmley,* 465 F.3d 46, 61 (2d Cir.2006) (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). Courts measure the reasonableness of the use of force by considering "the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Parmley,* 465 F.3d at 61 (quoting *Thomas v. Roach,* 165 F.3d 137, 143 (2d Cir.1999)).

***6** A police officer may use some degree of force when making an arrest, but the amount of force "must be reasonably related to the nature of [the] resistance and the force used, threatened, or reasonably perceived to be threatened, against the officer." *Sullivan v. Gagnier,* 225 F.3d 161, 166 (2d Cir.2000). The court must examine the totality of the circumstances, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham,* 490 U.S. at 396. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' violates the Fourth Amendment." *Id.* Dismissing an excessive force claim is appropriate where "no reasonable fact finder could conclude that the officers' conduct was objectively

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

unreasonable." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 123 (2d Cir.2004). For a plaintiff to prevail on a motion to dismiss, he must show that "no rational jury could [find] that the force used was so excessive that no reasonable officer would have made the same choice." *Lennon v. Miller,* 66 F.3d 416, 426 (2d Cir.1995).

Defendants contend that the use of pepper spray by an arresting officer does not by itself rise to the level of excessive use of force. In some cases, an unconstitutional act or injury may be so *de minimis* that the act cannot rise to the level of a constitutional violation as a matter of law. *Romano v. Howarth,* 998 F.2d 101, 105 (2d Cir.1993) ("[A] *de minimis* use of force will rarely suffice to state a constitutional claim."). The Second Circuit has noted, however, that "infliction of pepper spray on an arrestee has a variety of incapacitating and painful effects ... and, as such, its use constitutes a significant degree of force." *Tracy v. Freshwater,* --- F.3d ----, ----, 2010 WL 4008747 at *7 (2d Cir. Oct.14, 2010). "Accordingly, a number of our sister circuits have made clear that it should not be used lightly or gratuitously against an arrestee who is complying with police commands or otherwise poses no immediate threat to the arresting officer." *Id.* In *Tracy,* the Second Circuit held that the use of pepper spray on an individual who was handcuffed and was not offering physical resistance could be unreasonable under the circumstances. *Id.* Although Plaintiff admits to being drunk and angry and to having broken out the window of the police car, he also claims to have been handcuffed and placed on the ground with two police officers on top of him at the time he was pepper sprayed. These allegations are sufficient to plausible state a claim for the use of excessive force against the officer using the pepper spray and for a failure to intervene against the officer who was present but failed to intercede. *O'Neill v. Krzeminski,* 839 F.2d 9, 11 (2d Cir.1988).

**IV. CONCLUSION**

***7** For the foregoing reasons, Defendants' motion to dismiss is GRANTED as follows:

a. the claims against the City of Schenectady, the Mayor, and the Chief of Police are DISMISSED IN THEIR ENTIRETY; and

b. and claims alleging malicious prosecution, false arrest, the failure to provide medical care, or arising out of the failure to administer Miranda warnings are DISMISSED.

In all other regards, the motion to dismiss is DENIED. Plaintiff's motion to for leave to amend his original complaint is DENIED WITH LEAVE TO RENEW UPON PROPER PAPERS.

IT IS SO ORDERED.

N.D.N.Y.,2010.

Blond v. City of Schenectady
Slip Copy, 2010 WL 4316810 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.







H

Only the Westlaw citation is currently available.
**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,

N.D. New York.
Mark W. BLOND, Jr., Plaintiff,
v.
The CITY OF SCHENECTADY, Mayor Brian Stratton, SPD Chief Chaires, SPD Officer Daniel McDonald, SPD Officer St. Onge (Phonetic Spelling), SPD Det. Sherri Barnes, Individually, and in Their Official Capacities, Defendants.
No. 10-CV-0598.

Dec. 15, 2010.
Mark W. Blond, Jr., Romulus, NY, pro se.

Alaina K. Laferriere, Luke C. Davignon, Carter, Conboy Law Firm, Albany, NY, for Defendants.

***DECISION and ORDER***

THOMAS J. McAVOY, Senior District Judge.

***1** Plaintiff commenced the instant action under 42 U.S.C. § 1983 against officials and employees of the City of Schenectady alleging his constitutional rights were violated while he was arrested and interrogated by the police. Defendants moved to dismiss pursuant to Fed.R.Civ.P. 12(c). By Decision and Order dated October 26, 2010, the Court dismissed all of Plaintiff's claims, except those alleging the use of excessive force. Presently before the Court is Plaintiff's motion for reconsideration.

Plaintiff's moves for reconsideration claiming that he is not a lawyer and failed to include any arguments against the City of Schenectady and left the Court to speculate concerning any unconstitutional policies concerning the City. Plaintiff also objects to the dismissal of his other claims. Plaintiff contends that "[t]he fact that [he] ... was arrested for Criminal Mischeief in the 4th (2 Counts) as reported by the Department of Criminal Justice Services, and then charged with other crimes on May 23, 2000, 20 days after the initial [sic] does not give raise [sic] to the decision in *Heck v. Humphrey.*" Plaintiff then asks "the [C]ourt to allow [him] a new pleading" and for discovery and an investigation.

Plaintiff fails to raise any grounds warranting reconsideration, relief under Rule 60(b), or that would otherwise cause the Court to believe that its prior decision was in error. Plaintiff never alleged in his Complaint that he was arrested or prosecuted without probable cause. The fact that Plaintiff is currently incarcerated on counts of Rape, Engaging in a Criminal Sexual Act, and Assault strongly suggests that he was convicted after his arrest.

To the extent Plaintiff asks for leave to file an amended complaint, his motion is again denied with leave to renew. In the Court's prior decision (and in the Magistrate Judge's Order dated July 20), Plaintiff was expressly advised that a motion for leave to file an amended complaint must comply with this Court's local rules and, in particular N.D.N.Y.L.R. 7.1. Plaintiff has not done so.

Defendants also request that the Court clarify the prior order concerning Defendant Barnes. Barnes is alleged to have participated in the underlying conduct only insofar as she questioned Plaintiff once he was brought to the station. This was after the alleged use of excessive force (the only remaining claim). The Complaint does not allege any facts plausibly suggesting the use of excessive force by Barnes. Accordingly, the Complaint is dismissed as to her.

For the foregoing reasons, Plaintiff's motion for reconsideration and to amend and/or correct his Complaint (Dkt. No. 23) is DENIED. The Court also clarifies that all claims against Defendant Barnes are dismissed in their entirety.

N.D.N.Y.,2010.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Blond v. City of Schenectady
Slip Copy, 2010 WL 5185801 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





United States District Court,

N.D. New York.
Steven Joseph WENGER, Plaintiff,
v.
CANASTOTA CENTRAL SCHOOL DISTRICT and Commissioner of Education of the State of New York, Defendants.
No. 5:95–CV–1081FJSGJD.

April 5, 2004.

Menter, Rudin & Trivelpiece, P.C., Syracuse, New York, for Plaintiff, Mitchell J. Katz, of counsel.

Bond, Schoeneck & King, PLLC, Syracuse, New York, for Defendant Canastota Central School District, S. Paul Battaglia, of counsel.

Office of the New York State Attorney General, Syracuse, New York, for Defendant Commissioner of Education of the State of New York, Senta B. Siuda, AAG, of counsel.

MEMORANDUM–DECISION AND ORDER

SCULLIN, Chief J.

I. INTRODUCTION

***1** Plaintiff's father initially brought this action *pro se* on behalf of himself and Plaintiff, asserting claims under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.*, and the Due Process Clause of the Fourteenth Amendment to the United States Constitution against a number of individuals who worked for Defendant Canastota Central School District ("CCSD"), Defendant CCSD School Board members, Defendant CCSD itself, and Defendant Thomas Sobol, the Commissioner of Education of the State of New York. [FN1]

FN1. In 1991, Plaintiff, who was then fifteen years old, was seriously injured in an automobile accident. As a result of the injuries he sustained in the accident, he has been classified as traumatic brain injured. *See Wenger v. Canastota Cent. Sch. Dist.,* 961 F.Supp. 416, 418 (N.D.N.Y.1997), *aff'd in part, vacated and remanded,* 146 F.3d 123 (2d Cir.1998). In 1992 and again in 1994, doctors determined that Plaintiff was in a "persistent vegetative state." *Id.* at 418 n. 1.

The CCSD Defendants moved for summary judgment and Defendant Sobol moved for judgment on the pleadings. On April 14, 1997, this Court granted Defendants' motions and dismissed the complaint in its entirety. *See Wenger v. Canastota Cent. Sch. Dist.,* 961 F.Supp. 416 (N.D.N.Y.1997), *aff'd in part, vacated and remanded,* 146 F.3d 123 (2d Cir.1998).[FN2] Plaintiff's father appealed the dismissal to the Second Circuit.

FN2. Prior to the Court issuing its April 14, 1997 Memorandum–Decision and Order, Magistrate Judge DiBianco had considered and denied Plaintiff's father's motion for appointment of counsel. At that time, there was no request for appointment of counsel on behalf of Plaintiff.

The Second Circuit affirmed the dismissal of the action in its entirety as to Plaintiff's father's claims. However, the court held that it was clear that Plaintiff's father could not represent Plaintiff and that this Court should have focused on Plaintiff's need for counsel. Therefore, the Second Circuit vacated this Court's judgment as to Plaintiff and remanded so that this Court could consider whether appointment of counsel was appropriate. *See Wenger,* 146 F.3d at 125–126. This Court referred the question of appointment of counsel to Magistrate Judge DiBianco.

In an abundance of caution and in the interest of protecting the rights of a disabled plaintiff, Magistrate Judge DiBianco requested that an attorney evaluate the case to determine whether appointment of counsel was appropriate. In October 2001, after reviewing counsel's confidential report, Magistrate Judge DiBianco appointed counsel based upon counsel's statement that he believed

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

that "some" of Plaintiff's claims were "potentially meritorious" and may not have been advanced in an appropriate manner.

On May 27, 2003, the parties filed a stipulation dismissing Plaintiff's father as a plaintiff and dismissing all Defendants from this action with prejudice, except for Defendant CCSD and Defendant Sobol. *See* Dkt. No. 80. In addition, counsel moved to amend Plaintiff's father's original *pro se* complaint in an attempt to raise properly the "potentially meritorious" claims.

On March 1, 2004, Magistrate Judge DiBianco issued an Order and Report–Recommendation in which he denied Plaintiff's motion to amend the complaint and recommended that this Court *sua sponte* grant summary judgment to Defendants and dismiss the complaint in its entirety.

Presently before the Court are Plaintiff's objections to that Order and Report–Recommendation.

II. DISCUSSION

A. Plaintiff's motion to amend the complaint

Generally, a court, in exercising its discretion whether to grant leave to amend, must act pursuant to Rule 15(a) of the Federal Rules of Civil Procedure and grant such a motion "freely ... when justice so requires." Fed.R.Civ.P. 15(a); *see also* *Foman v. Davis,* 371 U.S. 178, 182 (1962). In deciding whether to grant a motion to amend, a court must examine whether there has been " 'undue delay, bad faith or dilatory motive" ' on the part of the movant. *See* *Evans v. Syracuse City Sch. Dist.,* 704 F.2d 44, 46 (2d Cir.1983) (quotation omitted). A court must also consider whether the amendment would be unduly prejudicial to the opposing party. *See* *Kovian v. Fulton County Nat'l Bank & Trust Co.,* 86–CV–154, 1992 WL 106814, *1 (N.D.N.Y. May 13, 1992) (quotation omitted). Finally, "[w]here it appears that granting leave to amend is unlikely to be productive" or that the amendment would be futile, it is not an abuse of discretion for a court to deny leave to amend. *See* *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (citations omitted).

***2** Plaintiff's proposed amended complaint contains two causes of action, one against Defendant CCSD and the other against Defendant Sobol. Plaintiff brings both of these claims pursuant to § 1983 for alleged violations of the IDEA and seeks only monetary damages. Magistrate Judge DiBianco concluded that allowing Plaintiff to file this amended complaint would be futile. Plaintiff objects to that conclusion. The Court will address each of Plaintiff's objections in turn.

*1. Plaintiff's proposed amendment regarding Defendant Sobol in his individual capacity*

Magistrate Judge DiBianco determined that, rather than asserting that Defendant Sobol was personally involved in the alleged violation of Plaintiff's rights under the IDEA, the proposed amended complaint essentially alleged *respondeat superior* liability, which is not available under § 1983. Therefore, he denied as futile Plaintiff's motion to amend the complaint to assert a claim against Defendant Sobol in his individual capacity.

Plaintiff does not appeal from this part of Magistrate Judge DiBianco's Order. As Magistrate Judge DiBianco correctly noted, absent allegations of personal involvement, a § 1983 claim will not lie against an official in his individual capacity. *See* *Hernandez v. Keane,* 341 F.3d 137, 144–45 (2d Cir.2003) (citation omitted). Since none of the allegations in the proposed amended complaint assert that Defendant Sobol was personally involved in the alleged violations of Plaintiff's rights under the IDEA, the Court affirms that part of the Order denying as futile Plaintiff's motion to amend the complaint to assert an individual-capacity claim against Defendant Sobol.

*2. Plaintiff's proposed amendment regarding Defendant Sobol in his official capacity*

Magistrate Judge DiBianco held that, because Defendant Sobol is clearly an official of New York State and New York State has not waived its immunity under § 1983, Plaintiff's proposed amendment to assert an official-capacity claim against Defendant Sobol would be futile.

Plaintiff appeals from this part of Magistrate Judge DiBianco's Order on the ground that the IDEA specifically abrogates the states' immunity under the Eleventh Amendment for suits brought based upon a violation of the IDEA. *See* Plaintiff's Objections at ¶ 3 (citing 20 U.S.C. §

1403(a) (West 2004) ("A State shall not be immune under the eleventh amendment to the Constitution of the United States from suit in Federal court for a violation of this Act [the IDEA]"); *Little Rock School District v. State of Arkansas,* 183 F.3d 816 (8th Cir.1999)).

Despite Plaintiff's assertion to the contrary, he cannot maintain a claim under § 1983 against Defendant Sobol in his official capacity, even if that claim is premised upon a violation of the IDEA.[FN3] In *Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz,* 290 F.3d 476 (2d Cir.2002), the plaintiffs asserted claims under the IDEA, the Fourteenth Amendment, and § 1983. The Second Circuit agreed with the district court that the Eleventh Amendment required dismissal of the plaintiffs' § 1983 claim. *See id.* at 480 (citations omitted). Moreover, the court held that " § 1403(a)'s waiver of sovereign immunity extends only to claims brought *pursuant to* the IDEA, not claims brought pursuant to § 1983...." *Id.* The court reasoned that "a waiver of sovereign immunity must be 'made either by invoking federal jurisdiction or by a clear declaration, a "stringent" test.'... The IDEA contains no such clear statement with regard to § 1983 claims, and so cannot be construed as a waiver." *Id.* (internal citations omitted).

FN3. The case that Plaintiff cites for the proposition that Congress abrogated the states' immunity under the Eleventh Amendment for suits based upon a violation of the IDEA, *Little Rock Sch. Dist. v.. Mauney,* 183 F.3d 816 (8th Cir.1999), was abrogated by the Eight Circuit's decision in *Bradley v. Arkansas Dep't of Educ.,* 189 F.3d 745 (8th Cir.1999). In *Bradley,* the Eighth Circuit held that, although *"Mauney'* s determination that § 1403 offers an unequivocal expression of Congress's intent to abrogate the states' immunity remains correct[,]" "[t]he IDEA ... cannot be an appropriate exercise of Congress's § 5 power, and its abrogation provision is not valid .... [thus, the abrogation] portion of *Mauney* no longer represents current law." *Id.* at 751–52 (citations omitted). The court in *Bradley,* however, did uphold that part of *Mauney* which held that "Arkansas waived its Eleventh Amendment immunity by receiving funds appropriated under the IDEA." *Id.* at 752 (citation omitted).

***3** Based upon the Second Circuit's decision in *Schutz,* the Court affirms Magistrate Judge DiBianco's Order denying as futile Plaintiff's motion to amend the complaint to assert a claim against Defendant Sobol in his official capacity.

*3. Plaintiff's proposed amendment regarding Defendant CCSD*

Magistrate Judge DiBianco began his analysis of Plaintiff's proposed claims against Defendant CCSD by noting that, because Defendant CCSD is considered a municipality for purposes of § 1983, to hold Defendant CCSD liable for the alleged violation of his rights under the IDEA, Plaintiff must show that these violations occurred as a result of a policy statement, ordinance, regulation or decision officially adopted and promulgated by Defendant CCSD's officers.

Magistrate Judge DiBianco then reviewed Plaintiff's proposed amended complaint in which he sought to allege two different ways in which Defendant CCSD violated the IDEA. First, Plaintiff alleges that the 1994–1995 IEP itself was insufficient to afford him a free appropriate public education and, second, that the 1994–1995 IEP was not consistently followed. Magistrate Judge DiBianco found that the first allegation was essentially the same claim that this Court had previously found to be without merit. Thus, he concluded that any attempt to amend the complaint to assert that the 1994–1995 IEP was insufficient, even under § 1983, would be futile.

With respect to the proposed claim that the 1994–1995 IEP was not consistently followed, Magistrate Judge DiBianco noted that Plaintiff did not allege that this violation was part of a policy or custom of Defendant CCSD. He found that, at worst, Plaintiff's claim was that the therapists did not properly follow the 1994–1995 IEP and did not show up on certain days or made up missed services on weekends. Magistrate Judge DiBianco also found that Plaintiff had made no showing that any alleged errors on the part of the service providers were made by individuals whose actions reflected the policy of Defendant CCSD. Thus, he concluded that any attempt to amend the complaint that the 1994–1995 IEP was not

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

consistently followed would be futile.

As Magistrate Judge DiBianco noted, in order for Plaintiff to hold Defendant CCSD liable under § 1983, Plaintiff must show that his rights were violated as the result of a policy, practice or custom of Defendant CCSD. *See* *J.F. v. Sch. Dist. of Philadelphia,* No. CIV. A. 98–1793, 2000 WL 361866, *8 (E.D.Pa. Apr. 7, 2000) (" § 1983 liability attaches to a municipality only when a municipal official, acting with the necessary policy-making authority and with deliberate indifference to the rights of individuals establishes or knows of and acquiesces in a policy, practice or custom which deprives individuals of constitutional or statutory rights." (citations omitted)).

When, as in this case, a plaintiff claims that a subordinate municipal official has committed the alleged violations, "municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority." *Amnesty Am. v. Town of W. Hartford,* No. 03–7332, 2004 WL 491647, *10 (2d Cir. Mar. 15, 2004). A plaintiff may meet this burden by (1) "establish[ing] that a policymaker ordered or ratified the subordinates' actions," or (2) "show [ing] that the policymaker was aware of a subordinate's ... actions, and consciously chose to ignore them, effectively ratifying the actions." *Id.* (citations omitted). Therefore, if a policymaking official exhibits deliberate indifference to a violation of a plaintiff's rights that his subordinates caused such that his inaction "constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city "policy or custom" that is actionable under § 1983." ' *Id.* (quotation and citations omitted).

***4** In pertinent part, Plaintiff's proposed amended complaint alleges

> that "the 1994–1995 IEP was inappropriate, and grossly insufficient to meet [Plaintiff's] unique educational needs to the point of constituting neglect on the part of the CCSD," *see* Proposed Amended Complaint at ¶ 19;
>
> that "the IEP that was developed for [Plaintiff] was intended to provide the absolute minimum amount of 'services' for [Plaintiff] technically required under state and federal law, without regard to whether those services were appropriate or would actually benefit [Plaintiff]," *see id.* at ¶ 19;
>
> that "CCSD utterly failed and neglected to make sure that the 1994–1995 IEP was implemented in a consistent manner," *see id.* at ¶ 20;
>
> that "the employees or agents of CCSD responsible for implementing the 1994–1995 IEP failed to provide the services outlined in the 1994–1995 IEP on a consistent basis by failing to show up at all for their scheduled times with [Plaintiff] or by engaging in activity other than that provided for in the IEP during the scheduled sessions with [Plaintiff]," *see id.* at ¶ 21;
>
> that "those employees or agents of CCSD responsible for implementing the 1994–1995 IEP would often skip [Plaintiff's] scheduled sessions altogether," *see id.* at ¶ 22;
>
> that "those employees or agents of CCSD responsible for implementing the 1994–1995 IEP would often engage in activities unrelated to [sic] instead of providing [Plaintiff] with the services called for in the IEP," *see id.* at ¶ 23; and
>
> that "CCSD's, 1) failure to draft an IEP for the 1994–1995 school year that was designed to meet [Plaintiff's] unique educational needs, and instead drafting an IEP that was designed to provide the absolute minimum amount of services to [Plaintiff], 2) failure to make sure that the 1994–1995 IEP was implemented by those employees and agents of CCSD whose job it was to make sure that the 1994–1995[IEP] was implemented, 3) permissiveness in allowing those agents or employees of CCSD responsible for implementing the IEP to skip sessions with [Plaintiff] altogether or engage in activities unrelated to [Plaintiff's] education during scheduled sessions, constitute deliberate indifference on the part of CCSD towards [Plaintiff's] right to a free and appropriate public education as guaranteed by the IDEA," *see id.* at ¶ 24.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

As a preliminary matter, Magistrate Judge DiBianco correctly determined that Plaintiff's proposed claim that the 1994–1995 IEP was insufficient to afford him a free appropriate public education was essentially the same claim that this Court had previously found to be without merit. In its previous decision, this Court noted that "[t]he issue before the Court ... is whether [Plaintiff's] 1994–95 IEP was 'reasonably calculated to enable [him] to receive educational benefits." ' *Wenger,* 961 F.Supp. at 420 (quotation omitted). The Court then explained that neither at the hearing nor in opposition to Defendants' motion for summary judgment had Plaintiff's father "provide[d] any evidence indicating that [Plaintiff] would benefit from increased special education and related services, i.e., occupational and physical therapy." *Id.* at 421 (footnote omitted). The Court further noted that "[a]fter considering all the evidence before him, the hearing officer decided that [Plaintiff's] 1994–95 IEP was appropriate and that [Plaintiff's] needs were primarily medical rather than educational. The SRO concurred with the hearing officer's decision and likewise found that Plaintiff's 1994–95 IEP was appropriate." *Id.* (footnotes omitted). The Court concluded that

> ***5** [g]iven the severity of [Plaintiff's] physical and mental condition, the evidence before the hearing officer clearly established that the special education and related services provided pursuant to [Plaintiff's] 1994–95 IEP were reasonably calculated to achieve these goals.... Therefore, on the basis of the record before the Court and giving due deference to the administrative proceedings below, the Court finds that [Plaintiff's] 1994–95 IEP was reasonably calculated to provide educational benefits and that [Plaintiff] was afforded a 'free appropriate public education' as required by the IDEA.

*Id.* at 421–22 (internal footnote omitted).

Plaintiff has pointed to nothing in the record that would warrant the Court reconsidering this conclusion. The fact that Plaintiff's father brought his claim under the IDEA, rather than § 1983, does not change the nature of the claim. Although Plaintiff argues that his counsel is able to argue a "viable legal theory" where his father was not, in effect, the only difference between these two claims is the type of relief sought. Moreover, Plaintiff has offered no legal support for his proposition that the Court, although bound to defer to the findings of the administrative officer under the IDEA, is not bound by the same deferential standard under § 1983. Accordingly, for all these reasons, the Court affirms Magistrate Judge DiBianco's Order denying as futile Plaintiff's motion to amend the complaint to assert a claim against Defendant CCSD based upon the alleged insufficiency of the 1994–1995 IEP.

The final proposed amendment involves Plaintiff's claim that Defendant CCSD was deliberately indifferent to his rights under the IDEA. Even if the Court were to look only at the proposed amended complaint, as Plaintiff argues, his claim fails for a number of reasons.[FN4] First, he has not identified a specific policymaker who was deliberately indifferent to his subordinates' actions with regard to Plaintiff. Nor has Plaintiff identified any policy or custom of Defendant CCSD that led to the alleged violation of his rights under the IDEA. Moreover, even if the Court were to consider Defendant CCSD, as a whole, to be the putative policymaker, Plaintiff has not alleged any facts to support his contention that Defendant CCSD failed to train or supervise its employees with regard to the proper implementation of the 1994–1995 IEP. Accordingly, for all these reasons, the Court affirms Magistrate Judge DiBianco's Order denying as futile Plaintiff's motion to amend the complaint to assert a claim against Defendant CCSD based upon the allegation that the 1994–1995 IEP was not consistently followed.

> FN4. Plaintiff argues, in his objections, that Magistrate Judge DiBianco erred because he did not use the correct legal standard in addressing his motion to amend the complaint, i.e., that he should have used the same standard as that applicable to a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. However, to support his motion to amend, Plaintiff relied upon extrinsic evidence. Therefore, to the extent that Magistrate Judge DiBianco looked outside the proposed amended complaint to reach his decision that amendment would be futile, the Court concludes that this was appropriate.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

B. Magistrate Judge DiBianco's recommendation that the Court *sua sponte* grant summary judgment in favor of Defendant CCSD and dismiss the complaint in its entirety

After denying Plaintiff's motion to amend in its entirety, Magistrate Judge DiBianco recommended that the Court dismiss the complaint because this Court had already held that the complaint was insufficient to withstand summary judgment and the Second Circuit had affirmed that determination.

***6** The complaint alleges, among other things,

> (1) that the CCSD Defendants failed to provide [Plaintiff] with an appropriate education in violation of the IDEA, 20 U.S.C. §§ 1400 *et.seq.;* (2) that the CCSD Defendants discriminated against [Plaintiff] on the basis of his disability in violation of section 504 of the Rehabilitation Act, 29 U.S.C. §§ 794 *et seq.;* and (3) that the CCSD Defendants violated [Plaintiff's father's] and [Plaintiff's] due process rights in violation of the Fourteenth Amendment to the United States Constitution.

*Wenger,* 961 F.Supp. at 419.

This Court granted the CCSD Defendants' motion for summary judgment with respect to each of these claims. On appeal, the Second Circuit held that, like this Court, it "ha[d] considered all of [Plaintiff's father's] arguments [with regard to his claim that the CCSD Defendants had violated his rights as a parent under the IDEA by failing properly to advise him of those rights, by not including him fully in the development of [Plaintiff's] educational plan, and by not allowing him a meaningful voice in determining the nature and extent of the services [Plaintiff] would receive] and have found them to be without merit." *Wenger,* 146 F.3d at 126. Therefore, the Second Circuit affirmed this Court's dismissal of Plaintiff's father's claims "for substantially the reasons stated by that court ." *Id.*

Although it is unusual for a court to grant summary judgment *sua sponte,* this case presents a unique set of circumstances. *See First Fin. Ins. Co. v. Allstate Interior Demolition Corp.,* 193 F.3d 109, 114–15 (2d Cir.1999) (" 'Where it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a *sua sponte* grant of summary judgment against that party may be appropriate if those materials show that no material dispute of fact exists and that the other party is entitled to judgment as a matter of law." ' (quotation omitted)).[FN5]

> FN5. In *First Fin. Ins.,* the court explained that the district court should take care "to determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried, and that the party for whom summary judgment is rendered is entitled thereto as a matter of law." ' *First Fin. Ins .,* 193 F.3d at 115 (quotation omitted). The court went on to state that
>
> > "Before granting summary judgment *sua sponte,* the district court must assure itself that following the procedures set out in Rule 56 would not alter the outcome. Discovery must either have been completed, or it must be clear that further discovery would be of no benefit. The record must, therefore, reflect the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment."
> >
> > *Id.* (quotation omitted).
> >
> > In this case, all of these elements are met. All discovery is completed—the administrative record is complete and there is nothing Plaintiff's counsel can do to change that record. Moreover, although Magistrate Judge DiBianco specifically informed Plaintiff that he could raise any arguments that summary judgment would be inappropriate in his objections, Plaintiff's only response is that, if the Court were to allow the case to continue, he would attempt to prove that the 1994–1995 IEP was insufficient. However, he does not point to any material issue of fact that would

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

preclude a grant of summary judgment.

With respect to Plaintiff's IDEA claim, since he is now over twenty-two, this claim is moot. *Cf.* *St. Johnsbury Academy v. D.H.,* 240 F.3d 163, 168 (2d Cir.2001) (citations omitted). Therefore, the Court grants summary judgment to Defendant CCSD with respect to this claim.[FN6]

FN6. Alternatively, the Court previously determined that Defendant CCSD provided Plaintiff with a free appropriate public education pursuant to the IDEA, and Plaintiff's counsel argues only that, if the Court allows this action to continue, he will endeavor to prove that the 1994–1995 IEP was insufficient. He does not state how he proposes to do this nor does he state what new evidence he could present to the Court that could possibly change the contents of the administrative record. Therefore, the Court grants summary judgment to Defendant CCSD on this alternative ground as well.

With respect to Plaintiff's § 504 claim, this Court previously held that "[i]n order to make out a violation of section 504 in the context of educating children with disabilities, a plaintiff must demonstrate not only that there was a failure to provide an appropriate education, he or she must also demonstrate bad faith or gross misjudgment." *Wenger,* 961 F.Supp. at 422 (citing *Monahan v. State of Nebraska,* 687 F.2d 1164, 1170–71 (8th Cir.1982)). The Court granted the CCSD Defendants' motion for summary judgment with respect to this claim because Plaintiff's father "ha[d] failed to demonstrate a failure to provide a free appropriate education, not to mention bad faith or gross misjudgment ." *Id.* In his objections, Plaintiff does not even attempt to demonstrate either bad faith or gross misjudgment on Defendant CCSD's part. Moreover, there is nothing in either Plaintiff's complaint or in the administrative record that would support such a claim. In addition, the Court has already determined that Plaintiff received a free appropriate public education, and Plaintiff has pointed to nothing in the record that would rebut this conclusion. Accordingly, the Court grants summary judgment to Defendant CCSD with respect to Plaintiff's § 504 claim.

***7** With respect to Plaintiff's due process claim, this Court previously held that "because ... the Court finds that the CCSD Defendants did not deny [Plaintiff] the right to an appropriate education ... [the] due process claim is dismissed as a matter of law." *Id.* at 422.[FN7] This claim is totally dependent on a finding that Defendant CCSD failed to provide Plaintiff with a free appropriate public education. The Court, however, has already determined that Defendant CCSD did, in fact, provide Plaintiff with such an education as the IDEA requires. Moreover, Plaintiff has not offered any argument to rebut this conclusion. Accordingly, the Court grants summary judgment to Defendant CCSD with respect to Plaintiff's due process claim.

FN7. The Court also noted that "while parents of children with disabilities are entitled to bring actions based on alleged violations of the Due Process Clause of the Fourteenth Amendment, these actions must be brought pursuant to 42 U.S.C. § 1983."*Wenger,* 961 F.Supp. at 422 n. 15 (citation omitted).

Finally, with respect to Plaintiff's claim that Defendant Sobol violated the IDEA by failing to ensure that Plaintiff received a free appropriate public education or take affirmative measures to remedy the actions of Defendant CCSD, the Court previously held that

> [Plaintiff's father] fails to allege facts to support his conclusory allegation that Defendant Sobol "failed and neglected" to ensure the rights of [Plaintiff] under the IDEA. Specifically, the complaint fails to state which rights under the IDEA Defendant Sobol failed to protect, and how Defendant Sobol failed and neglected to ensure these rights. As to [Plaintiff's father's] claim that Defendant Sobol failed to take affirmative measures to remedy the actions of the CCSD, [Plaintiff's father] fails to allege when and how Defendant Sobol failed to take these measures.

*Wenger,* 961 F.Supp. at 423.

Therefore, this Court granted Defendant Sobol's motion for judgment on the pleadings because Plaintiff's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

father's complaint failed to state a claim upon which relief could be granted. *See id* .[FN8]

FN8. It is not clear that Plaintiff's father appealed this part of the Court's decision.

Plaintiff has not come forward with any evidence nor offered any substantive argument that would warrant the Court's reconsideration of its previous decision regarding this claim. Accordingly, the Court grants summary judgment to Defendant Sobol with respect to this claim.

III. CONCLUSION

After carefully reviewing the file in this matter, Magistrate Judge DiBianco's March 1, 2004 Order and Report–Recommendation, Plaintiff's objections and Defendants' responses thereto, and the applicable law, and for the reasons stated herein, the Court hereby

ORDERS that Magistrate Judge DiBianco's Order denying Plaintiff's motion to amend the complaint in this action is AFFIRMED in its entirety; and the Court further

ORDERS that Magistrate Judge DiBianco's recommendation that the Court *sua sponte* grant summary judgment to Defendants is ADOPTED in its entirety; and the Court further

ORDERS that summary judgment is GRANTED to Defendants with respect to all of the claims in the complaint; and the Court further

ORDERS that the Clerk of the Court enter judgment in favor of Defendants and close this case.

IT IS SO ORDERED.

N.D.N.Y.,2004.

Wenger v. Canastota Cent. School Dist.
Not Reported in F.Supp.2d, 2004 WL 726007 (N.D.N.Y.), 27 NDLR P 316
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.
Sharon GAUSE (Wilmer-Young), Plaintiff,
v.
RENSSELAER CHILDREN AND FAMILY SERVICES, Defendant.
No. 10-CV-0482.

Nov. 29, 2010.
Sharon Gause, Troy, NY, pro se.

Nannette R. Kelleher, Bailey, Kelleher Law Firm, Albany, NY, for Defendant.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior District Judge.

***1** This action rises from events involving Plaintiff Sharon Gause's unsuccessful attempt to obtain custody of her infant grandchild following the temporary termination of her daughter's parental rights by Defendant Rensselaer Children and Family Services. Plaintiff asserts claims under 42 U.S.C. § 1983, 18 U.S.C. § 241, 18 U.S.C. § 1001, and under the New York State common law. Presently before the Court is Defendant Rensselaer Children and Family Services's motion pursuant to Fed.R.Civ.P. 12 seeking to dismiss the Complaint in its entirety.

**I. FACTS**

In March 2010, Rensselaer Children and Family Services commenced a neglect investigation concerning Plaintiff's granddaughter, 7-month old "S.S." As a result of the investigation, Audrea Gause, Plaintiff's daughter, temporarily lost parental rights over S .S. S.S. was placed into foster care with her paternal grandmother.[FN1]

FN1. The investigation was a result of pending criminal charges against Audrea Gause.

Plaintiff now challenges Defendant's determination to place S.S. in the temporary custody of her paternal grandmother. Plaintiff contends that Defendant's actions violated 18 U.S.C. § 241, 18 U.S.C. § 1001, the Child Welfare Act, and the 4th and 14th Amendments of the United States Constitution. Presently before the Court is Defendant's motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).

**II. STANDARD OF REVIEW**

"Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations ... a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65. "Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 1965. " '[T]he pleading must contain something more ... than ... a statement of facts that merely creates a suspicion [of] a legally cognizable right of action.' " *Id.* at 1965 (quoting 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed.2004)). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* ---U.S. ----, ----, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 570). A complaint does not suffice "if it tenders naked assertions devoid of further factual enhancement." *Ashcroft,* 129 S.Ct. at 1949. Legal conclusions must be supported by factual allegations. *Iqbal,* at 1950. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."

*Id.* at 1949. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly,* 550 U.S. 557) (internal quotations omitted).

***2** Deference is afforded to *pro se* litigants. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (" '[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704-05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

With these standards in mind, the Court will address the pending motions to dismiss.

**III. DISCUSSION**[FN2,FN3]

FN2. By letter dated September 21, 2010, Plaintiff requested an extension of time to file papers in opposition to the pending motion. The Court granted the request for an extension. On October 12, 2010, the Court again adjourned the motion, thereby allowing Plaintiff additional time to oppose the motion. To date, Plaintiff has failed to file papers in opposition to the motion to dismiss.

FN3. The Court notes, *sua sponte,* that there is an issue concerning subject matter jurisdiction. It appears based on the record that the issues concerning the placement of the child were determined by the New York Family Court and that Plaintiff's complaints arise out of the determination by that court. If so, this Court may lack jurisdiction under the *Rooker-Feldman* doctrine. *See V.S. v. Muhammad,* 595 F.3d 426, 430 (2d Cir.2010). That being said, the extent of any state court proceedings and Plaintiff's involvement in them are unknown at this time. Citing to the confidentiality of such matters, Defendant did not submit materials concerning the Family Court proceedings.

**a. *Plaintiff's First and Second Causes of Action***

Plaintiff's First and Second Causes of Action allege that the Defendant violated 18 U.S.C. § 1001 by making false or fraudulent statements because "Defendant, Rensselaer Children and Families Services accused Audrea Gause [Plaintiff's daughter] of having a Drug Addiction and I am further in the lawsuit alleged the caseworkers intentionally misled the court, fabricated evidence against her, and hid exculpatory evidence." Compl. at ¶ 6(sic). She further claims that Defendant's violation of § 1001 caused to her to lose various educational benefits.[FN4]

FN4. Plaintiff contends that:

> As a proximate result ... Plaintiff ... has suffered and continues to suffer substantial losses in education benefits, and other benefits shat [sic] she would have received as the honor student at Sage Colleges and grandmother rights by Defendant's Fraudulent intension to slander her name and fabricate her ability to care for grandchild which disabled her from applying temporary supervision of her grand-child. Furthermore, Plaintiff Sharon Gause t[sic] has incurred emotional distress due to Defendant's failure and fraudulent acts.
>
> Compl. at ¶ 13.

To seek redress under § 1983, "a plaintiff must assert the violation of a federal right, not merely a violation of federal law." *Blessing v. Freestone,* 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997). "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979). To determine whether a private right of action

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

exist, the Court must determine whether Congress intended to create a private right of action. *Touche Ross,* 442 U.S. at 568. The claims under 18 U.S.C. §§ 241 and 1001 do not provide a private right of action. *Bender v. General Services Admin.,* 539 F. Supp .2d 702, 715 (S.D.N.Y.2008); *John Street Leasehold, LLC v. Capital Management Resources, L.P.,* 154 F.Supp.2d 527, 547 (S.D.N.Y.2001); *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 511 (2d Cir.1994); *see also Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992); *Alger v. County of Albany, New York,* 489 F.Supp.2d 155, 158 (N.D.N.Y.2006); *see also Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 190, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) ("We have been quite reluctant to infer a private right of action from a criminal prohibition alone ... [W]e refused to infer a private right of action from a 'bare criminal statute.' And we have not suggested that a private right of action exists for all injuries caused by violations of criminal prohibitions."). Accordingly, these causes of action are dismissed.

**b.** ***Constitutional Violations***

***3** Plaintiff also asserts various constitutional violations. To state a claim under 42 U.S.C. § 1983, Plaintiff must identify a constitutional right she claims was violated. Here, Plaintiff's claims arise out of Defendant's decision to place S.S. with the paternal grandmother. It is questionable whether Plaintiff has any protected liberty or property interest here. "The federal court of appeals that have considered the contours of the liberty interest recognized in [ *Moore v. City of East Cleveland,* 431 U.S. 494, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977) ], have expressed a reluctance to extend it beyond grandparents living with their grandchildren." *Johnson v. City of Cincinnati,* 310 F.3d 484, 513 (6th Cir.2002) (and cases cited therein); *see also Troxel v. Granville,* 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000) (raising doubt whether grandparents have a fundamental liberty interest in being able to visit their grandchildren). Here, in light of the fact that Audrea Gause had custody of the child up until the subject termination proceedings, there are insufficient plausible allegations that Plaintiff had a sufficient relationship with S.S. to give rise to a protected liberty or property interest.[FN5] *See Mullins v. State of Or.,* 57 F.3d 789, 794 (9th Cir.1995) ("We have found no other authority supporting the proposition that a grandparent, by virtue of genetic link alone, enjoys a fundamental liberty interest in the adoption of her grandchildren."); *Ellis v. Hamilton,* 669 F.2d 510, 513 (7th Cir.1982) ("[W]e reach the more fundamental question whether ... a natural grandparent's interest in the society of her grandchildren ... is a liberty interest under the due process clause. If the grandchildren are in their parents' custody, the answer probably is no."); *Clayton v. Children's Choice,* 2010 WL 3282979, at 5 (E.D.Pa.2010).

FN5. For example, it does not appear that S.S. lived with Plaintiff. *See* Compl. at ¶ 33 ("Sharon Gause would be given an [sic] supervised visits of her grand child when in fact she had unsupervised visits with her grandchild since the child was born.").

Even assuming Plaintiff does have such a protected liberty interest, she fails to demonstrate how her rights were violated or that she was otherwise not afforded due process of law. Defendant's actions did not alter or affect Plaintiff's rights. Before Defendant's actions, Plaintiff did not have custody of S.S. and Plaintiff had whatever rights a grandparent may have under New York law. After Defendant's actions, Plaintiff still does not have custody of S.S. and Plaintiff continues to have whatever rights grandparents are afforded by state law. *See Brown v. Ives,* 129 F.3d 209, 211-12 (1st Cir.1997). Further, there were family court proceedings that gave the paternal grandmother temporary custody of S.S. It appears that Plaintiff had the opportunity to participate in the family court proceedings concerning the placement of S.S.

Moreover, because the only Defendant is a municipality, Plaintiff must demonstrate a basis for imposing municipal liability under § 1983.

> There is no *respondeat superior* liability in a suit, such as this one, brought pursuant to 42 U.S.C. § 1983. *Ciraolo v. City of New York,* 216 F.3d 236, 242 (2d Cir.2000). Before a municipal entity may be found liable, the plaintiffs must show that the municipality is "actually responsible" for their injuries, as through a "policy or custom" of the city. *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003). A policy or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

custom need not have "received formal approval through the body's official decisionmaking channels." *Jeffes v. Barnes,* 208 F.3d 49, 57 (2d Cir.2000) (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).

***4** *Nicholson v. Scoppetta,* 344 F.3d 154, 165 (2d Cir.2003).

Plaintiff does not allege sufficient facts suggesting an unconstitutional policy or custom. Rather, she complains of acts in this specific case. While Plaintiff does contend that Defendant failed to train its employees about the rights of grandparents, *see* Compl. at ¶ 23(f),[FN6] there are insufficient allegations plausibly suggesting that any such failure is likely to result in constitutional violations or that Defendant acted with deliberate indifference to constitutional rights. *See* *Okin v. Village of Corn mall-On-Hudson Police Dept.,* 577 F.3d 415, 439 (2d Cir.2009).

> FN6. "failing to consider fairly Plaintiff, Sharon Gause for her rights to proportioned failing to adequately train employees regarding the Constitutional rights of Parents and grandparent rights benefits fairly of equal status ..." [sic].

Lastly, Plaintiff claims that the seizure of S.S. violated Plaintiff' Fourth Amendment rights. Plaintiff cannot assert a violation under the 4th Amendment because she was not the legal guardian of S.S. and, therefore, does not have standing to assert such a claim. *See* *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *see also* *Osborne v. County of Riverside,* 385 F.Supp.2d 1048, 1052-53 (C.D.Cal.2005). Accordingly, Plaintiff's 4th Amendment claim is dismissed.

Having dismissed all federal-based claims, the Court declines to exercise supplemental jurisdiction over any remaining state law claims

**IV. CONCLUSION**

For the foregoing reasons, Defendant's motion to dismiss is GRANTED and the Complaint is DISMISSED.

IT IS SO ORDERED.

N.D.N.Y.,2010.

Gause v. Rensselaer Children and Family Services
Slip Copy, 2010 WL 4923266 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Franklin MARONE, Plaintiff,

v.

GREENE COUNTY PROBATION DEP'T; Barbara A. Valicenti, Director of Probation Individually and in her Official Capacity; Alan Frisbee, Senior Probation Officer, Individually and in his Official Capacity; Kevin P. Conway, Esq., Individually and in his Official Capacity, Defendants.

Civ. No. 1:08-CV-658 (LEK/RFT).

Sept. 26, 2008.

Franklin Marone, Otisville, NY, pro se.

***REPORT RECOMMENDATION and ORDER***

RANDOLPH F. TREECE, United States Magistrate Judge.

***1** The Clerk has sent to the Court for review a civil rights Complaint, pursuant to 42 U.S.C. § 1983, from *pro se* Plaintiff Franklin Marone, who is currently incarcerated at Otisville Correctional Facility. Dkt. Nos. 2, Compl.[FN1] & 12, Am. Compl. Plaintiff has also filed a Motion to Proceed *In Forma Pauperis* and an Inmate Authorization Form. Dkt. No. 1.

FN1. The original Complaint in this matter was filed in the Southern District of New York and was transferred to this Court on June 4, 2008, by Order of the Honorable Kimba M. Wood, Chief United States District Judge. Dkt. No. 5. Accompanying the filing of Plaintiff's Complaint was an Affidavit and proposed Order to Show Cause, in which he included a Temporary Restraining Order. Dkt. Nos. 3 & 4. On July 2, 2008, after the matter had been transferred to this District, the Honorable Lawrence E. Kahn, Senior United States District Judge, issued an Order rejecting Plaintiff's unsigned Order to Show Cause for failure to comply with the Local Rules of Practice of this District. Dkt. No. 11. Plaintiff thereafter amended his Complaint as of right. Dkt. No. 12.

## II. DISCUSSION

### A. *In Forma Pauperis* Application

Turning first to Plaintiff's Motion to Proceed with this Action *In Forma Pauperis,* after reviewing the entire file, the Court finds that Plaintiff may properly proceed with this matter *in forma pauperis.*

### B. Plaintiff's Complaint

Section 1915(e) of Title 28 of the United States Code directs that, when a plaintiff seeks to proceed *in forma pauperis,* "the court shall dismiss the case at any time if the court determines that ... the action or appeal (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). Thus, it is a court's responsibility to determine that a plaintiff may properly maintain his complaint before permitting him to proceed with his action.

Moreover, under 28 U.S.C. § 1915A, a court must, as soon as practicable, *sua sponte* review "a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employees of a governmental agency" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint (1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. §§ 1915A(a) & (b); *see also* *Carr v. Dvorin,* 171 F.3d 115, 116 (2d Cir.1999) (*per curiam* ).

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which "establishes a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *German v. Fed. Home Loan Mortgage Corp.,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

885 F.Supp. 537, 573 (S.D.N.Y.1995) (quoting *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990) & 42 U.S.C. § 1983); *see also Myers v. Wollowitz,* 1995 WL 236245, at *2 (N.D.N.Y. Apr. 10, 1995) (stating that " § 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights").

Though Plaintiff's Amended Complaint is sparse, the Court gleans the following information. In or about September 2004, Defendants Barbara Valicenti, Director of Greene County Probation Department, and Alan Frisbee, Senior Probation Officer of Greene County Probation Department, allegedly included false information in the Plaintiff's pre-sentence report (PSR), which was purportedly utilized by the state trial judge in rendering a sentence, on September 14, 2004, for Plaintiff's state convictions.[FN2] Dkt. No. 12, Am. Compl. at Part III.C. These allegedly false statements were procured from Defendant Kevin Conway, an attorney who was not involved in Plaintiff's state criminal prosecution, but is alleged to represent certain of Plaintiff's victims in other civil actions being litigated (or that have been litigated) against Plaintiff. *Id.* Some of the allegedly false statements include Conway's description of Plaintiff's crime as a "Ponzi scheme" [FN3] as well as an inflation of Plaintiff's possessions indicating Plaintiff owned boats, ten cars, and took European trips, whereas Plaintiff claims he only had one boat and made only one trip to Europe, not multiple. *Id.* Plaintiff also claims he never had ten cars "at one time." *Id.*

FN2. The Court takes judicial notice of the fact that according to the New York State Department of Correctional Services (DOCS) website, Plaintiff was received into DOCS custody on September 21, 2004, after being convicted of 1st Degree Grand Larceny-Not Auto (a Class B Felony) and 1st Degree Scheme to Defraud (a Class E Felony). Plaintiff was sentenced to an indeterminate term of incarceration of six to eighteen years. Greene County is listed as the County of Commitment and Plaintiff's earliest parole eligibility date, provided he can establish merit, is listed as March 14, 2010. DOCS Inmate Locator Website, *available at* http://nysdocslookup.docs.state.ny.us/GCA00P00/WIQ1/WINQ000 (last visited September 26, 2008).

FN3. According to the United States Securities and Exchange Commission, Ponzi schemes are a "type of illegal pyramid scheme named for Charles Ponzi who duped thousands of New England residents into investing in a postage stamp speculation scheme back in the 1920s.... Decades later, the Ponzi scheme continues to work on the 'rob-Peter-to-pay-Paul' principle, as money from new investors is used to pay off earlier investors until the whole scheme collapses." *See* U.S. Securities and Exchange Commission Website, *available at* http://www.sec.gov/answers/ponzi.htm (last visited September 26, 2008).

***2** The PSR has since been included in Plaintiff's inmate file. Plaintiff asserts that the inclusion of this document, which he believes contains false information, creates a stigma for him which affects administrative decisions such as parole eligibility, work release opportunities, and other matters that can "delay or preclude any release." *Id.* at Part IV. Plaintiff seeks to have the Defendant Probation Officers remove/expunge his PSR and all authorities in possession of the PSR to remove such and replace with a new PSR. *Id.* at Part V. Plaintiff emphasizes that without this injunctive relief, there is "a likelihood of substantial collateral consequences [which] will occur." *Id.* He also seeks monetary damages against Defendant Conway. *Id.*

*1. Ripeness*

We must first assess whether Plaintiff's claim is ripe for review. The purpose of the ripeness doctrine is to prevent the "premature adjudication of issues that may never arise." *Cooke v. Gen. Dynamics Corp.,* 1998 WL 696013, at * 1 (D.Conn. Sept. 11, 1998); *see also Thomas v. City of New York,* 143 F.3d 31, 34 (2d Cir.1998) ("[A]n Article III court cannot entertain a claim which is based upon contingent future events that may not occur as anticipated, or indeed may not occur at all." (internal quotation marks and citations omitted)). Because the ripeness doctrine derives from Article III limitations on

judicial power, the court may raise the issue *sua sponte. Reno v. Catholic Soc. Servs., Inc .,* 509 U.S. 43, 58 n. 18 (1993). "[W]hen resolution of an issue turns on whether there are nebulous future events so contingent in nature that there is no certainty they will ever occur, the case is not ripe for adjudication." *Thomas v. City of New York,* 143 F.3d at 34 (internal quotation marks and citations omitted).

It appears that the crux of Plaintiff's request for recourse is the inclusion of the PSR in his inmate file, which he believes creates a stigma, resulting in "a likelihood of substantial collateral consequences [which] will occur." Am. Compl. at Part V. Presumably, the collateral consequences to which he speaks are the potential that the information in his PSR will be used as a basis for denial of participation in an array of programs, such as work release and parole. Plaintiff has not, however, identified a particular program he has actually been denied access to due to the information included in the PSR. And, according to the New York State Department of Corrections (DOCS) Website, Plaintiff is not even eligible for parole, assuming he can establish merit, until March 14, 2010. *See* NYS DOCS Inmate Locator Website, *available at* http:// nysdocslookup.docs.state.ny.us; *see supra* note 2. In this regard, assuming he is challenging the presumed consequence of denied participation in programs, it appears that Plaintiff's § 1983 claim is not yet ripe for judicial review as he has not yet endured any of the injuries he identifies will befall him. And, even if he could identify a single program he's been denied access to, his recourse would be to challenge the individuals who made such determinations, either administratively or judicially, not to sue the Probation Officers who, aside from including the allegedly false information in the PSR, played no role in the actual decision-making process of Plaintiff's eligibility to participate in such programs.

***3** Thus, to the extent Plaintiff challenges the potential stigma which may affect his eligibility to participate in various correctional programs, such claim should be dismissed as not ripe for review. While normally we would allow a *pro se* Plaintiff an opportunity to amend his claims, such would be futile in this instance as the named Defendants play no role in the actual decision to deny Plaintiff's participation.

*2. Absolute Immunity*

If, instead, by his § 1983 Complaint, Plaintiff asserts a due process violation stemming from the inclusion of allegedly false information in the PSR, such claim would be ripe for review, but dismissible nevertheless.

It is well-established that a defendant has a due process right not to be sentenced on the basis of materially false information, however, that right is generally protected by "affording the defendant notice of and an opportunity to respond to information on which the court intends to rely in imposing sentence." *Hili v. Sciarrotta,* 140 F.3d 210, 215 (2d Cir.1998) (citing *Townsend v. Burke,* 334 U.S. 736, 741 (1948) & *United States v. Berndt,* 127 F.3d 251, 257 (2d Cir.1997)). Indeed, New York State affords defendants due process protection against sentencing on the basis of misinformation through various statutory safeguards, such as the opportunity for a defendant to review and challenge the substance of the PSR. *See* N.Y. CRIM. PROC. LAW §§ 390.50 *et seq.* "Thus, the mere presence of hearsay or inaccurate information in a PSR does not constitute a denial of due process." *Hili v. Sciarrotta,* 140 F.3d at 216. Furthermore, within the Second Circuit, it is unequivocal that New York State probation officers who "prepar[e] and furnish[ ] [PSRs] to the courts, like federal probation officers, are entitled to absolute immunity from suits for damages." *Id.* at 214. As stated above, this Court must recommend dismissal when a plaintiff seeks to sue a party that is immune from relief. Based on the above discussion, Defendants Valicenti and Frisbee are absolutely immune from damages. And if the Probation Officers themselves are immune from suit, then it follows that the Probation Department too would not be on the hook. Thus, to the extent Plaintiff seeks damages from these Defendants for any alleged due process violation, not only does he fail to state a cause of action entitling him to relief, but he has also named Defendants who are protected by absolutely immunity.

*3. Injunctive Relief*

By his Complaint, Plaintiff seeks to have his PSR expunged from all files, including his inmate file, and for the Defendants to issue a new PSR, which shall replace the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

original PSR *in toto*. Presumably, in seeking a new PSR, it is Plaintiff's desire that the allegedly erroneous language be omitted, thus potentially elevating his chances of being found eligible to participate in various programs. Again, we refer to the discussion on ripeness above, but we are compelled to point out two other obstacles to Plaintiff pursuing this § 1983 action.

***4** First, even if Plaintiff had pled that he had been denied access to certain programs, the relief he seeks cannot come from the named Defendants, but rather with the decision-making entity for which he was denied access to a program, *i.e.,* the parole board. As the Second Circuit noted, "[i]f defendant claims to be detrimentally affected by the use of an inaccurate PSR in decisionmaking as to parole or the conditions of his incarceration, he should challenge such use in the parole proceeding or seek injunctive relief against the relevant parole or correctional officials." *Hili v. Sciarrotta,* 140 F.3d at 216 (noting that the § 1983 complaint against a probation officer failed to state a claim upon which injunctive relief could be granted). The named Defendants are not in a position to purge any documents from Plaintiff's inmate file, or any other agency who may possess this document. Accordingly, there is no Defendant named upon which relief can be granted.

Second, and perhaps more importantly, Plaintiff's attack of the veracity of the information included in the PSR and his desire to have it amended reeks of what could amount to a challenge of the lawfulness of his sentence and therefore not cognizable under § 1983. The Supreme Court has held that

> in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction *or sentence* invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction *or sentence* that has *not* been so invalidated is not cognizable under § 1983.

*Heck v. Humphrey,* 512 U.S. 477, 486-87 (1994) (emphasis added).

In challenging the veracity of information submitted to the sentencing judge, an award to Plaintiff in the form of amending the PSR could call into question the validity of his sentence. Thus, whether it be the current Defendants or if he had named individuals purportedly using the PSR to deny his access to programs, Plaintiff's § 1983 action is not cognizable absent proof that his sentence was reversed, expunged, declared invalid, or called into question. *Hili v. Sciarrotta,* 140 F.3d at 216 ("[W]ere relief to be sought against appropriate defendants [regarding the denial of parole] ... that claim could be pursued only by means of a petition for habeas corpus[.]"). Thus, Plaintiff's § 1983 action should be dismissed as the improper vehicle to accomplish the relief being sought.

*4. State Actor*

Having determined that Plaintiff's action against the Probation Officers and the Probation Department should be dismissed, we address Plaintiff's inclusion of Defendant Kevin P. Conway, an attorney who represents victims in civil lawsuits against Plaintiff. Plaintiff asserts that Mr. Conway supplied the allegedly erroneous information to the Defendant Probation Officers which was included in the PSR. It is well-settled that parties may not be held liable under section 1983 unless it can be established that they have acted under the color of state law. *See, e.g., Rounseville v. Zahl,* 13 F.3d 625 (2d Cir.1994) (noting state action requirement under § 1983); *Wise v. Battistoni,* 1992 WL 280914, at * 1 (S.D.N.Y. Dec. 10, 1992) (same) (citations omitted). State action is an essential element of any § 1983 claim. *See Gentile v. Republic Tobacco Co.,* 1995 WL 743719, at *2 (N.D.N.Y. Dec. 6, 1995) (citing *Velaire v. City of Schenectady,* 862 F.Supp. 774, 776 (N.D.N.Y.1994) (citation omitted). No where in his Complaint does Plaintiff allege that Mr. Conway was acting under color of state law. In fact, it is clear from his pleading that Mr. Conway was acting as a private attorney who had no role in the state criminal prosecution of Plaintiff, beyond being purportedly interviewed by the Probation Officers. Thus Plaintiff's § 1983 action against Mr. Conway is not cognizable. At best, Plaintiff has attempted to plead a state defamation claim against Mr.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Conway, however, given the above discussion, the Court should dismiss the claim pursuant to 28 U.S.C. § 1367, which authorizes a federal court to decline to exercise supplemental jurisdiction over a state claim if all of the claims over which the court had original jurisdiction were dismissed. 28 U.S.C. § 1367(c)(3).[FN4]

FN4. Moreover, if indeed Plaintiff was pursuing a common law action of defamation, which standing alone would not provide a basis for federal jurisdiction, we note that his Complaint does not plead in any fashion the possibility of diversity jurisdiction. *See* 28 U .S.C. § 1332(b).

### III. CONCLUSION

***5** Based on the above discussion, it is hereby

**ORDERED,** that Plaintiff's *in Forma Pauperis* Application (Dkt. No. 1) is **granted;** and it is further

**ORDERED,** that the Clerk provide the Superintendent of the facility, designated by Plaintiff as his current location, with a copy of Plaintiff's Inmate Authorization Form (Dkt. No. 1), and notify the official that this action has been filed and that Plaintiff is required to pay the entire statutory filing fee of $350 .00 pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED,** that the Clerk provide a copy of Plaintiff's Inmate Authorization Form to the Financial Deputy of the Clerk's Office; and it is further

**RECOMMENDED,** that the Complaint be dismissed against Defendants Valicenti, Frisbee, and Greene County Probation Department, pursuant to 28 U.S.C. § 1915A and 28 U.S.C. § 1915(e) (2)(B)(ii) for failure to state a claim upon which relief can be granted and for suing Defendants who are absolutely immune from relief; and it is further

**RECOMMENDED,** that the Court dismiss any § 1983 claims against Defendant Conway and decline to exercise supplemental jurisdiction of any state claim against Defendant Conway; and it is further

**ORDERED,** that the Clerk serve a copy of this Report Recommendation and Order on Plaintiff by regular mail.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72, 6(a), & 6(e).

**IT IS SO ORDERED.**

### *DECISION AND ORDER*

LAWRENCE E. KAHN, District Judge.

This matter comes before the Court following a Report-Recommendation filed on September 26, 2008, by the Honorable Randolph F. Treece, United States Magistrate Judge, pursuant to 28 U .S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 13).

Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED. R. CIV. P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Treece's Report-Recommendation. Furthermore, after examining the record, the Court has determined that the Report-Recommendation is not subject to attack for plain error or manifest injustice.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 13) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Plaintiff's Amended Complaint (Dkt. No. 12) is **DISMISSED in its entirety;** and it is further

***6 ORDERED,** that the Clerk serve a copy of this Order on all parties.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**IT IS SO ORDERED.**

N.D.N.Y.,2008.

Marone v. Greene County Probation Dept.
Not Reported in F.Supp.2d, 2008 WL 4693196 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

James ALLEN, Plaintiff,
v.
W. STEEN, Sgt., L. Douglas, Capt. and P.E. O'Connor, Deputy Superintendent, Security, Defendants.
No. 94-CV-0277E(H).

Oct. 19, 1995.
MEMORANDUM AND ORDER

ELFVIN, Senior District Judge.

***1** The plaintiff, a prison inmate proceeding *pro se,* brought this action under 42 U.S.C. §1983 claiming violations of the First, Fifth, Eighth and Fourteenth Amendments to the United States Constitution. The defendants have moved to dismiss the Complaint pursuant to FRCvP[FN1] 12(b)(6). This Court has jurisdiction pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1343. The motion will be granted.

The plaintiff filed a "Cross-Notice of Motion" requesting the dismissal of the defendants' motion and any further relief deemed just and proper; such motion will be denied.

The events about which the plaintiff complains occurred while he was an inmate at the Collins Correctional Facility ("Collins") and continued after his transfer to another facility. According to the Complaint,[FN2] he was questioned by defendant Steen on February 28, 1994 about an assault which had occurred at Collins a few hours earlier. The plaintiff told Steen that he had no knowledge of the assault, that he had been in the Mess Hall kitchen at the time the assault was said to have occurred and that his alibi could be verified by checking the Mess Hall log book and by speaking with various named individuals. Steen then allegedly "threatened" the plaintiff with placement in the Special Housing Unit ("SHU") if he did not cooperate in the investigation by "becoming an informant." The following afternoon the plaintiff was charged with the assault and placed in SHU. At 9:00 a.m. on March 2, the plaintiff was given a written Misbehavior Report dated March 1 in which he was charged with having assaulted another inmate. Later that same morning, the plaintiff spoke with a facility employee, a Ms. Swain, who had been assigned to assist him in preparing for the disciplinary hearing. He presented his views of the events to Swain and suggested that she speak with the same individuals mentioned by him previously to Steen and check the entries in the aforementioned log book. In the afternoon of that day Swain reported back to the plaintiff that much of his alibi had been confirmed. She allegedly also informed the plaintiff that Steen had directed one of the individuals, a Correctional Officer, to be "ambiguous about the meaning" of the entries in the log book. That same afternoon the plaintiff spoke with defendant Douglas in the presence of Swain, and informed Douglas that he was being "frame[d]" while Swain provided the information she had gathered. The plaintiff then informed Douglas that he had submitted an application for work release, that he had a "conjugal" visit with his wife scheduled for March 5, that he was enrolled in a training program, that he had an upcoming Parole Board appearance and that the circumstances which were developing would have a detrimental impact on such opportunities. Late that afternoon, he was informed that the upcoming visit with his wife had been cancelled pending the disposition of the Misbehavior Report. The plaintiff had a hearing on March 3 during which he presented his defense, requested witnesses and provided Captain James, the presiding officer, with questions to be answered by the victim. On March 4 the plaintiff was given a written Administrative Segregation Recommendation signed by Douglas dated March 3. The report as transcribed in the Complaint indicates that his presence in the general population posed a threat to the safety and security of the facility and possibly to himself. On March 6 the plaintiff and his wife, at the plaintiff's request, met with Douglas and the plaintiff was informed that he would be transferred to another facility. Douglas indicated that such transfer was due to his having become a teacher in the prison's Muslim community despite having been warned by Douglas not to assume such a role. On

March 8 the plaintiff was informed that the Misbehavior Report had been dismissed due to insufficient evidence. On March 15 the plaintiff had an Administrative Segregation Hearing during which he indicated that he had no knowledge of the assault, that he believed that the segregation recommendation was "predicated" on the dismissed charge and that he did not "know exactly what to defend himself from." The written findings from the hearing indicated that "serious events" had transpired in the prison's Muslim community, that the plaintiff was "perceived as second in command in the Muslim Community" and that his presence in the general population would be disruptive to the facility. It was recommended that he remain in Administrative Segregation until his transfer in order to help restore stability to the Muslim community specifically and to the prison population in general. The plaintiff claims that he has lost or been denied several "privileges" including participation in the Family Reunion Program, telephone usage, regular visiting privileges (restricted to one every seven days while in Administrative Segregation), consideration for work release, regular commissary purchases -- *i.e.,* being restricted to "'Special Buy' status" --, use of a personal radio and use of other personal property (including clothing).

***2** The plaintiff further alleges that Steen filed a false misbehavior report, in retaliation for the plaintiff's exercise of his Fifth Amendment right not to incriminate himself, that Douglas -- in contravention of the plaintiff's First Amendment rights -- wrote an Administrative Segregation Recommendation as a result of and in retaliation for the plaintiff's practice of the Muslim religion, that Douglas (Steen's supervisor) knowingly approved of Steen's actions and wrote an Administrative Segregation Report which caused the plaintiff to lose liberty interests and to suffer cruel and unusual punishment, that defendant O'Connor caused the plaintiff to be transferred to another facility in deprivation of the plaintiff's constitutionally protected interests, that O'Connor placed false information in the plaintiff's prison file resulting in a denial to the plaintiff of work release and possible future denial of parole, and that all such deprivations and denials were inflicted without due process in violation of the Fourteenth Amendment.

In determining whether to grant a motion to dismiss,[FN3] this Court evaluates the pleadings in the light most favorable to the plaintiff[FN4] and such a motion will be denied unless such reading of the pleadings presents no set of facts on the basis of which the plaintiff would be entitled to relief.[FN5]

Under section 1983, a party may seek redress for the denial of a federal right by a person acting under color of state authority. In order to make a claim under the section, one must show "(1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege or immunity secured by the Constitution or laws of the United States" ( *Dwares v. City of New York,* 985 F.2d 94, 98 (2nd Cir. 1993)) and (3) that such deprivation, if one is found to have occurred, was imposed without due process of law ( *Parratt v. Taylor,* 451 U.S. 527, 536-537 (1981)).[FN6] For the purposes of this motion, this Court takes judicial notice that each defendant was acting under color of state law. The only issue is whether the actions of the defendants or any of them deprived the plaintiff of a right or rights guaranteed by the Constitution.

The plaintiff's claim that Steen's filing of a false misbehavior report in retaliation for the plaintiff's exercise of his right to remain silent is a violation of the Fifth Amendment has no merit. The plaintiff did not assert any right to remain silent when Steen questioned him regarding the assault and, instead, spoke freely with Steen.

Giving to the Complaint the broadest possible interpretation, the plaintiff may be alleging that the procedures followed after the Misbehavior Report had been filed violated his right to due process.[FN7] Although the filing of allegedly false charges does not amount to a violation that is actionable under section 1983,[FN8] if it be assumed that he has been denied a liberty interest[FN9] the next determination to be made is whether the plaintiff was "provided *** with the minimum procedural due process protections guaranteed by the Fourteenth Amendment."[FN10] The Complaint indicates that he was placed in SHU on March 1 and that he was at that time told that he was being charged with the assault of another inmate. On March 2 he received written notice of such charges. According to the

plaintiff's own account, he received substantial assistance prior to and in preparation for the hearing. FN11 On March 3 a disciplinary hearing was held during which the plaintiff presented his defense, requested several witnesses and submitted questions to be asked of the assault victim. The plaintiff complains that one requested witness was not interviewed during the disciplinary hearing. FN12 In light of the dismissal of the charges, there is no tenable claim of any hurt to the plaintiff due to such deprivation. The plaintiff alleges that a recording of the victim's testimony was not played for him. 7 NYCRR §253.5(b) provides that witnesses' statements may be recorded and made available to the inmate unless doing so could jeopardize safety or other penological interests. Again, any shortcoming in such regard caused no harm to the plaintiff. All of these factors listed by the plaintiff show that the requirements of New York law were followed FN13 and clearly indicate that the plaintiff was provided with all procedural protections due him, FN14 but the most significant point is that the charged misbehavior was dismissed for lack of evidence. The facts as stated in the Complaint show that, even if a liberty interest had been trammelled or inconvenienced, the plaintiff has been provided the full protection due him under the Fourteenth Amendment.

***3** The plaintiff's allegations that Douglas recommended that he be placed in SHU in retaliation for his religious pursuits, which segregation interfered with his right to the free exercise of his religion, and that such segregation also denied his liberty interests in visitation have no merit. While an "act in retaliation for the exercise of a constitutional right is actionable under [s] ection 1983 even if the act, when taken for different reasons, would have been proper," ( *Franco v. Kelly,* 854 F.2d 584, 590 (2nd Cir. 1988)) the courts have long recognized the possibility for abuse of claims of retaliation and "have insisted on a higher level of detail in pleading [such] and have held that 'a complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone,"' ( *Gill v. Mooney,* 824 F.2d 192, 194 (2nd Cir. 1987) (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2nd Cir. 1983))). The plaintiff only conclusorily alleges that certain acts of the defendants were taken "because he was active in the Muslim Community," FN15 and does not present any fact from which a reasonable person could infer that his religious practices were improperly interfered with. He did itemize six "privileges" that were lost when he was transferred to SHU, but he did not link any of such to religious practices. FN16

As for the claim that the Administrative Segregation deprived him of protected liberty interests, it is well established that a prisoner does not have a right to remain in the general population and that transfers to less favorable housing for non-punitive reasons are within the contemplated ambit of a prison sentence ( *Hewitt v. Helms,* 459 U.S. 460, 468 (1983)) and recent pronouncements from the Supreme Court of the United States raise serious doubts regarding the remaining validity of a previous decision by a lower court which held that the State of New York, by virtue of its prison regulations, had created a liberty interest in remaining free from administrative confinement. FN17 However, until further clarification is received from an appellate court, this Court must look to see if any such liberty interest was infringed without due process. FN18 The plaintiff admits that he, on March 4, 1994, was given a copy of the Administrative Segregation Recommendation dated March 3 FN19 which indicated that Douglas had decided that the plaintiff's presence in the general population posed a threat to the safety and security of the facility and that the plaintiff himself could be in danger. He admits that, on March 15, an Administrative Segregation Hearing was conducted, with the plaintiff present, during which he was given an opportunity to present his defense. Even if one includes the two days that the plaintiff had been confined in SHU awaiting the March 3 Disciplinary Hearing prior to the time he was given notice of the Administrative Segregation, he was held for a total of fourteen days prior to his second hearing. This comports with 7 NYCRR, Chapter VI, part 301.4. FN20 These events as presented in the Complaint plainly do not contravene the due process requirements that a person be given an opportunity to be heard in a reasonable time and manner. FN21 Therefore, even assuming that the plaintiff has stated a claim that a recognized liberty interest was interfered with, any and all procedural due process requirements were satisfied.

***4** The Complaint states that the findings of the Administrative Segregation hearing were that he was a threat to security, that his presence in the general population would be disruptive to the facility and that he

should remain in segregation to help restore stability to the Muslim community specifically and to the facility population in general. Institutional security and stability are legitimate penological objectives. Even if the plaintiff had a dubious interest questionably protected under the Constitution and even if the segregation imposed on him may have infringed or impinged on such interest, the conduct by the defendants, which followed the directives given in the 7 NYCRR, [FN22] was certainly reasonably related to legitimate penological interests in institutional security and stability of a particular group and of the prison population in general, and was therefore valid. *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349 (1987).

The plaintiff's allegation that his transfer deprived him of constitutionally protected rights cannot withstand the motion to dismiss. In fact, the case cited by him recites the law quite clearly: "no Due Process Clause liberty interest *** is infringed when [an inmate] is transferred from one prison to another ***." *Montanye v. Haymes,* 427 U.S. 236, 242-243 (1976).

The plaintiff's claim that the denial to him of work release while in SHU and after being transferred deprives him of a protected liberty interest is not viable. There is no constitutional right to work in prison.[FN23] Although some courts have closely examined statutory language to determine if through such language a state may have created an entitlement protected by the Due Process Clause, it now has been definitively declared that, unless the challenged conduct "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," the Due Process Clause is not engaged. *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 2300 (1995). [FN24] The denial of work release to an inmate is not such a hardship.

The plaintiff's allegation that he was denied conjugal visits while held in SHU and further denied such visits after his transfer similarly does not state a claim upon which relief can be granted. It has been determined that New York law[FN25] does not create a liberty interest in such visitations, even if an inmate previously had been allowed such prior to SHU or a transfer. *Hernandez v. Coughlin,* 18 F.3d 133, 135-138 (2nd Cir.), *cert. denied,* ––– U.S. ––––, 115 S.Ct. 117 (1994). Furthermore, under *Sandin,* the suspension of conjugal visits is simply not the type of "atypical and significant" hardship therein envisioned which would invoke the protection of the Due Process Clause.

The plaintiff also alleges that O'Connor placed false information in the prison files and that, because of such, he can "reasonably be expected to be denied parole."[FN26] "There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Nebraska Penal Inmates,* 442 U.S. 1, 7 (1979). Further, "New York's parole provisions do not create an entitlement to parole." *Washington v. White,* 805 F.Supp. 191, 193 (S.D.N.Y. 1992) (citing *Boothe v. Hammock,* 605 F.2d 661, 664 (2nd Cir. 1979)). From the facts alleged in the Complaint, no liberty interest has been derogated. Most importantly, this issue is not **ripe** for judicial review; there is no indication that a **hearing** to establish eligibility for **parole** or that any other aspect of a possible early release from incarceration has been denied. Therefore any such alleged harm is purely speculative and, at this juncture, there has been no injury.

***5** The question of standing also arises regarding all assertions claiming damages for alleged harms caused to his wife. In general, a person may not assert the rights of others in federal court. *Warth v. Seldin,* 422 U.S. 490, 498-499 (1975). This case does not present any exception to such rule. Therefore, the plaintiff has no standing to bring any claim on behalf or for the benefit of his wife; she herself may pursue any claims she may have.

Finally, the plaintiff attempts to state a claim that his Eighth Amendment right to be free from "cruel and unusual" punishment has been violated. As this Court has repeatedly stated in this discussion, the facts asserted by the plaintiff do not present a situation in which significant or extraordinary hardships or deprivations have been suffered by him "in relation to the ordinary incidents of prison life,"[FN27] and nothing that has been alleged by him could possibly be labeled "cruel and unusual". If there is any doubt, the United States Supreme Court has confirmed the meaning of the Eighth Amendment's prohibition against cruel and unusual punishment -- to wit, after incarceration, only the unnecessary and wanton infliction

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment. *Whitley v. Albers,* 475 U.S. 312, 319 (1986).

After thoroughly examining every claim reasonably gleanable from the Complaint,[FN28] this Court finds that the plaintiff has not stated any claim upon which relief can be granted.

Accordingly, it is hereby *ORDERED* that the defendants' motion to dismiss pursuant to FRCvP 12(b)(6) is granted, that the plaintiff's cross-motion is denied as moot and that the Complaint shall be dismissed.

FN1. Federal Rules of Civil Procedure.

FN2. This Court has considered the plaintiff's filing titled "Statement of Claim" and his Affidavit attached to his "Cross-Notice of Motion".

FN3. FRCvP 12 requires this Court to treat a motion to dismiss as one for summary judgment to the extent that matters outside the pleadings are considered, provided that all parties have been given reasonable notice of such treatment and appropriate opportunity to present pertinent materials. *See Kopec v. Coughlin,* 922 F.2d 152, 155-156 (2d Cir. 1991) (the court must give the parties notice that the motion is being converted to one for summary judgment). Although the plaintiff has taken the ample opportunity to attempt to augment and support his Complaint, because it is not apparent from the record that he had notice to the effect that the defendants' motion would be treated as one for summary judgment and because of the lack of any resulting prejudice to the defendants, this Court will not convert the defendants' motion to one for summary judgment.

FN4. *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974).

FN5. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

FN6. *Overruled in part on other grounds, Daniels v. Williams,* 474 U.S. 327, 330-331 (1986) (more than negligence required).

FN7. Generally, if a liberty interest -- which is what is here pertinent -- has not been interfered with, "we need not consider what process is due under the Fourteenth Amendment." *Hernandez v. Coughlin,* 18 F.3d 133, 138 (2nd Cir.), *cert denied,* 513 U.S. 836, 115 S.Ct. 117 (1994).

FN8. *Freeman v. Rideout,* 808 F.2d 949, 953 (2nd Cir. 1986), *cert. denied,* 485 U.S.. 982 (1988).

FN9. That segregation similar to what occurred in this case amounts to a deprivation of a liberty interest is doubtful under the current Constitutional standards. *See Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293 (1995), and discussion *infra.*

FN10. *Franco v. Kelly,* 854 F.2d 584, 587 (2nd Cir. 1988).

FN11. Statement of Claim, pages 3-4.

FN12. 7 NYCRR §253.5(a) indicates that an "inmate may call witnesses *** provided their testimony *** is not redundant ***."

FN13. 7 NYCRR, Chapter V, Part 251 (Cases of inmate misbehavior) and Part 253 (Disciplinary Hearing).

FN14. Minimum procedural due process requires that "[a]n inmate charged with a violation must be given (1) advance written notice of the charges at least 24 hours before the hearing; (2) the opportunity to appear at the hearing, call witnesses, and present rebuttal evidence; and (3) a written statement by the factfinders as to the evidence relied on for their decision, and the reasons for the prison committee's action." *Freeman v. Rideout,* footnote 8, *supra.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN15. Affidavit attached to "Cross-Notice of Motion," Paragraph number 5.

FN16. Paragraph number 28 of "Statement of Claim" lists the following "privileges" lost or denied while housed in SHU: participation in the Family Reunion Program; telephone privileges; regular visiting privileges; consideration for work release; regular commissary purchases; and use of personal property.

FN17. *Gittens v. LeFevere,* 891 F.2d 38, 40 (2nd Cir. 1989). However, *Sandin v. Conner* -- see footnote 9, *supra* -- sets forth that "the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause." *Id.,* at 2300.

FN18. "[T]he Constitution merely guarantees that prison inmates will 'not *** be deprived of a protected liberty interest without due process of law."' *Franco v. Kelly,* footnote 10, *supra* at 587.

FN19. Statement of Claim, Paragraph 17.

FN20. "Such [administrative segregation] hearing shall be conducted within 14 days of an inmate's admission to administrative segregation."

FN21. *Lowrance v. Achtyl,* 20 F.3d 529, 535-536 (2nd Cir. 1994).

FN22. The procedures followed 7 NYCRR Chapter VI Part 301 Special Housing Units Admissions, §301.4 (administrative segregation admissions) which indicates that administrative segregation is appropriate if at the hearing it is determined and set forth specifically that the inmate's presence in the general population poses a safety or security threat to the facility.

FN23. *Garza v. Miller,* 688 F.2d 480, 485 (7th Cir. 1982), *cert. denied,* 459 U.S. 1150 (1983).

FN24. See footnotes 9 and 17, *supra.*

FN25. New York has a Family Reunion Program governed by 7 NYCRR; *see* Chapter IV, Part 220, Family Reunion Program.

FN26. See Plaintiff's "Cross-Notice of Motion", paragraph number 7.

FN27. *Sandin,* at 2300-2301.

FN28. This Court also has considered the plaintiff's "Cross-Notice of Motion."

W.D.N.Y.,1995.

Allen v. Steen
Not Reported in F.Supp., 1995 WL 643846 (W.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
John STANDLEY, Plaintiff,
v.
Robert DENNISON, Terrence X. Tracy, Vanessa Clarke, Marietta Gailor, Smith Jr., Vernon Manley, Patricia Tappan, Debra Loomis, Roslyn Block, John Capacci, Edward Mevec and Livio Lazzari, Defendants.
No. 9:05-CV-1033 (GLS/GHL).

Aug. 21, 2007.
John Standley, Comstock, NY, pro se.

Hon. Andrew M. Cuomo, New York Attorney General, Christopher W. Hall, Assistant Attorney General, of Counsel, Albany, NY, for the Defendants.

***MEMORANDUM-DECISION AND ORDER***

GARY L. SHARPE, U.S. District Judge.

***1** After John Standley filed a § 1983 action alleging violations of his Fourteenth Amendment rights,[FN1] *see Dkt. No. 4; see also* 42 U.S.C. § 1983, his complaint was referred to Magistrate Judge George H. Lowe for report and recommendation. *See* 28 U.S.C. § 636(b)(1)(A), (B); N.D.N.Y. R. 72.3(c); Gen. Order No. 12, § D(1) (G). Subsequently, Judge Lowe issued a report recommending that Standley's motion for summary judgment be denied, and defendants' cross-motion for summary judgment be granted in its entirety. *See Report-Recommendation ("R & R"), Dkt. No. 45.*[FN2]

FN1. Standley chiefly asserts that his due process were violated when the recommendation of the sentencing court was not considered during his parole hearing. *See Dkt No. 4.*

FN2. The Clerk is directed to append Judge Lowe's Report-Recommendation to thisdecision, and familiarity is presumed. *See Dkt. No. 45.*

Broadly construing the complaint, Judge Lowe concluded the following: (1) Standley did not have a protected liberty interest in his parole proceedings, and therefore failed to establish a due process claim, and (2) Standley's equal protection claim fails to allege a protected class, and is therefore also deficient.

Standley has now filed timely objections to Judge Lowe's report. *See Dkt. No. 47.* Since he specifically objects to Judge Lowe's legal and factual findings, his objections will be reviewed *de novo*. *See Almonte v. N.Y. State Div. of Parole,* 9:04-CV-484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006). Upon careful consideration of the arguments, the relevant parts of the record, and the applicable law, the court adopts the Report-Recommendation in its entirey.

Standley specifically objects to Judge Lowe's failure to consider the Supreme Court's holding in *Wilkinson v. Dotson* in determining his due process claim. *See Wilkinson v. Dotson,* 544 U.S. 74, 125 S.Ct. 1242, 161 L.Ed.2d 253 (2005). He argues that *Wilkinson* permits prisoners to bring a § 1983 action to challenge the constitutionally of parole proceedings. The court will review this objection *de novo.*

While *Wilkinson* provides a viable § 1983 cause of action for prisoners seeking redress for state procedures, New York state prisoners have no constitutionally protected liberty interest in parole. *See Yourdon v. Johnson,* 01-CV-812E, 2006 WL 2811710, at *2 (W.D.N.Y. Sept.28, 2006). The *Yourdon* court noted:

> [t]he plaintiffs in *Wilkinson* were state prisoners in Ohio seeking declaratory and injunctive relief claiming that Ohio's state parole procedures were unconstitutional. The Supreme Court's ruling therein was narrow in that it only allowed a state prisoner who challenges the constitutionality of the state parole procedures to bring a claim under 42 U.S.C. § 1983 for declaratory and injunctive relief 'where success in the action would not necessarily spell immediate or speedier release for the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

prisoner' and did not create or comment on any constitutional entitlements relating to parole. Clearly, Wilkinson did not address whether discretionary parole in New York imparts a constitutional liberty interest in an inmate within the New York State Corrections System thereby entitling him to due process under the United States Constitution.

*Yourdon,* 2006 WL 2811710, at *2 (citing *Wilkinson,* 544 U.S. at 8182). Therefore, Standley's reliance on *Wilkinson* is misplaced. As Judge Lowe noted, Standley's complaint fails to state a due process claim because he has no liberty interest in parole and no constitutional due process rights in the parole process in New York.[FN3] Therefore, Standley's motion for summary judgment on this ground is denied, and defendants' motion on the basis of due process is granted.

> FN3. Since Standley does not have a protected liberty interest, to state a claim for relief he must allege that defendants acted "arbitrarily or capriciously." *See Bottom v. Pataki,* 03-CV-835, 2006 WL 2265408, at *6 (N.D.N.Y. Aug.7, 2006). Standley has not demonstrated that defendants acted either arbitrarily or capriciously, and therefore his due process claim must fail.

***2** Standley also objects to the use of internet citations throughout Judge Lowe's report since he does not have access to Lexis or Westlaw. The court will review this objection *de novo.* The Supreme Court has recognized that access to the courts under the First Amendment entitles prisoners to adequate law libraries. However, this does not translate into an abstract, free-standing right to a law library or legal assistance. *See Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *see also Lewis v. Casey,* 518 U.S. 343, 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Here, Standley does not argue that the Correctional Facility where he is housed does not have an adequate law library. Instead, he claims that does not have access to all the cases cited by Judge Lowe. Reviewing Judge Lowe's report, the cases cited for major tenets of law are reported in volumes presumably available to Standley. Therefore, to the extent that some peripheral cases were not available to him, Standley has not been unduly prejudiced. For the reasons stated, Standley's motion for summary judgment is denied, and defendants' cross-motion is granted. Accordingly, the court adopts Judge Lowe's report in its entirety.

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that Judge Lowe's March 30, 2007 Report-Recommendation (**Dkt. No. 45**) is accepted and adopted in its entirety; and it is further

**ORDERED** that Standley's motion for summary judgment (**Dkt. No. 24**) is **DENIED;** and it is further

**ORDERED** that defendants' cross-motion for summary judgment (**Dkt. No. 30**) is **GRANTED,** and the complaint (**Dkt. No. 4**) is **DISMISSED IN ITS ENTIRETY;** and it is further

**ORDERED** that the Clerk of the Court provide copies of this Order to the parties by mail.

***REPORT-RECOMMENDATION***

GEORGE H. LOWE, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Gary L. Sharpe, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). Generally, in this *pro se* civil rights action brought under 42 U.S.C. § 1983, New York State Inmate John Standley ("Plaintiff") alleges that twelve employees of the New York State Division of Parole-Robert Dennison, Terrence X. Tracy, Venessa Clarke, Marietta Gailor, Walter Smith, Jr., Vernon Manley, Patricia Tappan, Debra Loomis, Roslyn Block, John Capacci, Edward Mevec, and Livio Lazzari ("Defendants")-violated Plaintiff's due process and equal protection rights under the Fourteenth Amendment by, *inter alia,* failing to consider his sentencing minutes during four separate parole hearings on July 22, 2003, July 27, 2004, January 10, 2005, and July 19, 2005. (*See generally* Dkt. No. 4 [Plf.'s Am. Compl.].)

Currently before the Court are Plaintiff's motion for summary judgment and Defendants' cross-motion for summary judgment. (Dkt.Nos.24, 30.) [FN1] For the reasons

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

discussed below, I recommend that Defendants' cross-motion for summary judgment be granted, and that Plaintiff's motion for summary judgment be denied as moot, procedurally deficient, and/or without merit. In the alternative, I recommend that Plaintiff's *in forma pauperis* status be revoked as having been improvidently granted due to Plaintiff's lack of candor with the Court, and that his Amended Complaint be dismissed without prejudice to refiling.

FN1. I note that service of Plaintiff's Complaint was not effected on Patricia Tappan due to the fact that she is no longer employed by the New York State Division of Parole. (Dkt.Nos.18, 32.) However, the analysis and conclusions set forth in this Report-Recommendation apply to all Defendants, including Defendant Tappan.

**I. BACKGROUND**

***3** In his Amended Complaint, Plaintiff alleges as follows. At Plaintiff's first parole hearing, on **July 22, 2003,** Defendants **Tappan, Clarke** and **Gailor** denied Plaintiff parole. (Dkt. No. 4, ¶ 33 [Plf.'s Am. Compl.].) This hearing was improper in two ways: (1) Defendants **Tappan, Clarke** and **Gailor** should not have considered "sealed criminal information" contained in Plaintiff's pre-sentence report, and (2) Defendants **Tappan, Clarke** and **Gailor** failed to consider Plaintiff's "sentencing minutes," which contained "the recommendation from the sentencing judge [Judge Goodman] that plaintiff's release to parole after the completion of twenty years was entirely depend[ent] upon his record of rehabilitation," which record had been exemplary. (*Id.* at ¶¶ 25-35, 37, 40, 89.) On or about **February 12, 2004,** Defendant **Loomis** participated in the decision to affirm this hearing decision. (*Id.* at ¶¶ 37, 38.)

At Plaintiff's second parole hearing, on **July 27, 2004,** Defendants **Loomis, Block** and **Capacci** denied Plaintiff parole. (*Id.* at ¶¶ 41, 47.) This hearing was improper in five ways: (1) Defendant **Loomis** should not have participated in the hearing since, on June 18, 2004, the New York State Supreme Court, Albany County, had ruled that the hearing must be a *de novo* hearing before members of the New York State Division of Parole other than the members who decided the prior parole proceeding; (2) Defendant **Loomis** should not have participated in the hearing since "her statutory right to act as a parole commissioner expired on June 18, 2004"; (3) Defendants **Loomis, Block** and **Capacci** should have reviewed Plaintiff's sentencing minutes and the recommendation of Judge Goodman before they conducted the hearing, as ordered by the New York State Supreme Court, Albany County, on June 18, 2004; (4) instead, Defendants **Loomis, Block** and **Capacci** based their decision on "their own personal opinions as to the appropriate penalty" to impose on Plaintiff, and not on any evidence; and (5) Defendant **Tracy** should have ensured that Defendants Loomis, Block and Capacci reviewed those documents before they conducted the hearing, since Plaintiff had, before the hearing, written to Defendant Tracy expressing concern that those three Defendants would not review the documents. (*Id.* at ¶¶ 17-19, 36, 38-48, 51, 90, 95.) Subsequently, this hearing was affirmed by a panel that included Defendants **Gailor** and **Loomis** improperly (since Defendant Gailor had participated in the first hearing and Defendant Loomis had participated in deciding the appeal from the first hearing). (*Id.* at ¶¶ 68-69, 86.) Furthermore, at some point after **October 27, 2004,** Defendant **Tracy** failed to remedy these errors after being notified of them by Plaintiff. (*Id.* at ¶ 52.)

At Plaintiff's third parole hearing, on **January 18, 2005,** Defendants **Mevec, Manley** and **Smith** denied Plaintiff parole. (*Id.* at ¶¶ 59, 62.) This hearing was improper in three ways: (1) it was ordered without Plaintiff having been previously provided a written decision expressing the findings reached at the previous parole hearing or the findings reached by the appeals unit that had ordered the new hearing; (2) Defendants **Mevec, Manley** and **Smith** should have reviewed Plaintiff's sentencing minutes and the recommendation of Judge Goodman before they conducted the hearing; and (3) Defendant **Tracy** should have ensured that Defendants Mevec, Manley and Smith reviewed those documents before they conducted the hearing, since Plaintiff had, before the hearing, written to Defendant Tracy expressing concern that those three Defendants would not review the documents. (*Id.* at ¶¶ 54, 57-64, 66-67, 91, 95.) Furthermore, at some point after **February 5, 2005,** Defendant **Tracy** failed to remedy these errors after being

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

notified of them by Plaintiff. (*Id.* at ¶ 70.) In addition, at some point, Defendant **Tracy** failed to provide Plaintiff with "written reasons as to why he was granted a *second de novo* hearing," as requested by Plaintiff. (*Id.* at ¶ 72.)

***4** At Plaintiff's fourth parole hearing, on **July 19, 2005,** Defendants **Lazzari, Manley** and **Capacci** denied Plaintiff parole. (*Id.* at ¶¶ 73, 84.) This hearing was improper in four ways: (1) Defendants **Lazzari, Manley** and **Capacci** should have reviewed Plaintiff's sentencing minutes and the recommendation of Judge Goodman before they conducted the hearing; (2) Defendants **Lazzari, Manley** and **Capacci** "coerced" Plaintiff into agreeing to proceed with the hearing without the benefit of his sentencing minutes, by threatening to otherwise postpone the hearing for three months, and by misrepresenting to Plaintiff that it was his burden to provide such minutes to the Division of Parole; (3) Defendant **Lazzari** considered "sealed criminal information" contained in Plaintiff's pre-sentence report, despite the June 18, 2004, order of the New York State Supreme Court, Albany County, to not consider such information, and to "blackout" such information; and (4) Defendant **Capacci** deprived Plaintiff of his right "to be heard on the record" by "cut[ting] him off in mid sentence[ ] and in a hostile manner" when Plaintiff was attempting to respond to Defendant Capacci's question, "[W]hy did you decide to stab and kill [your victim]?" (*Id.* at ¶¶ 73-84, 92-94.)

Finally, Plaintiff alleges that Defendant **Dennison** is liable by failing "to ensure that plaintiff [was] accorded a proper Parole Board hearing by guaranteeing that the sentencing minutes would be submitted for review and consideration by the defendants prior to any parole determination," and failing to "ensure that the enumerated provisions of Criminal Procedure Law § 160.50 and Executive Law § 296(16), and the previous court's Memorandum and Judgment, [were] complied with by the removal of all statutorily sealed criminal information from plaintiff's parole file ...." (*Id.* at ¶ 95 [emphasis removed].)

## II. APPLICABLE LEGAL STANDARD

### A. Motion for Summary Judgment Under Rule 56

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. [FN3]

FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN3. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) [citation omitted]; *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) [citation omitted].

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e).[FN4] The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." [FN5] "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [FN6]

FN4. *See also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

FN5. *Matsushita,* 475 U.S. at 585-86; *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

FN6. *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

***5** When deciding a motion for summary judgment, the facts set forth in a movant's Rule 7.1(a)(3) Statement

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [FN7] and are not specifically controverted by the non-movant.[FN8] Once a movant has filed a Rule 7.1 Statement, the opposing party must file a Rule 7.1 Response.[FN9] This Rule 7.1 Response "shall mirror the movant's [Rule 7.1 Statement] by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." [FN10] A district court has no duty to perform an independent review of the record to find proof of a factual dispute.[FN11] In the event the district court chooses to conduct such an independent review of the record, any verified complaint filed by the plaintiff should be treated as an affidavit.[FN12] (Here, I note that Plaintiff's Amended Complaint is verified.)

FN7. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 243-245 (2d Cir.2004) ("If the evidence submitted in support of the motion for summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented.... [I]n determining whether the moving party has met this burden ..., the district court may not rely solely on the statement of undisputed material facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion.") [citation omitted]; *see, e.g., Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) ("In this case, [the plaintiff] did not file a statement of undisputed facts in compliance with Local Rule 7.1(a) (3). Consequently, the court will accept the *properly supported* facts contained in the defendants' 7.1 statement.") [emphasis added].

FN8. *See* N.D.N.Y. L.R. 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party."* ).

FN9. *See* N.D.N.Y. L.R. 7.1(a)(3).

FN10. (*Id.*)

FN11. *See Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002) ("We agree with those circuits that have held that Fed.R.Civ.P. 56 does not impose an obligation on a district court to perform an independent review of the record to find proof of a factual dispute.") [citations omitted]; *accord, Lee v. Alfonso,* No. 04-1921, 2004 U.S.App. LEXIS 21432 (2d Cir. Oct. 14, 2004), *aff'g,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *12-13 (N.D.N.Y. Feb. 10, 2004) (Scullin, J.) (granting motion for summary judgment); *Fox v. Amtrak,* 04-CV-1144, 2006 U.S. Dist. LEXIS 9147, at *1-4 (N.D.N.Y. Feb. 16, 2006) (McAvoy, J.) (granting motion for summary judgment); *Govan v. Campbell,* 289 F.Supp.2d 289, 295 (N.D.N.Y. Oct.29, 2003) (Sharpe, M.J.) (granting motion for summary judgment); *Prestopnik v. Whelan,* 253 F.Supp.2d 369, 371-372 (N.D.N.Y.2003) (Hurd, J.).

FN12. *See Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d. Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922, 122 S.Ct. 2586, 153 L.Ed.2d 776 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted].

However, to be sufficient to create a factual issue, an affidavit (or verified complaint) must, among other things, be based "on personal knowledge." [FN13] An affidavit (or verified complaint) is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[FN14] In addition, such an affidavit (or verified complaint) must not be conclusory.[FN15] An affidavit (or verified complaint) is conclusory if, for example, its assertions lack any supporting evidence or are too

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

general.[FN16] Moreover, "[a]n affidavit must not present legal arguments." [FN17]

FN13. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also* *U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom, Ferrante v. U.S.,* 516 U.S. 806, 116 S.Ct. 50, 133 L.Ed.2d 15 (1995).

FN14. *See* *Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.' ... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M.C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief .... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

FN15. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN16. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN17. N.D.N.Y. L.R. 7.1(a)(2).

Finally, even where an affidavit (or verified complaint) is based on personal knowledge and is nonconclusory, it may be insufficient to create a factual issue where it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN18]

FN18. *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb.15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), *aff'd,* 136 F. App'x 383 (2d Cir.2005) (unreported decision, cited not as precedential authority but merely to show the case's subsequent history, in accordance with Second Circuit's application of its Local Rule § 0.23). *See, infra,* note 24 of this Report-Recommendation.

**B. Motion to Dismiss for Failure to State a Claim Under Rule 12(b)(6)**

To the extent that a defendant's motion for summary judgment under Rule 56 of the Federal Rules of Civil Procedure is based entirely on the complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Rule 12(b) (6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise General Transatlantique,* 405 F.2d 270, 273-274 (2d Cir.1968) [citations omitted], *accord, Katz v. Molic,* 128 F.R.D. 35, 37-38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").

To prevail on a motion to dismiss for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the defendant must show "beyond doubt that the plaintiff can prove no set of facts in support of his claim [that] would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957) [citations omitted].[FN19] A defendant may base this motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Rule 8(a) (2); [FN20] or (2) a challenge to the legal cognizability of the claim.[FN21]

FN19. *See also Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("[A] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.") [internal quotations and citation omitted].

FN20. *See* 5C Wright & Miller, *Federe* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal

sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement that the pleader is entitled to relief.' ").

FN21. *See Swierkiewicz,* 534 U.S. at 514 ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b] [6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim.") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7 (S.D.N.Y. Jan. 30, 2002) (identifying two sorts of arguments made on a Rule 12[b][6] motion-one aimed at the sufficiency of the pleadings under Rule 8[a], and the other aimed at the legal sufficiency of the claims).

***6** Rule 8(a)(2) requires that a pleading include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Although Rule 8(a)(2) does not require a pleading to state the elements of a prima facie case,[FN22] it does require the pleading to "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharm., Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) (quoting *Conley,* 355 U.S. at 47).[FN23] The purpose of this rule is to "facilitate a proper decision on the merits." *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) (quoting *Conley,* 355 U.S. at 48). A complaint that fails to comply with this rule "presents far too a heavy burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims." *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, C.J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion).[FN24]

FN22. *See Swierkiewicz,* 534 U.S. at 511-512, 515.

FN23. *See also Swierkiewicz,* 534 U.S. at 512 (quoting *Conley,* 355 U.S. at 47); *Leathernman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) (quoting *Conley,* 355 U.S. at 47).

FN24. Consistent with the Second Circuit's application of its Local Rule § 0.23, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ); *U.S. v. Casado,* 303 F.3d 440, 449 n. 5 (2d Cir.2002) (citing, for similar purpose, unpublished table opinion of *U.S. v. Terry,* 927 F.2d 593 [2d Cir.1991] ); *Medforms, Inc. v. Healthcare Mgmt. Solutions, Inc.,* 290 F.3d 98, 114 (2d Cir.2002) (citing, for similar purpose, unpublished table opinion of *Zitz v. Pereira,* 225 F.3d 646 [2d Cir.2000] ); *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48, 57 (2d Cir.2001) (citing, for similar purpose, unpublished table opinion of *Herman Miller, Inc. v. Worth Capitol,* 173 F.3d 844 [2d Cir.1999] ); *Bayway Ref. Co. v. Oxygenated Mktg. & Trading A. G.,* 215 F.3d 219, 226 (2d Cir.2000) (citing, for similar purpose, unpublished table opinion of *St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.,* 895 F.2d 1410 [2d Cir.1989] ); *Name.Space, Inc. v. Network Solutions, Inc.,* 202 F.3d 573, 586 (2d Cir.2000) (citing, for similar purpose, unpublished table opinion of *Planned Parenthood Fed'n of Am. v. Bucci,* 152 F.3d 920 [2d Cir.1998] ). Moreover, I cite *Gonzales* to show a "a well-reasoned district court disposition of a similar case," as did the Second Circuit with regard to another case in a similar circumstance in *Carvey v. LeFevre,* 611 F.2d 19, 22 & n. 2 (2d Cir.1979).

The Supreme Court has characterized this pleading requirement under Rule 8(a)(2) as "simplified" and "liberal," and has rejected judicially established pleading requirements that exceed this liberal requirement. *See* *Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake."). However, even this liberal notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003); *see, e.g.,* *Dura Pharm.,* 125 S.Ct. at 1634-1635 (pleading did not meet Rule 8[a][2]'s liberal requirement); *accord,* *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004).[FN25]

FN25. Several other decisions exist from the Second Circuit affirming the Rule 12(b)(6) dismissal of a complaint due to its insufficiency under Rule 8(a)(2) after *Swierkiewicz. See, e.g.,* *Johnson v. U.S.,* No. 03-6054, 2003 WL 22849896, at *1 (2d Cir. Dec.2, 2003) (relying on pre-*Swierkiewicz* decision by the Second Circuit applying Rule 8[a] and Rule 12[b][6] ); *Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Second Circuit Local Rule § 0.23, I cite them because they clearly acknowledge the continued precedential effect, after *Swierkiewicz,* of cases from within the Second Circuit interpreting Rules 12(b)(6) and 8(a)(2). *See* *Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]. "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.*" *Hernandez,* 18 F.3d at 136 [citation omitted].[FN26] Indeed, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) (internal quotation and citation omitted). [FN27]

FN26. *See also* *Vital v. Interfaith Med. Ctr.,* 168

F.3d 615, 619 (2d Cir.1999) (affirming dismissal under Rule 12[b][6] ) [internal quotations and citation omitted].

FN27. Of course, the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended." *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980) [citations omitted], *accord, Gil v. Vogilano,* 131 F.Supp.2d 486, 491 (S.D.N.Y.2001).

Finally, when addressing a *pro se* complaint, a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) (internal quotation and citation omitted).[FN28] Of course, an opportunity to replead should be denied where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted]. Moreover, granting a *pro se* plaintiff an opportunity to amend his complaint is not required where the plaintiff has already been given an opportunity to amend his complaint (and has taken advantage of that opportunity).

FN28. *See also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

**C. Revocation of Plaintiff's Special Status as *Pro Se* Civil Rights Litigant**

***7** Imposed over the aforementioned burden-shifting framework is the generous perspective with which the Court *generally* views a *pro se* civil rights plaintiff's papers.[FN29] For example, where a civil rights plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, *generally* the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest.[FN30] Having said that, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment." [FN31]

FN29. *See Haines v. Kerner,* 404 U.S. 519, 520-21, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (*per curiam* ) (*pro se* civil rights action); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989) (*pro se* civil rights action); *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998) (*pro se* civil rights action), *aff'd in part, vacated in part on other grounds,* 205 F.3d 1324 (2d Cir.2000) (unpublished decision).

FN30. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

FN31. *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) [citations omitted], *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) [citations omitted]. For example, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec.5, 1994).

In addition, "there are circumstances where an overly litigious inmate, who is quite familiar with the legal system and with pleading requirements, may not be afforded [the] special solicitude" or status that is normally afforded *pro se* litigants.[FN32] The rationale for this revocation of special status (at least in the Second Circuit) is not that the *pro se* litigant should be punished but that his excessive litigiousness demonstrates his *experience,*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

the lack of which is the reason for conferring the special status upon *pro se* litigants in the first place.[FN33] Moreover, permitting experienced *pro se* litigants to retain their special status (despite their litigation experience) would tilt the scales of justice unfairly in favor of the *pro se* litigant and against his opponents.[FN34]

FN32. *Smith v. Burge,* 03-CV-0955, 2006 WL 2805242, at *3 & n. 3 (N.D.N.Y. Sept.28, 2006) (Kahn, J., adopting report-recommendation of Lowe, M.J.) [citations omitted].

FN33. *See, e.g., Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001) (unpublished opinion), *aff'g,* 97-CV-0938, Decision and Order (N.D.N.Y. filed May 28, 1999) (Kahn, J.), *adopting,* Report-Recommendation, at 1, n. 1 (N.D.N.Y. filed Apr. 28, 1999) (Smith, M.J.); *Johnson v. C. Gummerson,* 201 F.3d 431, *2 (2d Cir.1999) (unpublished opinion), *aff'g,* 97-CV-1727, Decision and Order (N.D.N.Y. filed June 11, 1999) (McAvoy, J.), *adopting,* Report-Recommendation (N.D.N.Y. filed April 28, 1999) (Smith, M.J.); *Davidson v. Flynn,* 32 F.3d 27, 31 (2d Cir.1994); *Gill v. Pidylpchak,* 02-CV-1460, 2006 WL 3751340, at *2 (N.D.N.Y. Dec.19, 2006) (Scullin, J., adopting report-recommendation of Treece, M.J.); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 (N.D.N.Y. Oct.18, 2006) (Hurd, M.J., adopting Report-Recommendation of Lowe, M.J.); *Gill v. Frawley,* 02-CV-1380, 2006 WL 1742738, at *3 (N.D.N.Y. June 22, 2006) (McAvoy, J., adopting Report-Recommendation of Lowe, M.J.); *Davidson v. Talbot,* 01-CV-0473, 2005 U.S. Dist. LEXIS 39576, at *20 (N.D.N.Y. March 31, 2005) (Treece, M.J.), *adopted by* 2006 U.S. Dist. LEXIS 47554 (N.D.N.Y. July 5, 2006) (Scullin, J.); *Gill v. Riddick,* 03-CV-1456, 2005 U.S. Dist. LEXIS 5394, at *7 (N.D.N.Y. March 31, 2005) (Treece, M.J.); *Yip v. Bd. of Tr. of SUNY,* 03-CV-0959, 2004 WL 2202594, at *3 (W.D.N.Y. Sept.29, 2004); *Davidson v. Dean,* 204 F.R.D. 251, 257 & n. 5 (S.D.N.Y.2001); *Santiago v. C.O. Campisi,* 91 F.Supp.2d 665, 670 (S.D.N.Y.2000); *McGann v. U.S.,* 98-CV-2192, 1999 WL 173596, at *2 (S.D.N.Y. March 29, 1999); *Hussein v. Pitta,* 88-CV-2549, 1991 WL 221033, at *4 (S.D.N.Y. Oct.11, 1991).

FN34. *See, e.g., Hussein,* 1991 WL 221033, at *4 (concluding that experienced *pro se* litigant should no longer be afforded special leniency because continuing to afford him such leniency would be unfair to "numerous attorneys," whose time and energy had already been consumed by plaintiff); *see also* Jessica Case, "Pro se Litigants at the Summary Judgment Stage: Is Ignorance of the Law an Excuse?" 90 *Ky. L.J.* 701, 735-740 (Spring 2001) (discussing how extending special leniency to *pro se* litigants in some circumstances "distorts the adversarial system and the role of trial judges") [citing cases]; Julie M. Bradlow, "Procedural Due Process Rights of *Pro se* Civil Litigants," 55 *U. Chi. L.Rev.* 659, 672 (Spring 1988) (discussing how "extending too much procedural leniency to a *pro* se litigant risks undermining the impartial role of the judge in the adversary system") [citations omitted].

Courts relying on the "experience" rationale for revoking a *pro se* litigant's special status look at a variety of factors in assessing whether or not the *pro se* litigant is experienced. Most often, these factors include (1) the number of previous federal court actions filed, (2) the number of previous federal court appeals filed, (3) the number of previous state court actions filed, (4) the number of previous state court appeals filed, and (5) the recency or simultaneity of the actions and/or appeals.[FN35]

FN35. *See, e.g., Eggersdorf,* 8 F. App'x at 143; *Gummerson,* 201 F.3d at *2; *Flynn,* 32 F.3d at 31; *Frawley,* 2006 WL 1742738, at *3 & n. 2; *Talbot,* 2005 U.S. Dist. LEXIS 39576, at *18-20 & n. 10; *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3; *Dean,* 204 F.R.D. at 257; *Santiago,* 91 F.Supp.2d at 670; *McGann,* 1999 WL 173596, at *2, 8-10; *McClellan,* 1996 U.S. Dist. LEXIS 8164, at *3-4 & n. 3; *Brown,* 1995 U.S. Dist. LEXIS 213, at *2 n. 1.

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

There is, of course, no formula for determining "How many is too many?" However, *generally,* if a *pro se* litigant has filed a dozen or more actions and/or appeals before the date of the decision in question, it is quite possible that he will be deemed to be "experienced." [FN36] Granted, there are some cases revoking the special status of a *pro se* litigant who has filed *fewer* than a dozen cases.[FN37] However, there appear to be *more* cases refusing to revoke the special status of a *pro se* litigant who has filed fewer than a dozen cases.[FN38]

FN36. *See, e.g., Eggersdorf,* 8 F. App'x at 143 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had ***twelve*** simultaneously pending lawsuits in Northern District alone); *Gummerson,* 201 F.3d at *2 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had ***twelve*** simultaneously pending lawsuits in Northern District alone); *Talbot,* 2005 U.S. Dist. LEXIS 39576, at * 18-20 & n. 10 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed ***twenty*** lawsuits in Northern District alone); *Riddick,* 2005 U.S. Dist. LEXIS 5394, at *7 & n. 3 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had filed ***twenty*** lawsuits in Northern District alone).

FN37. *See, e.g., Santiago,* 91 F.Supp.2d at 670 (denying leniency to *pro se* civil rights inmate based on fact that at one point plaintiff had ***ten*** lawsuits pending in Southern District); *Saunders v. Ricks,* 03-CV-0598, 2006 WL 3051792, at *2 & n. 11 (N.D.N.Y. Oct.18, 2006) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (denying leniency to *pro se* civil rights inmate who had previously filed ***eight*** federal court actions or appeals); *McClellan,* 1996 U.S. Dist. LEXIS 8164, at *3-4 & n. 3 (denying leniency to *pro se* civil rights inmate based on fact that inmate had filed ***seven*** previous lawsuits against prison officials); *Brown,* 1995 U.S. Dist. LEXIS 213, at *2 n. 1 (denying leniency to *pro se* civil rights inmate based on fact that plaintiff had ***seven*** lawsuits pending in Western District).

FN38. *See, e.g., McEachin v. Faruki,* 03-CV-1442, 2006 WL 721570, at *2 n. 3 (N.D.N.Y. March 20, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed ***eleven*** other federal lawsuits since 2000); *Pritchett v. Portoundo,* 03-CV-0378, 2005 WL 2179398, at *2 n. 3 (N.D.N.Y. Sept.9, 2005) (refusing to deny leniency to *pro se* civil rights inmate who had filed ***eight*** other federal lawsuits since 1996); *Burke v. Seitz,* 01-CV-1396, 2006 WL 383513, at *2 n. 5 (N.D.N.Y. Feb.13, 2006) (refusing to deny leniency to *pro se* civil rights inmate who had filed ***six*** other federal lawsuits in previous nine years); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *3 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting Report-Recommendation of Lowe, M.J.) (refusing to deny leniency to *pro se* civil rights inmate who had previously filed ***five*** actions or appeals in federal or state court); *Smith,* 2006 WL 2805242, at *3 & n. 4 (refusing to deny leniency to *pro se* civil rights inmate based on his filing of ***five*** other lawsuits); *Abbas v. Senkowski,* 03-CV-0476, 2005 WL 2179426, at *2 n. 4 (N.D.N.Y. Sept.9, 2005) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed ***three*** other federal actions since 1997); *Loren v. Feerick,* 97-CV-3975, 1997 WL 441939, at *1 & n. 9 (S.D.N.Y. Aug.6, 1997) (continuing to afford special status to *pro se* litigant despite his litigation experience due to his having filed ***three*** previous actions in state court regarding current matter, and two previous actions in district court regarding current matter).

One reason for this array of cases is that, in determining whether or not a *pro se* litigant is "experienced," courts sometimes consider additional factors, such as the quality of the *pro se* litigant's submissions to the Court (e.g., whether they are typed, cogent, supported by applicable affidavits, exhibits, and/or memoranda of law, etc),[FN39] and whether or not the *pro se* litigant has been victorious (or partially victorious) in any of his previous actions or appeals.[FN40]

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN39. *See, e.g., Saunders,* 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that, among other things, "with regard to the current action, ... the motion papers that [p]laintiff has submitted over the past several years have often been fairly good-being typed, being accompanied by affidavits, and containing legal memoranda, exhibits, etc.").

FN40. *See, e.g., Saudners,* 2006 WL 3051792, at *2 (in deciding whether *pro se* plaintiff should be denied special solicitude, considering the fact that plaintiff had settled two of his previous six federal court actions, receiving $25,000 in exchange for his agreement to voluntarily dismiss the actions, and the fact that some of plaintiff's motions in his many actions have been granted); *Ab v. Sekendur,* 03-CV-4723, 2004 WL 2434220, at *5 (N.D.Ill. Oct.28, 2004) (considering, during decision of whether *pro se* plaintiff should be denied leniency normally afforded inexperienced *pro se* litigants, fact that "[plaintiff's] has successfully applied for and received ... [a] patent, and as the record in this case indicates, he engaged in lengthy business negotiations with Anoto and various other corporations").

***8** Here, Plaintiff has filed at least ***sixteen*** federal or state court actions or appeals other than the current action. Specifically, he has filed at least ***five*** other federal court actions,[FN41] at least ***one*** federal court appeal,[FN42] at least ***seven*** state court actions,[FN43] and at least ***three*** state court appeals.[FN44] Plaintiff was victorious or partially victorious in at least ***four*** of these actions or appeals.[FN45] This last fact is of little surprise to me since, generally, Plaintiff's papers in the aforementioned actions-as well as the current action-have been exceptionally good, almost always being typed, coherent, organized, and accompanied by affidavits, exhibits and memoranda of law, etc.

FN41. *See Standley v. Lazerson,* 91-CV-6078 (S.D.N.Y.) (prisoner civil rights action); *Standley v. Artuz,* 93-CV-3528 (E.D.N.Y.) (habeas corpus action); *Standley v. Stewart,* 97-CV-6552 (S.D.N.Y.) (civil rights action); *Standley v. Lyder,* 99-CV-4711 (S.D.N.Y.) (prisoner civil rights action); *Standley v. Wilcox,* 02-CV-6230 (S.D.N.Y.) (prisoner civil rights action).

FN42. *See Standley v. Artuz,* No. 95-2755 (2d Cir.) (habeas corpus action).

FN43. *See Standley v. Stewart,* Index No. 402210/1999 (N.Y.S. Sup.Ct., New York County) (professional malpractice action); *Standley v. Goord,* Index No. 002763/2000 (N.Y.S. Sup.Ct., Dutchess County) (Article 78 proceeding); *Standley v. Goord,* Index No. 000120/2001 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Parole,* Index No. 000149/2004 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Goord,* Index No. 002828/2004 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Parole,* Index No. 000971/2005 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Parole,* Index No. 001989/2006 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding).

FN44. *See Standley v. N.Y.S. Div. of Parole,* 34 A.D.3d 1169, 825 N.Y.S.2d 568 (N.Y.App. Div., 3d Dept.2006) (Article 78 proceeding); *Standley v. Stewart,* 305 A.D.2d 332, 759 N.Y.S.2d 327 (N.Y.App.Div., 3d Dept.2003) (professional malpractice action); *Standley v. Goord,* 293 A.D.2d 922, 742 N.Y.S.2d 406 (N.Y.App.Div., 3d Dept.2002) (Article 78 proceeding); *see also Standley v. N.Y.S. Div. of Parole,* 823 N.Y.S.2d 922 (N.Y.App.Div., 3d Dept.2006) (Article 78 proceeding); *Standley v. N.Y.S. Div. of Parole,* 30 A.D.3d 730, 815 N.Y.S.2d 492 (N.Y.App.Div., 3d Dept.2006) (Article 78 proceeding).

FN45. *See Standley v. N.Y.S. Div. of Parole,* 34 A.D.3d 1169, 825 N.Y.S.2d 568 (N.Y.App. Div., 3d Dept.2006) (reversing and remanding trial court decision against Plaintiff); *Standley v.*

*N.Y.S. Div. of Parole,* 823 N.Y.S.2d 922 (N.Y.App.Div., 3d Dept.2006) (granting Plaintiff's motion for re-argument and motion to proceed as a poor person); *Standley v. Wilcox,* 02-CV-6230, Stipulation and Order of Settlement (S.D.N.Y. filed May 13, 2004) (entering order dismissing action upon settlement by parties). (*See also* Dkt. No. 4, ¶ 17-19 [Plf.'s Am. Compl., alleging that Plaintiff's case entitled *Standley v. New York State Division of Parole,* Index No. 149-04, which was pending in Supreme Court, Albany County, resulted in a judgment on June 18, 2003, in Plaintiff's favor, "vacat[ing] and annull[ing] the defendants' determination to deny parole release and order[ing] that plaintiff be brought before a *de novo* hearing"].).

As a result, I find that the circumstances warrant revoking Plaintiff's special status as a *pro se* litigant for the remainder of this action. Again, continuing to afford him such special status would be unnecessary (and unfairly prejudicial to Defendants).

**III. ANALYSIS**

**A. Defendants' Cross-Motion for Summary Judgment**

In support of their cross-motion for summary judgment, Defendants essentially assert three arguments: (1) Plaintiff has failed to state a due process claim because (a) Plaintiff had no "protected liberty interest" in parole in New York State, (b) a violation of New York State law does not in and of itself give rise to a due process violation, and (c) the parole board's actions were not sufficiently irrational and improper to give rise to a due process violation; (2) Plaintiff has failed to state an equal protection claim because he does not allege any facts indicating, or adduce any evidence establishing, any "discriminatory purpose or conduct"; and (3) three of Plaintiff's six causes of action are barred by the doctrine of *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). (Dkt. No. 30, Part 8 [Defs.' Mem. of Law].)

**1. Plaintiff's Due Process Claim**

This action is brought pursuant to 42 U.S.C. § 1983, which provides, in pertinent part, as follows: "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." 42 U.S.C. § 1983.[FN46] Thus, the deprivation of "any rights, privileges, or immunities secured by the Constitution and laws" is an "essential element[ ]" of a Section 1983 claim.[FN47] The term "the Constitution and laws" refers to the United States Constitution and *federal* laws.[FN48] A violation of a state law or regulation, *in and of itself,* does not give rise to a violation of the United States Constitution or a federal law, for purposes of 42 U.S.C. § 1983.[FN49]

FN46. "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) [citation omitted].

FN47. *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994) [emphasis added; citation omitted].

FN48. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) [emphasis added], *accord, Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986); *Pitchell,* 13 F.3d at 547 ("In order to maintain a section 1983 action, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws *of the United States."* ) [emphasis added], *accord, Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d

Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") [citation omitted; emphasis added].

FN49. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") [citation omitted]; *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") [citation omitted]; *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") [citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 (2d Cir.1990) ].

Having said that, it is true that a state may, *under certain circumstances,* create a liberty interest protected by the Fourteenth Amendment's Due Process Clause through its enactment of certain statutory or regulatory measures. At one point, the Supreme Court held that a state created such a liberty interest if it has repeatedly used, in a statute or regulation, explicit language of an "unmistakably mandatory character" (e.g., the words "shall," "will," or "must," etc.) with regard to specific procedures. *Hewitt v. Helms,* 459 U.S. 460, 466-472, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983). However, that rule created a perverse incentive (1) for inmates to "comb" state regulations for mandatory language upon which to base claims of entitlements, (2) for courts to draw negative inferences from mandatory language in state regulations, and to involve themselves in the day-to-day management of prisons, and (3) for states to not codify prison management procedures, or to confer on correctional personnel "standardless discretion." *Sandlin v. Connor,* 515 U.S. 472, 481-482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). As a result, the Supreme Court changed the rule, shifting the courts' focus from the *language* of a particular state law or regulation to the *nature of the deprivation. Sandlin,* 515 U.S. at 477-484 (describing history of due process analysis in modern Supreme Court precedents).[FN50]

FN50. *See also Blouin v. Spitzer,* 356 F.3d 348, 362-363 (2d Cir.2004) (recognizing abrogation or modification of prior rule which focused on language of state regulation), *accord, Anderson v. Recore,* 317 F.3d 194, 198-200 (2d Cir.2003), *accord, Watson v. City of N.Y.,* 92 F.3d 31, 37-38 (2d Cir.1996), *accord, Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

***9** The practical effect of this rule change is that, in cases involving due process challenges to parole hearings, "[i]n order for a state prisoner to have an interest in parole that is protected by the Due Process Clause, he must have *a legitimate expectancy of release* that is grounded in the state's statutory scheme." *Barna v. Travis,* 239 F.3d 169, 170 (2d Cir.2001) [emphasis added; citations omitted].[FN51] "Neither the mere possibility of release ... nor a statistical probability of release ... gives rise to a legitimate expectancy of release on parole." *Barna,* 239 F.3d at 171 [citations omitted]. Moreover, the Second Circuit has repeatedly recognized that "[t]he New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release." *Barna,* 239 F.3d at 171.[FN52] As a result, alleged violations of procedural requirements of the New York parole scheme "are matters for consideration by the state courts." *Boothe v. Hammock,* 605 F.2d 661, 665 (2d Cir.1979), *accord, Borcsok v. Pataki,* 05-CV-1542, 2006 WL 839545, at *2, n. 1 (N.D.N.Y. March 29, 2006) (Sharpe, J.).

FN51. *See also Greenholz v. Inmates of the Neb. Penal & Corr. Complex,* 442 U.S. 1, 7-16, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979) (stating that "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence," and

finding that Nebraska's parole scheme did create due process right but only because the parole scheme "mandat[ed]" that prisoners be released unless certain conditions existed), *accord, Board of Pardons v. Allen,* 482 U.S. 369, 373-381, 107 S.Ct. 2415, 96 L.Ed.2d 303 (1987) (holding that Montana parole statute created "a liberty interest protected by the Due Process Clause" only because the statute specifically provided that the Parole Board "shall" release the inmate when certain findings prerequisite to release are made).

FN52. *See also Davis v. Dennison,* No. 06-2723, 2007 WL 678331, at *1 (2d Cir. March 2, 2007) (summary order, cited for "persuasive value" in accordance with the *Advisory Committee Notes* to Fed. R.App. P. 32.1 [a], and cited to "acknowledge[ ] the continued precedential effect" of *Barna v. Travis,* 239 F.3d 161 [2d Cir.2001] in accordance with Second Circuit Local Rule § 0.23 as applied by the Second Circuit in *Khan v. Ashcroft,* 352 F.3d 521, 525 [2d Cir.2003] ) ("New York State's parole scheme does not create a liberty interest protected by the Due Process Clause. *See Barna v. Travis,* 239 F.3d 161, 171 (2d Cir.2001)."); *Marvin v. Goord,* 255 F.3d 40, 44 (2d Cir.2001) ("[T]he New York State parole scheme does not create a protectable liberty interest [under the Due Process Clause of the Fourteenth Amendment]."); *Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979) ("It is apparent that New York's parole provisions ... do not establish a scheme whereby parole shall be ordered unless specific conditions are found to exist.... While guidelines are used to structure the exercise of discretion ... no entitlement to release is created.").

Rather, to the extent that a New York State inmate has any liberty interest in parole that is protected by the Due Process Clause of the Fourteenth Amendment, that interest extends only to not being denied a parole release "arbitrarily" or "capriciously," for example, based on an inappropriate consideration of a protected classification (such as race, religion, gender, economic status, etc.) or an "irrational distinction." [FN53] This often-repeated recitation of the law is based on firmly established precedents from the highest court in the United States and the highest court in the State of New York.[FN54]

FN53. *See Romer v. Travis,* 03-CV-1670, 2003 WL 21744079, at *6 (S.D.N.Y. July 29, 2003) ("[Plaintiff] can claim a due process violation only if the Parole Board has denied his relief 'arbitrarily or capriciously.' "); *Morel v. Thomas,* 02-CV-9622, 2003 WL 21488017, at *4 (S.D.N.Y. June 26, 2003) ("[Plaintiff's] due process rights extend only to a refusal by the Parole Board to deny release arbitrarily or capriciously, based on inappropriate consideration of a protected classification or on an irrational distinction, or on any other constitutional grounds."), *accord, Manley v. Thomas,* 255 F.Supp.2d 263, 266 (S.D.N.Y.2003); *Defino v. Thomas,* 02-CV-7413, 2003 WL 40502, at *3-4 (S.D.N.Y. Jan.2, 2003) ("[Petitioner's] only interest in parole is in not being denied parole for arbitrary or constitutionally impermissible reasons.").

FN54. *See, e.g., Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) ("The touchstone of due process is protection of the individual against *arbitrary* action of government.... The liberty interest protected in *Wolff [v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) ] had its roots in state law, and the *minimum* procedures appropriated under the circumstances were held required by the Due Process Clause 'to ensure that the state-created right is not *arbitrarily* abrogated.' ") [internal quotation marks and citations omitted; emphasis added]; *Silmon v. Travis,* 95 N.Y.2d 470, 718 N.Y.S.2d 704, 707, 741 N.E.2d 501 (N.Y.2000) ("Our jurisprudence ... is well settled as to the authority of the Parole Board. Judicial intervention is warranted only when there is a showing of irrationality bordering on impropriety.") [internal quotation marks and citations omitted]; *Russo v. New York State Bd. of Parole,* 50 N.Y.2d 69, 427 N.Y.S.2d 982,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

986, 405 N.E.2d 225 (N.Y.1980) ("In light of the board's expertise and the fact that responsibility for a difficult and complex function has been committed to it, there would have to be a showing of irrationality bordering on impropriety before intervention would be warranted.").

Here, Plaintiff's Amended Complaint alleges various violations of procedural requirements set forth in N.Y. Exec. Law § 259-i, most notably, the requirement that the recommendation of the sentencing court be considered during his parole hearing. (*See, supra,* Part I of this Report-Recommendation.) Defendants may or may not have violated N.Y. Exec. Law § 259-i during one or more of Plaintiff's four parole hearings. For the sake of argument, I will assume that one or more Defendants did commit one or more such violations. [FN55] The problem is that, as stated above, any such violations do not, in and of themselves, give rise to a violation of the Due Process Clause of the Fourteenth Amendment. Rather, again, to state a due process claim under the Fourteenth Amendment, Plaintiff needs to allege facts indicating that he was denied parole release *arbitrarily* or *capriciously,* for example, based on an inappropriate consideration of a *protected classification* (such as race, religion, gender, economic status, etc.) or an *irrational distinction.*

FN55. I assume this fact even though it is of some uncertainty. Section 259-i(2)(c)(A) of the New York Executive Law (the particular section that governs parole release decisions) does not always require the Parole Board, during a parole release hearing, to consider "the recommendations of the sentencing court." Specifically, Section 259-i(2)(c)(A) provides, in pertinent part, as follows:

> Discretionary release on parole shall not be granted merely as a reward for good conduct ... while confined but after considering if there is a reasonable probability that ... his release ... will not so deprecate the seriousness of his crime as to undermine respect for law. In making the parole release decision ... the following [shall] be considered: (i) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments ...; (iii) release plans including community resources, employment, education and training and support services available to the inmate .... Notwithstanding the provisions of this section, in making the parole release decision for persons whose minimum period of imprisonment was not fixed pursuant to the provisions of subsection one of this section, in addition to the factors listed in this paragraph the board shall consider the factors listed in paragraph (a) of subdivision one of this section.

N.Y. Exec. Law § 259-i(2)(c)(A). Rather, the only circumstance under which the Parole Board must, during a parole release hearing, consider the recommendations of the sentencing court is when the parole release hearing concerns a "person[ ] whose minimum period of imprisonment was ***not*** fixed pursuant to the provisions of [Section 259-i(1) ]." *Id* [emphasis added]. Specifically, Section 259-i(1)(a), provides, in pertinent part, as follows,

> In any case where a person is received in an institution ... with an indeterminate sentence, and the court has not fixed a minimum period of imprisonment, the board shall cause to be brought before one or more members ... all information with regard to such person[ ] ... [and] shall study the same and shall personally interview the sentenced person. Upon conclusion of the interview, [the members] shall determine the minimum period of imprisonment to be served prior to parole consideration in accord with the guidelines ... [which] shall include (i) the seriousness of the offense with due consideration of the type of sentence, length of sentence and recommendations of the sentencing court, the district attorney, the attorney for the inmate, the pre-sentence probation report as well as consideration of any mitigating and

aggravating factors ... and (ii) prior criminal record, including ... adjustment to ... institutional confinement....

N.Y. Exec. Law § 259-i(1)(a). Here, I have trouble construing Plaintiff's Amended Complaint as alleging facts indicating that the sentencing court did *not* fix a "minimum period of confinement." (*See* Dkt. No. 4, ¶ 24 [Plf.'s Am. Compl., alleging that the sentencing court "imposed an indeterminate sentence of twenty years to life"].)

Plaintiff does not allege facts indicating that Defendants were acting out of an inappropriate consideration of a *protected classification,* but that, at most, they were acting, in part, out of a consideration of Plaintiff's status as convicted murderer (which is not a classification protected by the United States Constitution). (*See, infra,* Part III.A.2. of this Report-Recommendation.) Moreover, Plaintiff does not allege facts indicating that Defendants were acting *irrationally,* but that they were basing their decision too much, or perhaps solely, on the nature and seriousness of his offense (rather than also considering the recommendation of the sentencing judge). (*See, e.g.,* Dkt. No. 4, ¶¶ 56, 57, 70, 95 [Plf.'s Am. Compl., alleging that Defendants found Plaintiff unsuitable for parole release solely due to the seriousness of Plaintiff's offense].) More specifically, Plaintiff alleges facts indicating that Defendants, after acknowledging some factors weighing in favor of Plaintiff's release (such as his "institutional adjustment" and "release plan"), repeatedly concluded that Plaintiff's release, at that time, would so deprecate the seriousness of his crime (i.e., which involved, during the course of an attempted robbery, Plaintiff's, without being under the influence of alcohol or drugs, fatally stabbing a man 15 times, pouring a half-gallon of cleaning solvent on his body, and then lighting him afire) as to undermine respect for the law. (Dkt. No. 4, ¶¶ 33, 47, 62, 84 [Plf.'s Am. Compl.].) [FN56] Again, while such decision-making by Defendants might violate N.Y. Exec. Law § 259-i, it is not "irrational." Under the circumstances, Plaintiff's remedy for any violation of N.Y. Exec. Law § 259-i lies in state court.[FN57]

FN56. It is worth noting that Plaintiff does not even allege facts indicating that Defendants were *arbitrarily* failing to consider the (alleged) recommendation of the sentencing judge but that they were doing so for a variety of stated reasons: (1) that they did not have possession of the recommendation; (2) that they were laboring under the (allegedly) mistaken belief that they had a duty to consider the "sentencing minutes" *only* if Plaintiff could show that the "sentencing minutes" were relevant to Plaintiff's parole release; (3) that they were laboring under the (allegedly) mistaken belief that it was Plaintiff's duty to provide a copy of the recommendation; and (4) that they were laboring under the (allegedly) mistaken belief that Plaintiff could choose to waive his statutory right to require Defendants to consider such a recommendation. (Dkt. No. 4, ¶¶ 37, 42-43, 74-79 [Plf.'s Am. Compl.].)

FN57. *See* *Boothe,* 605 F.2d at 665 (alleged violations of procedural requirements of New York parole scheme "are matters for consideration by the state courts"), *accord,* *Borcsok,* 2006 WL 839545, at *2, n. 1 (Sharpe, J.). (*See, e.g.,* Dkt. No. 39, Ex. A [attaching state court decision dated 11/30/2006, addressing Plaintiff's statutory claim and ordering new parole hearing], Ex. B [attaching Parole Board Decision regarding such hearing on 1/23/07].)

***10** In opposition to Defendants' argument, Plaintiff places much reliance on *Graziano v. Pataki,* in which, last July, the Southern District of New York denied a Rule 12(b)(6) motion to dismiss, *inter alia,* the due process claims asserted by a class action of prisoners alleging that the New York State Division of Parole was carrying out a policy (or agenda of then-Governor George Pataki) for eliminating parole for practically all felons serving sentences for of class "A-1" violent felony offenses such as murder, rather than considering the factors required by N.Y. Exec. Law § 259-i. *Graziano v. Pataki,* 06-CV-0480, 2006 WL 2023082, at *6 (S.D.N.Y. July 17, 2006). However, instrumental in reaching that decision was the Southern District's finding that the plaintiffs' complaint asserted "a claim that there is in fact a *policy* [to deny

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

parole to A-1 violent felons], and under the *policy,* each Plaintiff's status as an A-1 violent offender predetermines the outcome of the parole decision, notwithstanding any positive factors ....” *Graziano,* 2006 WL 2023082, at *6 [emphasis added]. Plainly stated, the Southern District found that the plaintiffs' due process allegations stated a claim under Rule 12(b)(6) because the plaintiffs had alleged facts indicating the existence of a system-wide “policy” to make parole decisions for a certain class of offenders not on a case-by-case basis but on a basis that was “arbitrary” or “capricious” and thus in excess of the Parole Board's discretionary authority. *Id.* at *6-8.

The same cannot be said of Plaintiff's Amended Complaint in this action. The closest Plaintiff comes to premising his due process claim on such a “policy” is when he alleges, “[A]n argument could be made that these prejudices probably stem from a gubernatorial policy against parole for murders ....” (Dkt. No. 4, ¶ 87 [Plf.'s Am. Compl.].) However, in that same paragraph, Plaintiff makes clear that he is not in fact premising his due process claim on such a speculative “policy” but on his allegation that Defendants' treatment of him (personally) has been so arbitrary that it violates due process. (*Id.*) Furthermore, elsewhere in his Amended Complaint, Plaintiff alleges facts indicating that, during the four hearings, Defendants considered Plaintiff's case on an individual basis. Specifically, those allegations indicate that Defendants considered factors such as (1) Plaintiff's satisfactory “institutional adjustment” (i.e., the fact that Plaintiff “complet[ed] numerous programs, receiving [his] GED, and approximately 129 credits from Marist College ....” and the fact that Plaintiff has developed “commendable” artistic skills), and (2) his “release plan” (which involved “pursuing a vocation in Buddhism at Zen Mountain Monastery [in] Mt. Tremper, New York”), but that Defendants found that those two factors were outweighed by (3) Plaintiff's criminal record while in prison (i.e., the fact that “while incarcerated you have incurred two Tier III disciplinary sanctions,” although he had committed no such infractions in the previous four years), and most importantly (4) the particular nature of his crime (i.e., the fact that, during the course of an attempted robbery, Plaintiff, without being under the influence of alcohol or drugs, stabbed a man 15 times, poured a half-gallon of cleaning solvent on his body, and then lighting him afire). (*Id.* at ¶¶ 29, 33, 47, 62, 84.)

***11** Indeed, setting aside the way Defendants explicitly weighed the above-stated factors, I find that this last factual allegation (i.e., that Defendants repeatedly noted the particular nature of the facts giving rise to Plaintiff's conviction for murder) is, standing alone, sufficient to distinguish the current case from *Graziano.* In *Graziano,* the plaintiffs alleged that “there is nothing unique or particularly telling about most of the facts and circumstances that these decisions describe and are based on.... [T]he Board is denying parole ... just because [the] prisoner[s] committed murder and for no other reason.” *Graziano,* 2006 WL 2023082, at *6. Here, Plaintiff has alleged facts indicating that Defendants *did* find that there was something unique or telling about the facts and circumstances giving rise to Plaintiff's crime (i.e., again, the fact that, during the course of an attempted robbery, Plaintiff, without being under the influence of alcohol or drugs, stabbed a man 15 times, poured a half-gallon of cleaning solvent on his body, and then set him afire). As a result, according to Plaintiff's Amended Complaint, Defendants denied Plaintiff parole not simply because he committed murder but (largely) because of the *way* he committed the murder *and what he did with the body afterward*-which actions Defendants characterized as “brutal[ ],” “[in] utter disregard for the life of another,” “a significant escalation of your criminal behavior,” “violent,” “extreme[ly] serious[ ],” and a crime of such “sheer brutality ... [as to be] breathtaking in scope.” (Dkt. No. 4, ¶¶ 33, 47, 62, 84 [Plf.'s Am. Compl.].)

Finally, to the extent that Plaintiff relies on *Graziano* for its statement “while there is no due process right to being granted parole, there is a due process right to have the decision made only in accordance with the statutory criteria” (Dkt. No. 36, Part 2, ¶ 15 [Plf.'s Mem. of Law in Opp. to Defs.' Cross-Motion] ), two points deserve mentioning. First, such a proposition (which implies that a convicted felon serving a sentence in New York has a federal due process right to have *all* New York-statutory factors considered during a parole-release decision) is dictum since it is unnecessary to the court's holding that the *policy* at issue was “arbitrary and capricious” in that it involved a failure to consider *any* statutory factors other than the violent nature of the offense.[FN58] Second, in any

event, the decision cites no authority for such a proposition.[FN59]

FN58. *See, e.g., Graziano,* 2006 WL 2023082, at *1, 8, 9 ("Plaintiffs allege that since 1995, the 'Board of Parole has been issuing parole determinations pursuant to an unofficial policy of denying parole release to prisoners convicted of A-1 violent felony offenses, *solely* on the basis of the violent nature of such offenses and thus without proper consideration of *any* other relevant or statutorily mandated factor.' ... Plaintiffs ... contend that 'the Board is not exercising its discretion *at all.'* ... The allegation that there exists a policy or practice to deny parole based *solely* on the nature of the violent offense[ ] enables the Complaint in this case to transcend what all previous Court decisions have addressed ....") [internal record citations removed; emphasis added].

FN59. *See Graziano,* 2006 WL 2023082, at *6-9 (repeating this proposition several times but citing no case law supporting it, citing only *Barna v. Travis,* 239 F.3d 169 [2d Cir.2001], which undermines such a proposition, and *King v. N.Y. State Div. of Parole,* 190 A.D.2d 423, 598 N.Y.S.2d 245 [N.Y.App. Div., 1st Dept., 1993], which did not involve a due process claim).

This lack of authoritative support is not surprising since the proposition appears to be a significant departure from firmly established legal precedents from both the United States Supreme Court and the New York State Court of Appeals, as described above. The proposition creates a distinction between what the decision calls "a due process right to being granted parole" and what it calls "a due process right to have the decision made only in accordance with the statutory criteria." With respect, I do not perceive any such distinction. [FN60] In my view, any federal due process right a convicted felon has to a parole decision made only in accordance with a state's statutory criteria exists only if he possesses a "protected liberty interest" in parole.[FN61] If he possesses no such protected liberty interest, then he possesses only a *minimal* due process right with regard to that decision-making process (e.g., a right to have the decision made in a *non-arbitrary* way).[FN62] And New York State's parole scheme (unlike the parole schemes of various other states) creates no such protected liberty interest.[FN63]

FN60. Indeed, I note that the decision itself calls the distinction "theor[etical]." *Graziano,* 2006 WL 2023082, at *9.

FN61. *See, e.g., Greenholz,* 442 U.S. at 4, 5-9 (whether or not convicted felons possessed a "procedural due process" right in the manner in which their parole-release decisions were made by the Nebraska Board of Parole-other than the right to be free from arbitrary decision-making-depended on whether they had a "liberty interest" that was protected under the Fourteenth Amendment's Due Process Clause).

FN62. *See, supra,* cases cited in notes 53 and 54 of this Report-Recommendation; *see also Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) (referring to the right to non-arbitrary decision-making as "minimum" procedures required by the Due Process Clause).

FN63. *See Davis,* 2007 WL 678331, at *1; *Marvin,* 255 F.3d at 44; *Barna,* 239 F.3d at 171; *Boothe,* 605 F.2d at 664.

***12** Furthermore, by placing so much emphasis on New York statutory criteria, the *Graziano* decision demonstrates a lack of appreciation for the significance of the Supreme Court's decision in *Sandlin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), which declared a shift in focus (in a due process analysis) from the *language* of a particular state law or regulation to the *nature of the deprivation at issue,* as discussed above. Indeed, the Supreme Court in *Sandlin* specifically criticized the practice of, when determining the existence of a due process right, merely focusing on the existence of "mandatory" language in a state's parole statutes (e.g., language requiring release unless certain conditions exist), referring to such a practice as "mechanical." *Sandlin,* 515

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

U.S. at 479 (referring to the Court's earlier decision in *Greenholz v. Inmates of the Neb. Penal & Corr. Complex,* 442 U.S. 1 [1979], which analyzed Nebraska's parole scheme, and stating, "The time has come to return to the due process principles ... established [before the mandatory-discretionary dichotomy took hold].").

In the alternative, even assuming that Plaintiff has stated a due process claim, I recommend dismissal of that claim under a Rule 56 analysis. Based on the current record, Plaintiff has failed to adduce any evidence in support of a claim that Defendants were acting "arbitrarily" or "capriciously" in denying his parole.[FN64] For example, with respect to Plaintiff's claim that his due process rights were violated to the extent that Defendants based their four decisions on Plaintiff's (allegedly) expunged and sealed driving convictions, to the extent that the Second Circuit recognizes any such due process right, Plaintiff has adduced no evidence either that (1) Defendants were *responsible* for the presence of that information in his parole file during the first parole hearing or (2) a *likelihood* exists that, in reaching their subsequent three parole decisions, Defendants actually relied on that information in a constitutionally significant manner.[FN65] *See Antonucci v. David,* 03-CV-0653, 2006 WL 2265028, at *4-6 (N.D.N.Y. Aug.7, 2006) (Scullin, J.) (setting forth exact same analysis of similar due process challenge to parole board decision).

FN64. (*Compare* Dkt. No. 30, Part 2, ¶¶ 20-59 [Defs.' Rule 7.1 Statement, containing factual assertions regarding precisely what occurred at each hearing, followed by accurate citations to record evidence] *with* Dkt. No. 36, Part 1, ¶¶ 20-59 [Plf.'s Rule 7.1 Response, admitting the vast majority of Defendants' factual assertions except a few of those assertions which Plaintiff denies or partially denies, e.g., in Paragraphs 42, 45, 48-53, 55, 59, which denials are either immaterial to the due process issues at hand or are unsupported by specific citations to record evidence].)

FN65. (*Compare* Dkt. No. 30, Part 2, ¶¶ 57-59 [Defs.' Rule 7.1 Statement, containing factual assertions regarding precisely what occurred at each hearing, followed by accurate citations to record evidence] *with* Dkt. No. 36, Part 1, ¶¶ 57-59 [Plf.'s Rule 7.1 Response, admitting Defendants' factual assertions in Paragraphs 57 and 58, and denying factual assertions in Paragraph 59, but citing no record evidence in support of that denial except Plaintiff's "Ex. R," located at Dkt. No. 36, Part 4, which is simply a partial copy of N.Y. Exec. Law § 259-i].)

For all of these reasons, I recommend that Plaintiff's due process claim be dismissed.

**2. Plaintiff's Equal Protection Claim**

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. In other words, "[t]he Equal Protection Clause requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499 (2d Cir.2001) (citing *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439 [1985] ).

Liberally construed, Plaintiff's Amended Complaint, and his memorandum in opposition to Defendants' motion,[FN66] allege that, with respect to parole, he was treated differently than (2) non-violent felony offenders, or perhaps violent felony offenders who did not kill their victims in a particularly heinous manner (e.g., repeated stabbing followed by ignition of the body), and/or (2) convicted felons who do not have in their parole file sentencing minutes containing a recommendation regarding parole, or perhaps convicted felons who do have their sentencing minutes in their parole file but whose minutes do not contain a recommendation from the sentencing court. (Dkt. No. 4, ¶¶ 89-95 [Plf.'s Am. Compl.]; Dkt. No. 36, Part 2, ¶¶ 38-43 [Plf.'s Mem. of Law in Opp. to Defs.' Motion].)

FN66. When deciding a motion to dismiss for failure to state a claim, the court may, without converting the motion to dismiss into a motion for summary judgment, consider, *inter alia,* any documents provided by the plaintiff in opposition to defendants' motion, to the extent those documents are consistent with the allegations in

the complaint. *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 & n. 41 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting Report-Recommendation of Lowe, M.J.) (citing cases).

***13** The problem is that, even if these allegations are true, Plaintiff has failed to state an equal protection claim because neither of those two classes of persons is a "protected class" for purposes of the Equal Protection Clause of the Fourteenth Amendment. For example, several courts have specifically held that, for purposes of an equal protection analysis, (1) violent felony offenders are not actually "similarly situated" to non-violent offenders, and (2) in any event, discrimination against violent felony offenders in terms of parole release is "entirely appropriate." *See Bottom v. Pataki,* 03-CV-0835, 2006 WL 2265408, at *6-7 & n. 5 (N.D.N.Y. Aug.7, 2006) (Scullin, J.), *accord, Larocco v. N.Y.S. Div. of Parole,* 05-CV-1602, 2006 WL 1313341, at *3 (N.D.N.Y. May 12, 2006) (McAvoy, J.), *Borcsok v. Pataki,* 05-CV-1542, 2006 WL 839545, at *2, n. 2 (N.D.N.Y. March 29, 2006) (Sharpe, J.); *Parks v. Edwards,* 03-CV-5588, 2004 WL 377658, *4 (E.D.N.Y. Mar.1, 2004).

In the alternative, even assuming that Plaintiff has stated an equal protection claim, I recommend dismissal of that claim under a Rule 56 analysis. Based on the current record, Plaintiff has failed to adduce any evidence in support of such a claim.[FN67]

FN67. (*Compare* Dkt. No. 30, Part 2, ¶¶ 60-61 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 36, Part 1, ¶¶ 60-61 [Plf.'s Rule 7.1 Response, denying both of Defendants' factual assertions, but citing only Plaintiff's Complaint generally, and Plaintiff's Exs. J, K, and L, found at Dkt. No. 36, Part 3, which consist of only (1) a Board of Parole appellate decision with regard to one of Plaintiff's parole hearings, (2) a July 28, 2006, letter from Marco Ricci, an Agency Program Aide at the Division of Parole, to Inmate Hector Pena-Martinez regarding Mr. Pena-Martinez's request for early conditional parole for deportation, and (3) a January 4, 2005, letter from Plaintiff to Defendant Tracy regarding his parole hearing scheduled for January 18, 2005].)

For all of these reasons, I recommend that Plaintiff's due process claim be dismissed.

**3. The Doctrine of *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)**

Because I find that sufficient grounds exist upon which to base a dismissal of Plaintiff's Amended Complaint, I need not, and do not, reach the merits of this alternative argument advanced by Defendants. (Dkt. No. 30, Part 8, at 5-8 [Defs.' Mem. of Law].)

**B. Dismissal on Alternative Grounds**

Under the "Three Strikes Rule" set forth in the federal statute governing *in forma pauperis* proceedings,

> [i]n no event shall a prisoner bring a civil action ... under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it ... fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g). The power of a federal district court to invoke this rule is not limited to the outset of a litigation but extends all throughout the pendency of the proceeding. In other words, specifically, federal district courts have the authority to rescind or revoke the *in forma pauperis* status that it has previously bestowed upon a plaintiff, where it discovers that the status was improvidently granted, even if the courts exercise that authority well into the pendency of the proceedings.[FN68]

FN68. *See Gill v. Pidlypchak,* 02-CV-1460, 2006 WL 3751340, at *5 (N.D.N.Y. Dec.19, 2006) (Scullin, J., adopting Report-Recommendation by Treece, M.J.); *Polanco v. Burge,* 05-CV-0651, 2006 WL 2806574, at *2 (N.D.N.Y. Sept.28, 2006) (Kahn, J., adopting Report-Recommendation by Homer, M.J.); *Demos v. John Doe,* 118 F.Supp.2d 172, 174 (D.Conn.2000); *McFadden v. Parpan,* 16 F.Supp.2d 246, 247 (E.D.N.Y.1998); *see also*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Rolle v. Nassau County Correctional Facility,* 01-CV-2414, Order, at 2 (E.D.N.Y. filed Nov. 17, 2004) ("A court may revoke the *in forma pauperis* status it previously bestowed upon a [plaintiff], where that status is later determined to be 'improvident' ") [citation omitted], *accord, Rolle v. Kurtzrock,* 03-CV-1789 Order (E.D.N.Y. filed June 17, 2004).

Here, I granted Plaintiff's request to proceed *in forma pauperis* on October 5, 2005. (Dkt. No. 5 at 3.) However, when I granted this request, I was relying on (among other things) Plaintiff's sworn allegation in his Amended Complaint that, as of August 16, 2005 (the date of signing of the Amended Complaint), his "prior court proceedings" consisted of only ***three*** such proceedings: (1) *Standley v. Wilcox,* 02-CV-6230 (S.D.N.Y.); (2) *Standley v. N.Y.S. Div. of Parole,* Index No. 000149/04 (N.Y.S. Sup.Ct., Albany County); and (3) *Standley v. N.Y.S. Div. of Parole,* Index No. 000971/05 (N.Y.S. Sup.Ct., Albany County). (Dkt. No. 4, ¶¶ 15-21 [Plf.'s Am. Compl.].) This sworn assertion was not accurate. As of August 16, 2005, Plaintiff had filed at least ***sixteen*** actions or appeals in state or federal court (other than the current action), as explained above in Part II.B. of this Report-Recommendation. Even if Plaintiff had intended to mean that he had previously filed only three *actions relating to his imprisonment,* his sworn assertion would not have been accurate. By August 16, 2005, Plaintiff had filed at least ***eleven*** such actions [FN69]-***twelve*** if one counts the legal malpractice action he filed against his former counsel on a criminal appeal.[FN70]

FN69. *See Standley v. Lazerson,* 91-CV-6078 (S.D.N.Y.) (prisoner civil rights action); *Standley v. Artuz,* 93-CV-3528 (E.D.N.Y.) (habeas corpus action); *Standley v. Stewart,* 97-CV-6552 (S.D.N.Y.) (civil rights action); *Standley v. Lyder,* 99-CV-4711 (S.D.N.Y.) (prisoner civil rights action); *Standley v. Wilcox,* 02-CV-6230 (S.D.N.Y.) (prisoner civil rights action); *Standley v. Goord,* Index No. 002763/2000 (N.Y.S. Sup.Ct., Dutchess County) (Article 78 proceeding); *Standley v. Goord,* Index No. 000120/2001 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Parole,* Index No. 000149/2004 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Goord,* Index No. 002828/2004 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Parole,* Index No. 000971/2005 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding); *Standley v. Parole,* Index No. 001989/2006 (N.Y.S. Sup.Ct., Albany County) (Article 78 proceeding).

FN70. *See Standley v. Stewart,* Index No. 402210/1999 (N.Y.S. Sup.Ct., New York County).

***14** Plaintiff's lack of candor was material in that, had I known of these other actions, I would have reviewed the docket sheets of these matters, and learned of Plaintiff's considerable litigation experience and his accumulation of strikes. Specifically, as of the date of October 5, 2005 (the date on which I granted Plaintiff's request to proceed *in forma pauperis* ), Plaintiff had received at least ***three*** "strikes" for purposes of 28 U.S.C. § 1915(g). [FN71] I note that I find nothing on the face of the Amended Complaint indicating that Plaintiff is in "imminent danger of serious physical injury." [FN72]

FN71. *See Standley v. Stewart,* 97-CV-6552, Order of Dismissal (S.D.N.Y. filed Sept. 5, 1997) (dismissing prisoner civil rights action for failure to state a claim under Rule 12[b][6] ); *Standley v. Lyder,* 99-CV-4711, 2001 WL 225035 (S.D.N.Y. March 7, 2001) (granting defendants' motion to dismiss Plaintiff's prisoner civil rights action for failure to state a claim under Rule 12[b][6] ); *Standley v. Artuz,* No. 95-2755, Order of Dismissal (2d Cir. filed May 31, 1996) (habeas corpus action; docket sheet noting that, on 6/11/96, Plaintiff's was specifically informed that his "appeal was dismissed as frivolous").

FN72. 28 U.S.C. § 1915(g); *see also Malik v. McGinnis,* 293 F.3d 559, 561 (2d Cir.2002) (examining plaintiff's allegations in order to determine if plaintiff's case fell within the exception to the three strike's rule for prisoners

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

in "imminent danger of serious physical injury").

As a result, I recommend that, in the alternative, the Court revoke Plaintiff's *in forma pauperis* status and dismiss Plaintiff's Amended Complaint without prejudice to refiling through a paid complaint. I base this recommendation not only on the "three strikes rule" but on the Court's inherent ability to manage its docket through sanctioning abusive litigation practices such as making material misrepresentations or omissions to the Court.

**C. Plaintiff's Motion for Summary Judgment**

Because I have concluded that the Court should dismiss Plaintiff's Amended Complaint, I conclude that the Court should deny Plaintiff's motion for summary judgment as moot.

In the alternative, I conclude that the Court should deny Plaintiff's motion for summary judgment because that motion violates Local Rule 7.1 of the Local Rules of Practice for this Court by failing to provide a valid Statement of Material Facts as required. Specifically, Plaintiff has failed to provide record citations in support of the factual assertions contained in his Rule 7.1 Statement, as Defendants point out. (Dkt. No. 24, Part 2 [Plf.'s Rule 7.1 Statement]; Dkt. No. 30, Part 8, at 5 [Defs.' Mem. of Law].) Plaintiff's response to this argument is that his failure to provide such record citations should not result in dismissal because (1) Plaintiff's failure was the result of his mistaken reliance on the Northern District's "*Pro Se* Handbook," which does not clearly state that such record citations were required, and (2) Plaintiff's failure should be excused in light of his special status as a *pro se* litigant. (Dkt. No. 36, ¶¶ 41-45 [Plf.'s Reply].)

I reject Plaintiff's argument. First, the version of the *Pro Se Handbook* on which Plaintiff allegedly relied in preparing his motion makes quite clear that the *Handbook* is only a guide, intended for use along with the Local Rules of Practice for this Court and the Federal Rules of Civil Procedure; and the *Handbook* also makes quite clear that Plaintiff should read and become familiar with all of Local Rule 7.1 before he begins writing a motion.[FN73] As a result, it was far from reasonable for him to rely on one excerpt from the Manual in filing the dispositive motion at issue. The unreasonableness of Plaintiff's reliance on an excerpt from the *Pro Se Handbook* is magnified by the fact that the law library at the New York State correctional facility in which Plaintiff was incarcerated when he prepared his motion had on file, along with a copy of the *Pro Se Handbook,* a copy of the Local Rules of Practice for the Northern District of New York, since the Clerk of the Court provides an updated copy of such Local Rules to all such institutions.

FN73. *See, e.g., Pro Se Handbook: The Manual for the Litigant Filing a Lawsuit Without Counsel,* at 1, 34 (U.S.Dist.Ct.N.D.N.Y.2005) ("This handbook should not be considered the last word, nor should it be your only resource. Rather, this handbook should be considered simply as a procedural aid in helping you file and litigate your lawsuit.... Local Rule 7.1 sets forth the procedure for filing a motion in the Northern District; ***motions must be filed in conformity with Local Rule 7.1 or else they will be denied.*** Please read and become familiar with all of Local Rule 7.1 before you begin writing a motion.").

***15** Second, the special leniency that is normally afforded to *pro se* civil rights litigants does not require that such litigants be excused from complying with Local Rule 7.1.[FN74] In any event, as I explained above in Part II.B. of this Report-Recommendation, I have already found that the circumstances warrant revoking Plaintiff's special status as a *pro se* litigant for the remainder of this action. As a result, he may not use the Court's special leniency to save his procedurally deficient motion for summary judgment.

FN74. *See* Bussa, 2004 WL 1637014, at *4 ("Proceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment.") [citations omitted], *accord,* Durran, 251 F.Supp.2d at 1211 [citations omitted].

Finally, even if I were to reach the merits of Plaintiff's motion, I would deny it for the reasons stated above in Part III.A. of this Report-Recommendation. This is because the two main legal issues raised in Plaintiff's motion are also raised in Defendants' cross-motion which,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

again, I have addressed above. (*Compare* Dkt. No. 24, Part 4, ¶¶ 1-44 [Plf.'s Mem. of Law in Support of His Motion] *with* Dkt. No. 30, Part 8, at 9-21 [Defs.' Mem. of Law in Support of His Cross-Motion].)

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' cross-motion for summary judgment (Dkt. No. 30) be ***GRANTED;*** and it is further

**RECOMMENDED** that, in the alternative, Plaintiff's *in forma pauperis* status be revoked as having been improvidently granted due to Plaintiff's lack of candor with the Court, and that his Amended Complaint be ***DISMISSED*** without prejudice to refiling through a paid complaint; and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 24) be ***DENIED*** as moot, procedurally deficient, and/or without merit.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2007.

Standley v. Dennison
Not Reported in F.Supp.2d, 2007 WL 2406909 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
John ALLEN, Plaintiff,
v.
State of NEW YORK; New York State Department of Correctional Services; New York State Division of Parole, Defendants.
No. 9:05-CV-1613 (NAM)(GJD).

Oct. 5, 2006.
John Allen, Moravia, NY, Plaintiff, pro se.

**DECISION and ORDER**

Hon. NORMAN A. MORDUE, Chief U.S. District Court Judge.

***1** By prior Decision and Order, this Court ruled that the original pleading filed by *pro se* plaintiff John Allen failed to allege facts to support a live case or controversy which he has standing to pursue. Dkt. No. 4.[FN1] In light of his *pro se* status, plaintiff was afforded an opportunity to file an amended complaint. *Id.* at 4-6.

FN1. Plaintiff's *in forma pauperis* application was granted. *Id* . at 5.

Plaintiff's amended complaint is before this Court for consideration. Dkt. No. 5.

In its prior Decision and Order, the Court determined that plaintiff had not established that his perceived injury from the application of New York State Mental Hygiene Law to convicted sex offenders immediately prior to their scheduled release from state prison is "sufficiently real and immediate" so as to constitute an existing case or controversy which may be properly considered by this Court. Dkt. No. 4 at 4. As noted by the Court, plaintiff's complaint did not clearly identify him as a sex offender, nor did plaintiff claim that he is scheduled for imminent release from prison. *Id.*

Upon review of the amended complaint, the Court finds that plaintiff has failed to cure the deficiencies discussed by the Court in its prior Decision and Order. While the amended complaint sets forth plaintiff's criminal history in sufficient detail to demonstrate that he is within the class of inmates who might be evaluated pursuant to Mental Hygiene Law § 9.27 (*see* Dkt. No. 6 at 6-7, 10), it does not appear from that pleading that plaintiff's release is imminent. Rather, plaintiff's conditional release date is not until 2013. *Id.* at ex. 1.

The Court notes that the amended complaint also sets forth claims challenging what plaintiff describes as a practice of withholding participation in the Sexual Offender Counseling Program ("SOCP") until an inmate is within one year of his conditional release date. According to plaintiff, one result of this practice is that inmates may not have completed this program prior to their initial appearance before the parole board and may, as a result, be denied release. Dkt. No. 5 at 7-8. It is well-settled that inmates do not enjoy constitutionally rights to participate in particular programs or to parole release. *See Lee v. Governor of New York,* 87 F.3d 55, 58-59 (2d Cir.1996); *Grant v. Ahern,* No. 03-CV-0539, 2005 WL 1936175 * 5 (N.D.N.Y.) (Magnuson, V.J.). Accordingly, these allegations do not a state a claim upon which relief may be granted by this Court.

Plaintiff also seeks to consolidate this action with *Donhauser v. Goord,* 9:01-CV-1535 (DNH/GHL). Dkt. No. 5 at 10-11. *Donhauser* is a class action challenging certain aspects of the SOCP. By Order filed February 15, 2005, District Judge Hurd certified the class, which is defined as "[c]urrent or former New York State prisoners who have lost or been denied good time credits or have been threatened with the loss or denial of good time credits because of a refusal to admit guilt to criminal sexual conduct as part of the Sexual Offender Counseling Program." *Donhauser,* Dkt. No. 127. Upon review, because plaintiff has not demonstrated in his amended complaint that he is a member of the class certified in *Donhauser,* consolidation is not warranted.[FN2]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

FN2. Inasmuch as plaintiff claims that he has been denied the opportunity to enrol in the SOCP, he can not claim to be a member of a class consisting of SOCP participants who have refused to comply with certain program requirements.

***2** For the reasons set forth herein and in the Court's prior Decision and Order, plaintiff's amended complaint, as drafted, fails to state a claim upon which relief may be granted, and this action is hereby dismissed.

WHEREFORE, based upon the foregoing, it is hereby

ORDERED, that this action is dismissed due to plaintiff's failure to state a claim upon which relief can be granted, and it is further

ORDERED, that the Clerk serve a copy of this Order on plaintiff.

IT IS SO ORDERED.

N.D.N.Y.,2006.

Allen v. New York
Not Reported in F.Supp.2d, 2006 WL 2864951 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Dominic LAROCCO, Plaintiff,

v.

NYS DIVISION OF PAROLE; Edward Mevec, Commissioner; George C. Johnson, Commissioner; and W. William Smith, Jr., Defendants.

No. 9:05-CV-1602 (TJM)(DEP).

May 12, 2006.

Dominic Larocco Plaintiff, pro se.

*DECISION and ORDER of DISMISSAL*

THOMAS J. McAVOY, United States Senior Judge.

**I. Background**

***1** Presently before this Court is a complaint filed by *pro se* plaintiff Dominic Larocco, together with an *in forma pauperis* application.[FN1] Plaintiff has not paid the required filing fee.

FN1. Larocco has one other action pending in this District. *See Larocco v. Goord,* 9:05-CV1074 (GLS/GHL).

Plaintiff claims that he was denied early parole release because he refused to participate in certain "recommended voluntary programs." Dkt. No. 1 at 2. [FN2] According to plaintiff, he participated in comparable programs while confined at Rikers Island and should not be required to re-take them.[FN3] *Id.* Plaintiff also alleges that defendants denied him early parole release based on the nature of plaintiff's crime. *Id.* at 2. Plaintiff claims that defendants actions violate his constitutional rights. For a complete statement of plaintiff's claims, reference is made to the complaint.

FN2. Larocco refers specifically to anger management and substance abuse programs such as A.R.T. and A.S.A.T. *Id.*

FN3. Plaintiff also objects to any determination that his participation in these programs is warranted by his record. Dkt. No. 1, 19-23.

**II. Discussion**

Section 1915(e)(2)(B) of Title 28 of the United States Code, which governs proceedings *in forma pauperis,* directs, in pertinent part, that "the court shall dismiss the case at any time if the court determines that-... (B) the action ...-(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is the court's responsibility to determine whether a plaintiff may properly maintain his complaint in this District before the court may permit a plaintiff to proceed with an action *in forma pauperis. See* 28 U.S.C. § 1915(e)(2).

Moreover, under 28 U.S.C. § 1915A, a court must review any complaint in a civil action in which a prisoner seeks redress from officers or employees of a governmental agency and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also Carr v. Dvorin,* 171 F.3d 115, 116 (2d Cir.1999) (per curiam) (citation omitted). An action is frivolous as a matter of law when, among other things, it is " 'based on an indisputably meritless legal theory,' " i.e., when it "lacks an arguable basis in law ... or [when] a dispositive defense clearly exists on the face of the complaint...." *Livingston v. Adirondack Beverage Co.,* 141 F .3d 434, 437 (2d Cir.1998) (internal citations omitted).

Although the court has a duty to show liberality towards *pro se* litigants, *Nance v. Kelly,* 912 F.2d 605, 606 (2d Cir.1990) (per curiam), and should exercise extreme caution in ordering *sua sponte* dismissal of a *pro se* complaint "*before* the adverse party has been served and both parties ... have had an opportunity to respond,"

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Anderson v. Coughlin,* 700 F.2d 37, 41 (2d Cir.1983) (citations omitted), there is a responsibility on the part of the court to determine that a claim is not frivolous before permitting a plaintiff to proceed. *See* *Fitzgerald v. First East Seventh St. Tenants Corp.,* 221 F.3d 362, 363 (2d Cir.2000) (district court may dismiss frivolous complaint *sua sponte* notwithstanding fact that the plaintiff has paid the statutory filing fee); *Thomas v. Scully,* 943 F.2d 259, 260 (2d Cir.1991) (per curiam) (district court has power to dismiss a complaint *sua sponte* if the complaint is frivolous).

***2** In this case, the gravamen of plaintiff's complaint appears to be that he was improperly denied parole release because of his refusal to participate in certain DOCS programs and based upon the nature of his crime. Plaintiff contends that his denial of early parole release amounts to a denial of due process and equal protection, violates his right against double jeopardy, and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution.

**A. Due Process Claim**

Plaintiff commenced this action pursuant to 42 U.S.C. § 1983, which provides, in pertinent part, that

[e]very person who, under color of statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured....

42 U.S.C. § 1983.

"Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir.1993) (citing *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 2432, 85 L.Ed.2d 791 (1985)). An essential element of a § 1983 claim is that "the conduct complained of must have deprived a person of rights, privileges or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994) (citing *Parratt v. Taylor,* 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981), *overruled on other grounds by* *Daniels v. Williams,* 474 U .S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)); *see also* *Sykes,* 13 F.3d at 519 (holding that "to prevail on a section 1983 claim, the plaintiff must show that the defendant's conduct deprived him of a federal right" (citations omitted)).

In order to proceed with his due process claim, it must appear that plaintiff enjoyed a protected liberty interest under New York law for granting parole. *See* *Barna v. Travis,* 239 F.3d 169, 170 (2d Cir.2001) (per curiam). "In order for a state prisoner to have an interest in parole that is protected by the Due Process Clause, he must have a legitimate expectancy of release that is grounded in the state's statutory scheme." *Barna v. Travis,* 239 F.3d 169, 170 (2d Cir.2001) (per curiam). It is well-settled, however, that "the New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release" and that, as a result, prisoners in New York State "have no liberty interest in parole, and the protections of the Due Process Clause are inapplicable." *Id.* at 171; *see also* *Boothe v. Hammock,* 605 F.2d 661, 664-65 (2d Cir.1979) (citation omitted);[FN4] *Greenholtz v. Inmates of Neb. Penal & Corr. Complex,* 442 U.S. 1, 7 (1979) (holding that "there is no [federal] constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence"); *Berard v. Vt. Parole Bd.,* 730 F.2d 71, 75 (2d Cir.1984) (same). Moreover, "[d]enial of parole is neither arbitrary nor capricious when the Parole Board relies on the factors defined by New York statute." *Romer v. Travis,* No. 03 Civ. 1670, 2003 WL 21744079, *6 (S.D.N.Y. July 29, 2003) (citing *Davis v. Thomas,* 256 F.Supp.2d at 191 ("denial of parole may be justified on the basis of reasonable considerations defined by statute, including ... seriousness of the offense for which he is in custody.")) (other citation and footnote omitted).

FN4. Rather, any alleged violations of procedural requirements "are matters for consideration by the state courts." *Boothe,* 605 F.2d at 665.

***3** Because plaintiff has failed to establish that he enjoyed a protected liberty interest in obtaining parole release, any alleged deficiencies or improprieties in the

consideration of plaintiff's parole application do not state a claim upon which relief can be granted under 42 U.S.C. § 1983.

**B. Equal Protection claim**

Plaintiff also fails to set forth an equal protection claim. Plaintiff does not allege that he is a member of a protected class for purposes of equal protection. To the extent that plaintiff is trying to allege that, as a violent offender, he is treated differently than non-violent offenders, such discrimination has been held to be "entirely appropriate and not at all invidious." *Parks v. Edwards,* No. 03-CV-5588, 2004 WL 377658, at *4 (E.D.N.Y. Mar. 1, 2004).

**C. Double Jeopardy violation**

Plaintiff seems to claim that by denying plaintiff parole based upon the violent nature of his original crime, defendants are violating the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution. Dkt. No. 1 at 9-10. The Second Circuit has held that "[t]he Double Jeopardy Clause applies to judicial proceedings, not parole." *Romer v. Travis,* No. 03 Civ. 1670, 2003 WL 21744079, at *9 (S.D.N.Y. Jul. 29, 2003) (citations omitted); *see also* *Alessi v. Quinlan,* 711 F.2d 497, 501 (2d Cir.1983) ("A denial of parole is a decision to withhold early release from the confinement component of a sentence. It is neither the imposition nor the increase of a sentence, and it is not punishment for purposes of the Double Jeopardy Clause ..."). The Parole Board's decision to deny parole did not violate Plaintiff's Double Jeopardy rights.

**D. Plaintiff's cruel and unusual punishment claim**

Plaintiff claims that his continued incarceration beyond his **minimum** sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. "Detention beyond the termination of a sentence can constitute cruel and unusual punishment if it is the result of 'deliberate indifference' to the prisoner's liberty interest." *Wright v. Kane,* No. 94 Civ. 3836, 1997 WL 746457, *4 (S.D.N.Y. Dec. 2, 1997) (citing *Estelle v. Gamble,* 429 U.S. 97, 104-06, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Calhoun v. New York State Division of Parole Officers,* 999 F.2d 647, 654 (2d Cir.1993)). As discussed above, plaintiff does **not** have a liberty interest in being granted parole. Moreover, plaintiff cannot show that he was deprived of a constitutional right "because he was not incarcerated beyond his term ...," i.e., he has not yet completed his maximum term of incarceration. *Wright,* 1997 WL 746457, at *4.[FN5] Accordingly, the Court concludes that Plaintiff has failed to state a claim under the Eighth Amendment upon which relief can be granted.

FN5. On September 17, 1997, plaintiff was sentenced to a term of eight to sixteen years imprisonment. *See* Dkt. No. 1 at 10.

**E. Sentence adjustment**

In addition to claiming that his constitutional rights have been violated by the defendants, plaintiff contends that the trial court improperly determined that plaintiff was a "second time violent felony offender" when in fact plaintiff should have been classified as a "first time violent felony offender." Dkt. No. 1 at 11. Plaintiff further argues that, because he was improperly sentenced, his minimum term of incarceration should be adjusted by the defendants and plaintiff should be immediately released. *Id.* at 15, 37.

***4** To the extent that plaintiff seeks to alter the fact or duration of his custody, he is advised that such relief may only be obtained by way of a habeas corpus petition brought pursuant to 28 U.S.C. § 2254. *See id.; Preiser v. Rodriguez,* 411 U.S. 475, 490 (1973) ("Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity" of their underlying criminal conviction); *see also* *Channer v. Mitchell,* 43 F.3d 786, 787 (2d Cir.1994) ("habeas corpus-not a § 1983 action-provides the sole federal remedy where a state prisoner challenges the fact or duration of his imprisonment ....") (citing *Preiser).*

**F. Conclusion**

For all of the above-stated reasons, plaintiff's complaint is subject to dismissal pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A for failure to state a claim upon which relief may be granted.[FN6]

FN6. Although "the usual practice is to allow leave to replead a deficient complaint, *see* Fed.R.Civ.P. 15(a); *see also* *Ronzani v. Sanofi, S.A.,* 899 F.2d 195, 198 (2d Cir.1990), such leave may be denied where amendment would be

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

> futile, *see Ruffolo v.. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993) (per curiam) ("Where it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend.")." *Price v. Hasly,* No. 04-CV-0090S, 2004 WL 1305744, *2 (W.D.N.Y. June 8, 2004).

**III. *In forma pauperis* application**

In light of the dismissal of this action, plaintiff's *in forma pauperis* application is **DENIED** as moot.

**WHEREFORE,** it is hereby

**ORDERED,** that this action is **DISMISSED** pursuant to 28 U.S .C. §§ 1915(e)(2)(B) and 1915A for failure to state a claim upon which relief may be granted; and it is further

**ORDERED,** that plaintiff's *in forma pauperis* application (Dkt. No. 2) is **DENIED** as moot, and it is further

**ORDERED,** that the Clerk serve a copy of this Order on plaintiff by regular mail.

N.D.N.Y.,2006.

Larocco v. NYS Div. of Parole
Not Reported in F.Supp.2d, 2006 WL 1313341 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





H

Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Thomas DUEMMEL, Plaintiff,
v.
Brian FISCHER; New York State Department of Correctional Services; David A. Paterson; Robert Dennison; Susan O'Connell, Defendants.
No. 9:08-CV-1006 (TJM).

Jan. 23, 2009.
Thomas Duemmel, Rome, NY, pro se.

**DECISION AND ORDER**

THOMAS J. McAVOY, Senior District Judge.

**I. Background**

***1** Currently before the Court for review is plaintiff Thomas Duemmel's amended complaint. Dkt. No. 7. Plaintiff submitted the amended complaint in compliance with the Decision and Order of this Court filed on October 23, 2008. Dkt. No. 5 ("October Order"). The October Order granted plaintiff's *in forma pauperis* application. *Id.*

**II. Discussion**

Section 1915(e) (2)(B) of Title 28 of the United States Code, which governs proceedings *in forma pauperis,* directs, in pertinent part, that "the court shall dismiss the case at any time if the court determines that-... (B) the action ...-(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). It is the court's responsibility to determine whether a plaintiff may properly maintain his complaint in this District before the court may permit a plaintiff to proceed with an action *in forma pauperis. See* 28 U.S.C. § 1915(e)(2).

Moreover, under 28 U.S.C. § 1915A, the Court must review any complaint in a civil action in which a prisoner seeks redress from officers or employees of a governmental agency and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, fails to state a claim upon which relief may be granted or seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b); *see also* *Carr v. Dvorin,* 171 F.3d 115, 116 (2d Cir.1999) (per curiam). An action is frivolous as a matter of law when, *inter alia,* it is based on an "indisputably meritless legal theory"-that is, when it "lacks an arguable basis in law ... or [when] a dispositive defense clearly exists on the face of the complaint." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998).

The gravamen of plaintiff's amended complaint is that he has been denied parole release in violation of his constitutional rights. Dkt. No. 7. Plaintiff also alleges that defendants denied him the right to participate in SOP in a timely manner.[FN1] *Id.* Plaintiff seeks his immediate release from custody and an "examination by the Court" of the denial of programming and parole. *Id.* For a more complete statement of plaintiff's claims, refer to the amended complaint.

FN1. Plaintiff appears to be referring to the Sex Offender Counseling & Treatment Program, which is a comprehensive program of counseling and treatment for sex offenders. *See* http://www.docs.state.ny.us/ProgramServices/guidance.html#soctp. Plaintiff did enroll in SOP and eventually completed the program on January 29, 2006. Dkt. No. 7 at 10-11.

**A. Defendants**

Plaintiff has not named "New York State Department of Correctional Services," "David Paterson," or "Susan O'Connell" as defendants in his amended complaint. Accordingly, "New York State Department of Correctional Services," "David Paterson," or "Susan O'Connell" are dismissed as defendants in this action.

**B. No right to parole or programming**

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

In order to proceed with his claim that he was denied parole in violation of his constitutional rights, it must appear that plaintiff enjoyed a protected liberty interest under New York State's statutory scheme for determining whether to grant or deny an application for parole. *See* *Barna v. Travis,* 239 F.3d 169, 170 (2d Cir.2001) (per curiam). It is well-settled, however, that "the New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release," and that, as a result, prisoners in New York state are not entitled to the safeguards afforded by federal due process with respect to parole release determinations. *Barna, supra,* 239 F.3d at 171; *Boothe v. Hammock,* 605 F.2d 661, 663-64 (2d Cir.1979).[FN2] Rather, any alleged violations of procedural requirements "are matters for consideration by the state courts." *Boothe,* 605 F.2d at 665.

FN2. The decision of the Supreme Court in *Wilkinson v. Dotson,* 544 U.S. 74 (2005), allowing a § 1983 action by Ohio prisoners challenging the constitutionality of that state's parole process, is not applicable to this case. The *Wilkinson* Court "did not create or comment on any constitutional entitlements relating to parole." *Standley, supra,* 2007 WL 2406909 at *1 quoting *Yourdon v. Johnson,* 01-CV-812E, 2006 WL 2811710 at *2 (W.D.N.Y. Sept. 28, 2006). The Court also notes that plaintiff does not claim that defendants acted "arbitrarily or capriciously." *See* *Standley v. Dennison,* No. 9:05-CV-1033, 2007 WL 2406909 *1 (N.D.N.Y. Aug. 21, 2007); *Bottom v. Pataki,* No. 9:03-CV-0835, 2006 WL 2265408 at *6 (N.D.N.Y. Aug. 7, 2006).

***2** It is also clear that inmates do not enjoy a constitutionally protected right to participate in particular programs or to parole release. *Allen v. New York,* 9:05-CV-1613, 2006 U.S. Dist. LEXIS 72646, at *3 (N.D.N.Y. Oct. 5, 2006) (Mordue, C.J.) (citing *Lee v. Governor of New York,* 87 F.3d 55, 58-59 (2d Cir.1996); *Grant v. Ahern,* 2005 U.S. Dist. LEXIS 43274, No. 03-CV-0539, 2005 WL 1936175 *5 (N.D.N.Y.) (Magnuson, V.J.)).[FN3]

FN3. In *Allen,* as in this case, plaintiff alleged that DOCS had a practice of withholding an inmate's participation in the Sexual Offender Counseling Program until an inmate was within one year of his conditional release date; as a result of this practice, the inmate may not have completed this program prior to his or her initial appearance before the parole board, resulting in denial of parole release. *See Allen,* 2006 U.S. Dist. LEXIS 72646, at *2-3. The *Allen* court found that these allegations did not state a claim upon which relief may be granted. *Id.*

**C. Release from custody**

To the extent that plaintiff seeks his immediate release from custody, he is advised that such relief may only be obtained by way of a habeas corpus petition brought pursuant to 28 U.S.C. § 2254. *See id.;* *Preiser v. Rodriguez,* 411 U.S. 475, 490 (1973) ("[c]ongress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity" of their underlying criminal conviction); *see also* *Channer v. Mitchell,* 43 F.3d 786, 787 (2d Cir.1994) ("habeas corpus-not a § 1983 action-provides the sole federal remedy where a state prisoner challenges the fact or duration of his imprisonment ....") (citing *Preiser* ).

**III. Conclusion**

Because plaintiff has failed to establish that he enjoyed a protected liberty interest in parole release or programming, the alleged deficiencies in the consideration of his parole application or the delay in providing programming do not state a claim upon which relief can be granted under 42 U.S.C. § 1983. Moreover, to the extent that plaintiff seeks his immediate release from custody, such relief may only be obtained by way of a habeas corpus petition brought pursuant to 28 U.S.C. § 2254. The amended complaint is therefore dismissed.

WHEREFORE, it is hereby

ORDERED, that "New York State Department of Correctional Services," "David Paterson," or "Susan O'Connell" are dismissed as defendants in this action; and it is further

ORDERED that this action is **dismissed** pursuant to 28 U.S.C. §§ 1915(e) and 1915A for failure to state a

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

claim upon which relief may be granted, and it is further

ORDERED, that the Clerk of the Court serve a copy of this Decision and Order on plaintiff.

N.D.N.Y.,2009.

Duemmel v. Fischer
Slip Copy, 2009 WL 174364 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.



Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Fernando MOREL, Petitioner,

v.

Gail THOMAS, Acting Superintendent, Mid-Orange Correctional Facility; Brion D. Travis, Chairman, New York State Division of Parole, Respondents.

No. 02 CV 9622(HB).

June 26, 2003.

Inmate petitioned for a writ of habeas corpus, claiming that his due-process and equal-protection rights were violated when the New York State Division of Parole denied his release, and moving for bail pending habeas review. The District Court, Baer, J., held that: (1) New York parole statute did not create a liberty interest in parole; (2) parole board did not violate Due Process in denying inmate parole; and (3) there was no Equal Protection violation in the denial of parole.

Petition denied, and motion dismissed.

West Headnotes

[1] **Constitutional Law 92 4838**

92 Constitutional Law

92XXVII Due Process

92XXVII(H) Criminal Law

92XXVII(H)12 Other Particular Issues and Applications

92k4838 k. Parole. Most Cited Cases

(Formerly 92k272.5)

**Pardon and Parole 284 46**

284 Pardon and Parole

284II Parole

284k45 Authority or Duty to Grant Parole or Parole Consideration

284k46 k. Parole as Right or Privilege. Most Cited Cases

New York parole statute did not create a liberty interest in parole, so as to support an inmate's claim of a Due Process violation in the denial of parole. U.S.C.A. Const. Amend. 14; 28 U.S.C.A. § 2254(b)(1), (b)(2); McKinney's Executive Law § 259-i(2)(c)(A).

[2] **Pardon and Parole 284 61**

284 Pardon and Parole

284II Parole

284k57 Proceedings

284k61 k. Reasons for Decision. Most Cited Cases

Parole board acted within its discretion in denying inmate parole, despite the inmate's claim that the board failed to offer any reasons for rejecting his institutional record, community support, and employment prospects; board was supplied with numerous documents about the inmate's crime (manslaughter), was aware of the factors in the inmate's favor, and was entitled to determine that the nature of the crime outweighed the positive aspects of his record.

[3] **Constitutional Law 92 3821**

92 Constitutional Law

92XXVI Equal Protection

92XXVI(F) Criminal Law

92k3821 k. Parole. Most Cited Cases

(Formerly 92k250.3(2))

**Pardon and Parole 284 60**

284 Pardon and Parole

284II Parole

284k57 Proceedings

284k60 k. Decision; Reconsideration. Most

Cited Cases

Inmate convicted of manslaughter failed to show that he was similarly situated to two other prisoners convicted of manslaughter but granted parole, or that the parole board intended to treat him differently from similarly situated inmates, thus defeating his claim of an equal protection violation in the denial of parole. U.S.C.A. Const. Amend. 14.

*OPINION AND ORDER*

BAER, J.

***1** Fernando Morel ("Morel") petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, on the basis that his due-process and equal-protection rights were violated when the New York State Division of Parole denied his release. Morel also moved for bail pending habeas review. For the following reasons, the petition is DENIED and the motion for bail is dismissed.

I. BACKGROUND [FN1]

FN1. Gabe Miller, an intern in my Chambers during the summer of 2003 and a second-year law student at Columbia Law School, provided substantial assistance in the research and drafting of this opinion.

Morel was convicted of first-degree manslaughter for a fatal stabbing during an altercation in a parking lot in Queens, New York on July 20, 1991. He was convicted on November 13, 1992, but this conviction was later reversed. He was again convicted of the same crime on November 9, 1995, and the court imposed a sentence of eight and one-third to twenty-five years, which he is currently serving at the Mid-Orange Correctional Facility in Warwick, New York.

Morel became eligible for parole after he served his minimum sentence, and he appeared before the Parole Review Board (the "Board") for the first time on September 22, 1999. The Board denied his application for parole and recommended that he apply again for parole in two years, the maximum allowed interval under N.Y. Executive Law § 259-i(2)(a).

He appeared before the Board a second time on September 19, 2001. When asked about the details of his crime, Morel explained that he was acting in self-defense. He stabbed the victim unintentionally as the victim threatened to strike Morel in the head with a glass bottle. Resp. Ex. A at 11-12 (Morel Parole Board Hearing, Sept. 19, 2001). At the hearing, the Board discussed with Morel his "excellent institutional adjustment" and "great disciplinary record," and his employment prospects if paroled.[FN2] Nevertheless, the Board again denied him parole, stating:

FN2. The relevant portions of this discussion are as follows:

Q ... Since you've been in State prison you have an excellent institutional adjustment. You have completed many programs. You have a great disciplinary record. You don't have any tickets; is that correct?

A Yes.

...

Q If you were to get released where would you live?

A I would live at home where I have been living all my life, practically-

Q And, where is that?

A That's in Jamaica, Queens.

Q Forty-eight Street?

A Yes

Q And, you live there with your mother?

A Yes, I do.

Q And, what type of work would you do? You could be a mechanic; could you do that?

A Yes. I have numerous letters of employment.

Q Yes. you have got a lot of letters of support and a lot of community support.

This was an extremely heinous brutal act during the commission of which you took a human life. You have an excellent institutional adjustment, however, you appear to lack insight into the reason for your crime. This panel feels that you are a poor candidate for discretionary release at this time [as it] would deprecate the seriousness of the instant offense and diminish respect for the law.

*Id.* at 19.

Morel filed an administrative appeal on December 17, 2001 to the Appeals Unit of the Division of Parole, and on June 5, 2002, the decision was affirmed on grounds that the Board did not rely on any erroneous information in denying his claim nor did it fail to consider all relevant information regarding his release. Resp. Ex. B at 29-30.

On February 11, 2002, Morel filed a petition for judicial review of the parole denial in the Supreme Court of the State of New York, Albany County, pursuant to N.Y. C.P.L.R. § 7803 ("Article 78"). He asserted that the Board violated his rights to due process and equal protection under the federal Constitution and his state-law right to be free of arbitrary and capricious administrative action under the New York Constitution. He contended that the Board's determination was arbitrary and capricious as it was not supported by any evidence that his release was inappropriate at that time.

***2** Supreme Court Justice George L. Cobb dismissed Morel's Article 78 petition on all counts for failing to state facts on which relief could be granted. Justice Cobb observed that:

It is well settled that the serious nature of the crime together with a lack of remorse or insight constitutes sufficient grounds and evidence to deny parole release.... [A] review of the transcript of his parole release hearing indicates that petitioner attempted to minimize his fault, thereby clear[ly] establishing a lack of insight.

*Morel v. Travis,* No. 3044-02, slip op. at 2-3 (Sept. 30, 2002) (citations omitted). Morel has not appealed this most recent denial to the Appellate Division.

On December 4, 2002, Morel filed a petition for habeas corpus and a motion for bail pending habeas review.

## II. DISCUSSION

Morel contends that he is entitled to habeas corpus relief because the Parole Board violated his federal constitutional rights to due process and equal protection under the Fourteenth Amendment when it denied his September 2001 request for parole. In addition to contesting the merits of Morel's petition, respondent also argues that Morel is procedurally barred under 28 U.S.C. § 2254(b)(1)(a) from bringing his habeas petition until he has exhausted all remedies available to him at the state level.[FN3]

FN3. To exhaust a denial of parole under New York law, an inmate must first file an administrative appeal with the Division of Parole's Appeals Unit. *See* N.Y. Comp.Codes. R. & Regs. tit. 9, § 8006.1. If that appeal is denied, he must seek relief in state court pursuant to Article 78 of the Civil Practice Law and Rules. *See Desire v. N.Y. Div. Of Parole,* 2001 U.S. Dist. LEXIS 13784, at *6 (S.D.N.Y. Aug. 22, 2001). Morel did appeal his denial to the Appeals Unit, and he also filed an appeal in New York Supreme Court pursuant to Article 78. Yet, he did not appeal the denial rendered by Justice Cobb to the Appeals Division of the state court. Thus, he failed to fully exhaust the state remedies available to him; Morel concedes this fact. *See* Pet. Mem. of L. at 1.

A petitioner challenging his custody pursuant to a conviction in state court must first exhaust all state-court remedies unless "it appears that ... circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1). "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the state." 28 U .S.C. § 2254(b)(2). Morel contends that the appeal process for a denial of parole is ineffective because he will be eligible

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

for a new hearing before he has exhausted his appeal-thus his appeal will be moot. He also contends that the state remedy is ineffective because the only remedy available to him is a de novo hearing before the Board. Morel's argument is nearly identical to the argument raised in several recent habeas challenges by other inmates in the Mid-Orange Correctional Facility. In all four cases, the court dismissed the due-process and equal-protection claims on substantive grounds and declined to rule on the procedural question of state exhaustion. *See Brown v. Thomas,* 2003 U.S. Dist. LEXIS 3396 (S.D .N.Y. Mar. 10, 2003); *Defino v. Thomas,* 2003 U.S. Dist. LEXIS 4299 (S.D.N.Y. Mar. 24, 2003); *Hairston v. Thomas,* 2003 U.S. Dist. LEXIS 5020 (S.D.N.Y. Mar. 31, 2003); *Manley v. Thomas,* 2003 WL 1739003 (S.D.N.Y. Apr.1, 2003).[FN4] Judge Lynch stated in *Brown,*

FN4. In *Brown* and *Defino,* the petitioners were each incarcerated pursuant to convictions of manslaughter in the first degree. *See Brown,* 2003 U.S. Dist. LEXIS 3396 at *1; *Defino,* 2003 U.S. Dist. LEXIS 4299 at *1. In *Hairston,* the petitioner had been convicted of four counts of robbery and one count of assault, and the petitioner in *Manley* was incarcerated pursuant to a conviction of second-degree murder. *See Hairston,* 2003 U.S. Dist. LEXIS 5020 at *1; *Manley,* 2003 WL 1739003 at *1. Each of the petitioners had excellent institutional records, had met numerous rehabilitative goals, and had participated in several institutional programs while incarcerated.

[S]o often in habeas corpus cases potentially complex and difficult issues about the various obstacles to reaching the merits should not be allowed to obscure the fact that the underlying claims are totally without merit. Since [the] petition can easily be rejected on the merits, requiring submission of that petition to the state courts, with the likelihood that the same arguments will be presented here in any event, would be a waste of the resources of both the state and federal courts.

***3** 2003 U.S. Dist. LEXIS 3396, at *2-*3. Similarly, this Court declines to rule on Morel's exhaustion argument because the petition can be dismissed on the merits of both the due-process and equal-protection claims.

A. Due Process

[1] Morel contends that the Parole Board violated his federally-protected rights to procedural due process on three grounds. First, the Board provided no evidence to support its determination that granting him parole would be inappropriate. Second, the Board's denial was arbitrary and capricious because it "failed to proffer any reasons for rejecting Petitioner's institutional record, community support and employability." Pet. Mem. of L. at 18. Finally, the Board's decision was "impermissibly infected" with political and public pressure to deny parole to inmates convicted of violent felonies. *Id.* at 19. He concedes that if he was not deprived of a liberty interest, then his "claims necessarily fail." *Id.* at 7. Although Morel makes a compelling argument that he should be paroled under the present state of the law, his due-process claim must be dismissed.

The Supreme Court has held that a convicted inmate has no inherent or constitutional right to be released on parole prior to the expiration of a valid sentence. *Greenholtz v. Inmates of the Neb. Panel & Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). However, in *Greenholtz,* the Court found that a Nebraska statute that mandated parole unless certain requirements were met *created* a liberty interest in release.[FN5] Morel contends that the New York parole statute creates a liberty interest in the same fashion as the Nebraska statute. The New York statute provides:

FN5. The Nebraska statute provides:

Whenever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it *shall* order his release *unless* it is of the opinion that his release should be deferred because:

(a) There is a substantial risk that he will not conform to the conditions of parole;

(b) His release would depreciate the seriousness of his crime or promote disrespect for law;

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

(c) His release would have a substantially adverse effect on institutional discipline; or

(d) His continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance his capacity to lead a lawabiding life when released at a later date.

Neb.Rev.Stat. § 83-1,114(1) (emphasis added).

Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law. In making the parole release decision, the guidelines ... shall require that the following be considered: (i) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments, therapy and interpersonal relationships with staff and inmates; (ii) performance, if any, as a participant in a temporary release program; (iii) release plans including community resources, employment, education and training and support services available to the inmate; (iv) any deportation order issued by the federal government against the inmate while in the custody of the department of correctional services and any recommendation regarding deportation made by the commissioner of the department of correctional services pursuant to section one hundred forty-seven of the correction law; and (v) any statement made to the board by the crime victim or the victim's representative, where the crime victim is deceased or is mentally or physically incapacitated.

***4** N.Y. Exec. L. § 259-i(2)(c)(A). Morel relies on *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), in which the Supreme Court held that the deprivation of good-time credits because of serious misconduct required a certain degree of due process protection. Morel also cites *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), where the Court ruled that a liberty interest is violated if treatment of an inmate imposes an atypical and significant hardship in relation to the ordinary incidents of prison life. *See Sandin,* 515 U.S. at 480-84. However, the Second Circuit has ruled unequivocally that the New York parole process "is not one that creates in any prisoner a legitimate expectancy of release" so as to warrant full procedural due process protection. *Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001) (per curiam). Within a few months of the *Greenholtz* decision, this circuit found New York's parole scheme legally distinguishable from that in Nebraska. *See Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979). The Second Circuit observed, "[I]t is apparent that New York's parole provisions ... do not establish a scheme whereby parole shall be ordered unless specified conditions are found to exist." *Id.; see also Barna,* 239 F.3d at 171 (quoting *Boothe* ). Morel contends that in *Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), the Supreme Court departed from the analytical approach of *Greenholtz.* Even if Morel is correct, this court is bound by the Second Circuit's precedent, which is unambiguous on this point.[FN6]

FN6. Indeed, the *Barna* opinion appears to rely on the distinction mentioned in *Greenholtz* about whether the state's parole statute contains language of an unmistakable mandatory character. *See Barna,* 239 F.3d at 171 ("Thus, '[i]t is apparent that New York's parole provisions ... do not establish a scheme whereby parole shall be ordered unless specified conditions are found to exist.... [N]o entitlement to release is created [by the parole provisions].' *Boothe v. Hammock,* 605 F.2d at 664. Accordingly, plaintiffs have no liberty interest in parole, and the protections of the Due Process Clause are inapplicable."). There is no citation in *Barna* to *Sandin,* which instructed that the proper analysis was not about whether the statute contained "language of an unmistakable mandatory character," but rather about "the nature of the deprivation," and specifically whether it "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 480-84. However, even if Morel is correct that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the New York parole scheme, like the Nebraska statute, creates a liberty interest, he overlooks the fact that New York's scheme contains procedures similar to Nebraska's to minimize the risk of erroneous decisions, which the Court found met due process requirements. *See* *Greenholtz,* 442 U.S. at 16 ("The Nebraska procedure affords an opportunity to be heard, and when parole is denied it informs the inmate in what respects he falls short of qualifying for parole; this affords the process that is due under these circumstances. The Constitution does not require more.").

Thus, because a New York law does not create a liberty interest in parole, Morel's due process rights extend only to a refusal by the Parole Board to deny release arbitrarily or capriciously, based on inappropriate consideration of a protected classification or an irrational distinction, or on any other unconstitutional grounds. *See* *Manley v. Thomas,* 2003 WL 1739003 at *3 (S.D.N.Y. Apr.1, 2003) (citing *Meachum v. Fano,* 427 U.S. 215, 226, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976)). Morel has not proven that the government treated him in an arbitrary manner. The Board's decision was justified on the basis of reasonable considerations defined in the New York Executive Law.

[2] Morel contends that the Board's determination was arbitrary and capricious because it failed to offer any reasons for rejecting his institutional record, community support, and employment prospects.[FN7] Pet. Mem. of L. at 18. Morel also asserts that his behavioral record and his desire to provide assistance to the parents of the victim demonstrate that he has been rehabilitated. *See* Pet. Mem. of L. at 16. Indeed, Morel presented a number of other factors that seemed to weigh in his favor. Nevertheless, however productive Morel's institutional adjustment has been, the statute clearly states that the Board is not to determine parole based on this consideration alone. The record indicates that the Board was supplied with numerous documents about Morel's crime and discussed these details with him at the parole hearing. Further, as noted above, the Board was certainly aware of the factors in Morel's favor, as it adverted to his exceptional institutional history and employment prospects. Although Morel argues that the arbitrariness of the decision is demonstrated by the lack of a comprehensive and inclusive discussion as to the Board's decision, "[t]he fact that the [B]oard did not discuss each factor with petitioner at [his] hearing does not constitute convincing evidence that it did not consider them." *See* *Matter of Mackall v. New York State Bd. of Parole,* 91 A.D.2d 1023, 458 N.Y.S.2d 251, 251 (App. Div.2d Dep't 1983). Similarly, the Board has discretion to accord these considerations whatever weight it deems appropriate, and, contrary to assertions made by petitioner, need not expressly discuss each of the reasons in its determination. *See* *Garcia v. N.Y.S. Div. of Parole,* 239 A.D.2d 235, 657 N.Y.S.2d 415, 418 (App. Div. 1st Dep't 1997).

FN7. He also contends that the Board's determination was arbitrary and capricious because he believes it misconstrued the facts of his case when it issued its determination. Specifically, Morel contends that the Board incorrectly described how he killed the victim and then fled the scene, and that this inaccuracy adversely affected the Board's determination. However, Justice Cobb's ruling on this point aptly characterizes the Board's statements. He found that,

> [It] is uncontroverted that the stab wound in fact was responsible for the death of the victim. While there might be some implication from the language [of the Board's decision] that the victim died before petitioner fled, the records before the parole board clearly establish that such was not the case. It is thus far more likely that the parole board was inarticulate in stating its grounds for denial, rather than that it believed that the victim died immediately.

> *Morel v. Travis,* No. 3044-02, slip op. at 2-3 (Sept. 30, 2002).

***5** The Board was entitled to determine that the nature of the crime outweighed the positive aspects of his record.[FN8] *See Defino,* 2003 U.S. Dist. LEXIS 4299, at *4. New York law is clear that where the record "demonstrates that the Parole Board considered the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

relevant statutory factors, including petitioner's record in prison and postrelease plans, before concluding in its discretion that, due to the serious and violent nature of the crime and petitioner's other violent conduct, petitioner is not an acceptable candidate for release on parole," reliance on the nature of the inmate's crime in their denial is entirely consistent with the criteria laid down by the legislature. *Brown,* 2003 U.S. Dist. LEXIS 3396 (citing *Thurman v. Hodges,* 292 A.D.2d 872, 739 N.Y.S.2d 324, 324 (App. Div. 4th Dep't 2002)).

FN8. Although not rising to the level of arbitrary and capricious, the Board's decision in this case is somewhat troublesome. As noted, Morel presented a number of positive factors, such as his exemplary institutional record and the employment opportunities available to him upon release, which the Board was required by the statute to consider. *See* N.Y. Exec. L. § 259-i(2)(c)(A); *see also* *Greenholtz,* 442 U.S. at 15 ("The behavior record of an inmate during confinement is critical in the sense that it reflects the degree to which the inmate is prepared to adjust to parole release."). Yet, the Board apparently found that his crime, which it characterized as an "extremely heinous brutal act," and his apparent lack of insight outweighed these positive factors. Notwithstanding that Morel's actions caused the death of another person, one could easily be concerned, as I am, with the Parole Board's description and the denial which flowed from it, where the uncontroverted facts of the events preceding the crime indicate that Morel had been approached by the victim, that the victim threatened to strike Morel in the head with a glass bottle, that Morel stabbed him once in the abdomen and then fled the scene, and that Morel contacted the police to turn himself in the following day. Pet. Ex. 4 at 3-9. Concern, however, does not pass the arbitrary and capricious test.

Thus, for the aforementioned reasons, it was within the Board's discretion to find as they did, and Morel's contention that the Parole Board violated his due process rights is unfounded.

B. Equal Protection

[3] Morel also asserts that the Board violated his right to equal protection of the laws by denying him parole while granting it to offenders convicted of similar crimes. This contention too is without merit.

Morel's equal-protection claim is in the nature of a "class of one." See *Village of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000). As the Court explained in *Olech,* "Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Id.* Thus, the three elements of a "class of one" equal-protection claim are that 1) the person received different treatment than others similarly situated, and that this disparate treatment was 2) irrational and wholly arbitrary and 3) intentional.[FN9] *See* *Giordano v. City of New York,* 274 F.3d 740, 751 (2d Cir.2001); *DeMuria v. Hawkes,* 328 F.3d 704, 706-07 (2d Cir.2003).

FN9. Morel also contends that the *Giordano* approach runs counter to the Supreme Court's decision in *Olech,* where the Court sustained a "class of one" equal-protection claim without requiring proof of an illicit motivation by the state. The Circuit has not decided whether *Olech* eliminated the Circuit's previously existing requirement that malice or bad faith be shown. *See* *DeMuria,* 328 F.3d at 707 n. 2 (declining to decide the issue and noting that it was similarly left unresolved in *Giordano* and *Harlen Assocs. v. Inc. Vill. of Mineola,* 273 F.3d 494, 499-500 (2d Cir.2001)). It is not necessary to resolve this issue here, either.

As noted above, there was a rational basis for the Board's decision to deny him parole *i.e.,* the Board's determination that to release Morel would deprecate the seriousness of the crime and undermine respect for the law. This alone would seem to also dispose of his equal-protection claim. However, in addition, although Morel contends that on the same day he was denied parole, the same three commissioners granted parole to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

two inmates convicted of manslaughter, he fails to show that they were similarly situated. Indeed, as Judge Sweet noted, "Given the degree of discretion accorded to the parole Board and the wealth of factors that its members may take into account, [petitioner's equal-protection] argument is difficult if not impossible to sustain." *See Defino,* 2003 U.S. Dist LEXIS 4299, at * 19. Further, given the various factors the Board can consider, Morel does not and cannot allege or show that the Parole Board *intended* to treat him differently from similarly situated inmates. Finally, Morel points to the Circuit's recent *DeMuria* decision in support of his argument that he has stated a claim and is entitled to discovery on it. He is correct that in *DeMuria,* the Circuit noted that "the allegation of an impermissible motive and of animus is sufficient to establish an equal protection issue." *DeMuria,* 328 F.3d at 707. However, the motive and animus that Morel contends is impermissible-namely, the Board's decision to get tough on violent offenders because of public and political pressure-in fact seems entirely permissible, as it closely relates to the statutory factor of whether "release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law." *See* N.Y. Exec. L. § 259-i(2)(c)(A).

***6** Given the amount of discretion accorded to the Parole Board under the law and the lack of substantive proof that the Board irrationally and intentionally treated Morel in a different fashion than it did other similarly situated offenders, Morel's equal protection claim is dismissed as being without merit.

III. CONCLUSION

For the foregoing reasons, Morel's habeas corpus petition is DENIED. Accordingly, his motion for bail is moot and dismissed. The Clerk of the Court is instructed to close this case and remove it from my docket.

IT IS SO ORDERED.

S.D.N.Y.,2003.

Morel v. Thomas
Not Reported in F.Supp.2d, 2003 WL 21488017 (S.D.N.Y.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.







Only the Westlaw citation is currently available.

United States District Court,

S.D. New York.

Peter GRAZIANO, James Buckley, Mark Malone, Robert A. Harris, William Walker, Aaron Talley, Maurice Murrell, Steven Ho, Brian Jacques and Charles Friedgood, suing on behalf of themselves and all others similarly situated, Plaintiffs,

v.

George E. PATAKI, Governor of the State of New York, Robert Dennison, Chairman of the New York State Division of Parole, and The New York State Division of Parole, Defendants.

No. 06 Civ. 0480(CLB).

July 17, 2006.

Robert Nathan Isseks, Middletown, NY, for Plaintiffs.

Neil Shevlin, New York State Department of Law (EPB), Albany, NY, for Defendants.

***Memorandum and Order***

BRIEANT, J.

***1** Before the Court in this prisoner civil rights case, filed as a class action, is a motion to dismiss the Complaint (Doc. Nos.8, 9) filed on April 28, 2006. Opposition papers were filed May 25, 2006 and reply papers were filed June 9, 2006. Oral argument was held on June 16, 2006. No motion for class certification has yet been filed, but for ease of reference the Court may hereinafter refer to the case as a class action.

Unless otherwise noted, the following facts are assumed true for purposes of this motion only. The ten named individual Plaintiffs sue on behalf of themselves and all others similarly situated for violations of due process and equal protection under the Fourteenth Amendment, and for violations of the *ex post facto* clause. They argue that they have been denied full, fair and balanced parole hearings as required to be conducted pursuant to the provisions of New York State Executive Law § 259-1, and as a result have been subjected to unconstitutional enhancements of their sentences. All of the named plaintiffs were convicted of second degree murder by trial or plea, and several have additional crimes attached to their record.

Defendant Governor Pataki is being sued in his official capacity only. Defendant New York State Division of Parole is a 19-member Board of Parole with statutory responsibility for determining whether parole-eligible prisoners will be released. Defendant Robert Dennison was confirmed in June of 2000, as Chairman and Chief Executive Officer of the New York Division of Parole, and is sued only in his official capacity.

In the last several years during the tenure of Governor George E. Pataki, there has been commentary and speculation on what is perceived by some to be a sudden sharp curtailing of the number of parole grants for entire classes of otherwise eligible offenders. This statistically apparent policy change is perceived to be based on the fact that they have committed crimes of great violence such as murder. Certain state court judges and panel scholars have remarked on what they consider to be an undeniable inference that something has changed within the Parole Board, with respect to crimes of great violence while the statutory bases for the exercise of its discretion, common to all cases, remains unchanged.

In this action, Plaintiffs allege that since 1995, the "Board of Parole has been issuing parole determinations pursuant to an unofficial policy of denying parole release to prisoners convicted of A-1 violent felony offenses, solely on the basis of the violent nature of such offenses and thus without proper consideration to any other relevant or statutorily mandated factor." *First Amended Complaint ("Complaint") at* ¶ 31. Plaintiffs allege that the "unofficial policy of the Parole Board was instigated by [Governor] Pataki and has been implemented and executed by the Division of Parole under Parole Chairman Robert Dennison," contrary to and in violation of New York State Executive Law § 259-I, which provides that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

several enumerated factors must all be considered in deciding whether to grant parole in a specific case. These include, but are not limited to the seriousness of the offense, the type of sentence, the length of sentence, the pattern of offenses, the inmate's institutional record, including program goals and accomplishments, academic achievements, therapy and interpersonal relationships with staff and inmates. *Complaint* at ¶¶ 32, 33. Plaintiffs contend that the unofficial policy allegedly executed by the Parole Board is “in conflict with, and completely ignores the rehabilitative goals embodied in the provisions of the N.Y. S. Executive Law and Penal Law and contravenes the discretionary scheme mandated by these statutes.” *Complaint* at ¶ 36.

***2** Plaintiffs contend that the Defendants' “unofficial policy precludes and/or substantially curtails the Parole Board's full and meaningful consideration of the statutorily mandated factors,” and that the Parole Board bases its parole decisions for prisoners serving sentences for A-1 violent felonies upon impermissible factors. *Complaint at* ¶ 3. Plaintiffs allege that this unofficial policy has resulted in denials of parole that have been arbitrary and capricious and speculate that obtaining grants of federal money has been one of the motives for effecting a plunging parole release rate for violent criminals. *See Oppo. Memo at 2-4.* They cite to statistics illustrating that there has been a significant decline since 1995 in parole releases for prisoners serving sentences for A-1 violent offenses. Attached to the Complaint are summaries of the Parole Board Interviews and Release Rates for Fiscal Year (“FY”) 1991-1992 through 2002-2003, the Board decisions by Summary Crime Categories for 1992-1993 through 2002-2003, and the Board decisions by Crime of Commitment for FY 1991-1992 through 2002-2003. *Complaint at Ex. A.* Plaintiffs also refer to recent attention brought to this subject in an article in the New York Law Journal in which it was reported that the percentage of A-1 violent felons paroled each year had fallen from a high of 28% under Governor Cuomo to 3% in 2004-2005 under Governor Pataki. *Oppo. Memo at 2, citing to ‘Dismantling Parole: Parole Release Rates Plunge Under Pataki's Tough Policy,”* New York Law Journal, January 31, 2006.

Plaintiffs contend that such a policy exists and has led to unequal treatment of prisoners convicted of A-1 violent felony offenses as compared to prisoners who are not serving sentences for such offenses, “in that the single criterion-the nature of the present offense-is all that is being given weight or consideration in the Board's determinations as to whether prisoners convicted of A-1 violent felony offenses will be granted parole release, while due consideration is being given to other statutory criteria in determining whether other prisoners not so convicted will be granted parole release.” *Complaint* at ¶ 37.

Plaintiffs contend that the execution of this policy has also led to violations of their due process rights, because as a result of this policy, the denials of the parole release to class members “have been and continue to be arbitrary and capricious, based upon impermissible political and economic” reasons. They argue that execution of the policy of denying them parole without proper consideration of all relevant statutory factors constitutes unauthorized action in violation of Plaintiffs' rights to due process guaranteed by the Fourteenth Amendment. *Complaint at* ¶ 38.

Plaintiffs finally assert violations of the *ex post facto* clause, asserting that the Parole Board's policy has “brought about an ex post facto enhancement of the punishments imposed upon the named plaintiffs and members of the prospective class at their respective sentencings and thereby violates U.S. Const. Art. 1, § 10, cl. 1.” *Complaint at* ¶ 39.

***3** Plaintiffs acknowledge, as they must, that there have been numerous similar recent challenges in the New York State Supreme Courts through Article 78 proceedings and in the federal courts through § 1983 proceedings, in which it has been argued that the Parole Board has been dismantling parole, in refusing to give meaningful and balanced consideration to the various factors required by law and by giving undue weight to the violent nature of prisoners' crimes. They distinguish this class action as focusing their challenge “not just on their own individual parole determinations, but on the unlawful manner in which the Pataki Parole Board is issuing adverse parole determinations on a class-wide basis,” and thereby failing to exercise its discretion. *Oppo. Memo at 5.* They argue that the Board has instead been “carrying

out an Executive agenda, which calls for the elimination of parole for practically all A-1 violent felons." *Oppo. Memo at 6.*

Defendants move to dismiss the Complaint for failure to state a claim of violations of due process, equal protection and the *ex post facto* clause, contending, *inter alia,* that there exists no such policy to deny parole outright to A-1 violent offenders and that Plaintiffs ignore the fact that their sentences involve a maximum sentence range of life imprisonment.

*Proposed Class & Subclass*

Plaintiffs submit that members of the class are estimated to be in the thousands and are therefore so numerous to render joinder impracticable. The named Plaintiffs seek to represent a class comprised of all prisoners in the custody of the New York State Department of Correctional Services who:

1) were convicted of A-1 violent felony offenses;

2) have served the minimum terms of their indeterminate sentences and are therefore eligible for parole release; and

3) have had their most recent applications for parole release denied by the Parole Board solely because of the "seriousness of the offense," the "nature of the present offense," or words to that effect, and in some cases, their prior criminal history.

*Complaint* at ¶ 3.

Nine out of the ten named Plaintiffs (not Plaintiff Friedgood), also seek to represent a sub-class of prisoners who meet the same defining factors of the main class as set forth above, but who were also sentenced to *less* than the statutory maximum term of imprisonment-25 years to life-for their violent offenses.

The proposed class period for the class and subclass commences three years before the date the action was filed. The case was filed January 23, 2006, therefore the proposed class period begins January 23, 2003, and extends "until such date when the defendants are enjoined from, or otherwise cease, the unconstitutional manner in which the Parole Board is denying parole release to the plaintiffs and members of the proposed class and/or subclass." *Complaint at* ¶ 5.

*Abstention*

At the outset, the Court will address Defendants' suggestion that this Court should abstain from deciding this issue under *Pullman* for purposes of comity, federalism, and New York's separation of powers, and under *Younger,* for Plaintiffs Walker and Friedman, each of whom, they argue, has the same claims pending in state court.

***4** Abstention under the Pullman doctrine may be appropriate when three conditions are met: (1) an unclear state statute is at issue; (2) resolution of the federal constitutional issue depends on the interpretation of the state law; and (3) the law is susceptible "to an interpretation by a state court that would avoid or modify the federal constitutional issue." *Greater New York Metro. Food Council v. McGuire,* 6 F.3d 75, 77 (2d Cir.1993) (per curiam). Satisfaction of all three criteria does not automatically require abstention, however. "The doctrine of abstention ... is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it."

*Vermont Right to Life Comm. v. Sorrell,* 221 F.3d 376, 385 (2d Cir.2000).

Plaintiffs oppose abstention, arguing that there is no unclear state statute involved, as the plain meaning of New York Executive Law § 259-I and New York Penal Law § 70.00 is not in dispute, and that sensitive issues of federalism are not involved. The Court recognizes that the issue presented is an extremely sensitive one. Human liberty interests are implicated, counterbalanced by societal interests in punishment and prevention of violent crime, as well as state separation of powers principles. The Court nevertheless declines to abstain, as the state law is not, in this Court's view, unclear and the extraordinary recourse of abstention is not necessary. Insofar as concerns *Younger* abstention, it would apply only to two of the named plaintiffs, so the Court declines to consider that issue at this stage of the litigation.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Discussion*

In considering a motion to dismiss under Rule 12(b)(6), the Court is obliged to accept the well-pleaded assertions of fact in the complaint as true and to draw all reasonable inferences and resolve doubts in favor of the non-moving party. *See Kaluczky v. City of White Plains,* 57 F.3d 202, 206 (2d Cir.1995). The focus of the Court's inquiry is not whether plaintiffs will ultimately prevail, but whether the plaintiffs are entitled to an opportunity to offer evidence in support of their claims. Therefore a motion to dismiss must be denied unless it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim which would entitle plaintiff to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46 (1957).

*Parole in New York*

Parole in New York is entirely a creature of statute. "There shall be in the executive department of state government a state division of parole. The chairman of the state board of parole shall be the chief executive officer of the division." N.Y. Exec. Law § 259(1). "There shall be in the state division of parole a state board of parole which shall possess the powers and duties hereinafter specified. Such board shall consist of not more than nineteen members appointed by the governor with the advice and consent of the senate. The term of office of each member of such board shall be for six years." N.Y. Exec. Law § 259-b(1). "The governor shall designate one of the members of the board as chairman to serve in such capacity at the pleasure of the governor or until the member's term of office expires and a successor is designated in accordance with law, whichever first occurs." N.Y. Exec. Law § 259-b(3).

***5** The state board of parole shall "have the power and duty of determining which inmates serving an indeterminate or determinate sentence of imprisonment may be released on parole," N.Y. Exec. Law § 259-c(1), and shall "establish written guidelines for its use in making parole decisions as required by law, including the fixing of minimum periods of imprisonment or ranges thereof for different categories of offenders." *Id.* at § 259-c(4). New York's law provides that:

Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law.

N.Y. Exec. § 259-i(2)(c)(A). It also provides:

In making the parole release decision, the guidelines adopted pursuant to subdivision four of section two hundred fifty-nine-c of this article shall require that the following be considered: (I) the institutional record including program goals and accomplishments, academic achievements, vocational education, training or work assignments, therapy and interpersonal relationships with staff and inmates; (ii) performance, if any, as a participant in a temporary release program; (iii) release plans including community resources, employment, education and training and support services available to the inmate; (iv) any deportation order issued by the federal government against the inmate while in the custody of the department of correctional services and any recommendation regarding deportation made by the commissioner of the department of correctional services pursuant to section one hundred forty-seven of the correction law; and (v) any statement made to the board by the crime victim or the victim's representative, where the crime victim is deceased or is mentally or physically incapacitated.

*Id.* The law permits appeal of parole determinations as follows:

Except for determinations made upon preliminary hearings upon allegations of violation of presumptive release, parole, conditional release or post-release supervision, all determinations made pursuant to this section may be appealed in accordance with rules promulgated by the board. Any board member who participated in the decision from which the appeal is taken may not participate in the resolution of that appeal. The rules of the board may specify a time within which any appeal shall be taken and resolved.

NY Exec. § 259-i(4)(A).

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The New York Court of Appeals has held:

As the Supreme Court has recently stated, referring to the Federal parole system, in *United States v. Addonizio* (442 U.S. 178, 190): "The import of this statutory scheme is clear: the judge has no enforceable expectations with respect to the actual release of a sentenced defendant short of his statutory term. The judge may well have expectations as to when release is likely. But the actual decision is not his to make, either at the time of sentencing or later if his expectations are not met. To require the Parole Commission to act in accordance with judicial expectations, * * * would substantially undermine the congressional decision to entrust release determinations to the Commission and not the courts."

***6** *Russo v. New York State Board of Parole,* 50 N.Y.2d 69, 76-77 (N.Y.1980).

*Due Process Claim*

Defendants argue that the Board's denials have not been arbitrary, capricious, or otherwise unlawful, and that there exists no *policy* to deny parole to violent criminals based solely on the nature or severity of their crimes. They assert that "it is well-established that the Board may deny parole based upon the nature and severity of the underlying crime as long as it has taken the other statutory factors into consideration." *Memo at 20.* The Court agrees, but notes here that the allegation in this case is that the other statutory factors are not actually taken into consideration in connection with A-1 felons, and that this occurred and continues under a *policy,* rather than on an individualized process of decision-making.

Plaintiffs argue that prior courts could not fully address the allegation in this case, which is that the Parole Board is not exercising statutory discretion, but is instead carrying out a policy, or Executive agenda, which calls for the elimination of parole for practically all A-1 violent felons. They argue that reviewing state courts have thus far only considered this type of case on an individual case-by-case basis, and accordingly could not have perceived an illegal policy, as is alleged to exist in this litigation, of denying parole on the singular basis of the violent nature of the crime. Plaintiffs contend that:

With only one parole decision being reviewed per judicial proceeding, the Attorney General was always able to argue, and the courts were always able to accept, that, in the discretionary judgment of the Parole Board, the *particular* circumstances of the crime in question, as recited in the Board's decision, had some rational bearing upon whether the prisoner ought to be released at that time. But what becomes obvious when reading dozens of these parole decision at a single sitting, rather than just one at a time, is that there is nothing unique or particularly telling about most of the facts and circumstances that these decisions describe and are based on. The Board is simply describing murders and denying parole-nothing more than that. It becomes obvious, ... that the Board is denying parole to practically every prisoner who is serving time for murder, just because that prisoner committed murder and for no other reason, no matter how well that prisoner may have done in prison and no matter how well he may have prepared himself for a law abiding life on the outside.

*Oppo. Memo at 7.*

Plaintiffs argue that in this class action the "Court will have the entire picture and that picture makes it abundantly clear that, because of an Executive mandate, the plaintiffs and class members' "hopes for parole [have been] doomed from the start." *Oppo. Memo at 8,* citing *Cappiello v. New York State Bd. of Parole,* 6 Misc.3d 1010(A), 2004 WL 3112629 at * *6 (N.Y.Sup.). Defendants contend that when a panel finds that the gravity of violence in a particular inmate's crime outweighs any positive factors, and denies parole on that basis, it reflects a societal desire for enhanced safety, and as a matter of law does not reflect or constitute a prohibited policy to deny parole to A-1 violent felons. Perhaps this is the most likely reality, however, the Court reads the Complaint, in the light most favorable to Plaintiffs, to assert a claim that there is in fact a policy, and under the policy, each Plaintiff's status as an A-1 violent offender predetermines the outcome of the parole decision, notwithstanding any positive factors, and that this is in violation of New York law. Accordingly, the Complaint pleads facts, the validity or truth of which may not be determined on a Rule 12(b)(6) motion.

***7** Plaintiffs "readily acknowledge that a New York

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

State prisoner does not have a constitutional right to parole release." *Oppo. Memo at 12.* They acknowledge also that "New York's parole scheme gives the Parole Board discretionary authority to grant or deny parole and therefore does not create a legitimate expectancy of release." *Id., citing Barna v. Travis,* 239 F.3d 169, 170-171 (2d Cir.2001). However, the Board's discretionary authority does not amount to unlimited authority, as the Board is required to apply the three standards and consider the five factors set forth in Executive Law § 259-i(2)(c)(a). Plaintiffs argue, and the Court agrees, that even though there is no liberty interest in parole release, there is still a due process liberty interest in "not being denied parole for arbitrary or impermissible reasons" or as the result of "flagrant or unauthorized action," in derogation of the statute. *Oppo. Memo at 12.*

In *Barna v. Davis,* our Court of Appeals held:

The New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release. The State statute creates a parole board that has the power and the duty to determine "which inmates serving an indeterminate ... sentence of imprisonment may be released on parole ... and when." N.Y. Exec. Law § 259-c.1. The board is to establish its own guidelines for making such parole decisions. See *id.* § 259-c.4. The current parole board guidelines state, in pertinent part, that the purpose of the guidelines is to "structure [the parole board's] discretion with regard to [minimum-period-of-imprisonment] and release decisions," that the guidelines "are based on only two major factors-crime severity and past criminal history," and that "they are intended only as a guide, and are not a substitute for the careful consideration of the many circumstances of each individual case." 9 N.Y.C.R.R. § 8001.3(a).

*Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001). The Court also held in that decision that:

[I]t is apparent that New York's parole provisions ... do not establish a scheme whereby parole shall be ordered unless specified conditions are found to exist.... No entitlement to release is created [by the parole provisions]. Accordingly, plaintiffs have no liberty interest in parole, and the protections of the Due Process Clause are inapplicable.

*Id.* (citations and quotations omitted).

In *Barna,* the Plaintiffs argued on appeal that the State "systematically denies parole to prisoners who were convicted of crimes of violence." *Barna,* 239 F.3d at 170. Although our Court of Appeals clearly held that there is no entitlement or "legitimate expectation of release that is grounded in the state's statutory scheme," this Court concludes as a matter of law that there is an entitlement to a process of decision-making, which comports with the statutory guidelines of consideration to all relevant statutory factors. Expressed differently, the Executive Branch, by adopting a policy as alleged, which constricts or alters the intended operation of the statute, if it did so, would violate Plaintiffs' due process rights. Indeed, Defendants acknowledge that "decisions following *Barna* have recognized that because the Board is required to consider the guidelines set forth in N.Y. Exec. Law § 259-i(2)(a), an inmate's due process rights will extend 'only to a refusal by the Board to deny release arbitrarily or capriciously, based upon inappropriate consideration of a protected classification or an irrational distinction, or on any other unconstitutional grounds.' " *Memo at 19-20* (citations omitted). Defendants argue, however, that in this case, the parole denials challenged were neither arbitrary, nor capricious, nor otherwise unlawful, and that Plaintiffs' due process claims must accordingly be dismissed without taking evidence in support of the allegations of an unlawful policy.

***8** Defendants argue that as "as a matter of law, the Board's determinations in each of the plaintiffs' parole interviews do not constitute a prohibited policy" and that "this contention has been rejected time and again by both federal and state courts in New York," which have found that "as long as the Board has properly considered the statutory guidelines, it may determine that parole should be denied based on the nature and severity of the underlying crime and that such determinations do not constitute a policy to deny parole to inmates who have committed violent crimes." *Memo at 22.* The Court agrees that where a Board has properly considered statutory guidelines, it may in its proper exercise of discretion deny parole where it determines upon a fair consideration of all

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

relevant statutory factors that the nature and severity of the underlying crime outweigh other possibly positive factors.

In this case, however, Plaintiffs do not simply challenge "the way that the Board exercised its discretion in their particular cases," but contend that "the Board is not exercising its discretion, at all." *Oppo. Memo at 5.* They argue that in other Article 78 and § 1983 proceedings, a plaintiff could challenge only his own adverse parole decision, and such cases were usually decided against the individual Plaintiff, because of the reasoning that the well-settled state law of New York is that a Parole Board's decision is discretionary, resulting in no due process liberty interest in parole release; that the seriousness of a person's crime is a valid consideration; and that it was within the Board's discretion to deny parole release.

If there were proved to exist an unpublished official policy as alleged, imposed upon and implemented by the Board, which dictated the outcome of parole decisions for certain prisoners in contravention of the statutorily required process of determining an individualized outcome, Plaintiffs would have asserted a viable claim. They should be entitled to submit evidence in support of their non-frivolous allegations. Without suggesting that he has done so, the Court can hold with confidence that the Governor would not be permitted to effect a "policy" as an end run around the legislature, in order to accomplish a goal of amending the statutory criteria to deny parole to a class of violent offenders.

Such an end run is precisely what is alleged by the Plaintiffs. The abrupt and steep decline in the grant of parole in A-1 cases *(see supra,* pages 2-4) is at least circumstantial evidence suggesting that such a policy exists. Although there is no due process right to be granted parole, this Court concludes that there exists a Constitutional right to have a parole decision made in accordance with the statute.

The role of the Parole Board is ... to determine whether, as of this moment, given all the relevant statutory factors, he should be released. In that regard, the statute expressly mandates that the prisoner's educational and other achievements affirmatively be taken into consideration in determining whether he meets the general criteria relevant to parole release under section 259-i(2)(c).

***9** *King v. New York State Division of Parole,* 190 A.D.2d 423, 432 (N.Y.App.Div.1993). In King, the Appellate Division also held:

[W]hile the courts remain reluctant to second-guess the decisions of the Board, it is unquestionably the duty of the Board to give fair consideration to each of the applicable statutory factors as to every person who comes before it, and where the record convincingly demonstrates that the Board did in fact fail to consider the proper standards, the courts must intervene.

*Id.* at 431. In that case, the Court held that "the record clearly reveals that the denial of petitioner's application was a result of the Board's failure to weigh all of the relevant considerations and there is a strong indication that the denial of petitioner's application was a foregone conclusion." *Id.* at 431-432 (N.Y.App.Div.1993). The same is alleged in the case at bar, and that is all that is needed to defeat a Rule 12(b)(6) motion.

This Court discerns a meaningful distinction in theory between a challenge to the process of determining a parole decision, and a challenge of the actual outcome. While adhering to the Court of Appeals' holding that prisoners have no liberty interest in being *granted* parole, so as to invoke the protections of the due process clause, it is nevertheless understood that if, as alleged, there were to exist an "unofficial policy or practice of the Parole Board," to "unlawfully eliminate or substantially curtail the Parole Board's discretion concerning prisoners serving sentences for A-1 violent offenses" and to have the Parole Board "deny parole release to such prisoners solely on the basis of the violent nature of their present offenses," as clearly alleged in the Complaint, that this would constitute a violation of a due process right to have a parole decision made according to the legislatively enacted criteria. *See Complaint* at ¶ 2. In other words, while there is no due process right to being *granted* parole, there is a due process right to have the decision made only in accordance with the statutory criteria. Although difficulties of proof of the existence of the alleged policy are readily apparent, the Complaint appears to state a claim for a due process

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

violation, which at the very least would support declaratory or injunctive relief.[FN1] It is unclear that any Plaintiff could ultimately prove, in addition to the existence of the alleged policy, that his resulting parole decision would have been different if it had resulted from a fair and balanced consideration of all factors, including, of course, the violent nature of the offense.

> FN1. It seems extremely doubtful that the sudden change in the percentage of parole grants *(see* text at pages 2-4) standing alone, would prove the adoption or existence of the claimed policy. There are lies, damn lies and statistics.

The allegation that there exists a policy or practice to deny parole based solely on the nature of the violent offense, enables the Complaint in this case to transcend what all previous Court decisions have addressed, namely, whether a particular parole denial constituted a violation of one or more Constitutional rights. The Court perceives a distinction inherent in those prior cases, which only challenged the resulting decision, and this Complaint, which challenges the process of reaching a decision.

*Equal Protection Claim*

***10** Plaintiffs contend that they have been denied the benefit of full consideration of all the statutory factors, in contrast to inmates not convicted of A-1 violent crimes. Defendants argue that Plaintiffs cannot state a claim for an equal protection violation and move to dismiss that claim as well. They argue that violent felons are not similarly situated to non-violent felons for purposes of equal protection analysis, and that prisoners or A-1 felons are not a suspect class enabling them to state an equal protection claim. They argue that the Board's exercise of discretion, including giving more weight to one factor than another in reaching an ultimate decision, is exactly what the statute provides. They point to several decisions of the Eastern and Southern Districts of New York in which the courts decided that the Board may, after considering all of the statutory guidelines, determine that parole should be denied based on the nature and severity of the underlying crimes.

The Court disagrees with Defendants' assertion that Plaintiffs are not similarly situated to other (non-violent) prisoners eligible for parole, insofar as every prisoner eligible for parole, is subject to, and deserving of fair consideration of each relevant statutory factor. That the resulting decision could quite likely be legitimately different, according to whether someone is an A-1 violent offender or not, does not change the fact that each individual eligible for a parole determination has a right to actual consideration by proper procedure, rather than to a predetermined outcome imposed by an unpublished policy, not adopted by the legislature.

The Court concludes that the same distinction addressed *supra* in the due process analysis, between challenging the *outcome* of a parole decision and challenging the *process* of making a parole decision, applies to the equal protection analysis. An A-1 violent offender who is not similarly situated to a non-A-1 violent offender for purposes of being *granted* parole, is nevertheless similarly situated to a non-A-1 violent offender for purposes of *being considered* for parole, according to the statutorily-defined criteria. The violent nature of the offense may obviously be considered, but may not serve to make a denial a foregone conclusion, in contravention of the statutorily-prescribed process of consideration.

*Ex Post Facto Claim*

Defendants argue that a denial of parole does not increase the penalty by which a crime is punishable and doesn't operate retroactively. Our Court of Appeals has held:

> [There is no] merit in plaintiffs' claims that State parole procedures adopted after they were incarcerated violate the Ex Post Facto Clause. That Clause applies only to "legislative action that retroactively 'punishes as a crime an act previously committed, which was innocent when done,' 'makes more burdensome the punishment for a crime, after its commission,' or 'deprives one charged with crime of any defense available according to law at the time when the act was committed." *Doe v. Pataki,* 120 F.3d 1263, 1272 (2d Cir .1997) (quoting *Beazell v. Ohio,* 269 U.S. 167, 169-70, 70 L.Ed. 216, 46 S.Ct. 68 (1925)). A law that is merely procedural and does not increase a prisoner's punishment cannot violate the Ex Post Facto Clause even when applied retrospectively. *See California*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

*Dep't of Corrections v. Morales,* 514 U.S. 499, 507-09, 131 L.Ed.2d 588, 115 S.Ct. 1597 (1995).

***11** The Ex Post Facto Clause does not apply to guidelines that do not create mandatory rules for release but are promulgated simply to guide the parole board in the exercise of its discretion.

*Barna v. Travis,* 239 F.3d 169, 171 (2d Cir.2001).

"[W]here parole is concerned[,] discretion, by its very definition, is subject to changes in the manner in which it is informed and then exercised." *Garner v. Jones,* 529 U.S. 244 (U .S.2000). In *Garner,* Georgia's state board of pardons and paroles amended its rules so that the interval of time between parole considerations was extended to at least every eight years. The Supreme Court concluded that retroactive application of a law, which increased the maximum interval of years within which a petitioner could be reconsidered for parole, did not violate the *ex post facto* clause because there was no proof that the amendment created a significant risk of increased punishment for respondent. The rule gave the Parole Board broad discretion to schedule reconsideration hearings based on release suitability, and the Supreme Court reversed and remanded the action because there was no proof that the amended law lengthened respondent's incarceration. The High Court held:

The States are prohibited from enacting an ex post facto law. U .S. Const., Art. I, § 10, cl. 1. One function of the Ex Post Facto Clause is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission. Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept. Whether retroactive application of a particular change in parole law respects the prohibition on ex post facto legislation is often a question of particular difficulty when the discretion vested in a parole board is taken into account.

*Garner,* 529 U.S. at 249-250 (citations omitted).

Defendants argue that Plaintiffs do not cite "any instance where an *ex post facto* violation is founded upon a parole board's discretionary practice alone, in the absence of any change to governing regulations." *Reply Memo at 12.* Here, Plaintiffs' claim is that the discretionary practice has been materially altered by an outright policy to deny parole to certain prisoners, regardless of positive considerations.

Because under *Garner,* retroactive application of the policy *may* increase the punishment for a crime after its commission, the Complaint states a claim, although one of "particular difficulty when the [remaining] discretion vested in the parole board is taken into account." *See Garner, supra.*

*Failure to Exhaust Administrative Remedies*

Defendants argue that the Complaint should be dismissed for failure to allege or show that administrative remedies were exhausted. They assert that Plaintiffs' claims should be brought individually under 28 U.S.C. § 2254, which requires the exhaustion of state remedies. The Court disagrees. Due process and equal protection concerns raised by parole determinations do not necessarily seek to invalidate the underlying conviction or sentence. Indeed such claims may be brought under 42 U.S.C. § 1983, without the exhaustion requirement. *See Wilkinson v. Dotson,* 544 U.S. 74 (2005).

***12** The Court does not read the Complaint to complain literally that the Parole Board resentenced them, but rather that the application of an *ultra vires* policy of the Parole Board to the Plaintiffs has the effect of "extending their minimum term of imprisonment." *Oppo. Memo at 34-35.* The Court's present concern is whether a claim has been stated that an alleged policy of predetermined parole denials deprived Plaintiffs of a statutorily-required process of parole determination. Exhaustion is not required.

*Standing of Individual Plaintiffs*

In their reply papers, Defendants for the first time challenge Plaintiffs' standing, arguing that Plaintiffs' reliance on class allegations and abstract harm prevents the stating of a claim. Defendants assert that in Plaintiffs' opposition papers, it is clear for the first time that they are not asserting individualized injury based on the specific facts surrounding their specific parole denials, but are

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

relying rather upon a global characterization of unlawful practices of the Parole Board. Defendants argue that Plaintiffs cannot rely upon the class action mechanism to create a cause of action where one does not exist, and that Plaintiffs who do not state actual individualized claims do not have standing to serve as class representatives.

Fairly read, Plaintiffs each assert that an unlawful policy, not a part of the legislative criteria enacted with respect to parole, exists in New York, and was or will be employed in his case, and had or will have the adverse effect of causing him to be denied parole. This non-frivolous allegation is sufficient to establish standing.

*Collateral Estoppel*

Defendants assert that three Plaintiffs (Buckley, Graziano, and Jacques) have previously challenged their parole release denials in state courts on substantially the same bases and facts alleged in this case, and that their challenges have been denied. Plaintiffs respond that the individual Plaintiffs have never had a full and fair opportunity to litigate their allegations in this case, concerning what they claim is the Parole Board's class-wide policy.

Collateral estoppel is an affirmative defense to be pleaded and proved. Under the general principles of collateral estoppel:

> [A] judgment in a prior proceeding bars a party and its privies from relitigating an issue if, but only if: (1) the issues in both proceedings are identical, (2) the issue in the prior proceeding was actually litigated and actually decided, (3) there was full and fair opportunity to litigate in the prior proceeding, and (4) the issue previously litigated was necessary to support a valid and final judgment on the merits.

*Carney v. Philippone,* 332 F.3d 163, 169-170 (2d Cir.2003) (citations omitted).

Collateral estoppel under New York law is not automatic and the Court does not deem a ruling necessary at this stage in the litigation as to the three named Plaintiffs believed by Defendants to be collaterally estopped from litigating their claims. Were one or more individual Plaintiffs to be dismissed from the case, there are apparently ample Plaintiffs who have not previously litigated the claims raised in this case. This Court has already received letters from prisoners interested in the case, and additional cases have been filed as related to this case. For purposes of disposing of this motion, the Court declines to find any Plaintiffs collaterally estopped from being a part of the lawsuit.

### ***Conclusion***

***13** The Motion (Doc. Nos.8, 9) is denied.

The Court has received numerous letters from prisoners interested in this case and as noted above, separate cases have been filed *pro se* by prisoners as "related" to this case. It may well be that this order "involves a controlling question of law as to which there may be substantial ground for difference of opinion" and it is possible that an immediate appeal from the order might materially advance the ultimate termination of the litigation," which is likely to be lengthy and expensive. The pendency of this litigation of necessity brings confusion to pending cases in the Division of Parole and adds to unrest in the prisons, as shown by the recent *pro se* filings. On request, the Court will confer with counsel and consider whether it should make the findings contemplated by 28 U.S.C. § 1292(b), and permit an immediate interlocutory appeal. A case management conference with the Court is hereby set for July 28, 2006 at 11:00 a.m.

SO ORDERED.

S.D.N.Y.,2006.

Graziano v. Pataki
Not Reported in F.Supp.2d, 2006 WL 2023082 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.







Only the Westlaw citation is currently available.
United States District Court,

S.D. New York.
Steven J. ROMER, Petitioner,
v.
Brion D. TRAVIS, New York State Board of Parole & Brian S. Fischer, Respondents.
No. 03 Civ.1670 KMW AJP.

July 29, 2003.
*REPORT AND RECOMMENDATION*

PECK, Magistrate J.

***1** Petitioner Steven Romer [FN1] seeks a writ of habeas corpus from a June 2000 denial of parole by the New York State Division of Parole ("the Parole Board"). Romer's petition alleges that: (1) the Parole Board violated his Due Process rights by: (a) failing to follow its own regulations and policies, which created an expectation of parole, (b) acting arbitrarily and capriciously, and (c) making a decision that showed "irrationality bordering on impropriety" (Dkt. No. 1: Pet. ¶ 12(A)-(B)); (2) the Board effectively resentenced Romer in violation of the separation of powers clause by denying him parole (Pet.¶ 12(B)); (3) the Parole Board violated Romer's right to equal protection (Dkt. No. 2: Romer Br. at 70-71, 76-77); and (4) denial of parole subjected him to Double Jeopardy (Pet.¶ 12(C)).

FN1. Romer, an attorney, filed this petition "pro se," but was assisted by and is now formally represented by his son, Kenneth Romer, Esq. (Dkt. No. 10: 5/12/03 Order.)

For the reasons set forth below, Romer's petition should be DENIED.

*FACTS*

*Romer's Conviction and Incarceration*

Romer, an attorney, was convicted in 1992 of grand larceny and related offenses in connection with his theft of over $7 million of client funds and sentenced to seven and one-half to twenty-two and one-half years imprisonment. (Dkt. No. 1: Pet. ¶¶ 1-4; Dkt. No. 3: Pet.App.: 5/98 Inmate Status Report at 505-06; Pet.App.: 6/13/00 Parole Bd. Hearing Minutes ["H."] at 527, 530.) Since February 1992, Romer has been in the custody of the New York State Department of Correctional Services, and since April 1993, imprisoned at Sing Sing Correctional Facility. *See Romer v. Travis,* 00 Civ. 8671, 2001 WL 220115 at *1 (S.D.N.Y. Jan. 31, 2001) (Peck M.J.).

*Parole Proceedings*

*1998*

Romer appeared before the Parole Board in 1998 and was denied parole with a twenty-four-month hold. (Dkt. No. 3: Pet.App.: 6/18/98 Parole Bd. Release Decision Notice at 511-12.) The Parole Board acknowledged, and urged Romer to continue, his model behavior, but pointed to the seriousness of his crimes as one reason to deny parole. (*Id.* at 512.) [FN2] Romer had a second hearing before the Parole Board in June 2000. (Pet.App.: 4/10/00 Parole Report at 515-19; H. 524-38.) Romer submitted numerous letters for the Board's consideration from doctors, neighbors, legislators, clergy members, and the prison legal librarian attesting to Romer's good behavior in prison and supporting his release on parole. (*See* Pet.App. at 3-214.)

FN2. The Parole Board explained its denial of parole as follows:

> Parole is denied for the following reasons: In the instant offense, Grand Larceny 1st Degree/Not Auto; CPSP 1st, Grand Larceny 2nd/Not Auto, and Criminal Possession of Forged Instrument 2nd Degree. You misappropriated the funds of a number of clients. The multi[p]licity of the offenses involving numerous victims occurring over an extended period of years which demonstrated a high degree of sophistication in your taking

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

advantage of victims who were particularly vulnerable indicates to this panel that your parole now would be inappropriate, as well as incompatible with the public welfare. We note your exemplary institutional programming and model disciplinary record. You are urged to continue.

(*Id.; see also id.* at 525.)

*2000*

At the June 2000 parole hearing, Romer asserted his innocence and said that he would "lead a law-abiding life" should he be released. (Pet.App.: H. 528-29, 532, 535.) Romer also explained that, because he had been disbarred, he would no longer have access to the kinds of escrow and trust funds he had been convicted of misusing. (H.534-35.) During the hearing, a commissioner on the panel stated, "you have been a model prisoner. We have to[ ][l]ook at that.... You have no disciplinary infraction reports. That comes to us as a glaring and siren for all your good doing in here. We note that you have continued to program as a paralegal assistant in the law library, that you have participated in family reunion programs, that you continue to receive regular visits from your wife ....and we also note that you have strong family and community support." (H. 536-37 .) The commissioner assured Romer that "we have and will continue to review the entirety of your record," noting that Romer's adoption of eight children prior to his incarceration was "very positive." (H.537.) The commissioner added: "Many good things have been done [by Romer]. But we have to consider all of it." (*Id.*)

***2** On June 13, 2000, the Parole Board again denied Romer parole and imposed a second twenty-four-month hold, based in part on his crimes and his failure to express remorse:

Parole is again denied for the following reasons: In the instant offenses, Grand Larceny in the 1st/Not Auto, Criminal Possession of Stolen Property in the 1st, Grand Larceny in the 2nd/Not Auto, and Criminal Possession of a Forged Instrument in the 2nd Degree you misappropriated the funds of a number of clients.

The multiplicity of these offenses occurring over a period of years demonstrated a high degree of sophistication and a careless disregard for the welfare of the numerous vulnerable victims.

In this interview you continued to present yourself as a victim. In fact, you insisted that you are an "innocent man," and expressed little or no remorse other than making statements about wanting to pay restitution. These seem to be self-serving and disingenuous. As such, we find you to be an inappropriate candidate for discretionary release at this time. Your release at this time would deprecate the severity of your offense and diminish respect for the law.

(H. 539; *accord* Pet.App.: 6/15/00 Parole Bd. Release Decision Notice at 541.)

Romer appealed to the Parole Board's Appeals Unit on the grounds that the decision was excessive, arbitrary and capricious, and in violation of the Parole Board's lawful procedures. (Pet.App.: 12/4/00 Statement of Appeals Unit Findings at 543.) The Appeals Unit affirmed the Parole Board's decision. (*Id.; see also* Pet.App.: 12/29/00 Parole Appeal Dec. Notice at 542.) Subsequently, Romer challenged the parole decision in state court pursuant to C.P.L.R. Article 78.[FN3] (*See* Pet.App.: 11/21/01 Sup.Ct. Westchester Co. Decision, at 562-69.) The Supreme Court (*id.*) and the Second Department affirmed the denial of parole. *Romer v. Travis,* 299 A.D.2d 553, 750 N.Y.S.2d 519 (2d Dep't 2002),[FN4] *appeal denied,* 99 N.Y.2d 508, 757 N.Y.S.2d 818 (2003).

FN3. A prisoner may initiate an Article 78 proceeding to claim that a determination by the Parole Board was, *inter alia,* erroneous, arbitrary and capricious, in violation of lawful procedure, or an abuse of discretion.

Romer also sought injunctive relief from the Parole Board's decision under 42 U.S.C. § 1983; this Court dismissed the claim. *Romer v. Travis,* 00 Civ. 8671, 2001 WL 220115 (S.D.N.Y. Jan. 31, 2001) (Peck, M.J.) (dismissing Romer's § 1983 action because habeas corpus was the proper way to bring the claim), *report & rec. adopted,* 00 Civ. 8671

(S.D.N.Y. June 5, 2001) (Wood, D.J.) (reprinted in Dkt. No. 3: Pet.App. at 557-61).

FN4. The Second Department held:

The record demonstrates that the determination of the New York State Board of Parole (hereinafter the Board) denying the petitioner's second parole request does not show irrationality bordering on impropriety. The Board was justified in considering, among other factors, the severity of the underlying crime.

*Romer v. Travis,* 299 A.D.2d at 553, 750 N.Y.S.2d at 519 (citations omitted).

*2002*

Romer's third parole hearing was held in June 2002. (*See* Dkt. No. 12: State Br. at 3.) Due to lack of consensus among the June 2002 panel, a different panel interviewed Romer in July 2002. (*Id.*) At the July parole hearing, Romer said that he continued to work in the prison law library as a paralegal assistant, taught legal research courses, and generally helped in the law library. (Dkt. No. 11: 6/19/03 Affidavit of Asst. Atty. General Michael King: Ex. D: 7/02 Parole Hearing Minutes at 4.) Romer said he hoped the paralegal job was still waiting for him although he had not been in touch with the agency for a year and a half, but otherwise he felt he would have no problem obtaining a job because of his management and engineering background. (*Id.* at 5-6.) The July 2002 Parole Board again denied parole, and scheduled Romer's next appearance for July 2004, explaining:

Parole is denied, hold 24 months. Next appearance 06/04 Board.

***3** Reasons: After an interview and review of the pertinent portions of the file, including the present Inmate Status Report and prior Inmate Status Reports, parole is denied as follows: you are currently serving a sentence for the convictions of Grand Larceny 1st Degree, Not Auto, Criminal Possession of Stolen Property 1st Degree, Grand Larceny 2nd Degree, Not Auto, and Criminal Possession of a Forged Instrument 2nd Degree. You misappropriated the funds of a number of clients. You committed these offenses over a period of years, which has been demonstrated to a high sophistication in taking advantage of very vulnerable clients. You have minimized your criminal actions and have shown a lack of insight into the motivational factors associated with your criminality. We note your good programming and spotless disciplinary record. When all factors considered, your discretionary release is inappropriate. The decision is above the guidelines due to sentence structure. High degree of sophistication involved in the offense. Ineligible for Certificate of Relief. All commissioners concur.

(*Id.* at 14.)

Romer administratively appealed, and the Appeals Unit affirmed the Board's decision on February 24, 2003. (Dkt. No. 11: King Aff. Ex. E: Parole Appeals Decision.) Romer again sought judicial review via an Article 78 proceeding, on May 6, 2003. (Dkt. No. 11: King Aff. Ex. F: Article 78 Petition.) That Article 78 proceeding still is pending in Supreme Court, Westchester County.

*Romer's Current Federal Habeas Corpus Petition*

Romer seeks a writ of habeas corpus from the Parole Board's denial of parole at his second and subsequent parole hearings. Romer's petition alleges that: (1) the Parole Board violated his Due Process rights by: (a) failing to follow its own regulations and policies, which created an expectation of parole, (b) acting arbitrarily and capriciously, and (c) making a decision that showed "irrationality bordering on impropriety" (Dkt. No. 1: Pet. ¶ 12(A)-(B)); (2) the Board effectively resentenced Romer in violation of the separation of powers clause by denying him parole (Pet.¶ 12(B)); (3) the Parole Board violated Romer's right to equal protection (Dkt. No. 2: Romer Br. at 70-71, 76-77.); and (4) denial of parole subjected him to Double Jeopardy (Pet.¶ 12(C)).[FN5]

FN5. Although Romer groups his argument into three claims (*see* Pet. ¶ ¶ 12(A)-(C)), the Court addresses them as noted above for the sake of clarity.

*ANALYSIS* [FN6]

FN6. For discussion of the AEDPA review standard, *see, e.g., Skinner v. Duncan,* 01 Civ. 6656, 2003 WL 21386032 at *11-13 (S.D .N.Y. June 17, 2003) (Peck, M.J.) ( & cases cited therein).

I. *ROMER'S CLAIMS ARE NOT MOOT AND HAVE BEEN SUFFICIENTLY EXHAUSTED IN STATE COURT TO WARRANT REVIEW IN THIS COURT*

As the State notes, it is unclear whether Romer is challenging the Parole Board's 2000 decision or its 2002 decision. (*See* Dkt. No. 12: State Br. at 7.) If Romer is challenging the 2000 decision, the State argues, Romer's claim is moot because he has already received the subsequent July 2002 hearing, the only relief to which he might be entitled. (*Id.* at 8-10.) If Romer is challenging the 2002 decision, the State argues that Romer's claims are unexhausted because the state court has not yet ruled on his pending Article 78 proceeding. (*Id.* at 7-8.)

***4** Regardless of whether Romer is now challenging the 2000 or 2002 parole decision, Romer's claims contest the legal standards by which the Parole Board made its decisions, not the specific circumstances of each denial of parole. Romer exhausted these claims via his Article 78 challenge to the Parole Board's June 2000 decision. The fact that Romer may be making identical claims about the 2002 decision raises a question of mootness, not a question of exhaustion.

As to mootness, Romer may challenge an alleged error by the Parole Board, despite having already received a new hearing, if the error is " 'capable of repetition, yet evading review." ' *Olmstead v. Zimring,* 527 U.S. 581, 594 n. 6, 119 S.Ct. 2176, 2184 n. 6 (1999).[FN7] An otherwise moot question is justiciable when: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. at 149, 96 S.Ct. at 349.[FN8]

FN7. *See also, e.g., Spencer v. Kemna,* 523 U.S. 1, 17, 188 S.Ct. 978, 988 (1998); *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 349 (1975) (challenge to a denial of parole by a petitioner who was no longer under state supervision or custody was moot); *United States v. Ciccone,* 312 F.3d 535, 544 (2d Cir.2002) (dismissing as moot a claim that was " 'capable of repetition" ' but not possible to "characterize as 'evading review" '); *Board of Educ. of the Pawling Cent. Sch. Dist. v. Schutz,* 290 F.3d 476, 479 n. 1 (2d Cir.2002), *cert. denied,* 123 S.Ct. 1284 (2003); *Atlantic States Legal Found., Inc. v. Norton,* No. 01-6129, 29 Fed. Appx. 729, 731, 2002 WL 278040 at *1 (2d Cir. Feb. 26, 2002).

FN8. *Accord, e.g., Spencer v. Kemna,* 523 U.S. at 17, 118 S.Ct. at 988; *Bd. of Educ. of the Pawling Cent. Sch. Dist. v. Schutz,* 290 F.3d at 479 n. 1; *Irish Lesbian & Gay Organization v. Giuliani,* 143 F.3d 638, 647-48 (2d Cir.1998); *Rastelli v. Warden,* 782 F.2d 17, 20 (2d Cir.1986).

Here, each denial of parole has resulted in an additional two years of imprisonment for Romer. It took more than two years to litigate Romer's challenge to the Parole Board's June 2000 decision: the Appeals Unit ruled in December 2000, Romer's Article 78 challenge was denied by the State Supreme Court in November 2001 and by the Second Department in November 2002, and the New York Court of Appeals did not deny leave to appeal until February 2003 (*see* pages 3-6 above)-after Romer had again been denied parole in July 2002 for the same reasons he challenged in the Article 78 challenge to the June 2000 parole denial. Because it is unlikely that Romer can obtain full state court judicial review of his parole claims before the next Parole Board hearing and decision, the Court finds that a twenty-four-month hold is too short in duration for Romer's parole claim "to be fully litigated prior to its cessation or expiration." *See, e.g., Irish Lesbian & Gay Organization v. Giuliani,* 143 F.3d at 647-48 (case not moot where plaintiff who applied for a permit to participate in an annual parade was denied the permit a few weeks before the parade date and where plaintiff planned to seek a permit for subsequent annual parades); *Chabad-Lubavitch of Vermont v. City of Burlington,* 936 F.2d 109, 111 (2d Cir.1991) (where plaintiff sought permission to display a menorah in a city park at Chanukah, and Chanukah had passed but plaintiff

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

intended to seek such permission each year, case not moot because, "[g]iven the short length of Chanukah and the relatively slow pace of litigation," it would be "highly improbable" that the next year's challenge would reach the court before Chanukah passed again), *cert. denied,* 505 U.S. 1218, 112 S.Ct. 3026 (1992); *Rastelli v. Warden,* 782 F.2d at 20 (period of thirty-one to 119 days was insufficient for parole revocation challenges to be fully litigated).

***5** In addition, Romer contests not the factual findings of a specific parole proceeding or the actions of a particular parole commissioner, but the legal standards under which parole decisions are made (which have resulted in his denial of parole in 1998, 2000 and again in 2002). There thus is a "reasonable expectation" that Romer will face the same procedures and standards at his future parole hearings. *See, e.g., Russman v. Board of Educ. of the Enlarged City Sch. Dist. of Watervliet,* 260 F.3d 114, 120 (2d Cir.2001) ("To create a reasonable expectation of recurrence, repetition must be more than theoretically possible," but "a plaintiff need not show a 'demonstrated probability' of recurrence."); *Lerman v. Board of Elections in City of New York,* 232 F.3d 135, 141 (2d Cir.2000) (candidate's suit to seek ballot access was not moot after election had passed because there was a reasonable expectation that same candidate would seek ballot access in the next election); *Shrader v. Granninger,* 870 F.2d 874, 877 (2d Cir.1989) (former mental patient's due process challenge to the state's involuntary commitment procedures was not moot, even though patient was no longer in custody, because patient had been committed over 160 times, thus creating a reasonable expectation that patient would be subjected to commitment procedures again; *compare, e.g., Weinstein v. Bradford,* 423 U.S. at 149, 96 S.Ct. at 349 (challenge to a denial of parole was moot given that former prisoner was no longer in state custody and thus there was no reasonable expectation that former prisoner would again be subject to the parole system's jurisdiction).

Romer's claims are therefore not moot and can be reviewed by this Court.

II. *THE PAROLE BOARD DID NOT VIOLATE ROMER'S DUE PROCESS RIGHTS WHEN IT CONSIDERED THE SEVERITY OF ROMER'S CRIMINAL OFFENSES IN ITS DECISIONS TO DENY PAROLE*

Romer asserts that the Parole Board violated his constitutional rights and acted arbitrarily and capriciously by failing to follow its own regulations and policies, which created an expectation of parole. (Dkt. No. 1: Pet. ¶ 12(A)-(B).) Specifically, Romer argues that the Board should not have taken into account the severity of his criminal offenses during his 2000 and 2002 parole proceedings. (*See* Dkt. No. 2: Romer Br. at 27-56.) Romer's due process claim should be denied because Romer has not asserted a cognizable violation of his constitutional rights and because he relies on an incorrect interpretation of New York parole regulation, 9 N.Y.C.R.R. § 8002.3.

A. *The Parole Board Did Not Violate Romer's Right Not to Be Denied Parole Arbitrarily or Capriciously*

"There is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of the Neb. Penal & Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2104 (1979). "In order for a state prisoner to have an interest in parole that is protected by the Due Process Clause, he must have a legitimate expectancy of release that is grounded in the state's statutory scheme." *Barna v. Travis,* 239 F.3d 169, 170 (2d Cir.2001) (citing, *inter alia, Greenholtz v. Inmates of the Neb. Penal & Corr. Complex,* 442 U.S. at 11-13, 99 S.Ct. at 2106).[FN9]

FN9. *Accord, e.g., Board of Pardons v. Allen,* 482 U.S. 369, 373, 107 S.Ct. 2415, 2418 (1987); *Boothe v. Hammock,* 605 F .2d 661, 663-64 (2d Cir.1979).

***6** The Second Circuit, however, has held unequivocally that "[t]he New York parole scheme is not one that creates in any prisoner a legitimate expectancy of release." *Barna v. Travis,* 239 F.3d at 171; *accord, e.g., Marvin v. Goord,* 255 F.3d 40, 44 (2d Cir.2001); *Boothe v. Hammock,* 605 F.2d at 664. [FN10] Accordingly, Romer can claim a due process violation only if the Parole Board has denied his release "arbitrarily or capriciously." *Morel v. Thomas,* 2003 WL 21488017 at *4.[FN11]

FN10. *See also, e.g., Morel v. Thomas,* 02 Civ.

9622, 2003 WL 21488017 at *4 (S.D.N.Y. June 26, 2003); *Gilmore v. Stone,* No. 01-CV-00880, 2003 WL 1923734 at *3 (N.D.N.Y. Apr. 23, 2003); *Manley v. Thomas,* 255 F.Supp.2d 263, 266 (S.D.N.Y.2003); *Brown v. Thomas,* 02 Civ. 9257, 2003 WL 941940 at *1 (S.D.N.Y. Mar. 10, 2003); *Defino v. Thomas,* 02 Civ. 7413, 2003 WL 40502 at *3 (S.D.N.Y. Jan. 2, 2003); *Vasquez v. Reynolds,* 00 Civ. 0862, 2002 WL 417183 at *8 n. 11 (S.D.N.Y. Mar. 18, 2002) ("Notwithstanding the fact that Petitioner has served his minimum sentence ... he does not have a 'right' to parole release."), *aff'd,* No. 02-2219, 58 Fed. Appx. 553, 2003 WL 1025705 (2d Cir.2003).

FN11. *Accord, e.g., Manley v. Thomas,* 255 F.Supp.2d at 266; *Brown v. Thomas,* 2003 WL 941940 at *1; *Defino v. Thomas,* 2003 WL 40502 at *3.

Under New York law,

Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society *and will not so deprecate the seriousness of his crime as to undermine respect for law.*

Exec. L. § 259-i(2)(c)(A) (emphasis added). Where, as here, the prisoner's minimum sentence was set by the court and not by the Parole Board, the Board must specifically consider, among other factors, "the seriousness of the offense with due consideration to the type of sentence, length of sentence and recommendations of the sentencing court." Exec. Law § 259-i(2)(c)(A), -i(1)(a). *See Davis v. Thomas,* 256 F.Supp.2d 190, 192 (S.D.N.Y.2003). [FN12] The Parole Board may give whatever weight it deems appropriate to the statutory factors, and is "entitled to determine that the nature of the crime outweighed the positive aspects of [petitioner's] record." *Morel v. Thomas,* 2003 WL 21488017 at *4-5. [FN13]

FN12. *Accord, e.g., Manley v. Thomas,* 255 F.Supp.2d at 267; *Harris v. Travis,* No. 97-CV-3275, 1998 WL 812617 at *2 (E.D .N.Y. Mar. 24, 1998) (when court, and not Parole Board, sets minimum sentence, "the Board must also consider the seriousness of the offense"), *aff'd,* No. 98-2344, 175 F.3d 1007 (table), 1999 WL 96125 (2d Cir.1999); *Quartararo v. Catterson,* 917 F.Supp. 919, 939 (E.D.N.Y.1996) (same); *Silmon v. Travis,* 95 N.Y.2d 470, 476, 718 N.Y.S.2d 704, 708 (2000); *Garcia v. New York State Div. of Parole,* 239 A.D.2d 235, 238-39, 657 N.Y.S.2d 415, 418 (1st Dep't 1997).

FN13. *See, e.g., Davis v. Thomas,* 256 F.Supp.2d at 192; *Manley v. Thomas,* 255 F.Supp.2d at 266-67; *Brown v. Thomas,* 2003 WL 941940 at *2 ("the Board was fully entitled to determine that the nature of the crime outweighed the positive aspects of [petitioner's] record"); *Defino v. Thomas,* 2003 WL 40502 at *4 (finding petitioner's due process claim unlikely to succeed when the Parole Board looked to "the severity of [Petitioner's] offense" and petitioner's " 'positive programming and community support" ' and found that "the former outweighed the latter"); *Walters v. Ross,* No. CV-92-2290, 1992 WL 398307 at *3-4 (E.D.N.Y. Dec. 21, 1992) (denial of parole based on the severity of the prisoner's crime and his refusal to accept responsibility did not violate the Fourteenth Amendment); *Charlemagne v. New York Div. of Parole,* 281 A.D.2d 669, 670, 722 N.Y.S.2d 74, 75 (3d Dep't 2001) (Parole Board not required to give equal weight to each factor in parole decision); *Garcia v. New York State Div. of Parole,* 239 A.D.2d at 239, 657 N.Y.S.2d at 418 (weight accorded to each factor is within the Parole Board's discretion); *Farid v. Travis,* 239 A.D.2d 629, 629, 657 N.Y.S.2d 221, 221-22 (3d Dep't 1997).

Denial of parole is neither arbitrary nor capricious when the Parole Board relies on the factors defined by New York statute. *Davis v. Thomas,* 256 F.Supp.2d at 191 ("denial of parole may be justified on the basis of

reasonable considerations defined by statute, including ... seriousness of the offense for which he is in custody."); *Manley v. Thomas,* 255 F.Supp.2d at 266 (same). [FN14] Here, the Parole Board acknowledged Romer's good behavior in prison, but found that the severity of his crime and his apparent lack of remorse made him "an inappropriate candidate for discretionary release." (*See* Dkt. No. 3: Pet.App.: H. 539; Pet.App.: 6/15/00 Parole Bd. Release Dec. Notice at 541; Dkt. No. 11: King Aff. Ex. D: 7/02 Parole Hearing Minutes at 14.) Because it was within the discretion of the Parole Board to consider these factors, the Court cannot say that the decision to deny Romer parole was arbitrary or capricious, or irrational bordering on impropriety.[FN15]

FN14. *See, e.g., Garcia v. New York State Div. of Parole,* 239 A.D.2d at 238, 239, 657 N.Y.S.2d at 417-19 (Parole Board's denial of parole based on the seriousness of the prisoner's crime was not arbitrarily or capricious); *Farid v. Travis,* 239 A .D.2d at 629, 657 N.Y.S.2d at 221-22 (Parole Board's consideration of statutory factors, including prisoner's offense and criminal history, was proper); *see also* cases cited in fn.12 above.

FN15. Romer contends that the Parole Board's decision to deny parole "constitute[d] irrationality bordering on impropriety." (Dkt. No. 1: Pet. ¶ 12(B).) This is essentially another way to claim that the Board's decision was arbitrary and capricious. *See Manley v. Thomas,* 255 F.Supp.2d at 266 (noting that "any liberty interest in parole ... extends only to not being denied a petition arbitrarily or capriciously" and that "judicial intervention is warranted only when there is a showing of irrationality bordering on impropriety") (quotations omitted); *Silmon v. Travis,* 95 N.Y.2d at 476, 718 N.Y.S.2d at 707 (reviewing a decision to deny parole under an "arbitrary or capricious" standard because "[j]udicial intervention [in Parole Board decisions] is warranted only where there is a 'showing of irrationality bordering on impropriety' "); *Lue-Shing v. Pataki,* 301 A.D.2d 827, 828, 754 N.Y.S.2d 96, 96 (3d Dep't) (when Parole Board denied parole based on a finding that the seriousness of his offense and his criminal history outweighed his good behavior in prison, decision was not "arbitrary or capricious in that it was [not] affected by irrationality bordering on impropriety"), *appeal denied,* 99 N.Y.2d 511, 760 N.Y.S.2d 102 (2003). As such, the Court need not separately address this claim and finds that, because the Board's decision was not arbitrary and capricious, neither is there any showing of "irrationality bordering on impropriety."

B. *The Parole Board's Decision to Deny Romer Parole Was In Accord With New York Laws and Regulations*

Romer contends that the Parole Board should have granted him parole release pursuant to 9 N.Y.C.R.R. § 8002.3(b). (Dkt. No. 2: Romer Br. at 31-40.) Section 8003.2 states:

***7** (a) *Cases wherein the guidelines* [FN16] *have not previously been applied.* In making the parole release decision for those cases where the guidelines have not previously been applied (i.e., [minimum periods of imprisonment] MPI's set by the board prior to January 1, 1978 *and cases wherein the court imposed the minimum* ), the board shall apply the guidelines and in addition the following factors shall be considered:

FN16. The purpose of the parole guidelines is to

> structure [the Parole Board's] discretion with regard to MPI and release decisions. While the guidelines will be considered in each MPI and release decision, they are based on only two major factors-crime severity and past criminal history. They are intended only as a guide, and are not a substitute for the careful consideration of the many circumstances of each individual case.

9 N.Y.C.R.R. § 8001.3(a). The Parole Board may also render a decision outside the guidelines as long as the Board provides the inmate with "the detailed reason for such decision, including the fact or factors relied on." *Id.* § 8001.3(c); *see also Tatta v. State,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

290 A.D.2d 907, 908, 737 N.Y.S.2d 163, 164 (3d Dep't) (Parole Board not "required to adhere to the guideline time range established by 9 N.Y.C.R.R. § 8001.3" when the nature of inmate's offense and his criminal history outweighed other factors under consideration), *appeal denied,* 98 N.Y.2d 604, 746 N.Y.S.2d 278 (2002); *Ganci v. Hammock,* 99 A.D.2d 546, 547, 471 N.Y.S.2d 630, 632 (2d Dep't 1984) ("[T]he board may in its discretion ... deny parole release to an inmate who has served time in excess of the guideline range, so long as it sets forth its reasons for doing so in sufficient detail.").

(1) the institutional record, including program goals and accomplishments, academic achievements, vocational education training or work assignments, therapy and interpersonal relationships with staff and inmates;

(2) performance, if any, as a participant in a temporary release program; and

(3) release plans, including community resources, employment, education and training and support services available to the inmate.

(b) *Cases where the guidelines have previously been applied.* In those cases where the guidelines have previously been applied, *the board shall consider the following in making the parole release decision.* Release shall be granted unless one or more of the following is unsatisfactory:

(1) the institutional record, including program goals and accomplishments, academic achievements, vocational education training or work assignments, therapy and interpersonal relationships with staff and inmates;

(2) performance, if any, as a participant in a temporary release program; or

(3) release plans, including community resources, employment, education and training and support services available to the inmate.

9 N.Y.C.R.R. § 8002.3 (emphasis added). Romer argues that once a prisoner has had an initial parole hearing (as he did in 1998), he is no longer subject to subsection (a) but rather falls under subsection (b) because the Parole Board applied the "guidelines" to him during his first parole proceeding. (Dkt. No. 2: Romer Br. at 38-39.) Romer argues further that, because he met all of the conditions under subsection (b), the Parole Board in 2000 and 2002 was required to grant him parole and could not consider factors not listed in subsection (b). (Romer Br. at 39-40.)

Contrary to his argument, the case law makes clear that Romer remained subject to 9 N.Y.C.R.R. § 8002.3(a), and not just to the factors in § 8002.3(b), because the New York State Supreme Court, not the Parole Board, set his minimum sentence of seven and one-half years. *See, e.g., Guerin v. New York State Div. of Parole,* 276 A.D.2d 899, 901, 714 N.Y.S.2d 770, 772 (3d Dep't 2000) ("petitioner's minimum period of imprisonment was set by the trial court and not pursuant to the guidelines in Executive Law § 259-i(1)(a) and, thus, the Board was not restricted to considering only those factors set forth in 9 NYCRR 8002.3(b).") (citing cases); *Ward v. Hammock,* 90 A.D.2d 594, 595, 456 N.Y.S.2d 204, 205 (3d Dep't 1982) (where 1978 parole decision denied parole based on seriousness of criminal offense, 1980 parole board was not precluded from considering criminal record; Department rejected petitioner's argument that 1980 board was limited to 9 N.Y.C.R.R. § 8002.3(b) factors, where court had set minimum period of imprisonment); *see also, e.g., Ortiz v. Hammock,* 96 A.D.2d 735, 735, 465 N.Y.S.2d 341, 342 (4th Dep't 1983). Thus, the Parole Board properly considered the same statutory factors in the 2000 and 2002 parole proceedings as it had in the first parole proceeding in 1998, including the seriousness of a $7 million theft of client funds by an attorney. *See, e.g., Nelson v. New York State Parole Bd.,* 274 A.D.2d 719, 719-20, 711 N.Y.S.2d 792, 792 (3d Dep't 2000) (Parole Board properly considered the seriousness of inmate's offense even though it had considered that factor in previous parole determinations). In fact, the Board was not only permitted but *required* to consider certain factors beyond those listed in § 8002.3(b), including the seriousness of Romer's offense. *See Harris v. Travis,* No. 97-CV-3275, 1998 WL 812617 at *2 (E.D.N.Y. Mar. 24, 1998) (Parole Board

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

"must" consider seriousness of inmate's offense when trial court has set minimum sentence), *aff'd,* No. 98-2344, 175 F.3d 1007 (table), 1999 WL 96125 (2d Cir.1999); *Watkins v. Annucci,* 2003 N.Y. Slip. Op. 14354, 758 N.Y.S.2d 853, 854 (3d Dep't May 22, 2003) ("Because petitioner's minimum sentence was set by the sentencing court, the [Parole] Board was required to consider evidence of the seriousness of petitioner's offense."); *Hawkins v. Travis,* 259 A.D.2d 813, 813, 686 N.Y.S.2d 198, 198 (3d Dep't) (Parole Board was required to consider seriousness of inmate's offense at even his sixth parole hearing), *appeal dismissed,* 93 N.Y.2d 1033, 697 N.Y.S.2d 556 (1999); *Flecha v. Travis,* 246 A.D.2d 720, 720, 667 N.Y.S.2d 519, 520 (3d Dep't 1998) ("Because the trial court set petitioner's minimum period of imprisonment, the [Parole] Board was required to take into account, among other statutory factors, the seriousness of petitioner's crimes," despite prior application of parole guidelines).

***8** Accordingly, state law permitted (indeed, required) the Parole Board in 2000 and 2002 to consider Romer's crime. Romer's due process claim should be denied.

III. *THE PAROLE BOARD'S PAROLE DECISION WAS NOT A RESENTENCING AND DID NOT VIOLATE THE SEPARATION OF POWERS CLAUSE*

Romer asserts that the Parole Board, by extending Romer's incarceration beyond the seven-and-one-half-year minimum set by the court, effectively re-sentenced Romer in violation of the separation of powers clause. (Dkt. No. 1: Pet. ¶ 12(B); *see* Dkt. No. 2: Romer Br. at 73.) However, the denial of parole is "neither the imposition nor the increase of a sentence." *Alessi v. Quinlan,* 711 F.2d 497, 501 (2d Cir.1983). An inmate has no inherent right to be released on parole before the end of his sentence. *Greenholtz v. Inmates of the Neb. Penal & Corr. Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2104 (1979); *accord, e.g., Morel v. Thomas,* 02 Civ. 9622, 2003 WL 21488017 at *3 (S.D.N.Y. June 26, 2003); *Gilmore v. Stone,* No. 901-CV-00880, 2003 WL 1923734 at *3 (N.D.N .Y. Apr. 23, 2003) (finding no inherent or constitutional right to parole when petitioner's sentence had not yet expired); *Manley v. Thomas,* 255 F.Supp.2d 263, 266 (S.D.N.Y.2003) (no right to parole prior to expiration of sentence). Here, the court imposed an indeterminate sentence of seven and one-half to twenty-two and one-half years. (Dkt. No. 1: Pet. ¶ 3.) In denying Romer's discretionary release, the Parole Board did not in any way extend Romer's incarceration beyond the twenty-two-and-one-half-year maximum set by the court and, thus, did not "resentence" Romer. Indeed, under Romer's argument, since parole cannot be granted before the inmate serves the judicially imposed minimum sentence, any subsequent denial of parole would, in Romer's view, "effectively re-sentence" the inmate, creating a right to parole that the Supreme Court clearly has stated does not exist. Romer's claim is frivolous.

IV. *ROMER HAS NOT ALLEGED FACTS SUFFICIENT TO SUPPORT AN EQUAL PROTECTION CLAIM*

Romer alleges that the Parole Board violated his right to equal protection by singling him out from among other similarly situated inmates for disparate treatment. (*See* Dkt. No. 2: Romer Br. at 70-71, 76-77.) [FN17] To establish such a claim, Romer must allege that: (1) he was similarly situated to other inmates but received different treatment from them; (2) "irrational and wholly arbitrary acts" by the Parole Board; and (3) intentional disparate treatment. *See, e.g., Giordano v. City of New York,* 274 F.3d 740, 750-51 (2d Cir.2001); *Morel v. Thomas,* 2003 WL 21488017 at *5; *Gittens v. Thomas,* 02 Civ. 9435, 2003 WL 21277151 at *2 (S.D.N.Y. May 30, 2003).[FN18]

FN17. Romer does not allege his equal protection rights derive from membership in a suspect class; rather, his claim is in the nature of a "class of one." (*See* Romer Br. at 70-71, 76-77.) *See, e.g., Morel v. Thomas,* 02 Civ. 9622, 2003 WL 21488017 at *5 (S.D.N.Y. June 26, 2003).

FN18. *See also, e.g., Davis v. Thomas,* 256 F.Supp.2d 190, 192 (S.D.N.Y.2003); *Manley v. Thomas,* 255 F.Supp.2d 263, 267-68 (S.D.N.Y.2003); *Brown v. Thomas,* 02 Civ. 9257, 2003 WL 941940 at *2 (S.D.N.Y. Mar. 10, 2003); *Defino v. Thomas,* 02 Civ. 7413, 2003 WL 40502 at *4 (S.D.N.Y. Jan. 2, 2003).

Romer has claimed that four inmates, including two attorneys convicted of larceny, are similarly situated to himself. (Romer Br. at 70-71.) Romer does not provide

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

enough detail to establish their similarity to him. On the contrary, unlike Romer, all four inmates pled guilty to their crimes. (*Id.*) Given that the Parole Board's decision was based in part on Romer's unwillingness to show remorse for or admit to guilt of his crime (*see* Dkt. No. 3: Pet.App.: H. 539; Dkt. No. 11: King Aff. Ex. D: 7/02 Parole Hearing Minutes at 14), it would not be "irrational" or "arbitrary" to treat differently those inmates who were incarcerated on guilty pleas from those incarcerated following a trial and conviction who still professed their innocence. Moreover, Romer has presented no proof that the Parole Board considered impermissible factors in denying him parole. *See, e.g., Morel v. Thomas,* 2003 WL 21488017 at *5 (denying equal protection claim where the Board gave a rational reason for denying parole, *i.e.,* the seriousness of the crime, where petitioner failed to show he was similarly situated with two other inmates convicted of the same crime, and where he did not even allege parole board intended to treat him differently); *Gittens v. Thomas,* 2003 WL 21277151 at *2 (no equal protection claim where "there is no evidence that the Parole Board's determinations ... were 'based on impermissible considerations" '); *Washington v. Thomas,* 03 Civ. 363, 2003 WL 21262089 at *1 (S.D.N .Y. May 29, 2003) ("[T]here is no basis for a federal court to attempt to assess whether petitioner has been given similar or dissimilar treatment in relation to other persons coming before the Parole Board."); *Davis v. Thomas,* 256 F.Supp.2d at 192 (no evidence of an equal protection violation despite petitioner's assertion that, on the day the Parole Board denied petitioner parole, the Board granted parole to several inmates convicted of the same crime as petitioner).[FN19]

FN19. *See also, e.g., Manley v. Thomas,* 255 F.Supp.2d at 267-68 (finding "no evidence" of an equal protection violation); *Brown v. Thomas,* 2003 WL 941940 at *2 ("[T]he number and variety of factors bearing on the seriousness of the underlying offense and the likelihood that an offender will be a danger to the community make it impossible to conclude, on the basis of the sketchy data presented, that petitioner has been singled out from among all homicide offenders for disparate treatment."); *Hairston v. Thomas,* 02 Civ. 9301, 2003 WL 1744728 at *1 (S.D.N.Y. Mar. 31, 2003) (same); *Defino v. Thomas,* 2003 WL 40502 at *4 (when petitioner alleged that three inmates who had committed the same crime as he had were similarly situated to him, it was "difficult to determine" whether petitioner had shown an equal protection violation "[d]ue to [the] lack of details" presented).

V. *ROMER'S DOUBLE JEOPARDY CLAIM SHOULD BE DENIED BECAUSE THE DOUBLE JEOPARDY CLAUSE DOES NOT APPLY TO PAROLE PROCEEDINGS*

***9** Romer contends that the Parole Board's denial of parole and imposition of a twenty-four-month hold after each hearing increased Romer's minimum sentence from seven and one-half to thirteen and one-half years, thereby violating Romer's rights under the Double Jeopardy clause of the Fifth Amendment. (Dkt. No. 2: Romer Br. at 87-88.). The Second Circuit has held, however, that "[t]he Double Jeopardy Clause applies to judicial proceedings, not parole." *Priore v. Nelson,* 626 F.2d 211, 217 (2d Cir.1980); *see also, e.g., Jones v. Fraser,* No. 96-CV-5484, 1998 WL 355341 at *4 (E.D.N.Y. May 8, 1998) ("The double jeopardy clause does not apply to parole proceedings...."); *Scherl v. United States Parole Comm'n,* 92 Civ. 7435, 1993 WL 258736 at *3 (S.D.N.Y. July 7, 1993) (Leval, D.J.) ("Courts have consistently held that the 'Double Jeopardy Clause applies to judicial proceedings, not parole' proceedings."). "A denial of parole is a decision to withhold early release from the confinement component of a sentence. It is neither the imposition nor the increase of a sentence, and it is not punishment for purposes of the Double Jeopardy Clause...." *Alessi v. Quinlan,* 711 F.2d 497, 501 (2d Cir.1983); *accord, e.g., United States v. Porrini,* No. 01-1060, 34 Fed. Appx. 19, 20, 2002 WL 992167 at *1 (2d Cir. May 14, 2002).[FN20] Accordingly, the Parole Board's decisions to deny parole and impose a twenty-four-month hold did not violate Romer's Double Jeopardy rights.

FN20. *See also Mayrides v. Chaudhry,* No. 01-3369, 43 Fed. Appx. 743, 745, 2002 WL 1359366 at *2 (6th Cir. June 20, 2002) (denial of parole did not violate double jeopardy rights

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

> because "parole board's refusal to grant parole does not increase [petitioner's] sentence, nor is parole designed to punish a defendant for the violation of criminal law."); *Sand v. Bogan,* No. 93-2280, 21 F.3d 428 (table), 1994 WL 112862 at *2 (6th Cir. Mar. 31, 1994).

*CONCLUSION*

For the reasons set forth above, Romer's habeas petition should be denied, and a certificate of appealability should not issue.

*FILING OF OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Kimba M. Wood, 500 Pearl Street, Room 1610, and to my chambers, 500 Pearl Street, Room 1370. Any requests for an extension of time for filing objections must be directed to Judge Wood. Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993), *cert. denied,* 513 U.S. 822, 115 S.Ct. 86 (1994); *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.), *cert. denied,* 506 U.S. 1038, 113 S.Ct. 825 (1992); *Small v. Secretary of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57-59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir.1983); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).
S.D.N.Y.,2003.

Romer v. Travis
Not Reported in F.Supp.2d, 2003 WL 21744079 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

James BARNA and Jason B. Nicholas, Plaintiffs,
v.
Brion D. TRAVIS, Chairperson, New York State Div. of Parole et al., Defendants.
No. CIV97CV1146(FJS/RWS).

April 22, 1999.

James Barna, Wallkill Correctional Facility, Walkill, Plaintiff Pro Se.

Jason B. Nicholas, Walkill Correctional Facility, Walkill, Plaintiff Pro Se.

Hon. Eliot Spitzer, Attorney General of the State of New York, Attorney for Defendants, Department of Law, Albany, Steven H. Schwartz, Esq., Asst. Attorney General, of Counsel.

ORDER AND REPORT–RECOMMENDATION

SMITH, Magistrate J.

***1** Plaintiffs bring this civil rights action pursuant to 42 U.S.C. § 1983. This case has been referred to the undersigned for report and recommendation by the Honorable Rosemary S. Pooler, then United States District Judge,[FN1] pursuant to 28 U.S.C. Section 636(b) and N.D.N.Y.L.R. 72.4. Pending before the court is a motion by the defendants to dismiss plaintiffs' complaint. Plaintiffs allege violations of both due process and the Ex Post Facto Clause. Each plaintiff has filed a memorandum of law in opposition to the motion. For the reasons which follow, it is recommended that defendants' motion be granted, dismissing plaintiffs' complaint in its entirety.

FN1. Judge Pooler now serves as a member of the Second Circuit Court of Appeals. This action has been reassigned to the Honorable Frederick J. Scullin, United States District Judge.

*The Underlying Convictions and Sentences*

Plaintiff Barna was sentenced in 1977 following a conviction for second degree murder and first degree burglary, for which he received concurrent prison sentences of fifteen years to life and zero to fifteen years, respectively. The New York State Division of Parole considered and denied him parole in 1991, 1993, 1995, and 1997. Barna's next appearance before the Board is scheduled for July 1999.

Plaintiff Nicholas was sentenced in 1991 following a conviction of first degree manslaughter and a youthful offender crime, for which he received consecutive prison sentences of five to fifteen years and one and one-third to four years, respectively. The New York State Division of Parole considered and denied him parole in 1997. Nicholas was scheduled to appear before the Board for the second time in January 1999.

DISCUSSION

*Due Process Claim*

Plaintiffs first allege that defendants systematically deny parole applicants due process safeguards in parole release determinations. It is a fundamental principle of constitutional law that the first inquiry in the analysis of an alleged due process violation is whether there exists a protected liberty interest. *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908, 104 L.Ed.2d 506 (1989). As a predicate to their due process claim, then, plaintiffs must establish that they enjoy a protected liberty interest under New York's statutory scheme for determining whether to grant or deny an inmate's application for parole (i.e., a legitimate expectation of release).

In 1979, the Supreme Court announced that an inmate is entitled to due process safeguards in parole determinations only when the state's parole provisions create a legitimate expectation of release. *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 11–13, 99 S.Ct. 2100, 2106–07, 60 L.Ed.2d 668 (1979). The *Greenholtz* Court held that the presence of mandatory language in state parole schemes,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

directing that an inmate "shall" be released upon a finding that the relevant criteria have been met, creates a presumption that parole release will be granted and thus gives rise to an expectation of release. *Id.* at 12, 99 S.Ct. at 2106. In accordance with the principles set forth in *Greenholtz,* the Second Circuit thereafter held that New York's statutory scheme creates no such expectation because the state's parole provisions "do not establish a scheme whereby parole shall be ordered unless specified conditions are found to exist." *Boothe v. Hammock,* 605 F.2d 661, 664 (2d Cir.1979). On the contrary, under New York's scheme, the decision to release is a matter committed to the discretion of the Parole Board. [FN2] N.Y. Exec. Law § 259–i(2)(c) (McKinney Supp.1999). "Decisions that are purely discretionary or ultimately discretionary with the parole authorities do not create a protectible liberty interest ...." *Berard v. State of Vermont Parole Bd.,* 730 F.2d 71, 75 (2d. Cir.1984) (citations omitted). As a result, pursuant to *Boothe,* prisoners in New York state are not entitled to the safeguards afforded by federal due process with respect to parole release determinations.

FN2. New York's statute provides the following:

> Discretionary release on parole shall not be granted merely as a reward for good conduct or efficient performance of duties while confined but after considering if there is a reasonable probability that, if such inmate is released, he will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of the crime as to undermine respect for law.
>
> N.Y. Exec. Law § 259–i(2)(c) (McKinney 1993 & Supp.1999).

***2** Until recently, discussion of plaintiffs' due process claim would have concluded with reference to *Greenholtz* and *Boothe.* In 1995, however, the Supreme Court reformulated the liberty interest analysis under which federal courts determine whether state law confers a liberty interest on inmates. *Sandin v. Conner,* 515 U.S. 472, 483, 115 S.Ct. 2293, 2300, 132 L.Ed.2d 418 (1995). Under *Sandin,* the presence or absence of mandatory language, while still relevant, is no longer dispositive in determining whether a particular statute gives rise to a protectible liberty interest. *Id.* Rather, the focus of the inquiry should be on the nature of the interest allegedly created by the state. *Id.* State created liberty interests "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to ordinary prison life." *Id.*

In light of *Sandin,* the validity of the conclusion that New York's parole provisions do not create a protectible liberty interest must be reexamined. Such a reexamination reveals, however, that although *Sandin* changes the analysis, it does not change the result. Even assuming, arguendo, that the "absence of procedural safeguards attending a decision denying an inmate's application for parole is one that 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," ' the discretionary language of New York's parole provisions nonetheless militates against a finding of a protectible liberty interest. *Quartararo v. Catterson,* 917 F.Supp. 919, 963 (E.D.N.Y.1996) (*quoting* *Sandin,* 515 U.S. at 483, 115 S.Ct. at 2300). Although *Sandin* expressly rejects the approach of drawing negative implications from mandatory language, it does not render language considerations irrelevant to the liberty interest analysis. *See id.* at 964; *see also,* *Orellana v. Kyle,* 65 F.3d 29, 32 (5th Cir.1995). Given the broad discretion afforded the Parole Board under New York's statutory scheme, *Sandin* does not alter the conclusion that inmates in this state have no legitimate expectation of release. Accordingly, plaintiffs are not entitled to federal due process protection with respect to parole release determinations.

Finally, even if New York's parole provisions conferred upon inmates a protectible liberty interest, plaintiffs fail to state a claim against the Parole Board under § 1983. The Second Circuit recently held that Parole Board officials are entitled to absolute immunity from liability for damages under § 1983 for their decisions to grant, deny, or revoke parole. *Montero v. Travis,* No.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

98–2063, 1999 WL 163554, at *4 (2d Cir. Mar. 26, 1999).

*Ex Post Facto Claim*

Plaintiffs further allege that the Parole Board's enforcement of the “Pataki policy” to eliminate parole of violent offenders, particularly those convicted of homicide and sex-related offenses, violates their right to be free of ex post facto punishment under Article I, § 10 of the federal Constitution. Plaintiffs do not cite to any specific legislative enactment or measure as having violated the Ex Post Facto Clause. Rather, they allege only that they have been aggrieved by the enforcement of a “policy”, one that is both unwritten and unofficial. In other words, the basis of plaintiffs' claim is the purported “get-tough” approach recently adopted by the New York State Parole Board. Assuming, without deciding, that such a “policy” does in fact exist, plaintiffs' claim lacks an arguable basis in law and thus fails.

***3** It has long been held that the Ex Post Facto Clause prohibits laws that “retroactively alter the definition of crimes or increase the punishment for criminal acts.” *Collins v. Youngblood,* 497 U .S. 37, 43, 110 S.Ct 2715, 2719–20, 111 L.Ed.2d 30 (1990) (*citing Calder v. Bull,* 3 Dall. 386, 391–392 (1798)). In large part, ex post facto jurisprudence centers on whether a particular enactment, measure, or regulation runs afoul of the Clause under that definition. *See e.g., California Dep't of Corrections v. Morales,* 514 U.S. 499, 115 S.Ct. 1597, 131 L.Ed.2d 588 (1995); *Lee v. Governor of the State of New York,* 87 F.3d 55 (2d Cir.1996).

Although such an inquiry is determinative in many cases, the analysis of plaintiffs' claim begins, and ultimately ends, on a much more fundamental level. Simply stated, the “policy” upon which plaintiffs rely as the basis of their claim is not a law subject to ex post facto analysis. This is not to say, of course, that a policy can never constitute a law for purposes of the Ex Post Facto Clause. A number of circuit courts have addressed, or at least made reference to, the issue of whether an administrative policy or regulation can be an ex post facto law.[FN3] The focus of the inquiry in those courts has been whether the policy or regulation is binding on the Parole Board, or merely serves as a guideline for the exercise of discretionary decisionmaking. *See e.g., Shabazz v. Gabry,* 123 F.3d 909, 914–915 (6th Cir.1997), *cert denied,* 118 S.Ct. 1061, 140 L.Ed.2d 122 (1998) (finding memoranda and directives not laws for ex post facto purposes); *Hamm v. Latessa,* 72 F.3d 947, 956 n. 14 (1st Cir.1995) (identifying the nature of the inquiry); *Bailey v. Gardebring,* 940 F.2d 1150, 1156–57 (8th Cir.1991) (finding parole regulations merely aid Parole Board in exercise of discretionary authority); *Devine v. New Mexico Dep't of Corrections,* 866 F.2d 339, 343 n. 7 (10th Cir.1989) (finding guidelines that merely channel discretion of Parole Board do not constitute ex post facto laws); *Prater v. United States Parole Comm'n,* 802 F.2d 948, 952–53 (7th Cir.1986) (finding written policies do not qualify as laws for purposes of ex post facto analysis). Under such an analysis, binding regulations fall within the purview of the Clause whereas those that merely function as discretionary guides are not subject to ex post facto review.

FN3. The Second Circuit is not among the courts that have considered this issue.

When viewed in accordance with this distinction, it is clear that the policy relied upon by the plaintiffs in the instant case is not one that is binding on the Parole Board. No official promulgation of the policy, either through legislative mandate or internal directive, requires the Board to follow or adopt it. The Board remains free to ignore the policy if it is so inclined. The most such a policy can be said to do is guide or channel the discretion of the Parole Board, thereby effectively removing it from the reach of the Ex Post Facto Clause. Simply put, this policy does not have the force and character of law necessary to invoke ex post facto analysis.

***4** Finally, plaintiff Barna contends that the application of parole guidelines enacted after his 1976 conviction, instead of those in force at the time of his offense, similarly violates the Ex Post Facto Clause. Specifically, Barna asserts that the guidelines now permit consideration of both the seriousness of the offense and the defendant's prior criminal record, two criteria that allegedly worked to his detriment. It is well-established in the Second Circuit, however, that federal parole guidelines are not laws within the meaning of the Ex Post Facto Clause. *Beltempo v. Hadden,* 815 F.2d 873, 875 (2d

Cir.1987); *DiNapoli v. Northeast Regional Parole Comm'n,* 764 F.2d 143, 145 (2d Cir.1985). To the extent that *Beltempo* and *DiNapoli* involved the application of federal, rather than state, parole guidelines, such a distinction is one without a difference. Accordingly, Barna cannot establish an ex post facto violation with respect to the application of amended parole guidelines.

CONCLUSION

For the reasons stated above, it is hereby

RECOMMENDED, that defendants' motion to dismiss be granted and that the complaint be dismissed in its entirety.

IT IS HEREBY ORDERED that the Clerk of the Court serve a copy of this Order and Report–Recommendation, by regular mail, upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993); *Small v. Secretary of Health & Human Serv.,* 892 F.2d 15, 16 (2d Cir.1989); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a), 6(e).

N.D.N.Y.,1999.

Barna v. Travis
Not Reported in F.Supp.2d, 1999 WL 305515 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





C

Only the Westlaw citation is currently available.

United States District Court,

D. Connecticut.

Donald R. LEDUC Plaintiff,

v.

James R. TILLEY, et al. Defendants.

No. 3:05CV157MRK.

June 22, 2005.

Donald T. LeDuc, Quaker Hill, CT, pro se.

*RULING AND ORDER*

KRAVITZ, J.

***1** Plaintiff, Donald LeDuc is confined at the Carl Robinson Correctional Institution in Enfield, Connecticut. He brings this 42 U.S.C. § 1983 civil rights action *pro se* pursuant to 28 U.S.C. § 1915. Mr. LeDuc alleges that his rights under the Second, Fifth, Eighth and Fourteenth Amendments were violated when state officials, while enforcing state statutes, seized and destroyed his collection of firearms. For the reasons that follow, the Court dismisses all of Mr. LeDuc's claims.

I.

Mr. LeDuc has met the requirements of 28 U.S.C. § 1915(a) and has been granted leave to proceed *in forma pauperis* in this action. However, pursuant to 28 U.S.C. § 1915(e)(2)(B), "the court shall dismiss the case at any time if the court determines that ... the action ... is frivolous or malicious; ... fails to state a claim on which relief may be granted; or ... seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B)(i)-(iii). *See Cruz v. Gomez,* 202 F.3d 593, 596 (2d Cir.2000) (dismissal of a complaint by a district court under any of the three enumerated sections in 28 U.S.C. § 1915(e)(2)(B) is mandatory rather than discretionary).

In reviewing the complaint, the court "accept[s] as true all factual allegations in the complaint" and draws inferences from these allegations in the light most favorable to the plaintiff. *Cruz,* 202 F.3d at 596. "When an *in forma pauperis* plaintiff raises a cognizable claim, his complaint may not be dismissed *sua sponte* for frivolousness under § 1915(e)(2)(B)(i) even if the complaint fails to flesh out all the required details." *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998) (quotations and citations omitted). Dismissal of the complaint under 28 U.S.C. § 1915(e)(2)(B) is appropriate only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *Id.* at 597 (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Furthermore, the Second Circuit has recently emphasized that "*pro se* litigants ... cannot be expected to know all of the legal theories on which they might ultimately recover. It is enough that they allege that they were injured, and that their allegations can conceivably give rise to a viable claim." *Phillips v. Girdich,* 408 F.3d 124, 130 (2d Cir.2005). It is up to the district court to determine what claims a *pro se* plaintiff's complaint could raise, and in doing so, "the court's imagination should be limited only by [the plaintiff]'s factual allegations, not by the legal claims set out in his pleadings." *Id.*

II.

Mr. LeDuc's claims are based on the following facts alleged in his Complaint. On May 9, 2001, in response to a harassment complaint made by one of Mr. LeDuc's co-workers, Defendants Connecticut State Troopers Weber, Tilley and McWilliams executed search and seizure and arrest warrants at Mr. LeDuc's home in Hamden, Connecticut. *See* Compl. [doc. # 1] at 3-3D. Mr. LeDuc's weapons collection was seized by the Connecticut State Police in accordance with section 29-38c of the Connecticut General Statutes, which authorizes the seizure of firearms from a person "pos[ing] a risk of imminent personal injury to himself or herself, or to other individuals," and Mr. LeDuc was arrested for violations of the State's pistol permit regulations. *See id.* at 4-4D.

Among the twenty-four weapons seized was a collection of eleven pistols and revolvers valued by Mr. LeDuc at approximately $7,000. *See* Compl. at 4C-4D. Mr. LeDuc values the remaining thirteen firearms at $8,000. *See* Compl. at 3C.

***2** From May 9, 2001, until January 4, 2002, Mr. LeDuc was held on bond and his weapons were stored at the Connecticut State Police Barracks for Troop I in Bethany, Connecticut. Mr. LeDuc later pleaded guilty to violating section 29-28 of the Connecticut General Statutes, which requires, among other things, that any holder of a pistol permit notify the authority issuing the permit of any change of address within two business days of the change. *See id.* at 4B. The penalty for violating section 29-28 is set forth in section 29-37(a), which provides that "[a]ny person violating any provision of section 29-28 or 29-31 shall be fined not more than five hundred dollars or imprisoned not more than three years, or both, and any pistol or revolver found in the possession of any person in violation of any said provisions shall be forfeited."

On January 4, 2002, Mr. LeDuc appeared before Connecticut Superior Court Judge Earl Richards for sentencing. As part of his penalty for violating section 29-28, Mr. LeDuc's eleven pistols and revolvers were forfeited to the State. *See* Compl. at 4C. Assistant State's Attorney James Turcotte also asked the court to order the destruction of all twenty-four of Mr. LeDuc's seized weapons. Mr. LeDuc asked that his collection of thirteen firearms valued at $8,000 be transferred in accordance with section 29-38c(e) of the Connecticut General Statutes, which allows "[a]ny person whose firearm or firearms have been ordered seized pursuant to subsection (d) of this section" to "transfer such firearm or firearms in accordance with the provisions of section 29-33 ... to any person eligible to possess such firearm or firearms." Judge Richards denied the request and ordered the entire collection of twenty-four weapons destroyed. Trooper Kennedy then destroyed the weapons in November 2002, in accordance with the Judge Richard's order. *See id.* at 4C.

III.

For the reasons stated below, Mr. LeDuc cannot maintain any of the claims stated in his Complaint based on the facts he has alleged. The Court addresses each claim in turn.

A. Second Amendment

Mr. LeDuc claims that in seizing and destroying his weapons collection, Defendants violated his Second Amendment right to bear arms. *See* Compl. at 4D ("Plaintiff claims that his Second Amendment Right to bear arms was violated ... since the Plaintiff never had any control over the fate of his firearm collection."). However, Mr. LeDuc cannot maintain a Second Amendment claim against Defendants because, as the Second Circuit recently held, " 'the right to keep and bear arms' does not apply against the States" and "is a right only against the federal government." *Bach v. Pataki,* 408 F.3d 75, 84-86 (2d Cir.2005) (citing *Presser v. Illinois,* 116 U.S. 252, 6 S.Ct. 580, 29 L.Ed. 615 (1886)). Mr. LeDuc's Second Amendment claims are asserted only against the State. Indeed, his Complaint is premised entirely upon application of sections 29-28, 29-37 and 29-38c of the Connecticut General Statutes, and it names only state actors as defendants. Because Mr. LeDuc's Second Amendment claims are barred by the Second Circuit's recent decision in *Bach,* the Court dismisses his Second Amendment claims pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

B. Fourteenth Amendment

***3** Next, Mr. LeDuc also makes what the Court liberally construes as a "void for vagueness" due process claim. *See* Compl. at 3F ("Plaintiff claims that his Fourteenth Amendment Right was violated, because [section 29-38c] failed to clarify for the Plaintiff that his firearm would or would not be able to be transferred."). In particular, Mr. LeDuc alleges that Defendants violated his due process rights when they applied section 29-38(c) to him, because the words "may transfer" in the statute are "misleading" and "gave the Plaintiff a false hope" that he would be able to transfer his gun collection to another person, "without indicating that the weapons could be taken without any possibility of salvage." Compl. at 3F. Mr. LeDuc cannot maintain a void for vagueness claim based on the facts he has alleged.

The void for vagueness doctrine is rooted in the principle that "[t]he Due Process Clause requires that laws

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

be crafted with sufficient clarity to give the person of ordinary intelligence a reasonable opportunity to know what is prohibited and to provide explicit standards for those who apply them." *Perez v. Hoblock,* 368 F.3d 166, 174 (2d Cir.2004) (citations and quotation marks omitted). Therein lies the principal problem with Mr. LeDuc's claim: the portion of the Connecticut statute that he identifies as "misleading" does not forbid or proscribe any conduct. To the contrary, section 29-38c(e) simply permits a person in Mr. LeDuc's situation to request transfer of seized firearms to another person; the section itself does not prohibit any conduct. *See United States v. Payden,* 598 F.Supp. 1388, 1396 (S.D.N.Y.1984) (statute that did not prohibit conduct was not proper subject of a vagueness challenge), *rev'd on other grounds,* 759 F.2d 202 (2d Cir.1985). Because Mr. LeDuc does not, and cannot, allege that section 29-38(c)(e) failed to give him notice as to what conduct was "prohibited," the Court dismisses his Fourteenth Amendment claims pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).

C. Fifth Amendment

Mr. LeDuc also asserts that Defendants violated his rights under the takings clause of the Fifth Amendment by requiring forfeiture of his collection of eleven pistols and revolvers, which he values at approximately $7,000, as well as thirteen other firearms which he values at $8,000, without providing him just compensation. *See* Compl. at 3C-3E.

Mr. LeDuc's claim with respect to the pistols and revolvers fails because a statutory forfeiture without compensation is not an unlawful taking under the Fifth Amendment. It is well-established that "if the government acts pursuant to a forfeiture statute, it may seize personal property without compensating the owner." *Redford v. U.S. Dep't of Treas.,* 691 F.2d 471, 473 (10th Cir.1982) (collecting cases). *See also Bennis v. Michigan,* 516 U.S. 442, 452-53, 116 S.Ct. 994, 134 L.Ed.2d 68 (1996) ("The government may not be required to compensate an owner for property which it has already lawfully acquired under the exercise of governmental authority other than the power of eminent domain."). Indeed, courts routinely approve statutory forfeitures of property without compensation. *See, e.g., United States v. One Assortment of 89 Firearms,* 465 U.S. 354, 366, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984) (approving of statutory forfeiture of firearms where owner was acquitted of criminal charges involving firearms); *United States v. Gaskin,* 364 F.3d 438, 463 (2d Cir.2004) (approving of statutory forfeiture of $16,000 that was intended to be used in a drug offense).

***4** As Mr. LeDuc alleges in his Complaint, his pistols and revolvers were destroyed after he pleaded guilty to violating section 29-28. *See* Compl. at 4A. As Mr. LeDuc also recognizes, section 29-37(a) expressly authorizes forfeiture of any pistols or revolvers found in possession of a person who violates the State's pistol permit regulations contained in section 29-28. *See* Compl. at 4D. In those circumstances, Mr. LeDuc cannot maintain a Fifth Amendment takings claim for forfeiture of his pistols and revolvers.

The status of Mr. LeDuc's claim Fifth Amendment claim regarding his remaining eleven firearms is less clear. On the facts as alleged by Mr. LeDuc, the Court is unable to discern what statutory authority, if any, Defendants asserted in requiring forfeiture and destruction of Mr. LeDuc's remaining eleven firearms. Section 29-38c does not appear to authorize the State to hold firearms seized pursuant to that section for more than one year. *See* Conn. Gen.Stat. § 29-38c(d) ("If [after a hearing] the court finds by clear and convincing evidence that the person [whose firearms were seized] poses a risk of imminent personal injury to himself ... or to other individuals, it may order the ... firearms seized pursuant to the warrant issued under subsection (a) of this section continue to be held by the state for a period not to exceed one year.").

However, even assuming that Mr. LeDuc could state a viable takings claim regarding the forfeiture of the remaining eleven firearms, he is nonetheless required to exhaust state remedies before asserting such a claim in this Court. *See Williamson County Reg. Planning Comm'n v. Hamilton Bank,* 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985) ("[I]f a state provides an adequate procedure for seeking just compensation, the property owner cannot claim a violation of the Just Compensation Clause until it has used the procedure and been denied just compensation."); *see also San Remo Hotel, L.P. v. City and County of San Francisco,* --- U.S. ----, --- S.Ct. ----, --- L.Ed.2d ----, 2005 WL 1421451, at *13 (June 20,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

2005) (same). In *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375 (2d Cir.1995), the Second Circuit recognized that the Connecticut Constitution contains "a straight forward takings clause" and required a plaintiff, like Mr. LeDuc, to seek compensation under the State's Constitution before bringing a federal takings claim. *Id.* at 380 ("So long as a remedy potentially is available under the state constitution's provision, [plaintiff] has not yet met the preconditions for a valid takings claim."). Mr. LeDuc has not stated or suggested anywhere in his Complaint that he has satisfied this exhaustion requirement. The Complaint does contain an allegation that Mr. LeDuc filed a claim for property loss with Connecticut's Claims Commissioner. *See* Compl. at 6. However, he does not allege that his claim has been fully and finally adjudicated as is required by the Second Circuit. Unless and until Mr. LeDuc exhausts his state remedies, any federal takings claim he might have is not yet ripe, and this Court lacks subject matter jurisdiction over it. *See Warboys v. Proulx,* 303 F.Supp.2d 111, 117 (D.Conn.2004) (dismissing plaintiff's federal takings claim as unripe for failure to exhaust state remedies).

***5** Accordingly, the Court dismisses Mr. LeDuc's Fifth Amendment claims regarding forfeiture of his pistols and revolvers pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and dismisses Mr. LeDuc's Fifth Amendment claim regarding his remaining firearms as unripe. The Court will provide Mr. LeDuc an opportunity to amend his Complaint to address the latter defect if he has basis in fact to assert that he has satisfied exhaustion requirements.

D. Eighth Amendment

Finally, Mr. LeDuc asserts an Eighth Amendment claim challenging his conviction, the length of his sentence, and the forfeiture of his weapons. First, Mr. LeDuc alleges that "his Eighth Amendment Right of the U.S. Constitution" was violated when "the penalty provided for violation of [section] 29-28 as stated in [section] 29-37 resulted in a felony conviction and a prison term which was far too harsh and wildly disproportionate for the Plaintiff's act of failing to notify CT State Police of an address change." Compl. at 4C. Based on the facts that he has alleged, Mr. LeDuc cannot maintain an Eighth Amendment claim under § 1983 regarding his conviction or the length of his sentence. It is well-established that:

> [W]here a judgment in favor of the plaintiff would necessarily implicate the validity of the plaintiff's conviction or the length of his sentence, a cause of action under section 1983 is not cognizable unless the plaintiff can show that his underlying "conviction or sentence had been reversed on direct appeal, declared invalid by a state tribunal authorized to make such a determination, or called into question by the issuance of a federal writ of habeas corpus."

*Torres v. Stewart,* 263 F.Supp.2d 463, 467 (D.Conn.2003) (quoting *Heck v. Humphrey,* 512 U.S. 477, 487, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994)). Mr. LeDuc has not alleged that his conviction or sentence has been reversed. Because Mr. LeDuc's claim is precisely the kind of claim that *Heck* bars, the Court dismisses Mr. LeDuc's Eighth Amendment claim pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) insofar as he challenges his conviction and the length of the sentence he received.

Mr. LeDuc also asserts that the forfeiture of his weapons collection also violated the Excessive Fines provision of the Eighth Amendment. *See* Compl. at 3E ("by the actions of the Defendants, [Plaintiff's] ... Eighth Amendment (excessive fines shall not be imposed) ... Rights of the U.S. Constitution were violated."); *id.* at 4C (same). The Supreme Court has held that a forfeiture could violate the Excessive Fines clause of the Eighth Amendment if the forfeiture was "grossly disproportionate to the gravity of the offense" for which forfeiture was found appropriate. *United States v. Bajakajian,* 524 U.S. 321, 333, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). This principle applies to both criminal and civil forfeitures. *See, e.g., Austin v. United States,* 509 U.S. 602, 610, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993); *United States v. Collado,* 348 F.3d 323, 328 (2d Cir.2003).

For three reasons, the Court entertains considerable doubt whether Mr. LeDuc has stated a viable Eighth Amendment claim under the Excessive Fines clause. First, the Court questions whether Mr. LeDuc's § 1983 action concerning the forfeiture of his firearms is actually an indirect attack on his underlying criminal sentence. *See Jordan v. Appeldorn,* No. Civ. A. 00-1717, 2000 WL

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

1100786, at *4 n. 6 (E.D.Pa. Aug.1, 2000). If it is, then this claim would also appear to be barred by *Heck.* Second, while the Court does not discount Mr. LeDuc's personal sense of loss over the forfeiture and destruction of Mr. LeDuc's pistols and revolvers pursuant to section 29-37, it seems unlikely that forfeiture of eleven pistols and revolvers with a total value of approximately $7,000 is "grossly disproportionate" to the gravity of his offense within the meaning of the relevant case law. *See Bajakajian,* 524 U.S. at 333-38; *United States v. 32 Medley Lane,* --- F.Supp.2d ----, 2005 WL 1341135, at *5-*6 (D.Conn. May 31, 2005). Third and finally, with respect to Mr. LeDuc's remaining firearms, the Court questions whether the forfeiture of these firearms constitutes punishment. A forfeiture is subject to the Excessive Fines clause only if "it is punishment." *Austin,* 509 U.S. at 609-10. Putting aside the question of whether the State was authorized to require forfeiture of firearms seized pursuant to Conn. Gen.Stat. § 29-38c, the language of that provision suggests a non-punitive purpose.

***6** Nevertheless, the Court need not at this time decide these issues, because as the Court explains below, there are other defects in Mr. LeDuc's Eighth Amendment claims that require dismissal.

1. State Trooper Defendants

The Court dismisses Mr. LeDuc's Eighth amendment claim against all five state troopers named in his Complaint because Mr. LeDuc has not alleged that they were personally involved in imposing an excessive fine on him. "[A]bsent personal involvement, an individual defendant cannot be liable under § 1983." *Atkins v. County of Orange,* No. 01 CIV. 11536(WCC), --- F.Supp.2d ----, 2005 WL 1330962, at *14 (S.D.N.Y. Jun.3, 2005). Indeed, Mr. LeDuc's Complaint is completely devoid of any allegation that any of the five state troopers he has named as defendants played any role in imposing a forfeiture of his firearms, the act that Mr. LeDuc claims constituted an excessive fine.

The Court notes in particular that while Mr. LeDuc has alleged that State Trooper Kennedy was involved in the *destruction* of Mr. LeDuc's firearms, he has not alleged that Trooper Kennedy was involved in the *forfeiture* of those firearms. *See* Compl. at 3C-3D, 3F. "The Excessive Fines Clause ... limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense." *Bajakajian,* 524 U.S. at 328. The forfeiture of Mr. LeDuc's firearms occurred when Judge Richards ordered the weapons forfeited (and denied Mr. LeDuc's request to transfer them). Mr. LeDuc has not alleged that Trooper Kennedy was involved in any manner in Judge Richards' decision to order forfeiture of the weapons. Instead, his sole allegation is that Trooper Kennedy carried out the state court's order that the firearms, having been forfeited, be destroyed. *See* Compl. at 3C-3D, 3F. Therefore, on the facts as alleged in Mr. LeDuc's complaint, Trooper Kennedy could not have violated Mr. LeDuc's Eighth Amendment right under the Excessive Fines clause.

Accordingly, the Court dismisses Mr. LeDuc's Eighth Amendment excessive fines claim against State Troopers Tilley, Webster, Williams, Matson and Kennedy pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).[FN1]

FN1. Parenthetically, the Court also notes that even if Mr. LeDuc had stated a viable claim against Trooper Kennedy, as a state officer, Trooper Kennedy is also immune from any suit for damages against him in his official capacity because he is a state officer. Therefore, any claims for money damages against Trooper Kennedy in his official capacity are hereby dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii). *See Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005) (state officials acting in their official capacity are not "persons" for purposes of § 1983). Trooper Kennedy would also likely be entitled to qualified immunity on any individual capacity claims. A state official is entitled to qualified immunity when the official has an objectively reasonable basis for believing in the lawfulness of his actions. *See Connecticut v. Crotty,* 346 F.3d 84, 101-02 (2d Cir.2003). Reliance on a presumptively valid court order and statute would ordinarily be sufficient to satisfy this requirement. *Id.*

2. Judge Richards

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The Court also dismisses all of Mr. LeDuc's claims against Judge Earl Richards. A judge is absolutely immune for all claims for damages relating to actions taken in his judicial capacity, whether sued in his individual or official capacity. Mr. LeDuc's allegations against Judge Richards, the state court judge who sentenced Mr. LeDue, exclusively concern the orders he issued in Mr. LeDuc's criminal case, acts that unquestionably performed in the course of Judge Richards' judicial duties. Therefore, Judge Richards is absolutely immune from Mr. LeDuc's claim for damages arising from Judge Richards' actions in Mr. LeDuc's criminal case. *See Cruz v. Superior Court Judges,* No. 3:04CV1103 (CFD), 2005 WL 677282, at *3 (D.Conn. Mar.21, 2005) (citing *Mireles v. Waco,* 502 U.S. 9, 11, 112 S.Ct. 286, 116 L.Ed.2d 9 (1991)). "Although unfairness and injustice to a litigant may result" due to this rule, "it is a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, shall be free to act upon his own convictions, without apprehension of personal consequences to himself." *Mireles,* 502 U.S. at 9 (quotation marks and citations omitted). Accordingly, all claims for damages asserted in the Complaint against Judge Richards are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii).

***7** Judges are also immune from civil rights claims for injunctive relief based on actions taken in their judicial capacities, unless "a declaratory decree was violated or declaratory relief was unavailable." 42 U.S.C. § 1983, *amended by* Federal Courts Improvement Act of 1996, § 309(c), Pub.L. No. 104-317, 110 Stat. 3847, 3853 (1996). Mr. LeDuc has not alleged that any declaratory decree was violated or that declaratory relief was unavailable. Declaratory relief against a judge for actions taken within his or her judicial capacity is ordinarily available by appealing the judge's order. *See Salem v. Paroli,* 260 B.R. 246, 254 (S.D.N.Y.2001) (dismissing § 1983 claim for injunctive relief against judge because declaratory relief was available through appeal in state court); *Hultberg v. State,* No. CIV. A. 97-3577, 1998 WL 30288, at *6 (E.D.La. Jan.28, 1998) (same). Mr. LeDuc has not alleged any facts suggesting that he was unable to take an appeal of Judge Richards' order requiring forfeiture of his weapons. Accordingly, the Court dismisses Mr. LeDuc's claims for injunctive relief against Judge Richards pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii).

Finally, Mr. LeDuc also seeks a "declaratory judgment" from the Court that "Plaintiff's ... Eighth ... Amendment Rights of the U.S. Constitution were violated by the actions of any and/or some and/or all of the above named Defendants." The doctrine of judicial immunity does not shield judges from claims for prospective declaratory relief. *See, e.g., Davidson v. Garry,* 956 F.Supp. 265, 268 (E.D.N.Y.1996). Nevertheless, the Court must dismiss Mr. LeDuc's claim for declaratory relief against Judge Richards, because any prospective declaratory relief he could conceivably assert is now moot. *See Alexander v. Yale Univ.,* 631 F.2d 178, 183 (2d Cir.1980) ("A party's case or controversy becomes moot ... when it becomes impossible for the courts, through exercise of their remedial powers, to do anything to redress the injury."). The forfeiture order does not constitute an ongoing violation; nor does Mr. LeDuc allege that he will be subject to a similar injury in the future. Therefore, Mr. LeDuc's injury is not one that the Court can redress through a prospective declaratory judgment. *See Stack v. City of Hartford,* 170 F.Supp.2d 288, 293 (D.Conn.2001) (" 'A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show that he or she will be injured in the future.' ") (quoting *Deshawn E. v. Safir,* 156 F.3d 340, 344 (2d Cir.1998)).

In essence, Mr. LeDuc's claim for declaratory relief is really a retrospective claim because rather than seeking relief for a future or ongoing violation, his claim is "intertwined with [his] claim for money damages," for it asks the Court to "declare whether a past constitutional violation occurred." *Nat'l Audubon Soc. v. Davis,* 307 F.3d 835, 848 n. 5 (9th Cir.2002) (citing *F.E.R. v. Valdez,* 58 F.3d 1530, 1533 (10th Cir.1995)). However, as the Court has explained, a claim for retrospective relief does not lie against Judge Richards. *See Ippolito v. Meisel,* 958 F.Supp. 155, 165 (D.Conn.1997) ("[T]he courts are not obliged to entertain actions for declaratory judgment not seeking prospective relief but merely declaring past wrongs."). Accordingly, the Court dismisses Mr. LeDuc's Eighth Amendment claim for declaratory relief.

3. State's Attorney Turcotte

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

***8** Mr. LeDuc's damages claim against Assistant State's Attorney James Turcotte (in both his official and individual capacity) is similarly barred by the doctrine of absolute prosecutorial immunity. "It is well established that prosecutors have absolute immunity from a civil suit for damages under 42 U.S.C. § 1983 when engaged in activities that are 'intimately associated with the judicial phase of the criminal process' " such as initiation of a prosecution and presentation of the government's case. *Root v. Liston,* 363 F.Supp.2d 190, 193 (D.Conn.2005) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 430-31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). This is because "[t]he public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." *Mangiafico v. Blumenthal,* 358 F.Supp.2d 6, 14 (D.Conn.2005) (citing *Imbler,* 424 U.S. at 424-25). Mr. LeDuc's allegations against Assistant State's Attorney Turcotte relate exclusively to actions taken in the course of prosecuting the State's case against Mr. LeDuc. *See* Compl. at 3B ("States Attorney James Turcotte asked the Court to order the Plaintiff's seized firearms destroyed."). Accordingly, all claims for damages asserted in the Complaint against Assistant State's Attorney Turcotte are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(iii).

In addition to his damages claims, Mr. LeDuc also seeks declaratory and injunctive relief against State's Attorney Turcotte. Unlike claims for damages, the doctrine of prosecutorial immunity does not shield prosecutors from claims for prospective injunctive or declaratory relief. *See, e.g., Nicholson v. Williams,* 203 F.Supp.2d 153, 246 (E.D.N.Y.2002). Nevertheless, Mr. LeDuc's claim for declaratory relief against State's Attorney Turcotte is dismissed, because as explained in Part III.D.2, *supra,* the only declaratory relief that Mr. LeDuc seeks is retrospective rather than prospective.

By contrast, Mr. LeDuc's claim for injunctive relief requesting that the Court "impose an injunction to repeal" certain state statutes does seek prospective relief. Compl. at 7, 7B. However, as stated, Mr. LeDuc's request is not one upon which relief can be granted. Putting aside whether the Court could ever actually order such relief [FN2]-a matter that is very doubtful-it is clear that State's Attorney Turcotte does not have the authority to repeal state statutes. Nor, for that matter, do any of the defendants that Mr. LeDuc has sued. Therefore, even if the Court were inclined and able to order repeal of the statutes, the Court could not order such relief against State's Attorney Turcotte or any other defendants named in this lawsuit.

FN2. *Rial v. McGinnis,* 756 F.Supp. 1070, 1072 (N.D.Ill.1991) (Shadur, J.) (noting that the principles of federalism and of the separation of powers would likely preclude the ability of the court to grant such a "bizarre" prayer for relief).

However, the Court's inquiry does not end here, because construed liberally, Mr. LeDuc's Complaint could also be read to request the Court to enjoin the remaining defendants from enforcing sections 29-37 and 29-38c of the Connecticut General Statues in the future. Even so construed, the Court would still be unable to grant Mr. LeDuc's request, because he lacks standing to assert a claim for such "preventative" injunctive relief. In *Lyons v. City of Los Angeles,* 461 U.S. 95, 103, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), the Supreme Court held that a plaintiff lacked standing to pursue prospective injunctive relief where he failed to allege a real and immediate threat of harm at the hands of the defendant. Past harm, the Supreme Court explained, was insufficient to establish standing. *See Lyons,* 461 U.S. at 106; *Ward v. Murphy,* 330 F.Supp.2d 83, 98 (D.Conn.2004) (same).

***9** Mr. LeDuc's Complaint deals exclusively with past harm. He has not alleged anywhere in his Complaint that there is a likelihood that he will again be required to forfeit weapons to the State. Indeed, the possibility that Mr. LeDuc will again be required to forfeit his pistols and revolvers pursuant to section 29-37, or any other provision, seems remote at best given the allegations of the Complaint. For having been convicted of a felony, Mr. LeDuc is no longer eligible to lawfully obtain pistols and revolvers under Connecticut law. *See* Conn. Gen.Stat. § 29-28. In fact, Mr. LeDuc is no longer lawfully eligible to obtain *any* firearm that has traveled through interstate commerce under federal law. *See* 18 U.S.C. § 922(g)(3). In the absence of any allegations to the contrary, therefore, the Court concludes that the possibility that Mr. LeDuc will again be subject to the forfeiture provisions of section

29-37 or section 29-38c is speculative at best. Accordingly, the Court dismisses without prejudice Mr. LeDuc's claims for prospective injunctive relief against State's Attorney Turcotte pursuant to 28 U.S.C. § 1915(e)(2)(B).

IV.

At this juncture, the Court has dismissed without prejudice all claims set forth in Mr. LeDuc's Complaint. The Court will allow Mr. LeDuc an opportunity to remedy the defects identified by the Court-if possible. Mr. LeDuc shall file any amended complaint on or before July 22, 2005. Mr. LeDuc must also deliver the appropriate service and summons forms as well a copies of the amended complaint to the U.S. Marshals Service so that they may serve any defendants named in the Amended Complaint on or before July 22, 2005.

Failure to comply with this order will result in dismissal of Mr. LeDuc's entire lawsuit, which was filed on January 27, 2005, for failure to serve defendants within 120 days of filing the complaint pursuant to Rule 4(m) of the *Federal Rules of Civil Procedure*.

IT IS SO ORDERED.

Dated at New Haven, Connecticut on: *June 21, 2005.*

D.Conn.,2005.

LeDuc v. Tilley
Not Reported in F.Supp.2d, 2005 WL 1475334 (D.Conn.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.





Only the Westlaw citation is currently available.

United States District Court,

N.D. New York.

Robert WARREN, Petitioner,

v.

Dale ARTUS, Superintendent of Clinton Correctional Facility, Respondent.

No. 9:05-CV-1032 (LEK/DEP).

March 30, 2007.

Robert Warren, pro se.

Hon. Eliot Spitzer, Attorney General of the State of New York, Malancha Chanda, Esq., Assistant Attorney General, of counsel, New York, NY, for Respondent.

***DECISION AND ORDER***

LAWRENCE E. KAHN, U.S. District Judge.

**I. Background**

***1** Petitioner Robert Warren ("Petitioner") filed his *pro se* Petition for habeas corpus in this matter, on August 15, 2005. *See* Petition (Dkt. No. 1). Respondent filed a Motion to dismiss the Petition on July 31, 2006. *See* Motion (Dkt. No. 10). Petitioner filed his Petition while an inmate at Clinton Correctional Facility, in Dannemora, New York. The Clinton Correctional Facility address is the address currently listed for Petitioner on the Docket of this case, and is the last address of record for Petitioner.

On February 20, 2007, a Court Notice was filed informing the parties of the availability of the option to consent to the jurisdiction of the assigned United States Magistrate Judge for all further proceedings. *See* Court Notice (Dkt. No. 12). The copy of the Notice that was mailed to Petitioner, however, was returned as undeliverable, with a notation on the envelope that Petitioner was not at the prison, as he had been paroled. *See* Dkt. No. 13.

In addition, searching the Inmate Locator maintained by the New York State Department of Correctional Services-using Petitioner's Department ID Number 98-A-5547-the Court has determined that Petitioner was discharged on October 23, 2006. *See* N.Y.S. DOCS Inmate Population Information Search website *at* http://nysdocslookup.docs.state.ny.us/kinqw00 (last visited Mar. 27, 2007).

In the March 2006 Order of this Court, Petitioner was clearly warned that: **"Petitioner is also required to promptly notify the Clerk's Office and counsel for Respondent of any change in his address; his failure to do so will result in the dismissal of this action".** *See* March 2006 Order (Dkt. No. 6) at 3 (emphasis in original).

Furthermore, a Report and Recommendation was filed on March 12, 2007, by the Honorable David E. Peebles, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.4 of the Northern District of New York. *See* Report-Rec. (Dkt. No. 22). Said Report-Recommendation recommends granting Respondent's Motion to dismiss, and dismissing Petitioner's Petition. *Id.* Within ten days, excluding weekends and holidays, after a party has been served with a copy of a Magistrate Judge's Report-Recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations," FED.R.CIV.P. 72(b), in compliance with L.R. 72.1. No objections have been raised in the allotted time with respect to Judge Peebles' Report-Recommendation. Respondent has, however, filed a Letter Request asking this Court to adopt Judge Peebles' Report-Recommendation in its entirety. *See* Resp's Letter Request (Dkt. No. 16). In addition, after examining the record, the Court has determined that the Report and Recommendation is not subject to attack for plain error or manifest injustice.

Therefore, after review of the Report-Recommendation, and for the reasons that follow, this Court **adopts** Judge Peebles' Report-Recommendation **in its entirety,** Respondent's Motion is **granted,** Petitioner's habeas Petition is **dismissed,** and this case is **closed.**

**II. Discussion**

***2** United States Courts are vested with broad discretion to impose sanctions for non-compliance with court orders, and those sanctions can include the severe sanction of dismissing a case. *See* *Internet Law Library, Inc. v. Southridge Capital Mgmt., LLC,* No. 01 Civ. 6600(RLC), 2005 WL 3370542, at *1 (S.D.N.Y. Dec. 12, 2005) ("Moreover, the court has the inherent authority to dismiss a case when a party disobeys any of its orders.") (citing *Chambers v. Nasco, Inc.,* 501 U.S. 32, 45 (1991)). *Southridge* addressed discovery orders, but there is also no difference for non-compliance with any other court order. *See* *Dumpson v. Goord,* No. 00-CV-6039 CJS, 2004 WL 1638183 (W.D.N.Y. Jul. 22, 2004) (Court ordered one of the plaintiffs to provide address where he could be reached; plaintiff failed to comply; plaintiff was dismissed from the case). Rule 41(b) of the *Federal Rules of Civil Procedure* addresses not only a plaintiff's failure to prosecute, but also a plaintiff's "failure ... to comply with these rules or any order of court". FED.R.CIV.P. 41(b). *See also* *Dumpson,* 2004 WL 1638183, at *2 ("a court may *sua sponte* dismiss a plaintiff's action for failure to comply with an order of the court.... Such decisions are committed to the Court's sound discretion.... *Pro se* plaintiffs are entitled to a degree of leniency, but this 'should not extend to the disregard of a judge's plain directives.' ") (citing, *inter alia,* *Costello v. United States,* 365 U.S. 265, 286-87 (1961); *Lucas v. Miles,* 84 F.3d 532, 538 (2d Cir.1996)).

Both attorneys and *pro se* litigants are required to immediately notify the Court and their adversaries of any change in their address or contact information. *See* N.D.N.Y. L.R. 10.1(b)(2). "Failure to notify the Court of a change of address in accordance with L.R. 10.1(b) may result in the dismissal of any pending action." N.D.N.Y. L.R. 41.2(b). "The demand that plaintiffs provide contact information is no esoteric rule of civil procedure, but rather the obvious minimal requirement for pursuing a lawsuit." *Dumpson,* 2004 WL 1638183, at *3.

Moreover, as then-District Judge Pooler stated:

> It is neither feasible nor legally required that the clerks of the district courts undertake independently to maintain current addresses on all parties to pending actions. It is incumbent upon litigants to inform the clerk of address changes, for it is manifest that communications between the clerk and the parties or their counsel will be conducted principally by mail. In addition to keeping the clerk informed of any change of address, parties are obliged to make timely status inquiries. Address changes normally would be reflected by those inquiries if made in writing.

*Dansby v. Albany County Corr. Facility Staff,* No. 95-CV-1525, 1996 WL 172699, at * 1 (N.D.N.Y. Apr. 10, 1996) (Pooler, D.J.) (quoting *Perkins v. King,* No. 84-3310, slip op. at 4 (5th Cir. May 19, 1985) (other citations omitted)); *see, generally,* N.D.N.Y. L.R. 41.2(b).

***3** The Second Circuit in *LeSane v. Hall's Sec. Analyst, Inc.,* 239 F.3d 206 (2d Cir.2001), held that:

> *pro se* plaintiffs should be granted special leniency regarding procedural matters.... Finally, "this court has repeatedly detailed factors ... to be considered before dismissal for failure to comply with a court order," and these factors significantly cabin a district court's discretion under Rule 41(b), so that "deference is due to the district court's decision to dismiss a *pro se* litigant's complaint only when the circumstances are sufficiently extreme."... Specifically, a district court contemplating dismissing a plaintiff's case, under Rule 41(b), for failure to prosecute must consider: "[1] the duration of the plaintiff's failures, [2] whether plaintiff had received notice that further delays would result in dismissal, [3] whether the defendant is likely to be prejudiced by further delay, [4] whether the district judge has take[n] care to strik[e] the balance between alleviating court calendar congestion and protecting a party's right to due process and a fair chance to be heard ... and [5] whether the judge has adequately assessed the efficacy of lesser sanctions."

*LeSane,* 239 F.3d at 209 (citing and quoting *Lucas,* 84 F.3d at 535; *Alvarez v. Simmons Mkt. Research Bureau, Inc.,* 839 F.2d 930, 932 (2d Cir.1988)).

This Court has evaluated the factors as set forth by the Second Circuit. Petitioner's inaction and failure to update his address has spanned several months. Petitioner has clearly failed to comply with an Order of the Court (March 2006-*see* Dkt. No. 6) and with Local Rule 10.1(b)(2) in failing to update his address. Petitioner's own failure to update his address has frustrated this Court's ability to contact him. The

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Court finds that it would be futile to make any further attempts to contact Petitioner. *See, generally, Bottom v. Cooper,* No. 03-CV-6493L, 2005 WL 2496052 (W.D .N.Y. Oct. 7, 2005).

Given the law and factors discussed above, Petitioner's failures in this matter warrant the imposition of the sanction of dismissal.

**III. Conclusion**

Based on the foregoing discussion, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 14) is **APPROVED and ADOPTED in its ENTIRETY;** and it is further

**ORDERED,** that Respondent's Motion to dismiss (Dkt. No. 10) is **GRANTED;** and it is further

**ORDERED,** that Petitioner's Petition for a writ of habeas corpus (Dkt. No. 1) is **DISMISSED** both for the reasons contained in Judge Peebles' Report-Recommendation and due to Petitioner's failure to update his address as required by this District's Local Rules and a prior Order of the Court. The Clerk of the Court shall **CLOSE Case Number 9:05-CV-1032 (LEK/DEP);** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

*REPORT AND RECOMMENDATION*

DAVID E. PEEBLES, U.S. Magistrate Judge.

***4** Petitioner Robert Warren, who at the time of filing was a prison inmate as a result of a 1998 St. Lawrence County conviction of six separate offenses based upon a guilty plea entered in satisfaction of nine pending indictments, has commenced this proceeding seeking federal habeas relief, pursuant to 28 U.S.C. § 2254. In his petition, Warren asserts that the cumulative sentence imposed in connection with his crimes of conviction, and upheld on appeal, resulted in his serving two sentences for the same offense.

In response to Warren's petition respondent has moved seeking its dismissal, arguing that its filing was untimely under the governing limitation provision, and that there is no basis to find equitable tolling or otherwise excuse its lateness. Respondent's motion also addresses the merits of Warren's petition, asserting that the state courts' rejection of his double jeopardy claim was neither contrary to nor an unreasonable application of governing clearly established Supreme Court precedent.[FN1]

FN1. While moving for pre-answer dismissal of a section 2254 petition is generally not a favored practice, there is authority to support a respondent's choice to make such a motion under appropriate circumstances. *See McLeod v. Moscicki,* No. 02 Civ. 9335, 2003 WL 22427757, at *3 (S.D.N.Y. Oct. 22, 2003) (allowing a Rule 12(b)(6) motion under similar circumstances, and citing cases); *see also, e.g., Valverde v. Stinson,* 224 F.3d 129, 136 (2d Cir.2000) (discussing motion to dismiss on basis of section 2244 without comment on procedural propriety); *Garcia v. Portuondo,* 334 F.Supp.2d 446, 450 (S.D.N.Y.2004) (same).

Having carefully reviewed the parties' submissions and considered their arguments regarding the preliminary, threshold issue, I find that the filing of the petition in this matter was untimely, and that the petitioner has presented no basis to overlook this deficiency. Turning to the merits of Warren's otherwise untimely petition, and assuming that his habeas claim is deemed to have been properly exhausted, when considered with the requisite deferential standard as a backdrop, I find that the state court's rejection of that claim is neither contrary to nor an unreasonable application of clearly established Supreme Court precedent.

I. *BACKGROUND*

On August 4, 1998, at the time faced with as many as nine pending indictments against him, petitioner entered a plea of guilty in St. Lawrence County Court to six separate felony offenses, including attempted escape in the first degree, attempted second degree burglary, criminal possession of marijuana in the second degree, first degree criminal contempt, sexual abuse in the first degree, and driving while intoxicated. *See* Transcript of Plea Hearing,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

conducted on August 4, 1998, at 2-19. As a result of those pleas, petitioner was sentenced on September 8, 1998 as a second felony offender to various determinate and indeterminate prison terms, some of which were to run concurrently, while others were to be consecutively served, resulting in an aggregate sentence of between nine and ten and one-half years of incarceration. [FN2] Transcript of Sentencing Hearing, conducted on September 8, 1998, at 2-22; *see also* *People v. Warren,* 280 A.D.2d 75, 76, 721 N.Y.S.2d 152, 152-53 (3d Dep't 2001). Also included as part of the trial court's sentence was the issuance of an order of protection in favor of petitioner's spouse and stepdaughter, both of whom were found to be victims of certain of his crimes. *Warren,* 280 A.D.2d at 76, 721 N.Y.S.2d at 153. Petitioner was represented by counsel both at the time of entry of his plea, and at sentencing.

FN2. The sentence imposed by the trial court included 1) an indeterminate term of imprisonment of between one and one-half and three years for attempted escape in the first degree; 2) a determinate term of three and one-half years on the charge of attempted second degree burglary, to run consecutively to the sentence for attempted escape; 3) an indeterminate term of between two and four years of incarceration on the drug possession charge, to run concurrently with the sentences for attempted escape and attempted burglary; 4) an indeterminate term of two to four years of imprisonment on the charge of first degree criminal contempt, to run concurrently with the sentences for both attempted escape and attempted burglary; 5) a determinate term of four years of imprisonment on the charge of first degree sexual abuse, to run consecutively to the sentences for attempted escape and attempted burglary, but concurrently with the sentences for marijuana possession and criminal contempt; and 6) an indeterminate term of imprisonment of between two and four years on the charge of driving while intoxicated, to run concurrently with all other sentences. *See* Transcript of Sentencing Hearing, conducted on September 8, 1998, at 16-20. The net result of those sentences required petitioner to serve consecutive sentences of one and one-half to three years for attempted escape, three and one-half years for attempted burglary, and four years for sexual abuse, yielding an aggregate sentence of between nine and ten and one-half years of incarceration.

***5** Petitioner appealed his conviction to the New York State Supreme Court Appellate Division, Third Judicial Department, resulting in the issuance by that court of a decision dated March 1, 2001, modifying the conviction in a manner which did not affect his sentence of incarceration, and otherwise affirming the trial court's judgment. *Id.* at 77-78, 721 N.Y.S.2d at 153-54. While rejecting the argument now being made to this court, regarding the cumulative effects of his sentence, in its opinion the Third Department did conclude that the trial court had erred in its issuance of the order of protection, in that it exceeded in duration the maximum period authorized under New York law. *Id.* at 77, 721 N.Y.S.2d at 153. Finding the information necessary to affix an appropriate expiration date to be lacking in the record, the Appellate Division remitted the matter to the trial court for the limited purpose of reissuing an appropriate order of protection with a proper end date. *Id.* at 78, 721 N.Y.S.2d at 153-54. In its decretal paragraph, the Third Department

> [o]rdered that the judgment is modified, on the law, by reversing so much thereof as fixed the duration of the order of protection; matter remitted to the County Court of St. Lawrence County for further proceedings not inconsistent with this Court's decision; and, as so modified, affirmed.

*Id.* There is no indication in the record that petitioner sought leave to appeal that determination to the New York State Court of Appeals.[FN3] It was not until on or about July 12, 2004 that the trial court acted upon the remittitur and issued a new order of protection in the case. *See* Petitioner's Memorandum (Dkt. No. 11) Attachment 6.

FN3. In his petition, Warren asserts that permission for leave to appeal that determination was made, but denied. *See* Petition (Dkt. No. 1) ¶ 9(e), at 3. There is no support for this assertion, however, either in the state court records provided by respondent's counsel or in the reported history associated with that appeal. Moreover, in a later submission, Warren acknowledged that he did not pursue the matter to the New York State Court of

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Appeals. *See* Amended Memorandum (Dkt. No. 5) ¶ 3, at 2.

In addition to perfecting a direct appeal from his judgment of conviction, petitioner has pursued efforts to obtain two separate forms of collateral relief from the state courts. On August 31, 2004, Warren filed an application under section 440.20 of the N.Y. Criminal Procedure Law to set aside his sentence. That application was denied by order issued by County Court Judge Kathleen Rogers on October 19, 2004. Leave to appeal that determination to the New York State Court of Appeals was subsequently denied by the Third Department on December 29, 2004.

Petitioner also sought relief in the state courts through the filing on May 6, 2004, in Clinton County Supreme Court, of an application for a writ of habeas corpus pursuant to Article 70 of the N.Y. Civil Practice Law and Rules. By decision and judgment issued on June 7, 2004, Acting Supreme Court Justice S. Peter Feldstein denied petitioner's application for state court habeas relief. That determination was upheld, on appeal to the Third Department, by decision issued on April 21, 2005. *See People ex rel. Warren v. Artus,* 17 A.D.3d 896, 792 N.Y.S.2d 879 (3d Dep't 2005).[FN4] On June 30, 2005, leave to appeal the denial of habeas relief to the New York Court of Appeals was denied. *People ex rel. Warren v. Artus,* 5 N.Y.3d 705, 834 N.E.2d 1262 (2005).

FN4. An application for reargument of the state court's refusal to grant habeas relief was denied on August 26, 2004.

II. *PROCEDURAL HISTORY*

***6** Petitioner commenced this proceeding on August 15, 2005. Dkt. No. 1. Appropriately named as the respondent in Warren's petition is Dale Artus, Superintendent of the Clinton Correctional Facility, where petitioner was held at the time of filing. *Id.* Following the filing by petitioner on December 22, 2005 of a legal memorandum in support of his habeas petition, Dkt. No. 5, apparently prompted by a previously-issued order by District Judge Lawrence E. Kahn on November 21, 2005, Dkt. No. 4, respondent Artus, who is represented by the office of the New York State Attorney General, responded by the filing on July 31, 2006 of a motion to dismiss Warren's petition on the basis of the governing one year statute of limitations, and additionally on the merits. Dkt. No. 10. Petitioner has since countered in opposition to that motion. Dkt. No. 11.

Respondent's motion, which is now ripe for determination, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. Rule 72(b).

III. *DISCUSSION*

A. *Mootness*

Of its own initiative, the court has made an investigation as to petitioner's current status, and has learned that he was released from custody in October of 2006. *See* http:/nysdocslookup.docs.state.ny.us. The court must therefore determine whether Warren's release from prison, subsequent to commencement of this proceeding, renders the habeas claims now raised moot.

Habeas corpus relief is available to a state prisoner who is "in custody pursuant to the judgment of a State court ... on the ground that he [or she] is in custody in violation of the Constitution or laws or treaties of the United States". 28 U.S.C. § 2254(a). While on its face this provision contemplates that a habeas petitioner be in custody, section 2254 does not require that a petitioner be physically confined in order for a federal district court to retain jurisdiction over a properly filed habeas petition. *See Maleng v. Cook,* 490 U.S. 488, 491, 109 S.Ct. 1923, 1925 (1989). Thus, for example, a petitioner who, like Warren, has been released from custody after the filing of a habeas petition satisfies the "in custody" requirement of section 2254 if he or she remains subject to adverse collateral consequences which result from the subject conviction. *See Carafas v. LaVallee,* 391 U.S. 234, 237-39, 88 S.Ct. 1556, 1559-60 (1968). Collateral consequences are presumed to persist as a result of a conviction even after an inmate's release from prison.[FN5] *Spencer v. Kemna,* 523 U.S. 1, 12, 118 S.Ct. 978, 985 (1998) ("it is an 'obvious fact of life that most criminal convictions do in fact entail adverse collateral legal consequences' ") (quoting *Sibron v. New York,* 392 U.S. 40, 55, 88 S.Ct. 1889, 1899 (1968)); *see also, e.g., Barker v. Reynolds,* No. 9:98-CV-0732, 2001 WL 1860929, at *2 (N.D.N.Y. Apr. 19, 2001) (Sharpe, M.J.) (citing

*Spencer* and *Sibron*); *Binder v. Szostak,* No. 96-CV-840, 1997 WL 176353, at *3 (N.D.N.Y. Apr. 11, 1997) (Pooler, J. and DiBianco, M.J.).

> FN5. Examples of such potential collateral consequences can include the inability to serve as a juror, engage in certain businesses, or vote. *Johnson v. Levine,* No. 00 Civ. 8402, 2001 WL 282719, at *1 (S.D.N.Y. Mar. 21, 2001).

***7** In this case, since there is no indication the petitioner no longer suffers any adverse consequences from his conviction, his claims do not appear to have been rendered moot by his release from prison.

B. *Statute of Limitations*

Enactment by Congress of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), brought about significant changes to the prisoner litigation landscape. One of those was the institution of a one-year statute of limitations for habeas corpus petitions filed after April 24, 1996. 28 U.S.C. § 2244(d).[FN6]

> FN6. That section provides, in relevant part, that
>
> (1) [a] 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of-
>
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> * * *
>
> (2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.
>
> 28 U.S.C. § 2244(d).

The obvious starting point for resolving issues surrounding the timeliness of a section 2254 habeas petition is a determination of when the challenged conviction became final. In most cases, including in connection with convictions finalized subsequent to the April 24, 1996 effective date of the AEDPA, a state conviction becomes final when the time to seek review in the Supreme Court by petition for writ of *certiorari* expires. *Williams v. Artuz,* 237 F.3d 147, 151 (2d Cir.), *cert. denied,* 534 U.S. 924, 122 S.Ct. 279 (2001). In this case, however, petitioner did not seek leave to appeal the Third Department's determination to the New York State Court of Appeals. Accordingly, Warren's conviction became final on March 31, 2001, upon expiration of the thirty day period within which to seek review by that court of the Appellate Division's decision affirming his conviction. *Bethea v. Girdich,* 293 F.3d 577, 578 (2d Cir.2002); *People v. Wooley,* 40 N.Y.2d 699, 700-01, 358 N.E.2d 493, 494 (1976); *see* N.Y. Criminal Procedure Law § 460.10(5)(a).

In his opposition to respondent's motion, petitioner argues that because of the fact that the Appellate Division remitted the matter to the sentencing court for the issuance of an amended order of protection, an act which did not occur until July of 2004, the Third Department's decision was not immediately appealable, and thus his conviction was not final, until after the amended order of protection was issued. In making that argument, Warren places heavy reliance upon the Ninth Circuit's decision in *United States v. Colvin,* 204 F.3d 1221 (9th Cir.2000). In that case the two judge majority of the panel hearing the case, over a spirited dissent, concluded that an appellate decision which affirmed the defendant's conviction on two of three counts, but reversed as to the third and remanded the matter to the trial court with directions to strike the conviction on the third count and make a corresponding reduction in the special assessment imposed, was not a final determination which sufficed to trigger commencement of the applicable period for seeking habeas review, in that case under 28 U.S.C. § 2255.[FN7] *Id.* at 1222-26.

> FN7. 28 U.S.C. § 2255 prescribes a mechanism for a sentenced federal prisoner to challenge his or her continued custodial status by seeking to vacate, set aside or correct the sentence, thereby partially supplanting earlier jurisprudence relying upon 28 U.S.C. § 2241 to accomplish such an end. *Cephas*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

*v. Nash,* 328 F.3d 98, 103-04 (2d Cir.2003).

Unfortunately for Warren, the Ninth Circuit's decision in *Colvin* has not been universally accepted, and in fact was recently rejected by the Second Circuit in *Burrell v. United States,* 467 F.3d 160 (2d Cir.2006). In *Burrell,* after reviewing the applicable caselaw, which was noted to be in conflict, including the Ninth Circuit's decision in *Colvin,* the Second Circuit concluded that when a portion of a criminal judgment is reversed and the matter is remanded to the trial court solely for the purpose of performing a "strictly ministerial task of correcting the judgment" in a manner not affecting the defendant's sentence, the appellate decision is not thereby deprived of finality. *Id.* at 169.

***8** In order to determine whether *Burrell* is controlling in this case, it is necessary to understand the interplay between the petitioner's judgment of conviction and the order of protection issued by the trial court. New York law defines the term "judgment" as being "comprised of a conviction and the sentence imposed" by the court. N.Y.Crim. Proc. Law § 1.20(15) (McKinney 2003); *People v. Hernandez,* 93 N.Y.2d 261, 267, 689, 711 N.E.2d 972, 975 (1999). A criminal defendant has the right to appeal a "judgment." N.Y.Crim. Proc. § 450.10 (McKinney 2005); *People v.. Nieves,* 2 N.Y.3d 310, 314, 778 N.Y.S.2d 751, 811 N.E.2d 13, 16 (2004); *Hernandez,* 93 N.Y.2d at 269, 711 N.E.2d at 976. Under New York Law, an order of protection is not a form of punishment or a component of sentencing, but is instead a measure taken to protect victims and witnesses. *Nieves,* 2 N.Y.3d at 316, 811 N.E.2d at 17. An order of protection issued at the time of sentencing is, nonetheless, "part of the final adjudication of the criminal action involving [the] defendant." *Id.* at 315, 811 N.E.2d at 16.

In *Nieves,* the court drew an analogy between an order of protection and a certification as a sex offender under the Sex Offender Registration Act, codified at N.Y. Correction Law § 168 *et seq. Id.* at 315, 811 N.E.2d at 16-17. The court held that while neither is a component of sentencing, both are part of the final judgment of conviction in a criminal case. *Id.* Accordingly, a defendant has the right to appeal an order of protection entered at sentencing. *Id.* Applying a similar line of reasoning, in *Hernandez* the court held that the defendant's certification as a sex offender "was unmistakably part of the court's final adjudication with respect to defendant's crimes," and that the certification, along with the order of protection entered against the defendant, "formed an integral part of the conviction and sentencing." 93 N.Y.2d at 267, 711 N.E.2d at 975. It is thus apparent that under New York law, the issuance of an order of protection entered at sentencing, while not affecting a defendant's sentence, is part of the final judgment entered in a criminal case.

The circumstances now presented are closely analogous to those before the court in *Burrell.* As in *Burrell,* the Third Department remitted the matter to the trial court for the sole purpose of performing a ministerial task, in this case to recalculate the duration of its order of protection. In doing so the Third Department issued specific directives for the court to follow when affixing the duration of the order of protection, instructing it that "the maximum duration of the order of protection is three years from the date of the expiration of the four-year maximum" of the sentences imposed upon the criminal contempt and sexual abuse convictions. *Warren,* 280 A.D.2d at 77-78, 721 N.Y.S.2d at 153. While the trial court unmistakably retained the discretion to issue an order of protection of a shorter duration, it had already plainly evidenced its intention to issue one to remain in effect for the maximum allowable period. On remand, the trial court was thus left to perform a mere arithmetic calculation, using as guidance the specific instructions provided by the Third Department. That calculation thus was one which " 'involv[ed] obedience to instructions ... instead of discretion, judgment, or skill,' " and was therefore a ministerial duty. *Burrell,* 467 F.3d at 164 (*quoting* Blacks Law Dictionary 1017 (8th Ed.2004)). Because the remand was clearly for "ministerial purposes," it did not delay the "judgment's finality." *Id.* Based upon these circumstances I find that petitioner's judgment of conviction became final thirty days following issuance of the Third Department's decision, or on March 31, 2001.

***9** Once the appropriate limitation period commencement date is established, it is next necessary to determine whether there are any intervening tolling periods resulting from applications by the petitioner for collateral review. Under the AEDPA, "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or

claim is pending" is properly excludable from the one year limitation period, and results in its tolling. 28 U.S.C. § 2244(d)(2). Because the applicable statute speaks in terms of tolling, however, any such collateral or other review application filed within the otherwise applicable one year statute of limitations merely serves to toll the limitation period; such an event does not have the effect of resetting the one year clock. *Smith v. McGinnis,* 208 F.3d 13, 17 (2d Cir.) *(per curiam), cert. denied,* 531 U.S. 840, 121 S.Ct. 104 (2000); *see also* *Stokes v. Miller,* 216 F.Supp.2d 169, 172 N.3 (S.D.N.Y.2000) ("It is well-settled that post-conviction or other collateral review does not start the one year statute of limitations to run anew") (citing *Smith).*

The petitioner in this case filed two applications for collateral review, one by way of an application under section 440.20 to vacate his sentence, and the other in the form of a petition seeking state court habeas review under Article 70 of the N.Y. Civil Practice Law and Rules. Since both of those applications were filed in 2004, and thus after expiration of the one year limitation period, they did not effect any tolling of that period.[FN8] Consequently, even giving petitioner the benefit of the prison mailbox rule, in light of his *pro se* inmate state status, *see* *Noble v. Kelley,* 246 F.3d 93, 97 (2d Cir.), *cert. denied,* 534 U.S. 886, 122 S.Ct. 197 (2001), and assuming that the petition was conveyed to prison officials on August 12, 2005, the day on which it was signed, it was untimely absent a basis to overlook its lateness.

> FN8. Although a timely application under section 440.20 filed within one year after petitioner's judgment of conviction became final would have served to toll the application limitations period, *see* *King v. Cunningham,* 442 F.Supp.2d 171, 180 (S.D.N.Y.2006), the situation is less clear with regard to his habeas petition. *See* *Martino v. Berbary,* No. 03-CV-0923, 2005 WL 724133, at *2 (W.D.N.Y. Mar. 30, 2005) (collecting cases and noting a split among courts within the circuit on this issue).

C. *Equitable Tolling*

While Warren's petition is facially time-barred, the Second Circuit has cautioned that a habeas petition which would otherwise be subject to dismissal in light of the AEDPA's statute of limitations may nonetheless be considered by a district court where the court determines that the statute of limitations should be equitably tolled. *See* *Smith,* 208 F.3d at 17-18. And, although the Second Circuit has acknowledged that the "question remains open" as to whether the United States Constitution requires that an "actual innocence' " exception be engrafted onto the AEDPA's statute of limitations, *see* *Whitley v. Senkowski,* 317 F.3d 223, 225 (2d Cir.2003), that court has nevertheless directed district courts to consider a properly raised claim of actual innocence as a basis for invoking equitable tolling before dismissing a habeas petition as untimely filed. *Id.; see also* *Doe v. Menefee,* 391 F .3d 147, 161 (2d Cir.2004).

1. *Traditional Tolling*

***10** Equitable tolling applies "only in the 'rare and exceptional circumstance[ ].' " *Smith,* 208 F.3d at 17 (quoting *Turner v. Johnson,* 177 F.3d 390, 391-92 (5th Cir.), *cert. denied,* 528 U.S. 1007, 120 S.Ct. 504 (1999)) (alteration in original). Under traditional tolling principles, the equitable tolling of the AEDPA's statute of limitations is only available when " 'extraordinary circumstances' prevent a prisoner from filing a timely habeas petition." *Warren v. Garvin,* 219 F.3d 111, 113 (2d Cir.2000) (quoting *Smith,* 208 F.3d at 17); *see also* *Agramonte v. Walsh,* No. 00 CV 892, 2002 WL 1364086, at *1 (E.D.N.Y. June 20, 2002). "To merit application of equitable tolling, the petitioner must demonstrate that he acted with 'reasonable diligence' during the period he wishes to have tolled, but that despite his efforts, extraordinary circumstances 'beyond his control' prevented successful filing during that time." *Smaldone v. Senkowski,* 273 F.3d 133, 138 (2d Cir.2001) (quoting *Smith,* 208 F.3d at 17), *cert. denied,* 535 U.S. 1017, 122 S.Ct. 1606 (2002); *see also* *Warren,* 219 F.3d at 113 (citing *Smith,* 208 F.3d at 17).

In this instance, petitioner does seemingly request equitable tolling, arguing that his lack of access to sufficient books and legal assistance, as well as the fact that he did not receive (or even request) a copy of his sentencing minutes until April of 2004, provide a basis for equitable tolling. Such circumstances, however, are insufficiently unusual or compelling to warrant a finding of equitable tolling in this case. *Gant v. Goord,* 430 F.Supp.2d 135, 139 (W.D.N.Y.2006) ("In general, the difficulties attendant on prison life, such as transfers between facilities, solitary

confinement, lockdowns, restricted access to the law library, and an inability to secure court documents, do not by themselves qualify as extraordinary circumstances."); *Peck v. United States,* No. 06-CV-0822, 03-CR-496, 2006 WL 3762001, at *5 (N.D.N.Y. Dec. 20, 2006) (finding no basis for equitable tolling where petitioner claimed that he had inadequate access to legal books and legal assistance).

2. *Actual Innocence Tolling*

To ameliorate the harshness of the AEDPA's one year procedural bar to seeking habeas review in the unusual case where the petitioner appears to be the victim of a fundamental miscarriage of justice and is actually innocent of the crime of conviction, courts, including the Second Circuit, have suggested that the presentation of a credible claim of actual innocence may provide a basis for equitable tolling, provided that the petitioner can also show that he or she pursued the claim with reasonable diligence. *Doe,* 391 F.3d at 161; *Whitley,* 317 F.3d at 225. Addressing the tension which such an exception would potentially present with respect to the considerations of comity and finality underpinning the AEDPA's limitations requirement, the Second Circuit observed that "[b]ecause credible claims of actual innocence are 'extremely rare,' federal court adjudication of constitutional challenges by petitioners who may be actually innocent prevents miscarriages of justice, but does not threaten state interests in finality." *Doe,* 391 F.3d at 161 (citing *Schlup v. Delo,* 513 U.S. 298, 321-22, 115 S.Ct. 851, 864-65 (1995)). Drawing upon the Supreme Court's decision in *Schlup,* which addressed the actual innocence exception to a petitioner's ability to file successive or otherwise procedurally defaulted habeas petitions in federal courts, the Second Circuit in *Doe* required that the claim of actual innocence be supported "with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Doe,* 391 F.3d at 161 (quoting *Schlup,* 513 U.S. at 324, 115 S.Ct. at 865).

***11** In this instance Warren does not allege that he is actually innocent of the crimes of his conviction, which was the product of his guilty plea and concomitant admission of having committed those offenses. Accordingly, Warren has not provided any compelling grounds for the court to apply the *Whitley* test and recommend that the AEDPA statute of limitations be tolled based upon a claim of actual innocence. *See, e.g., Catala v. Bennett,* 273 F.Supp.2d 468, 473-74 (S.D.N.Y.2003) (acknowledging *Whitley's* application to claims of actual innocence but declining to apply it when the petitioner in that case did not attempt an actual innocence claim).

In sum, I recommend against the invocation of equitable tolling to salvage Warren's otherwise untimely petition.

D. *Merits of Warren's Petition*

As has been noted, petitioner apparently did not pursue the direct appeal of his conviction to the State's highest court. He did, however, assert arguments surrounding his sentencing, and specifically his claim that the resulting term of incarceration was unlawful, in the context of both his motion to vacate his sentence, pursuant to section 440.20 of the N.Y. Criminal Procedure Law, and by way of his petition for state habeas relief. Since both of those resulting determinations were pursued through to the Appellate Division, and a request was made for leave to appeal to the Court of Appeals from the denial of his state habeas petition, respondent does not contest Warren's petition on the procedural basis of failure to exhaust and, consequently, I will assume that he has fulfilled his obligation to pursue his claims to the highest state court before seeking to elicit this court's habeas intervention, and will turn to the merits of his claim.

1. *Standard of Review*

Critical to a review of the merits of Warren's petition is recognition of his deferential standard which this court must apply. Enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), brought about significant new limitations on the power of a federal court to grant habeas relief to a state court prisoner under 28 U.S.C. § 2254. Under the AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct [and t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Boyette v. Lefevre,* 246 F.3d 76, 88 (2d Cir .2001) (quoting § 2254(e)(1)) (internal quotes omitted). Significantly, a federal court may not grant habeas relief to a state prisoner on a claim

that was adjudicated on the merits in State court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

proceedings unless the adjudication of the claim-

1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

***12** 28 U.S.C. § 2254(d); *see also* *Noble v. Kelly,* 246 F.3d 93, 98 (2d Cir.), *cert. denied,* 122 S.Ct. 197 (2001); Boyette, 246 F.3d at 88. When applying this test, the Second Circuit has noted that

[u]nder AEDPA, we ask three questions to determine whether a federal court may grant habeas relief: 1) Was the principle of Supreme Court case law relied upon in the habeas petition "clearly established" when the state court ruled? 2) If so, was the state court's decision "contrary to" that established Supreme Court precedent? 3) If not, did the state court's decision constitute an "unreasonable application" of that principle?

*Williams v. Artuz,* 237 F.3d 147, 152 (2d Cir.2001) (citing *Williams v. Taylor* and *Francis S. v. Stone,* 221 F.3d 100, 108-09 (2d Cir.2000)).

Because the AEDPA's restriction on federal habeas power was premised in no small part upon the duty of state courts to uphold the Constitution and faithfully apply federal laws, the AEDPA's exacting review standards apply only to federal claims which have been actually adjudicated on the merits in the state court. *Washington v. Shriver,* 255 F.3d 45, 52-55 (2d Cir.2001). Specifically, as the Second Circuit explained in *Sellan v. Kuhlman,* "[f]or the purposes of AEDPA deference, a state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." 261 F.3d 303, 312 (2001); *see* *Jimenez v.. Walker,* 458 F.3d 130, 140 (2d Cir.2006). Significantly, the Second Circuit further held that when a state court adjudicates a claim on the merits, "a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim-*even if the state court does not explicitly refer to either the federal claim or to relevant federal case law.*" *Sellan,* 261 F.3d at 312 (emphasis added).[FN9,FN10]

FN9. In the past, when wrestling with interpretation and application of the AEDPA's deference standard the Second Circuit had suggested, although leaving open the question, that deference under section 2254(d) is not mandated if a state court decides a case without citing to federal law or otherwise making reference to a federal constitutional claim in a manner adequate to justify deference under AEDPA, in which case pre-AEDPA standards would apply. *Washington,* 255 F.3d at 52-55; *see also* *Noble,* 246 F.3d at 98. That court clarified in *Sellan,* however, that the question of whether or not a state court makes specific reference to a constitutional principle is not controlling.

FN10. In his opinion in *Sellan,* Chief Judge Walker acknowledged that enlightenment in state court decisions as to the manner of disposition of federal claims presented would greatly enhance a federal court's ability, on petition for habeas review, to apply the AEDPA deference standard. *Sellan,* 261 F.3d at 312. He noted, however, that a state court's failure to provide such useful guidance does not obviate a federal court's duty to make the analysis and pay appropriate deference if the federal claim was adjudicated on the merits, albeit tacitly so. *Id.*

When a state court's decision is found to be decided "on the merits", that decision is "contrary to" established Supreme Court precedent if it applies a rule that contradicts Supreme Court precedent, or decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Williams,* 529 U.S. at 405-06, 120 S.Ct. at 1519-20. Moreover, a federal court engaged in habeas review must also determine not whether the state court's determination was merely incorrect or erroneous, but instead whether it was "objectively unreasonable". *Sellan,* 261 F.3d at 315 (quoting *Williams,* 529 U.S. at 409, 120 S.Ct. at 1521 (O'Connor, J.)). The Second Circuit has noted that this inquiry admits of "[s]ome increment of incorrectness beyond error", though "the increment need not be great [.]" *Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000).

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. *Clearly Established Supreme Court Precedent*

Warren's petition asserts a single ground, alleging that the net affect of the various sentences imposed in connection with the six crimes of connection was to render the sentence unlawful, in derogation of his right to be free from double jeopardy.

***13** The double jeopardy clause, which forms an integral part of the Fifth Amendment to the United States Constitution, provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb...." U.S. Const. Amend. V. The essence of controlling double jeopardy jurisprudence has been summarized as follows by the Second Circuit:

> [t]he Double Jeopardy Clause protects, among other things, against multiple punishments for the same offense. *See North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.E.d.2d 656 (1969). When two acts violate the same statute, ... the Supreme Court has distinguished between a statute that punishes a continuous offense and one that punishes distinct acts. *See Blockburger v. United States,* 284 U.S. 299, 303, 52 S.Ct. 180, 76 L.Ed. 306 (1932) (two drug sales to the same person on different days punishable as separate offenses). The Court looked to see if lawmakers had intended to criminalize each act. " 'The test is whether the individual acts are prohibited, or the course of action which they constitute. If the former, then each act is punishable separately.... If the latter, there can be but one penalty.' " *Id.* at 302, 52 S.Ct. 180.

*McCullough v. Bennett,* 413 F.3d 244, 246 (2d Cir.2005).

It should be noted that the charging of multiple offenses based upon the same conduct does not *per se* violate the double jeopardy clause. *United States v. Cavanaugh,* 948 F.2d 405, 413 n. 8 (8th Cir.1991) *(citing Ohio v. Johnson,* 467 U.S. 443, 449, 104 S.Ct. 2536, 2540-41 (1984)). Instead, the question becomes whether, by enacting the particular criminal provision, the respective legislative body intended that facts underlying the potentially overlapping counts constitute separate " 'units' of prosecution". *United States v. Ansaldi,* 372 F.3d at 118, 124 (2d Cir.2004) *(citing Bell v. United States,* 349 U.S. 81, 83-84, 175 S.Ct. 620, 622 (1955)).

Petitioner's double jeopardy argument is perplexing. The operative crimes for which he received consecutive sentences included attempted escape, attempted burglary, and sexual abuse. The court has reviewed the transcribed minutes of petitioner's plea hearing and finds no basis to conclude that in accepting pleas to those three charges, and imposing consecutive sentences in connection with those pleas, punished the petitioner twice for the same criminal conduct. [FN11]

> FN11. In his memorandum in opposition to respondent's dismissal motion, petitioner intimates that the sentence that he received may have resulted in a breach of a plea agreement which included assurances as to the sentence to be imposed by the court. *See* Petitioner's Memorandum (Dkt. No. 11) at 12-22. If such a claim is being made it is not apparent from the face of Warren's petition. Moreover, it does not appear that such a claim has ever been fairly presented to the state courts prior to being raised in this proceeding, and therefore is not properly exhausted. *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 808-09 (2d Cir.2000) ("To have exhausted claims in state court, petitioner must have "fairly presented" each federal claim to the highest state court.") (citation omitted).

Accordingly, I find no basis to conclude that the state courts' determination that no double jeopardy violation has occurred, arising from his sentencing, was either contrary to or an unreasonable application of clearly established Supreme Court precedent.

IV. *SUMMARY AND RECOMMENDATION*

Based upon the circumstances now presented, it appears that petitioner's conviction became final when his time to seek leave to appeal to the Court of Appeals from the Third Department's decision affirming his conviction expired, notwithstanding the fact that the matter was remitted to the trial court for an essentially ministerial act, in the nature of substituting a new order of protection which was compliant with the applicable legal provisions under which it was issued for the prior, invalid order. Since the petition in this matter was filed more than a year after that date, and having

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

been presented with no proper basis to conclude that the governing limitation period should be equitably tolled, I recommend a finding that the petition is time barred and should be dismissed on this procedural basis, without reaching the merits. In the event that the court finds that the petition was timely filed and should be considered on its merits, I find that the state courts' determination rejecting Warren's sentence claims was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent, and find no other basis to conclude that he was the subject of a constitutional deprivation.

***14** Based upon the foregoing it is hereby

RECOMMENDED that respondent's motion to dismiss the petition in this matter [Dkt. No. 10] be GRANTED, and the petition be DISMISSED in all respects.

NOTICE: pursuant to 28 U.S.C. § 636(b)(1), the parties have ten (10) days within which to file written objections to the foregoing report-recommendation. Any objections shall be filed with the clerk of the court. FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is further ORDERED that the Clerk of the Court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

N.D.N.Y.,2007.

Warren v. Artus
Not Reported in F.Supp.2d, 2007 WL 1017112 (N.D.N.Y.)
END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.